**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Fernando A. Bohorquez, Jr.
Keith R. Murphy

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated)<br><br><br>**AMENDED**<br>**COMPLAINT** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>SAUL B. KATZ, in his individual capacity, and as trustee of the Katz 2002 Descendants' Trust; FRED WILPON, in his individual capacity, as trustee of the Wilpon 2002 Descendants' Trust, and as co-executor of the Estate Of Leonard Schreier; | Adv. Pro. No. 10-5287 (BRL) |

RICHARD WILPON, in his individual capacity, as trustee of the Fred Wilpon Family Trust, and as trustee of the Saul B. Katz Family Trust; MICHAEL KATZ, in his individual capacity, and as the trustee of the Saul B. Katz Family Trust; JEFFREY WILPON, in his individual capacity, and as beneficiary of the Fred Wilpon Family Trust; DAVID KATZ, in his individual capacity, as trustee of the Saul B. Katz Family Trust, and as beneficiary of the Saul B. Katz Family Trust; GREGORY KATZ, in his individual capacity, and as beneficiary of the Katz 2002 Descendants' Trust; ARTHUR FRIEDMAN; L. THOMAS OSTERMAN; MARVIN B. TEPPER; ESTATE OF LEONARD SCHREIER, JASON BACHER as co-executor of the Estate of Leonard Schreier; METS LIMITED PARTNERSHIP; STERLING METS LP; STERLING METS ASSOCIATES; STERLING METS ASSOCIATES II; METS ONE LLC; METS II LLC; METS PARTNERS, INC.; C.D.S. CORP.; CONEY ISLAND BASEBALL HOLDING COMPANY LLC; BROOKLYN BASEBALL COMPANY LLC; FS COMPANY LLC; 157 J.E.S. LLC; AIR STERLING LLC; BAS AIRCRAFT LLC; BON MICK FAMILY PARTNERS LP; BON-MICK, INC.; CHARLES 15 ASSOCIATES; CHARLES 15 LLC; CHARLES STERLING LLC; CHARLES STERLING SUB LLC; COLLEGE PLACE ENTERPRISES LLC; FFB AVIATION LLC; IRIS J. KATZ AND SAUL B. KATZ FAMILY FOUNDATION, INC.; JUDY AND FRED WILPON FAMILY FOUNDATION, INC.; RED VALLEY PARTNERS; ROBBINSVILLE PARK LLC; RUSKIN GARDEN APARTMENTS LLC; SEE HOLDCO LLC; SEE HOLDINGS I; SEE HOLDINGS II; STERLING 10 LLC; STERLING 15C LLC; STERLING 20 LLC; STERLING AMERICAN ADVISORS II LP; STERLING BRUNSWICK CORPORATION; STERLING BRUNSWICK SEVEN LLC; STERLING DIST PROPERTIES LLC; STERLING EQUITIES; STERLING EQUITIES ASSOCIATES; STERLING EQUITIES INVESTORS; STERLING HERITAGE LLC; STERLING

INTERNAL V LLC; STERLING JET LTD;
STERLING JET II LTD; STERLING
PATHOGENESIS COMPANY; STERLING
THIRD ASSOCIATES; STERLING THIRTY
VENTURE LLC; STERLING TRACING LLC;
STERLING TWENTY FIVE LLC; STERLING
VC IV LLC; STERLING VC V LLC; VALLEY
HARBOR ASSOCIATES; SAUL B. KATZ
FAMILY TRUST; FRED WILPON FAMILY
TRUST; KATZ 2002 DESCENDANTS' TRUST;
WILPON 2002 DESCENDANTS' TRUST;
IRIS KATZ, in her individual capacity, and as
trustee of the Saul B. Katz Family Trust;
JUDITH WILPON, in her individual capacity, and
as trustee of the Fred Wilpon Family Trust;
DAYLE KATZ, in her individual capacity, as
trustee of the Katz 2002 Descendants' Trust, and
as beneficiary of the Katz 2002 Descendants'
Trust;
DEBRA WILPON, in her individual capacity, as
trustee of the Fred Wilpon Family Trust, and as
trustee of Wilpon 2002 Descendants' Trust;
VALERIE WILPON; AMY BETH KATZ;
HEATHER KATZ KNOPF, in her individual
capacity, as trustee of the Saul B. Katz Family
Trust, and as beneficiary of the Saul B. Katz
Family Trust;
HOWARD KATZ, in his individual capacity, and
as beneficiary of the Katz 2002 Descendants'
Trust;
NATALIE KATZ O'BRIEN, in her individual
capacity, as trustee of the Saul B. Katz Family
Trust, and as beneficiary of the Saul B. Katz
Family Trust;
TODD KATZ, in his individual capacity, and as
beneficiary of the Katz 2002 Descendants' Trust;
BRUCE N. WILPON, in his individual capacity,
and as beneficiary of the Fred Wilpon Family
Trust;
DANIEL WILPON, in his individual capacity, and
as beneficiary of the Wilpon 2002 Descendants'
Trust;
JESSICA WILPON, in her individual capacity,
and as beneficiary of the Wilpon 2002
Descendants' Trust;
ROBIN WILPON WACHTLER, in her individual
capacity, and as beneficiary of the Fred Wilpon
Family Trust;

PHILIP WACHTLER;
KIMBERLY WACHTLER, in her individual
capacity, and as beneficiary of the Fred Wilpon
Family Trust;
SCOTT WILPON, in his individual capacity, and
as beneficiary of the Wilpon 2002 Descendants'
Trust;
MINOR 1 (REDACTED);
MINOR 2 (REDACTED);
RUTH FRIEDMAN; PHYLLIS REBELL
OSTERMAN; ELISE C. TEPPER; JACQUELINE
G. TEPPER; EDWARD M. TEPPER;
DEYVA SCHREIER ARTHUR, in her individual
capacity, and as beneficiary of the Estate of
Leonard Schreier;
MICHAEL SCHREIER, in his individual capacity,
and as beneficiary of the Estate of Leonard
Schreier;
REALTY ASSOCIATES MADOFF II;
STERLING ACQUISITIONS LLC; STERLING
AMERICAN PROPERTY III LP; STERLING
AMERICAN PROPERTY IV LP; STERLING
AMERICAN PROPERTY V LP,

Defendants.

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ........................................................................ 1

II.    JURISDICTION AND VENUE .................................................................. 6

III.   BACKGROUND, THE TRUSTEE AND STANDING.................................. 7

IV.    THE FRAUDULENT PONZI SCHEME ..................................................... 11

V.     STERLING DEFENDANTS ...................................................................... 14

    A.     Overview.......................................................................................... 14

    B.     Sterling Partners............................................................................. 18

    C.     Sterling Entity Defendants............................................................. 34

        1.     New York Mets and Related Entities.................................... 34

        2.     Other Sterling Entities.......................................................... 47

    D.     Katz/Wilpon Trust Defendants ....................................................... 86

    E.     Sterling Family Member Defendants............................................... 90

    F.     Madoff Investment Entity Defendants............................................. 114

VI.    STERLING'S INVESTMENTS WITH MADOFF WERE PART OF ITS REAL
      ESTATE, PROFESSIONAL BASEBALL, PRIVATE EQUITY AND HEDGE
      FUND BUSINESS ..................................................................................... 118

    A.     The Sterling Partners Are Sophisticated Investors With A Deep Bench Of
        Financial And Business Experience Across Numerous Asset Classes............. 121

        1.     Real estate ........................................................................... 121

        2.     Professional baseball and sports media................................. 122

        3.     Private equity ....................................................................... 123

    B.     The Sterling Partners Relied On Madoff To Assist The Growth Of Their
        Businesses ...................................................................................... 123

        1.     The Sterling Partners exploited their Madoff access by opening
            and administering 483 BLMIS accounts for themselves, their
            families, various related trusts and entities, their friends and
            employees. ........................................................................... 124

        2.     The Sterling Partners structured their Madoff investments to ensure
            that Madoff money flowed through every arm of their business........... 128

    C.     Sterling Partners Expanded Their Business To Include Their Own Hedge
        Fund—Sterling Stamos—As An Alternative To Madoff ................................. 130

VII.   STERLING'S QUARTER-CENTURY RELATIONSHIP WITH MADOFF............. 135

    A.     The Madoffs, Wilpons And Katzes Had A Close Friendship And Business
        Relationship ..................................................................................... 135

B. The Sterling Partners, Families, Trusts And Entities Withdrew Approximately $300 Million Of Other People's Money From Their BLMIS Accounts .................................................................... 138

C. Sterling Steered Dozens Of Friends, Business Associates, And Their Own Employees To Madoff ................................................................ 139

D. Sterling Administered 483 BLMIS Accounts On Behalf Of The Sterling Partners, Families, Trusts, Entities, Friends, Business Associates, and Employees .................................................................. 140

   1. Sterling Partner Arthur Friedman tracked, monitored, and acted as BLMIS liaison for all 483 BLMIS Accounts .......................................... 140

   2. Sterling manipulated tenant-in-common BLMIS accounts to maximize SIPC protection ................................................................ 143

E. Madoff Invested Approximately $12 Million In Sterling Business Ventures ................................................................................. 144

VIII. MADOFF MONEY AIDED THE GROWTH OF THE STERLING BUSINESSES, WHICH PROVIDED EVERY INCENTIVE TO IGNORE INDICIA OF FRAUD ................................................................. 146

A. Sterling Used BLMIS Accounts To Support The Operations Of The New York Mets ............................................................................... 148

B. Sterling Employed BLMIS Accounts To Meet Capital Commitments ............. 150

C. Sterling Depended On BLMIS Accounts To Provide Cash Flow To Its Businesses Through Its Internal Bank, Sterling Equities Funding ................... 151

D. Sterling Used BLMIS Accounts As Leverage To Borrow Capital And Double Its Returns ......................................................................... 153

   1. Sterling's leveraged BLMIS accounts relied upon Madoff's implausible returns ................................................................. 153

   2. Sterling used other forms of leverage across various BLMIS accounts ............................................................................. 159

E. Sterling Depended On Its BLMIS Investments To Consummate Key Deals And Secure Access To Capital Under Favorable Lending Terms .................... 160

F. Post-12/11/08 Debt Restructuring Proves Sterling's Dependency on Madoff ................................................................................... 161

IX. THE STERLING PARTNERS WILLFULLY TURNED A BLIND EYE TO SUBSTANTIAL INDICIA OF MADOFF'S FRAUD ................................. 164

A. Numerous Financial Industry Professionals Warned Sterling About Madoff ................................................................................... 165

   1. Sterling Stamos warned Sterling of its Madoff concerns .................... 165

2. Merrill Lynch confirmed Stamos' concerns and rejected Saul Katz's proposal to invest with Madoff.................................................. 172

3. Other financial institutions and industry professionals advised Sterling of additional concerns, including that Madoff's "math … wasn't right.".......................................................................................... 175

4. American Securities' Chuck Klein recommended that Sterling obtain fraud insurance for its investments with Madoff ...................... 180

B. Sterling Was Aware Of—And Even Enabled—Madoff's Attempts To Avoid Regulatory And Other Third Party Scrutiny ......................................... 182

1. Madoff's concerns regarding SEC disclosures forced Sterling Stamos to reorganize its business prior to registering as an investment adviser ............................................................................. 182

2. By February 2006, Sterling knew or should have known that Madoff was evading his requirement to register with the SEC as an investment adviser. .............................................................................. 186

3. Sterling insulated Madoff from scrutiny in connection with its BLMIS 401(k) plan investment option ................................................. 187

4. Sterling protected Madoff by insulating referral accounts ................... 189

5. Sterling only used Madoff's approved bank for Double Up Loans....... 190

C. The Sterling Partners Knew That Madoff Was Dishonest In His Investment Advisory Business............................................................................ 191

1. Madoff and Sterling falsely documented a $54 million bridge loan ..... 191

2. Madoff and Sterling misled regulators in an inquiry by the New York Attorney General's office. ........................................................... 194

3. The Sterling Partners knew that Madoff lied about not accepting investments from funds of funds............................................................ 195

D. Sterling Was Aware Of The Indicia Of Fraud In The Bayou Ponzi Scheme And Chose To Ignore Them When It Came To Madoff.................................... 196

E. Madoff's Returns Were Too Good To Be True And Sterling Knew It ............ 201

X. THE STERLING PARTNERS' INEXCUSABLE LACK OF DILIGENCE ON MADOFF AND BLMIS AFTER REPEATED INDICIA OF FRAUD...................... 208

XI. THE STERLING PARTNERS' KNOWLEDGE AND/OR INQUIRY NOTICE MUST BE IMPUTED TO ALL DEFENDANTS ....................................................... 210

XII. TRANSFERS...................................................................................................... 213

A. Overview ........................................................................................................... 213

B. Sterling Partners ............................................................................................... 218

C. Sterling Entity Defendants ............................................................................... 240

       1.    New York Mets and Related Entities.................................................... 240

       2.    Other Sterling Entities........................................................................ 256

    D.    Katz/Wilpon Trust Defendants ........................................................... 309

    E.    Sterling Family Member Defendants................................................... 319

    F.    Madoff Investment Entity Defendants................................................. 352

XIII.    CUSTOMER CLAIMS.................................................................................... 356

COUNT ONE: STERLING TWO YEAR ACTUAL FRAUD DEFENDANTS
    FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551 ........... 357

COUNT TWO: STERLING TWO YEAR CONSTRUCTIVE FRAUD DEFENDANTS
    FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551 ........... 358

COUNT THREE: STERLING SIX YEAR DCL ACTUAL FRAUD DEFENDANTS
    FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
    §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551 ....... 359

COUNT FOUR: STERLING SIX YEAR DCL CONSTRUCTIVE FRAUD
    DEFENDANTS (INSOLVENCY) FRAUDULENT TRANSFER – NEW YORK
    DEBTOR AND CREDITOR LAW §§ 273, 278, AND/OR 279, AND 11 U.S.C.
    §§ 544(b), 550(a), 551 ................................................................................... 361

COUNT FIVE: STERLING SIX YEAR DCL CONSTRUCTIVE FRAUD
    DEFENDANTS (UNREASONABLY SMALL CAPITAL) FRAUDULENT
    TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278,
    AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551 ...................................... 362

COUNT SIX: STERLING SIX YEAR DCL CONSTRUCTIVE FRAUD
    DEFENDANTS (DEBTS BEYOND ABILITY TO PAY) FRAUDULENT
    TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278,
    AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551 ...................................... 363

COUNT SEVEN: STERLING INITIAL TRANSFEREE DEFENDANTS RECOVERY
    OF ALL FRAUDULENT TRANSFERS –  NEW YORK CIVIL PROCEDURE
    LAW AND RULES §§ 203(g) AND 213(8), NEW YORK DEBTOR AND
    CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544(b),
    550(a), AND 551 ........................................................................................... 364

COUNT EIGHT: STERLING PREFERENTIAL TRANSFEREE DEFENDANTS
    PREFERENTIAL TRANSFER – 11 U.S.C. §§ 547(b), 550(a), AND 551 ................. 365

COUNT NINE: STERLING SUBSEQUENT TRANSFEREE DEFENDANTS
    RECOVERY OF SUBSEQUENT TRANSFER – NEW YORK DEBTOR AND
    CREDITOR LAW §§ 278 AND 279 AND 11 U.S.C. §§ 544(b) AND 550(a)............ 366

COUNT TEN: STERLING CLAIMS DEFENDANTS DISALLOWANCE OF
    DEFENDANTS' CUSTOMER CLAIMS ................................................................... 367

COUNT ELEVEN: STERLING CLAIMS DEFENDANTS EQUITABLE
    SUBORDINATION................................................................................................ 368

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act §§ 78aaa *et seq.*, by and through his undersigned counsel, for this Complaint, states as follows:

## I.    NATURE OF THE ACTION

1.      There are thousands of victims of Madoff's massive Ponzi scheme.  But Saul Katz is not one of them.  Neither is Fred Wilpon.  And neither are the rest of the partners at Sterling Equities ("Sterling")[1] who, along with Fred Wilpon and Saul Katz, are sophisticated investors who oversee and control Sterling and its many businesses and investments.

2.      The Sterling partners, their family members, their related trusts, and various entities they own, operate, and control were collectively one of the largest beneficiaries of Madoff's fraud, reaping hundreds of millions in fictitious profits over their quarter-century relationship with Madoff.  The Sterling partners, their family members, trusts and Sterling-related entities made so much easy money from Madoff for so long that despite the many objective indicia of fraud before them, the Sterling partners chose to simply look the other way.

3.      Sterling is a closely-held family run business that over the last several decades has evolved into a multi-billion dollar real estate, professional baseball, private equity, and hedge fund empire with the New York Mets Major League Baseball franchise standing at the helm. Many of Sterling's businesses were fueled by Sterling's tremendous investments with Madoff, the steady flow of fictitious profits, and the myriad leverage opportunities presented by Madoff's consistent returns.  In fact, over the last three decades, the Sterling partners, their family members, their trusts and related entities received approximately $300 million in fictitious profits

---

[1] Sterling Equities—collectively, the partners and the entities that they own, operate, and control—will hereinafter be referred to as "Sterling."

from Madoff and used the purported equity in their BLMIS accounts to, among other things, secure hundreds of millions more in loans and lines of credit.

4.     The Sterling partners capitalized on their close personal connection to Madoff and deep bench of financial and business experience to use their BLMIS investments as the arm of the Sterling business that anchored the rest.  The Sterling partners opened and administered 483 BLMIS accounts: approximately 300 for themselves, their families, their trusts and entities; and the rest for their closest friends, employees, and business associates.  Madoff money flowed through every aspect of Sterling's business.  Be it real estate, professional baseball, or private equity, every part of Sterling's business held investments with Madoff through approximately 65 BLMIS accounts in the name of various entities created, owned, and controlled by the Sterling partners.  The Mets alone had sixteen related BLMIS accounts from which Sterling withdrew over $90 million in fictitious profits.

5.     But the Sterling partners' reliance on Madoff's consistent and steady returns ran further than just opening hundreds of accounts.  Sterling used its BLMIS accounts as a substantial source of liquidity to develop and sustain its businesses, including professional baseball and real estate.  For instance, much of the approximately $90 million of other people's money withdrawn from the Mets' BLMIS accounts helped fund its day-to-day operations. Sterling also used BLMIS returns to generate sufficient profits to meet capital commitments for its Sterling American Property real estate funds.  Further, BLMIS returns provided the necessary cash flow to Sterling's internal bank—Sterling Equities Funding, a clearing house for the movement of intermingled funds and financial obligations between and among the Sterling partners, their families, and their related trusts and entities.

6.      The Sterling partners also leveraged their investments with Madoff by employing the purported equity in certain BLMIS accounts as collateral for a multitude of bank loans and then invested the proceeds of those loans into BLMIS and/or other facets of the Sterling business.  In addition, the Sterling partners used the purported equity in their hundreds of BLMIS accounts to prove their net worth and creditworthiness and convince banks to extend them credit facilities, which allowed Sterling access to capital to consummate key deals that otherwise may not have been available.

7.      The Sterling partners' reliance on Madoff to not only generate returns to help support their businesses, but also to provide them with collateral and creditworthiness, led to a cycle of dependency whereby Madoff money helped create and expand new and existing Sterling businesses that in turn generated profits to re-invest in BLMIS.  Much of the new capital the Sterling partners invested in BLMIS was generated by Madoff's returns and acted to propel and sustain their successful businesses.

8.      Sterling was so heavily invested in BLMIS and the financing provided by Sterling's lenders was so tied to these BLMIS investments that upon revelation of Madoff's fraud, Sterling faced a liquidity crisis.  This crisis prompted a complete and comprehensive restructuring of over half a billion dollars of Sterling's debt, not just the multiple millions in defaulted loans collateralized by Sterling's various BLMIS accounts.

9.      Given Sterling's dependency on Madoff, it comes as no surprise that the Sterling partners willfully turned a blind eye to every objective indicia of fraud before them.  The Sterling partners' willful blindness is even more inexcusable because they had their very own hedge fund, Sterling Stamos, a partnership between Sterling and Peter Stamos—a highly sophisticated and

experienced businessman with personal ties to Saul Katz—created as an alternative investment vehicle to BLMIS in which Sterling partners Saul Katz and David Katz played integral roles.

10. The warning signs were many and varied, ranging from cautionary counsel from financial industry experts and trusted advisors, to Madoff's schemes to avoid regulatory scrutiny, to the Sterling partners' knowledge from their personal experience that Madoff was dishonest in his Investment Advisory business, to the fact that the Sterling partners had even invested in a Ponzi scheme before BLMIS' collapse that bore similar markings to another fraud right under their collective noses. But the Sterling partners were simply in too deep—having substantially supported their businesses with Madoff money—to do anything but ignore the gathering clouds. Despite being on notice and having every resource at their disposal to investigate the litany of legitimate questions surrounding Madoff, the Sterling partners chose to do nothing. Among the many red flags the Sterling partners consciously disregarded:

a. Sterling Stamos rejected Madoff and "told . . . the Wilpon and Katz families about [its] concerns. Notwithstanding [its] concerns, the Wilpon and Katz families continued to invest with Madoff . . . and maintained their investments independent of [Sterling Stamos'] advice," *see infra* Section IX.A.1;

b. Merrill Lynch—which acquired a 50% non-controlling share of Sterling Stamos in 2007 and had a long-standing prohibition against investing with Madoff—parroted Sterling Stamos' Madoff warnings to Saul Katz on several occasions, even going so far as telling him that Madoff would not pass Merrill Lynch's due diligence protocols, *see infra* Section IX.A.2;

c. Ivy Asset Management—which strongly suspected fraud or illegality at BLMIS by the time Sterling approached it in April 2002 to help generate funding for Sterling

Stamos—told Sterling partners Saul Katz, David Katz, and Arthur Friedman about its concerns with Madoff and cautioned them that it had redeemed all of its BLMIS investments years before, *see infra* Section IX.A.3;

d.    At least one Sterling consultant advised Saul Katz in or around 2003 that he "couldn't make Bernie's math work and something wasn't right," *see id.*;

e.    Madoff was so concerned with the possible disclosures he and Sterling would have had to make if Sterling Stamos registered with the SEC as an investment adviser that the Sterling partners appeased Madoff by undertaking a significant structural overhaul of Sterling Stamos to ensure that Sterling Stamos could register without having to disclose the Sterling partners' business relationship with Madoff, including the extent of their BLMIS investments, *see infra* Section IX.B.1;

f.    Madoff and certain Sterling partners were together willing to create a fraudulent letter agreement falsely describing a $54 million loan from Madoff to Sterling as an "investment" by Madoff's wife, Ruth, in the predecessor entity to SportsNet New York, *see infra* Section IX.C;

g.    The Sterling partners invested, through Sterling Stamos, in the prior Bayou Ponzi scheme and were aware that Sterling Stamos' due diligence had uncovered many red flags—similar in kind to Madoff—that led to full redemption of Sterling Stamos' Bayou investments, *see infra* Section IX.D; and

h.    The Sterling partners knew or should have known that Madoff's consistently high and extremely non-volatile returns over almost a quarter-century were "too good to be true" because they were at odds with the strategy Madoff purported to employ, were

suspiciously unaffected by major market dislocation events, and could not be duplicated by their own hedge fund, Sterling Stamos, *see infra* Section IX.E.

11.     The Sterling partners knew or should have known that with every withdrawal from their BLMIS accounts they reaped the benefits of a fraud, and for the reasons described below, the Sterling partners' actual and/or inquiry notice must be imputed to all defendants named herein.  *See infra* Section XI.

12.     Despite the objective indicia of fraud before them, despite being sophisticated real estate and major league baseball moguls with their very own hedge fund, and despite steering hundreds of innocent investors to Madoff—including their own employees through a 401(k) plan that was 90% invested with BLMIS—the Sterling partners conducted no diligence on Madoff or BLMIS, instead choosing to blindly accept their good fortune without conducting any investigation whatsoever.

13.     The purpose of this proceeding is to recover the avoidable transfers from BLMIS of approximately $300,000,000 in fictitious profits and over $700,000,000 in principal received by the Sterling partners, their families, their trusts and related entities, including the Mets.  The Trustee seeks to set aside such transfers and preserve the property for the benefit of the victims of the Madoff fraud.

## II.     <u>JURISDICTION AND VENUE</u>

14.     This is an adversary proceeding commenced before the same Court before which the main underlying Securities Investors Protection Act ("SIPA") proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction

over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

15. This Court has personal jurisdiction over all of the defendants captioned herein pursuant to NY CPLR §§ 301 and 302 and Bankruptcy Rule 7004. All defendants have maintained minimum contacts with New York in connection with the claims alleged herein.

16. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O).

17. Venue in this district is proper under 28 U.S.C. § 1409.

## III. BACKGROUND, THE TRUSTEE AND STANDING

18. On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court that commenced the District Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains pending in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

19. On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. as receiver (the "Receiver") for the assets of BLMIS.

20. On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor

---

[2] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." 15 U.S.C. § 78*lll*(7)(B). Thus, even though the application for a protective decree was filed on December 15, 2008, the Filing Date in this action is December 11, 2008.

Protection Corporation ("SIPC"). Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

21. Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

a. appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C.§ 78eee(b)(3) of SIPA;

b. appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3) of SIPA; and

c. removed the case to this Bankruptcy Court pursuant to 15 U.S.C. § 78eee(b)(4) of SIPA.

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

22. By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

23. At a Plea Hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *See* Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Additionally,

Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

24.     On August 11, 2009, a former BLMIS employee, Frank DiPascali ("DiPascali"), pled guilty to participating and conspiring to perpetuate the Ponzi scheme. At a Plea Hearing on August 11, 2009 in the case entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the fictitious scheme had begun at BLMIS since at least the 1980s. *See* Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. August 11, 2009) (Docket No. 11).

25.     As the Trustee appointed under SIPA, the Trustee has the job of recovering and paying out customer property, as defined below, to BLMIS' customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers and others who received preferences, payouts of fictitious profits, and/or other avoidable transfers to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

26.     Pursuant to section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant

to section 78fff-1(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case.

27.     Pursuant to section 78fff(b) and 78*lll*(7)(B) of SIPA, the Filing Date is deemed to be the date of the filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

28.     The Trustee has standing to bring these claims pursuant to section 78fff-1 of SIPA and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

a.      Defendants received customer property as defined in 15 U.S.C. § 78*lll*(4) (hereinafter "Customer Property");

b.      BLMIS incurred losses as a result of the claims set forth herein;

c.      BLMIS' customers were injured as a result of the conduct detailed herein;

d.      SIPC cannot by statute advance funds to the Trustee to fully reimburse all customers for all of their losses;

e.      the Trustee will not be able to fully satisfy all claims;

f.      the Trustee, as bailee of Customer Property, can sue on behalf of customer bailors;

g.      the Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders").  As of the date hereof, the Trustee has received multiple express unconditional assignments of the applicable Accountholders' causes of action, which actions could have been asserted against the defendants herein.  As assignee, the Trustee stands in the

shoes of persons who have suffered injury in fact and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages. The Trustee brings this action on behalf of, among others, those defrauded customers of BLMIS who invested more money in BLMIS than they withdrew;

h.      SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding. SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

i.      the Trustee has the power and authority to avoid and recover the transfers pursuant to sections 544, 547, 548, 550(a) and 551 of the Bankruptcy Code and SIPA sections 78fff-2(c)(3).

## IV.    THE FRAUDULENT PONZI SCHEME

29.     BLMIS was founded in 1959 by Madoff and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, SIPA § 78o(b). By virtue of that registration, BLMIS is a member of SIPC. BLMIS had three business units: Investment Advisory (the "IA Business"), market making, and proprietary trading.

30.     Outwardly, Madoff ascribed the consistent success of the IA Business to his so-called "split-strike conversion" strategy ("SSC Strategy"). Pursuant to that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the S&P 100 Index—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100 Index. He also asserted that he

would carefully time purchases and sales to maximize value, and correspondingly, BLMIS customers' funds would, intermittently, be out of the equity markets. While out of the market, those funds were purportedly invested in United States Treasury bills or in mutual funds holding Treasury bills. The second part of the SSC Strategy was the hedge of Madoff's stock purchases with S&P 100 Index option contracts. Those option contracts functioned as a "collar," limiting both the potential gains and the potential losses. Madoff purported to use proceeds from the sale of S&P 100 Index call options to finance the cost of purchasing S&P 100 Index put options. Madoff also told IA Business customers, including, upon information and belief, some of the defendants named herein, that he would enter and exit the market between six and ten times each year.

31. BLMIS' IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in such account statements never occurred and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never purchased any of the securities he claimed to have purchased for the IA Business' customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy. Madoff's SSC Strategy was entirely fictitious.

32. At times prior to his arrest, Madoff generally assured customers and regulators that he purchased and sold the put and call options over-the-counter ("OTC") rather than through an exchange. Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold any of the options described in customer statements. The Options Clearing Corporation, which clears all option contracts based upon the stocks of S&P

100 companies, has no record of the IA Business having bought or sold any exchange-listed options on behalf of any of IA Business customers.

33.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options. Rather, BLMIS used its IA Business customers' deposits to pay redemptions by other customers, and to make other transfers, which are avoidable by the Trustee. Many of these transfers were to enrich Madoff, his associates, and his family.

34.     The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme, BLMIS did not have the funds to pay investors on account of their new investments. BLMIS was only able to survive for as long as it did by using the stolen principal invested by some customers to pay other customers.

35.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors, and to lure other investors into the Ponzi scheme.

36.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (a) its assets were worth less than the value of its liabilities; (b) it could not meet its obligations as they came due; and (c) at the time of the transfers, BLMIS was left with insufficient capital.

37.     Madoff's scheme continued until December 2008, when the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

38.     In an effort to hinder, delay, or defraud authorities from detecting the fraud, BLMIS did not register as an investment adviser until August 2006.

39.     In or about January 2008, BLMIS filed with the SEC an Amended Uniform Application for Investment Adviser Registration.  The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $68 billion. In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $68 billion under management.

40.     Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm located in a Rockland County, New York strip mall.  Of the two accountants at the firm, one was semi-retired and living in Florida for many years prior to the Filing Date.

41.     This and similar complaints are being brought to recapture monies paid to or for the benefit of certain investors so that this Customer Property can be distributed among all of the victims of BLMIS in accordance with the provisions of SIPA.

## V.     **STERLING DEFENDANTS**

### A.     **Overview**

42.     The Sterling partners, their family members, trusts and Sterling-related entities withdrew more money than they invested in BLMIS ("Fictitious Profits").  Pursuant to the Bankruptcy Code, the DCL, and SIPA, this Complaint seeks to avoid and recover: (a) $295,465,565 in fraudulent transfers of Fictitious Profits from the Ponzi scheme received by the Sterling partners, their family members, trusts, and Sterling-related entities; (b) $710,601,377 in

additional fraudulent transfers of principal received by the Sterling partners, their family members, trusts, and Sterling-related entities within the six years prior to the Filing Date, including $14,191,667 in transfers of principal withdrawn during the 90-day Preference Period, as defined below; and (c) $12,031,257 in fraudulent transfers of payments made by Madoff, his wife Ruth Madoff, and/or Peter Madoff to certain Sterling entities using BLMIS Customer Property, i.e., other people's money.

43.     As discussed below, Sterling is a closely held, family run general partnership that owns, operates, and controls many businesses and related entities and invests in numerous asset classes across various lines of business, including real estate, professional baseball and sports media, and private equity. *See infra* Section VI.

44.     The general partners of Sterling include Saul B. Katz, Fred Wilpon, Michael Katz, Richard Wilpon, David Katz, Thomas Osterman, Jeffrey Wilpon, Arthur Friedman, Gregory Katz, Marvin B. Tepper, and the late Leonard Schreier, whose BLMIS account interests after his death through the Filing Date were held by his estate (the "Sterling Partners").

45.     As set forth below, the Sterling Partners are sophisticated investors who—for almost a quarter-century—collectively opened BLMIS accounts on behalf of and for the benefit of themselves, their family members, trusts, and Sterling-related entities, and then directed, operated, and administered these BLMIS accounts as part and parcel of Sterling's overall business. *See infra* Section VI.

46.     The Sterling Partners and their family members held interests in numerous BLMIS accounts in various capacities, including as individuals holding accounts in their own names, as joint tenants and tenants-in-common, through trusts formed, funded, and controlled by the Sterling Partners, and through corporations, limited liability companies, and/or partnerships

formed by and for the benefit of the Sterling Partners that were principally owned, controlled, and operated by the Sterling Partners.

47.     Specifically, BLMIS made transfers from approximately 305 BLMIS accounts directly or indirectly to the defendants named herein, including the Sterling Partners, their family members (the "Sterling Family Member Defendants"), their trusts (the "Katz/Wilpon Trust Defendants"), and certain Sterling-related entities (the "Sterling Entity Defendants").

48.     Of these 305 BLMIS accounts, 185 accounts are the subject of this action (the "Sterling BLMIS Accounts") and are identified in Appendix I, Exhibit A.

49.     The transfers for each Sterling BLMIS Account constituting: (a) transfers that are in whole or in part Fictitious Profits; and/or (b) transfers of principal during the six years prior to the Filing Date, including preferential transfers within the 90 day period prior to the Filing Date (the "Preference Period Transfers") are identified in each account's corresponding Exhibit B to Appendix I.[3]

50.     Moreover, Madoff, his wife Ruth Madoff, and/or his brother Peter Madoff used BLMIS Customer Property to invest in several Sterling-related entities named as defendants herein (the "Madoff Investment Entity Defendants"). *See infra* Section VII.E. As a result, the Madoff Investment Entity Defendants also received fraudulent transfers of BLMIS Customer Property.

---

[3] For each transfer, Exhibit B to Appendix I provides the following: Column 1 identifies the date of the transfer; Column 2 provides the transaction description; Column 3 identifies the transaction amount of deposits, withdrawals and transfers in each respective Sterling BLMIS Account as reflected in that account's BLMIS statement; Column 4 identifies cash deposits; Column 5 identifies cash withdrawals; Columns 6 and 7, respectively, identify the transfers of principal in and out of the corresponding Sterling BLMIS Account; Column 8 represents the balance of principal within the corresponding Sterling BLMIS Account; Column 9 identifies the portion of each transfer constituting Preference Period Transfers; Columns 10 through 13 identify the portion of each transfer constituting principal and Fictitious Profits within the two year and six year period prior to the Filing Date, respectively; and Column 14 identifies the portion of each transfer constituting Fictitious Profits during the full history of the corresponding Sterling BLMIS Account.

51. The Sterling Partners, Sterling Family Member Defendants, Katz/Wilpon Trust Defendants, Sterling Entity Defendants, and Madoff Investment Entity Defendants (collectively, the "Sterling Defendants") are listed in Appendix II, Exhibit A.

52. As set forth in Section XII below, a number of the Sterling Defendants received avoidable transfers from one or more of the Sterling BLMIS Accounts or, in the case of the Madoff Investment Entity Defendants, from BLMIS (the "Initial Transfers").

53. The Initial Transfers received by each Sterling Defendant are identified in each Sterling Defendant's corresponding Exhibit B to Appendix II.

54. A number of Initial Transfers were transfers of principal in the 90-day Preference Period prior to the Filing Date. The Preference Period Transfers received by each Sterling Defendant from any Sterling BLMIS Account(s) are identified in each Sterling Defendant's corresponding Exhibit B to Appendix II, Column 4.

55. A number of the Initial Transfers were subsequently transferred to a number of Sterling Defendants (the "Subsequent Transfers"). The Subsequent Transfers that, in whole or in part, include Fictitious Profits are identified in each Sterling Defendant's corresponding Exhibit C to Appendix II.

56. To the extent the funds transferred from BLMIS were for the benefit of a Sterling Defendant who received Subsequent Transfers, each Sterling Defendant in receipt of Subsequent Transfers is the initial transferee of such transfers and is included in the definition of Sterling Defendant for purposes of the allegations herein.

57. In addition to Fictitious Profits, this Complaint seeks to avoid and recover from the Sterling Defendants $710,601,377 in additional fraudulent transfers of principal received in the six years prior to the Filing Date based on the Trustee's investigation concluding that the

Sterling Partners knew or should have known of the fraud at BLMIS, *see infra* Section IX, and

that the Sterling Partners' actual or constructive notice of the fraud at BLMIS must be imputed to

all other Sterling Defendants named herein, *see infra* Section XI.

58.    The Initial and Subsequent Transfers referenced herein and detailed in Section

XII *infra* are avoidable and recoverable from the Sterling Defendants described, in turn, below:

(a) the Sterling Partners; (b) the Sterling Entity Defendants, including the Mets and Related

Entities and Other Sterling Entities; (c) the Katz/Wilpon Trust Defendants; (d) the Sterling

Family Member Defendants; and (e) the Madoff Investment Entity Defendants.

### B.    Sterling Partners

### Saul B. Katz

59.    Upon information and belief, Defendant Saul B. Katz (hereinafter "Saul Katz")

maintains his residence in Glen Cove, New York and, for purposes of the Sterling BLMIS

Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite

408, Great Neck, New York 11021.

60.    Defendant Saul Katz is a general partner of Sterling Equities.  He is the brother of

Sterling Partner Michael Katz and the father of Sterling Partner David Katz.

61.    Defendant Saul Katz co-founded the Sterling partnership in 1972 with his brother-

in-law, Fred Wilpon.  He currently serves as Sterling's President and Chief Operating Officer

and as President of the New York Mets and the Brooklyn Cyclones.  Saul Katz oversees all

aspects of Sterling's businesses, directs Sterling's day-to-day real estate operations, and presides

over Sterling's non-real estate businesses.  Saul Katz, a Certified Public Accountant ("CPA"), is

primarily responsible for Sterling's overall finances and the long-term planning of Sterling's

businesses, including real estate, the New York Mets, Brooklyn Cyclones and SNY.  As chief

strategist at Sterling, Saul Katz is also primarily responsible for Sterling's investments, including

those in real estate, private equity, Sterling Stamos, and—up until December 11, 2008—BLMIS. In addition, Saul Katz sits on the Board of Directors of Sterling Stamos. Accordingly, as President, Chief Operating Officer, and general partner of Sterling, Saul Katz is intimately involved in Sterling's operations and investments, including those in BLMIS.

62.    At all times relevant hereto, Defendant Saul Katz was a client of the IA Business. Saul Katz opened his first account with BLMIS through Sterling in October of 1985.

63.    Saul Katz held an interest in approximately sixty-eight (68) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities. In many cases, Saul Katz's interests overlap, in that he owned multiple interests in the same account in different capacities.

64.    Saul Katz is named as a Defendant in this action in his individual capacity, as trustee of the Katz 2002 Descendants' Trust, as settlor of the Saul B. Katz Family Trust, and as tenant-in-common in the accounts identified in Section XII below.

65.    As set forth more fully in Section XII below, BLMIS made transfers directly to Saul Katz totaling $13,960,991 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $17,874,068 in principal during the six years prior to the Filing Date, totaling approximately $31,835,059. Appendix II, Saul B. Katz Exhibit B. In addition, Saul Katz received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $31,143,050 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $57,106,710 in principal during the six years prior to the Filing Date, totaling approximately $88,249,759. Appendix II, Saul B. Katz Exhibit C.

**Fred Wilpon**

66.     Upon information and belief, Defendant Fred Wilpon maintains his residence in Locust Valley, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

67.     Defendant Fred Wilpon is a general partner of Sterling Equities.  Fred Wilpon is the brother of Sterling Partner Richard Wilpon and the father of Sterling Partner Jeffrey Wilpon.

68.     Defendant Fred Wilpon co-founded the Sterling partnership in 1972 with his brother-in-law, Saul Katz.  He currently serves as Sterling's Chairman of the Board, as well as Chief Executive Officer and Chairman of the New York Mets.  Fred Wilpon is also Chairman of the Brooklyn Cyclones.  Fred Wilpon oversees all aspects of Sterling's businesses.  Accordingly, as Chairman and general partner of Sterling, Fred Wilpon is intimately involved in Sterling's operations and investments, including those in BLMIS.

69.     At all times relevant hereto, Defendant Fred Wilpon was a client of the IA Business.  Fred Wilpon opened his first account with BLMIS through Sterling in October 1985.

70.     Fred Wilpon held an interest in approximately fifty-seven (57) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.  In many cases, Fred Wilpon's interests overlap, in that he owned multiple interests in the same account in different capacities.

71.     Fred Wilpon is named as a Defendant in this action in his individual capacity, as trustee of the Wilpon 2002 Descendants' Trust, as settlor of Fred Wilpon Family Trust, as co-executor of Estate of Leonard Schreier, and as tenant-in-common in the accounts identified in Section XII below.

72.     As set forth more fully in Section XII below, BLMIS made transfers directly to Fred Wilpon totaling $8,094,733 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $32,483,062 in principal during the six years prior to the Filing Date, totaling approximately $40,577,796.  Appendix II, Fred Wilpon Exhibit B.  In addition, Fred Wilpon received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $44,818,855 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $82,056,209 in principal during the six years prior to the Filing Date, totaling approximately $126,875,064.  Appendix II, Fred Wilpon Exhibit C.

### Richard Wilpon

73.     Upon information and belief, Defendant Richard Wilpon maintains his residence in Port Washington, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

74.     Defendant Richard Wilpon is a general partner of Sterling Equities.  Richard Wilpon is the brother of Sterling Partner Fred Wilpon.

75.     Defendant Richard Wilpon joined Sterling in or around 1972 and became a partner shortly thereafter.  He currently serves as Sterling's Senior Executive Vice President. Richard Wilpon is primarily involved in the real estate side of the business, and is currently Co-Chief Executive Officer of SAP, where he manages its investments and oversees its real estate acquisitions and dispositions.  Richard Wilpon is also a Board member of the New York Mets. Accordingly, as Senior Executive Vice President and general partner of Sterling, Richard Wilpon is intimately involved in Sterling's operations and investments, including those in BLMIS.

76.     At all times relevant hereto, Defendant Richard Wilpon was a client of the IA Business.  Richard Wilpon opened his first account with BLMIS through Sterling in December of 1986.

77.     Richard Wilpon held an interest in approximately sixty (60) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.  In many cases, Richard Wilpon's interests overlap, in that he owned multiple interests in the same account in different capacities.

78.     Richard Wilpon is named as a Defendant in this action in his individual capacity, as trustee of the Fred Wilpon Family Trust and the Saul B. Katz Family Trust, as settlor of Wilpon 2002 Descendants' Trust, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

79.     As set forth more fully in Section XII below, BLMIS made transfers directly to Richard Wilpon totaling $6,925,067 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $14,961,751 in principal during the six years prior to the Filing Date, totaling approximately $21,886,818.  Appendix II, Richard Wilpon Exhibit B.  In addition, Richard Wilpon received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $16,241,651 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $33,207,078 in principal during the six years prior to the Filing Date, totaling approximately $49,448,729.  Appendix II, Richard Wilpon Exhibit C.

### Michael Katz

80.     Upon information and belief, Defendant Michael Katz maintains his residence in Old Westbury, New York and, for purposes of the Sterling BLMIS Accounts at issue, received

correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

81.     Defendant Michael Katz is a general partner of Sterling Equities. Michael Katz is the brother of Sterling Partner Saul Katz and the father of Sterling Partner Gregory Katz.

82.     Defendant Michael Katz joined Sterling in or around 1973 and became a partner shortly thereafter. Michael Katz, a CPA, currently serves as Sterling's Senior Executive Vice President and, up until 2001, was Sterling's Chief Financial Officer. He is primarily involved in the real estate side of the business, and is currently Co-Chief Executive Officer of SAP where he is responsible for the day-to-day management of its investments. Michael Katz is also a Board member of the New York Mets. Accordingly, as Senior Executive Vice President, general partner, and former Chief Financial Officer of Sterling, Michael Katz is intimately involved in Sterling's operations and investments, including those in BLMIS.

83.     At all times relevant hereto, Defendant Michael Katz was a client of the IA Business. Michael Katz opened his first account with BLMIS through Sterling in October of 1985.

84.     Michael Katz held an interest in approximately fifty-nine (59) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities. In many cases, Michael Katz's interests overlap, in that he owned multiple interests in the same account in different capacities.

85.     Michael Katz is named as a Defendant in this action in his individual capacity, as trustee of the Saul B. Katz Family Trust, as settlor of Katz 2002 Descendants' Trust, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

86. As set forth more fully in Section XII below, BLMIS made transfers directly to Michael Katz totaling $4,901,745 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $9,180,758 in principal during the six years prior to the Filing Date, totaling approximately $14,082,503. Appendix II, Michael Katz Exhibit B. In addition, Michael Katz received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $14,209,601 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $29,504,875 in principal during the six years prior to the Filing Date, totaling approximately $43,714,476. Appendix II, Michael Katz Exhibit C.

### Jeffrey Wilpon

87. Upon information and belief, Defendant Jeffrey Wilpon maintains his residence in Greenwich, Connecticut and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

88. Defendant Jeffrey Wilpon is a general partner of Sterling Equities. Jeffrey Wilpon is the son of Sterling Partner Fred Wilpon.

89. Defendant Jeffrey Wilpon joined Sterling in or around 1986 and became a partner shortly thereafter. He currently serves as Sterling's Senior Executive Vice President, and as Chief Operating Officer, Senior Executive Vice President, and Board member of the New York Mets. Jeffrey Wilpon is also the Senior Executive Vice President and Chief Operating Officer of the Brooklyn Cyclones. He is primarily responsible for overseeing the day-to-day baseball and business operations of the New York Mets. Accordingly, as Senior Executive Vice President and general partner of Sterling, Jeffrey Wilpon is intimately involved in Sterling's operations and investments, including those in BLMIS.

90.     At all times relevant hereto, Defendant Jeffrey Wilpon was a client of the IA Business.  Jeffrey Wilpon opened his first account with BLMIS through Sterling in October of 1987.

91.     Jeffrey Wilpon held an interest in approximately sixty-two (62) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.  In many cases, Jeffrey Wilpon's interests overlap in that he owned multiple interests in the same account in different capacities.

92.     Jeffrey Wilpon is named as a Defendant in this action in his individual capacity, as beneficiary of the Fred Wilpon Family Trust, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

93.     As set forth more fully in Section XII below, BLMIS made transfers directly to Jeffrey Wilpon totaling $3,339,296 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $9,434,973 in principal during the six years prior to the Filing Date, totaling approximately $12,774,269.  Appendix II, Jeffrey Wilpon Exhibit B.  In addition, Jeffrey Wilpon received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $33,731,951 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $148,480,979 in principal during the six years prior to the Filing Date, totaling approximately $182,212,930. Appendix II, Jeffrey Wilpon Exhibit C.

**David Katz**

94.     Upon information and belief, Defendant David Katz maintains his residence in Glen Cove, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

95.     Defendant David Katz is a general partner of Sterling Equities.  David Katz is the son of Sterling Partner Saul Katz.

96.     Defendant David Katz joined Sterling in 1987 and became a partner shortly thereafter.  He currently serves as Sterling's Executive Vice President and is a Board member of the New York Mets.  David Katz holds responsibilities within Sterling's real estate business and private equity investments.  He was also integral in the founding and management of Sterling Stamos and previously served as one of its board members.  Accordingly, as Executive Vice President and general partner of Sterling, David Katz is intimately involved in Sterling's operations and investments, including those in BLMIS.

97.     At all times relevant hereto, Defendant David Katz was a client of the IA Business.  David Katz opened his first account with BLMIS through Sterling in December of 1989.

98.     David Katz held an interest in approximately fifty-eight (58) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.  In many cases, David Katz's interests overlap, in that he owned multiple interests in the same account in different capacities.

99.     David Katz is named as a Defendant in this action in his individual capacity, as trustee of the Saul B. Katz Family Trust, as beneficiary of the Saul B. Katz Family Trust, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

100.     As set forth more fully in Section XII below, BLMIS made transfers directly to David Katz totaling $4,039,917 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $1,674,656 in principal during the six years prior to the Filing Date, totaling approximately $5,714,572.  Appendix II, David Katz Exhibit B.  In

addition, David Katz received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $31,797,164 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $116,297,142 in principal during the six years prior to the Filing Date, totaling approximately $148,094,306. Appendix II, David Katz Exhibit C.

## **Gregory Katz**

101.    Upon information and belief, Defendant Gregory Katz maintains his residence in Syosset, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

102.    Defendant Gregory Katz is a general partner of Sterling Equities.  Gregory Katz is the son of Sterling Partner Michael Katz.

103.    Defendant Gregory Katz joined Sterling in 2001 and became a partner shortly thereafter.  He currently serves as Sterling's Vice President.  Gregory Katz focuses on the real estate aspect of Sterling's business where he acquires multi-family, commercial and retail real estate properties and arranges financing for SAP.  Accordingly, as Vice President and general partner of Sterling, Gregory Katz is intimately involved in Sterling's operations and investments, including those in BLMIS.

104.    At all times relevant hereto, Defendant Gregory Katz was a client of the IA Business.  Gregory Katz opened his first account with BLMIS through Sterling in January of 1992.

105.    Gregory Katz held an interest in approximately thirty-one (31) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner,

member, and/or shareholder in various Sterling entities.  In many cases, Gregory Katz's interests overlap, in that he owned multiple interests in the same account in different capacities.

106.     Gregory Katz is named as a Defendant in this action in his individual capacity, as beneficiary of the Katz 2002 Descendants' Trust, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

107.     As set forth more fully in Section XII below, BLMIS made transfers directly to Gregory Katz totaling $98,488 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $1,426,939 in principal during the six years prior to the Filing Date, totaling approximately $1,525,427.  Appendix II, Gregory Katz Exhibit B.  In addition, Gregory Katz received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $1,962,314 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $21,564,999 in principal during the six years prior to the Filing Date, totaling approximately $23,527,313.  Appendix II, Gregory Katz Exhibit C.

### Arthur Friedman

108.     Upon information and belief, Defendant Arthur Friedman maintains his residence in Glen Cove, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

109.     Defendant Arthur Friedman is a general partner of Sterling Equities.

110.     Defendant Arthur Friedman, who is a CPA and holds a law degree, joined Sterling in or around 1986 and became a partner shortly thereafter.  He currently serves as Sterling's Senior Vice President and Board member of the Mets.  Arthur Friedman is currently responsible for coordinating Sterling's cash management.  From the time he joined Sterling

through December 11, 2008, Arthur Friedman administered all 483 BLMIS accounts opened through Sterling, including those held by the Sterling Partners, the Sterling Family Member Defendants, the Katz/Wilpon Trust Defendants, and the Sterling Entity Defendants. Accordingly, as Senior Vice President and general partner of Sterling, Arthur Friedman is intimately involved in Sterling's operations and investments, including those in BLMIS.

111. At all times relevant hereto, Defendant Arthur Friedman was a client of the IA Business. Arthur Friedman opened his first account with BLMIS through Sterling in December of 1986.

112. Arthur Friedman held an interest in approximately fifty-four (54) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities. In many cases, Arthur Freidman's interests overlap, in that he owned multiple interests in the same account in different capacities.

113. Arthur Friedman is named as a Defendant in this action in his individual capacity, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

114. As set forth more fully in Section XII below, BLMIS made transfers directly to Arthur Friedman totaling $1,325,671 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $1,929,814 in principal during the six years prior to the Filing Date, totaling approximately $3,255,485. Appendix II, Arthur Friedman Exhibit B. In addition, Arthur Friedman received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $929,732 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $4,607,244 in principal during the six years prior to the Filing Date, totaling approximately $5,536,976. Appendix II, Arthur Friedman Exhibit C.

## L. Thomas Osterman

115.     Upon information and belief, Defendant L. Thomas Osterman (hereinafter "Thomas Osterman") maintains his residence in Stamford, Connecticut and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

116.     Defendant Thomas Osterman is a general partner of Sterling Equities.

117.     Defendant Thomas Osterman joined Sterling in or around 1975 and became a partner shortly thereafter. He currently serves as Sterling's Executive Vice President. Thomas Osterman is responsible for overseeing the development and construction of Sterling's commercial and residential properties in Manhattan, as well as for the strategic management of SAP's real estate assets. Thomas Osterman is also a Board member of the New York Mets. Accordingly, as Executive Vice President and general partner of Sterling, Thomas Osterman is intimately involved in Sterling's operations and investments, including those in BLMIS.

118.     At all times relevant hereto, Defendant Thomas Osterman was a client of the IA Business. Thomas Osterman opened his first account with BLMIS through Sterling in February of 1987.

119.     Thomas Osterman held an interest in approximately fifty-five (55) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities. In many cases, Thomas Osterman's interests overlap, in that he owned multiple interests in the same account in different capacities.

120.     Thomas Osterman is named as a Defendant in this action in his individual capacity, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

121. As set forth more fully in Section XII below, BLMIS made transfers directly to Thomas Osterman totaling $3,313,813 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $578,741 in principal during the six years prior to the Filing Date, totaling approximately $3,892,555. Appendix II, Thomas Osterman Exhibit B. In addition, Thomas Osterman received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $10,181,803 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $12,973,496 in principal during the six years prior to the Filing Date, totaling approximately $23,155,299. Appendix II, Thomas Osterman Exhibit C.

## Marvin B. Tepper

122. Upon information and belief, Defendant Marvin B. Tepper (hereinafter "Marvin Tepper") maintains his residence in Sands Point, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

123. Until 2008, Defendant Marvin Tepper was a general partner of Sterling Equities.

124. Defendant Marvin Tepper joined Sterling in or around 1990 as general counsel and partner after serving as Sterling's outside counsel for many years. Marvin Tepper retired from Sterling in or around 2005, but upon information and belief retained (and currently retains) his partnership interests in Sterling and related entities. Marvin Tepper remains listed as a partner on Sterling's website. Accordingly, as general counsel and general partner of Sterling, Marvin Tepper is intimately involved in Sterling's operations and investments, including those in BLMIS.

125.     At all times relevant hereto, Defendant Marvin Tepper was a client of the IA Business.  Marvin Tepper opened his first account with BLMIS through Sterling in December of 1986.

126.     Marvin Tepper held an interest in approximately fifty-eight (58) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.  In many cases, Marvin Tepper's interests overlap in that he owned multiple interests in the same account in different capacities.

127.     Marvin Tepper is named as a Defendant in this action in his individual capacity, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

128.     As set forth more fully in Section XII below, BLMIS made transfers directly to Marvin Tepper totaling $4,091,935 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $4,352,853 in principal during the six years prior to the Filing Date, totaling approximately $8,444,788.  Appendix II, Marvin B. Tepper Exhibit B.  In addition, Marvin Tepper received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $5,562,276 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $24,709,145 in principal during the six years prior to the Filing Date, totaling approximately $30,271,421.  Appendix II, Marvin B. Tepper Exhibit C.

**Estate of Leonard Schreier, Co-Executors of the Estate Fred Wilpon and Jason Bacher**

129.     Upon information and belief, prior to his death, Leonard Schreier maintained his residence in Huguenot, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

130.     Leonard Schreier served as a Sterling Partner until his death in 2001.  Upon

information and belief, after Leonard Schreier's death, his partnership interests in Sterling and

related entities were held and maintained by the Estate of Leonard Schreier by co-executors Fred

Wilpon and Jason Bacher.  Leonard Schreier remains listed as a partner on Sterling's website.

Accordingly, as general partner of Sterling up until his death in 2001, Leonard Schreier was

intimately involved in Sterling's operations and investments, including those in BLMIS.

131.     Leonard Schreier died on October 28, 2001.  Upon information and belief, the

Estate of Leonard Schreier was administered in the Surrogate's Court of the State of New York,

County of Orange under File No. 103-2002.  Leonard Schreier's Last Will and Testament was

admitted to probate, and letters testamentary were issued to Fred Wilpon and Jason Bacher, as

co-executors of his estate.  Leonard Schreier's surviving children, Deyva Schreier Arthur and

Michael Andrew Schreier, were the sole beneficiaries of his estate.

132.     At all times relevant hereto, Defendant Estate of Leonard Schreier and/or Leonard

Schreier was a client of the IA Business.  Leonard Schreier opened his first account with BLMIS

through Sterling in June of 1987.

133.     The Estate of Leonard Schreier held an interest in approximately forty-five (45)

Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as

a partner, member, and/or shareholder in various Sterling entities.  In many cases, the Estate of

Leonard Schreier's interests overlap, in that it owned multiple interests in the same account in

different capacities.

134.     Jason Bacher and Fred Wilpon are named as Defendants as co-executors of the

Estate of Leonard Schreier in the accounts identified in Section XII below.

135.    As set forth more fully in Section XII below, BLMIS made transfers directly to the Estate of Leonard Schreier and/or Leonard Schreier totaling $6,963,209 in Fictitious Profits from the opening dates of the estate's or his Sterling BLMIS Accounts to the Filing Date, and $7,813,322 in principal during the six years prior to the Filing Date, totaling approximately $14,776,531.  Appendix II, Estate of Leonard Schreier Exhibit B.  In addition, the Estate of Leonard Schreier and/or Leonard Schreier received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $11,161,695 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $8,662,947 in principal during the six years prior to the Filing Date, totaling approximately $19,824,641.  Appendix II, Estate of Leonard Schreier Exhibit C.

C.      **Sterling Entity Defendants**

1.      **New York Mets and Related Entities**

136.    The Sterling Partners acquired their first interest in the Mets in 1980.  In or around August 2002, the Sterling Partners through various holding companies acquired Nelson Doubleday's 50% interest in the Mets.  The acquisition of Doubleday's interest gave Fred Wilpon, Saul Katz, and the other Sterling Partners ultimate ownership and control of the Mets.

137.    Upon information and belief, the Mets are owned, operated and otherwise controlled by the Sterling Partners through two limited partnerships: Sterling Mets LP and Mets Limited Partnership.  As detailed below, Sterling Mets LP and Mets Limited Partnership are held by intermediate LLCs and partnerships that are ultimately owned and controlled by the Sterling Partners.

138.    The following Sterling Partners are officers of the Mets: Fred Wilpon is Chief Executive Officer and Chairman of the Board of Directors, Saul Katz is President, and Jeffrey Wilpon is Senior Executive Vice President and Chief Operating Officer.  Sterling Partners

Richard Wilpon, Michael Katz, David Katz, Thomas Osterman, Arthur Friedman, and, upon information and belief, Marvin Tepper, are members of the Board of Directors of the Mets.

## Mets Limited Partnership

139. Upon information and belief, Defendant Mets Limited Partnership is a limited partnership formed under the laws of the state of Delaware. Its principal place of business is located at Citi Field, Flushing, New York 11368. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

140. The sole general partner of Mets Limited Partnership is C.D.S. Corp. Fred Wilpon is the sole shareholder of C.D.S. Corp, and Saul Katz, among others, is an officer and/or director of C.D.S. Corp.

141. The limited partners of Mets Limited Partnership are Mets One LLC and Mets II LLC, both Delaware limited liability companies.

142. The sole member of Mets One LLC is Sterling Mets Associates, a New York general partnership. The partners of Sterling Mets Associates are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Jeffrey Wilpon, Thomas Osterman, Arthur Friedman, Marvin Tepper, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust. Fred Wilpon is the managing partner.

143. The sole member of Mets II LLC is Sterling Mets Associates II, a New York general partnership. The partners of Sterling Mets Associates II are Fred Wilpon, Saul Katz, Jeffrey Wilpon, David Katz, Thomas Osterman, Marvin Tepper, Arthur Friedman, the Fred Wilpon Family Trust, the Saul B. Katz Family Trust, the Wilpon 2002 Descendants' Trust, the Katz 2002 Descendants' Trust, and the L. Thomas Osterman Family Trust. Arthur Friedman and Fred Wilpon are the managing partners.

144.    Upon information and belief, the Sterling Partners owned, operated and controlled Mets Limited Partnership and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Mets Limited Partnership's name and in which Mets Limited Partnership held an interest.

145.    At all times relevant hereto, Defendant Mets Limited Partnership was a client of the IA Business.  Mets Limited Partnership opened its first account with BLMIS through Sterling in December of 1990.

146.    As set forth more fully in Section XII below, BLMIS made transfers directly to Mets Limited Partnership totaling $84,618,667 in Fictitious Profits from the opening dates of its Sterling BLMIS Accounts to the Filing Date and $282,878,055 in principal during the six years prior to the Filing Date, totaling approximately $367,496,722.  Appendix II, Mets Limited Partnership Exhibit B.  In addition, Mets Limited Partnership received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $9,388,295 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $37,429,289 in principal during the six years prior to the Filing Date, totaling approximately $46,817,584.  Appendix II, Mets Limited Partnership Exhibit C.

### Sterling Mets LP

147.    Upon information and belief, Defendant Sterling Mets LP is a limited partnership formed under the laws of the state of Delaware.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

148.    The sole general partner of Sterling Mets LP is Mets Partners, Inc., a New York corporation whose sole shareholder is Fred Wilpon and whose officers and/or directors include Fred Wilpon, among others.

149.     The sole limited partner of Sterling Mets LP is Mets Limited Partnership, a Delaware limited partnership.

150.     The sole general partner of Mets Limited Partnership is C.D.S. Corp.  Fred Wilpon is the sole shareholder of C.D.S. Corp, and Saul Katz, is an officer and/or director, among others not listed as defendants herein.

151.     The limited partners of Mets Limited Partnership are Mets One LLC and Mets II LLC, both Delaware limited liability companies.

152.     The sole member of Mets One LLC is Sterling Mets Associates, a New York general partnership.  The partners of Sterling Mets Associates are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Jeffrey Wilpon, Thomas Osterman, Arthur Friedman, Marvin Tepper, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust.  Fred Wilpon is the managing partner.

153.     The sole member of Mets II LLC is Sterling Mets Associates II, a New York general partnership.  The partners of Sterling Mets Associates II are Fred Wilpon, Saul Katz, Jeffrey Wilpon, David Katz, Thomas Osterman, Marvin Tepper, Arthur Friedman, the Fred Wilpon Family Trust, the Saul B. Katz Family Trust, the Wilpon 2002 Descendants' Trust, and the Katz 2002 Descendants' Trust.  Arthur Friedman and Fred Wilpon are the managing partners.

154.     Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Mets LP and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Sterling Mets LP's name.

155.     At all times relevant hereto, Defendant Sterling Mets LP was a client of the IA Business.  Sterling Mets LP opened its first account with BLMIS through Sterling in February of 1998.

156.     As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Mets LP totaling $9,388,295 in Fictitious Profits from the opening dates of its Sterling BLMIS Accounts to the Filing Date and $37,429,289 in principal during the six years prior to the Filing Date, totaling approximately $46,817,584.  Appendix II, Sterling Mets LP Exhibit B.

**Sterling Mets Associates**

157.     Upon information and belief, Defendant Sterling Mets Associates is a general partnership formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

158.     The general partners of Sterling Mets Associates are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Jeffrey Wilpon, Thomas Osterman, Arthur Friedman, Marvin Tepper, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust.

159.     Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Mets Associates and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Sterling Mets Associates' name and in which Sterling Mets Associates held an interest.

160.     At all times relevant hereto, Defendant Sterling Mets Associates was a client of the IA Business.  Sterling Mets Associates opened its first account with BLMIS through Sterling in May of 1999.

161.     As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Mets Associates totaling $111,653 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date.  Appendix II, Sterling Mets Associates Exhibit B.

In addition, Sterling Mets Associates received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $46,550,814 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $158,552,135 in principal during the six years prior to the Filing Date, totaling approximately $205,102,949. Appendix II, Sterling Mets Associates Exhibit C.

### Sterling Mets Associates II

162. Upon information and belief, Defendant Sterling Mets Associates II is a general partnership formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

163. The general partners of Sterling Mets Associates II are Fred Wilpon, Saul Katz, Jeffrey Wilpon, David Katz, Thomas Osterman, Marvin Tepper, Arthur Friedman, the Fred Wilpon Family Trust, the Saul B. Katz Family Trust, the Wilpon 2002 Descendants' Trust, the Katz 2002 Descendants' Trust, and the Thomas Osterman Family Trust. Arthur Friedman and Fred Wilpon are the managing partners.

164. Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Mets Associates II and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in which Sterling Mets Associates II held an interest.

165. Defendant Sterling Mets Associates II received transfers from one or more Sterling BLMIS Accounts as early as September of 1988.

166. As set forth more fully in Section XII below, Sterling Mets Associates II received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $46,533,446 in Fictitious Profits from the opening dates of such

Sterling BLMIS Accounts to the Filing Date and $165,394,999 in principal during the six years prior to the Filing Date, totaling approximately $211,928,445. Appendix II, Sterling Mets Associates II Exhibit C.

## Mets One LLC

167.     Upon information and belief, Defendant Mets One LLC is a limited liability company formed under the laws of the state of New York. Its principal place of business is located at Citi Field, Flushing, New York. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

168.     The sole member of Mets One LLC is Sterling Mets Associates, a New York general partnership.

169.     The partners of Sterling Mets Associates are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Jeffrey Wilpon, Thomas Osterman, Arthur Friedman, Marvin Tepper, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust. Fred Wilpon is the managing partner.

170.     Upon information and belief, the Sterling Partners owned, operated and controlled Mets One LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in which Mets One LLC held an interest.

171.     Defendant Mets One LLC received transfers from one or more Sterling BLMIS Accounts as early as September of 1988.

172.     As set forth more fully in Section XII below, Mets One LLC received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $46,533,446 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $158,552,135 in principal during the six years prior to the Filing Date, totaling approximately $205,085,581. Appendix II, Mets One LLC Exhibit C.

## Mets II LLC

173.     Upon information and belief, Defendant Mets II LLC is a limited liability company formed under the laws of the state of Delaware.  Its principal place of business is located at Citi Field, Flushing, New York, 11368.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

174.     The sole member of Mets II LLC is Sterling Mets Associates II, a New York general partnership.

175.     The partners of Sterling Mets Associates II are Fred Wilpon, Saul Katz, Jeffrey Wilpon, David Katz, Thomas Osterman, Marvin Tepper, Arthur Friedman, the Wilpon 2002 Descendants' Trust, the Katz 2002 Descendants' Trust, the Thomas Osterman Family Trust, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust.

176.     Upon information and belief, the Sterling Partners owned, operated and controlled Mets II LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Mets II LLC's name and in which Mets II LLC held an interest.

177.     Defendant Mets II LLC received transfers from one or more Sterling BLMIS Accounts as early as September of 1988.

178.     As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Mets II LLC totaling $6,842,864 during the six years prior to the Filing Date. Appendix II, Mets II LLC Exhibit B.  In addition, Mets II LLC received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $46,533,446 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $158,552,135 in principal during the six years prior to the Filing Date, totaling approximately $205,085,581.  Appendix II, Mets II LLC Exhibit C.

## Mets Partners, Inc.

179.     Upon information and belief, Defendant Mets Partners, Inc. is a corporation formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

180.     The sole general partner of Mets Partners, Inc. is Fred Wilpon.

181.     Upon information and belief, the Sterling Partners owned, operated and controlled Mets Partners, Inc. and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in which Mets Partners, Inc. held an interest.

182.     Defendant Mets Partners, Inc. received transfers from one or more Sterling BLMIS Accounts as early as September of 1988.

183.     As set forth more fully in Section XII below, Mets Partners, Inc. received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $9,388,295 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $37,429,289 in principal during the six years prior to the Filing Date, totaling approximately $46,817,584.  Appendix II, Mets Partners, Inc. Exhibit C.

## C.D.S. Corp.

184.     Upon information and belief, Defendant C.D.S. Corp. is a corporation formed under the laws of the state of New York.  Its principal place of business is located at Citi Field, Flushing, New York, 11368.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

185.     Fred Wilpon is the sole shareholder of C.D.S. Corp., and Saul Katz, among others, is an officer and/or director of C.D.S. Corp.

186.    Upon information and belief, the Sterling Partners owned, operated and controlled C.D.S. Corp. and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in which C.D.S. Corp. held an interest.

187.    Defendant C.D.S. Corp. received transfers from one or more Sterling BLMIS Accounts as early as September of 1988.

188.    As set forth more fully in Section XII below, C.D.S. Corp. received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $940,070 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $3,203,073 in principal during the six years prior to the Filing Date, totaling approximately $4,143,143.  Appendix II, C.D.S. Corp. Exhibit C.

### Coney Island Baseball Holding Company LLC

189.    Upon information and belief, Defendant Coney Island Baseball Holding Company LLC ("Coney Island Baseball LLC") is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

190.    The members of Coney Island Baseball LLC include FS Company LLC, among others not named as defendants herein.

191.    The sole member of FS Company LLC is Sterling Heritage LLC.

192.    The members of Sterling Heritage LLC are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, the Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz, and Marvin Tepper.

193.    The managers of Coney Island Baseball LLC are FS Company LLC, Fred Wilpon, Michael Katz, and Marvin Tepper.

194.    Upon information and belief, the Sterling Partners owned, operated and controlled Coney Island Baseball LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Coney Island Baseball LLC's name and in which Coney Island Baseball LLC held an interest.

195.    At all times relevant hereto, Defendant Coney Island Baseball LLC was a client of the IA Business.  Coney Island Baseball LLC opened its first BLMIS Account through Sterling in November of 2001.

196.    As set forth more fully in Section XII below, BLMIS made transfers directly to Coney Island Baseball LLC constituting a minimal amount of Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date.  Appendix II, Coney Island Baseball LLC Exhibit B.  In addition, Coney Island Baseball LLC received avoidable and recoverable Subsequent Transfers from a Sterling BLMIS Account held by another Sterling Defendant totaling $329,354 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $700,000 in principal during the six years prior to the Filing Date, totaling approximately $1,029,354.  Appendix II, Coney Island Baseball LLC Exhibit C.

## Brooklyn Baseball Company LLC

197.    Upon information and belief, Defendant Brooklyn Baseball Company LLC ("Brooklyn Baseball LLC") is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

198.    The sole owner and managing member of Brooklyn Baseball LLC is Coney Island Baseball LLC.

199.     The members of Coney Island Baseball LLC include FS Company LLC, among others.  The managers of Coney Island Baseball LLC Holding Company LLC are FS Company LLC, Fred Wilpon, Michael Katz, and Marvin Tepper.

200.     The sole member of FS Company LLC is Sterling Heritage LLC.

201.     The members of Sterling Heritage LLC are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, the Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz, and Marvin Tepper.

202.     Upon information and belief, the Sterling Partners owned, operated and controlled Brooklyn Baseball LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Brooklyn Baseball LLC's name and in which Brooklyn Baseball LLC held an interest.

203.     At all times relevant hereto, Defendant Brooklyn Baseball LLC was a client of the IA Business.  Brooklyn Baseball LLC opened its first account with BLMIS through Sterling in February of 2001.

204.     As set forth more fully in Section XII below, BLMIS made transfers directly to Brooklyn Baseball LLC totaling $329,354 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date and $700,000 in principal during the six years prior to the Filing Date, totaling approximately $1,029,354.  Appendix II, Brooklyn Baseball LLC Exhibit B.

### FS Company LLC

205.     Upon information and belief, Defendant FS Company LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent

for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

206.     The sole member of FS Company LLC is Sterling Heritage LLC.

207.     The members of Sterling Heritage LLC are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, the Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz, and Marvin Tepper.

208.     The managers of FS Company LLC are Arthur Friedman, Fred Wilpon, Saul Katz, Michael Katz, and Richard Wilpon.

209.     Upon information and belief, the Sterling Partners owned, operated and controlled FS Company LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in FS Company LLC's name and in which FS Company LLC held an interest.

210.     At all times relevant hereto, Defendant FS Company LLC was a client of the IA Business.  FS Company LLC opened its first account with BLMIS through Sterling in October of 2001.

211.     As set forth more fully in Section XII below, BLMIS made transfers of principal directly to FS Company LLC totaling $9,643,000 during the six years prior to the Filing Date. Appendix II, FS Company LLC Exhibit B.  In addition, FS Company LLC received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $358,780 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $700,000 in principal during the six years prior to the Filing Date, totaling approximately $1,058,780.  Appendix II, FS Company LLC Exhibit C.

### 2. Other Sterling Entities

### 157 J.E.S. LLC

212.     Upon information and belief, Defendant 157 J.E.S. LLC is a limited liability
company formed under the laws of the state of New York.  Its principal place of business is
located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent
for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New
York 11021.

213.     The members of 157 J.E.S. LLC are Fred Wilpon, Saul Katz, Richard Wilpon,
Michael Katz, the Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman, Jeffrey
Wilpon, David Katz, Marvin Tepper, the Fred Wilpon Family Trust, and the Saul B. Katz Family
Trust.

214.     Upon information and belief, the Sterling Partners owned, operated and controlled
157 J.E.S. LLC and authorized, directed, controlled, and administered the Sterling BLMIS
Account in 157 J.E.S. LLC's name.

215.     At all times relevant hereto, Defendant 157 J.E.S. LLC was a client of the IA
Business.  157 J.E.S. LLC opened its first account with BLMIS through Sterling in October of
2001.

216.     As set forth more fully in Section XII below, BLMIS made transfers directly to
157 J.E.S. LLC totaling $389,682 in Fictitious Profits from the opening date of its Sterling
BLMIS Account to the Filing Date and $695,000 in principal during the six years prior to the
Filing Date, totaling approximately $1,084,682.  Appendix II, 157 J.E.S. LLC Exhibit B.

### Air Sterling LLC

217.     Upon information and belief, Defendant Air Sterling LLC is a limited liability
company formed under the laws of the state of New York.  Its principal place of business is

located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

218.    The sole member of Air Sterling LLC is Sterling Mets Associates.

219.    Sterling Mets Associates is a New York general partnership whose general partners are Fred Wilpon, the Fred Wilpon Family Trust, Saul Katz, the Saul B. Katz Family Trust, Richard Wilpon, Michael Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman and Marvin Tepper.

220.    Upon information and belief, the Sterling Partners owned, operated and controlled Air Sterling LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Air Sterling LLC's name.

221.    At all times relevant hereto, Defendant Air Sterling LLC was a client of the IA Business. Air Sterling LLC opened its first account with BLMIS through Sterling in March of 2001.

222.    As set forth more fully in Section XII below, BLMIS made transfers directly to Air Sterling LLC constituting a minimal amount of Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date. Appendix II, Air Sterling LLC Exhibit B.

**BAS Aircraft LLC**

223.    Upon information and belief, Defendant BAS Aircraft LLC is a limited liability company formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

224.     The members of BAS Aircraft LLC are Richard Wilpon, Marvin Tepper, and Jeffrey Wilpon.

225.     Upon information and belief, the Sterling Partners owned, operated and controlled BAS Aircraft LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in BAS Aircraft LLC's name.

226.     At all times relevant hereto, Defendant BAS Aircraft LLC was a client of the IA Business.  BAS Aircraft LLC opened its first account with BLMIS through Sterling in March of 2001.

227.     As set forth more fully in Section XII below, BLMIS made transfers directly to BAS Aircraft LLC constituting a minimal amount of Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date. Appendix II, BAS Aircraft LLC Exhibit B.

### Bon Mick Family Partners LP

228.     Upon information and belief, Defendant Bon Mick Family Partners LP is a limited partnership formed under the laws of the state of Delaware.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

229.     The sole general partner of Bon Mick Family Partners is Bon-Mick, Inc., a Delaware corporation whose sole shareholder is Arthur Friedman.  Michael Katz is also an officer and/or director of Bon-Mick, Inc.

230.     The limited partners of Bon Mick Family Partners include individuals who are not named as defendants in this action.

231.     Upon information and belief, the Sterling Partners owned, operated and controlled Bon Mick Family Partners LP and authorized, directed, controlled, and administered the Sterling BLMIS Account in Bon Mick Family Partners LP's name.

232.     At all times relevant hereto, Defendant Bon Mick Family Partners LP was a client of the IA Business.  Bon Mick Family Partners LP opened its first account with BLMIS through Sterling in December of 1989.

233.     As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Bon Mick Family Partners LP totaling $107,000 during the six years prior to the Filing Date.  Appendix II, Bon Mick Family Partners LP Exhibit B.

### Bon-Mick, Inc.

234.     Upon information and belief, Defendant Bon-Mick, Inc. is a corporation formed under the laws of the state of Delaware.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

235.     The sole shareholder of Bon-Mick, Inc. is Arthur Friedman.  Michael Katz is also an officer and/or director of Bon-Mick, Inc.

236.     Upon information and belief, the Sterling Partners owned, operated and controlled Bon-Mick, Inc. and authorized, directed, controlled, and administered the Sterling BLMIS Account in which Bon-Mick, Inc. held an interest.

237.     Defendant Bon-Mick, Inc. received transfers from one or more Sterling BLMIS Accounts as early as December of 1989.

238.     As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Bon-Mick, Inc. totaling $107,000 during the six years prior to the Filing Date. Appendix II, Bon Mick Inc. Exhibit B.

**Charles 15 Associates**

239.     Upon information and belief, Defendant Charles 15 Associates is a general partnership formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

240.     The general partners of Charles 15 Associates are Cross Charles, Inc. and Charles 15 LLC.

241.     Cross Charles, Inc. is a New York corporation whose sole shareholder is SC Acquisition Corp.

242.     SC Acquisition Corp. is a New York corporation whose sole shareholder is Sterling Argent, Inc.

243.     Sterling Argent, Inc. is a New York corporation whose shareholders are Fred Wilpon, Richard Wilpon, Saul Katz, Michael Katz, David Katz, Arthur Friedman, Jeffrey Wilpon, Thomas Osterman, and the Estate of Leonard Schreier.

244.     Charles 15 LLC is a New York limited liability company whose sole member is Charles Sterling Sub LLC.

245.     Charles Sterling Sub LLC is a New York limited liability company whose sole member is Charles Sterling LLC.

246.     Charles Sterling LLC is a New York limited liability company whose members are Charles Sterling 15 LLC and Charles Sterling, Inc.

247.     Charles Sterling 15 LLC is a New York limited liability company whose members are Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz,

Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, and Robin and Philip Wachtler.

248.     Charles Sterling, Inc. is a New York corporation whose shareholders are Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, and Robin and Philip Wachtler.

249.     Upon information and belief, the Sterling Partners owned, operated and controlled Charles 15 Associates and authorized, directed, controlled, and administered the Sterling BLMIS Account in Charles 15 Associates' name.

250.     At all times relevant hereto, Defendant Charles 15 Associates was a client of the IA Business.  Charles 15 Associates opened its first account with BLMIS through Sterling in January of 1995.

251.     As set forth more fully in Section XII below, BLMIS made transfers directly to Charles 15 Associates totaling $437,531 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date.  Appendix II, Charles 15 Associates Exhibit B.

### Charles 15 LLC

252.     Upon information and belief, Defendant Charles 15 LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

253.     The sole member of Charles 15 LLC is Charles Sterling Sub LLC.

254.     Charles Sterling Sub LLC is a New York limited liability company whose sole member is Charles Sterling LLC.

255.    Charles Sterling LLC is a New York limited liability company whose members are Charles Sterling 15 LLC and Charles Sterling, Inc.

256.    Charles Sterling 15 LLC is a New York limited liability company whose members are Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, and Robin and Philip Wachtler.

257.    Charles Sterling, Inc. is a New York corporation whose shareholders are Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, and Robin and Philip Wachtler.

258.    Upon information and belief, the Sterling Partners owned, operated and controlled Charles 15 LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in which Charles 15 LLC held an interest.

259.    Defendant Charles 15 LLC received transfers from one or more Sterling BLMIS Accounts as early as January of 1995.

260.    As set forth more fully in Section XII below, Charles 15 LLC received avoidable and recoverable Subsequent Transfers from a Sterling BLMIS Account held by another Sterling Defendant totaling $437,093 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date.  Appendix II, Charles 15 LLC Exhibit C.

### Charles Sterling LLC

261.    Upon information and belief, Defendant Charles Sterling LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent

for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

262.     Upon information and belief, the members of Charles Sterling LLC are Charles Sterling 15 LLC and Charles Sterling, Inc.  Charles Sterling 15 LLC is the managing member.

263.     Upon information and belief, the members of Charles Sterling 15 LLC are Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, and Robin and Philip Wachtler.

264.     Upon information and belief, the shareholders of Charles Sterling, Inc. are Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, and Robin and Philip Wachtler.

265.     Upon information and belief, the Sterling Partners owned, operated and controlled Charles Sterling LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Charles Sterling LLC's name and in which Charles Sterling LLC held an interest.

266.     At all times relevant hereto, Defendant Charles Sterling LLC was a client of the IA Business.  Charles Sterling LLC opened its first account with BLMIS through Sterling in August of 2001.

267.     As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Charles Sterling LLC totaling $489,000 during the six years prior to the Filing Date. Appendix II, Charles Sterling LLC Exhibit B.  In addition, Charles Sterling LLC received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $437,531 in Fictitious Profits from the opening dates of such

Sterling BLMIS Accounts to the Filing Date and $8,977,000 in principal during the six years prior to the Filing Date, totaling approximately $9,414,531. Appendix II, Charles Sterling LLC Exhibit C.

## Charles Sterling Sub LLC

268. Upon information and belief, Defendant Charles Sterling Sub LLC is a limited liability company formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

269. The sole member of Charles Sterling Sub LLC is Charles Sterling LLC.

270. The members of Charles Sterling LLC are Charles Sterling 15 LLC and Charles Sterling, Inc.

271. Upon information and belief, the members of Charles Sterling 15 LLC are Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, and Robin and Philip Wachtler.

272. Upon information and belief, the shareholders of Charles Sterling, Inc. are Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, and Robin and Philip Wachtler.

273. Upon information and belief, the Sterling Partners owned, operated and controlled Charles Sterling Sub LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Charles Sterling Sub LLC's name and in which Charles Sterling Sub LLC held an interest.

274.     At all times relevant hereto, Defendant Charles Sterling Sub LLC was a client of the IA Business.  Charles Sterling Sub LLC opened its first account with BLMIS through Sterling in October of 2004.

275.     As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Charles Sterling Sub LLC totaling $8,977,000 during the six years prior to the Filing Date.  Appendix II, Charles Sterling Sub LLC Exhibit B.  In addition, Charles Sterling Sub LLC received avoidable and recoverable Subsequent Transfers from a Sterling BLMIS Account held by another Sterling Defendant totaling $437,531 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date.  Appendix II, Charles Sterling Sub LLC Exhibit C.

### College Place Enterprises LLC

276.     Upon information and belief, Defendant College Place Enterprises LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

277.     The members of College Place Enterprises LLC include Fred Wilpon and Saul Katz, among others not named as defendants herein.

278.     Upon information and belief, the Sterling Partners owned, operated and controlled College Place Enterprises LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in College Place Enterprises LLC's name.

279.     At all times relevant hereto, Defendant College Place Enterprises LLC was a client of the IA Business.  College Place Enterprises LLC opened its first account with BLMIS through Sterling in May of 1986.

280.     As set forth more fully in Section XII below, BLMIS made transfers directly to College Place Enterprises LLC totaling $5,492,275 in Fictitious Profits from the opening dates of its Sterling BLMIS Accounts to the Filing Date and $601,932 in principal during the six years prior to the Filing Date, totaling approximately $6,094,207.  Appendix II, College Place Enterprises LLC Exhibit B.

## FFB Aviation LLC

281.     Upon information and belief, Defendant FFB Aviation LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

282.     The members and managers of FFB Aviation LLC include Saul Katz and Michael Katz, among others who are not named as defendants herein.

283.     Upon information and belief, the Sterling Partners owned, operated and controlled FFB Aviation LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in FFB Aviation LLC's name and in which FFB Aviation LLC held an interest.

284.     At all times relevant hereto, Defendant FFB Aviation LLC was a client of the IA Business.  FFB Aviation LLC opened its first account with BLMIS through Sterling in May of 2006.

285.     As set forth more fully in Section XII below, BLMIS made transfers directly to FFB Aviation LLC totaling $112,975 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date and $400,000 in principal during the six years prior to the Filing Date, totaling approximately $512,975.  Appendix II, FFB Aviation LLC Exhibit B.  In addition, FFB Aviation LLC received avoidable and recoverable Subsequent Transfers of

principal from a Sterling BLMIS Account held by another Sterling Defendant totaling $725,479 during the six years prior to the Filing Date. Appendix II, FFB Aviation LLC Exhibit C.

### Iris J. Katz and Saul B. Katz Family Foundation, Inc.

286.    Upon information and belief, the Iris J. Katz and Saul B. Katz Family Foundation, Inc. (the "Iris J. Katz and Saul B. Katz Family Foundation") is a corporation formed under the laws of the state of Delaware. Saul Katz is the President and a director of the Iris J. Katz and Saul B. Katz Family Foundation. Iris J. Katz and David Katz are also directors of the Iris J. Katz and Saul B. Katz Family Foundation.

287.    Upon information and belief, the Sterling Partners owned, operated and controlled Iris J. Katz and Saul B. Katz Family Foundation and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Iris J. Katz and Saul B. Katz Family Foundation's name.

288.    At all times relevant hereto, Defendant Iris J. Katz and Saul B. Katz Family Foundation was a client of the IA Business. The Iris J. Katz and Saul B. Katz Family Foundation opened its first account with BLMIS through Sterling in July of 1990.

289.    The Iris J. Katz and Saul B. Katz Family Foundation held approximately six (6) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder and as a member in a Sterling entity.

290.    As set forth more fully in Section XII below, BLMIS made transfers directly to the Iris J. Katz and Saul B. Katz Family Foundation totaling $3,272,382 in Fictitious Profits from the opening dates of its Sterling BLMIS Accounts to the Filing Date and $3,009,403 in principal during the six years prior to the Filing Date, totaling approximately $6,281,785. Appendix II, Iris J. Katz and Saul B. Katz Family Foundation Exhibit B. In addition, the Iris J. Katz and Saul B. Katz Family Foundation received avoidable and recoverable Subsequent Transfers of

principal from a Sterling BLMIS Account held by another Sterling Defendant constituting a minimal amount of Fictitious Profits from the opening date of such Sterling BLMIS account to the Filing Date. Appendix II, Iris J. Katz and Saul B. Katz Family Foundation Exhibit C.

### Judy and Fred Wilpon Family Foundation, Inc.

291. Upon information and belief, Defendant Judy and Fred Wilpon Family Foundation, Inc. (the "Judy and Fred Wilpon Family Foundation") is a corporation formed under the laws of the state of Delaware. The directors of the Judy and Fred Wilpon Family Foundation are Fred Wilpon, Judith Wilpon, Jeffrey Wilpon, Robin Wilpon Wachtler, and Bruce N. Wilpon.

292. Upon information and belief, the Sterling Partners owned, operated and controlled the Judy and Fred Wilpon Family Foundation and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Judy and Fred Wilpon Family Foundation's name.

293. At all times relevant hereto, Defendant Judy and Fred Wilpon Family Foundation was a client of the IA Business. The Judy and Fred Wilpon Family Foundation opened its first account with BLMIS through Sterling in February of 1989.

294. The Judy and Fred Wilpon Family Foundation held a direct interest in approximately four (4) Sterling BLMIS Accounts.

295. As set forth more fully in Section XII below, BLMIS made transfers directly to the Judy and Fred Wilpon Family Foundation totaling $2,230,588 in Fictitious Profits from the opening dates of its Sterling BLMIS Accounts to the Filing Date and $398,820 in principal during the six years prior to the Filing Date, totaling approximately $2,629,408. Appendix II, Judy and Fred Wilpon Family Foundation Exhibit B.

### Red Valley Partners

296. Upon information and belief, Defendant Red Valley Partners is a general partnership formed under the laws of the state of New York. Its principal place of business is

located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

297.     The general partners of Red Valley Partners are David Katz, Heather Katz Knopf, and Natalie Katz O'Brien.

298.     Upon information and belief, the Sterling Partners owned, operated and controlled Red Valley Partners and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Red Valley Partners' name and in which Red Valley Partners held an interest.

299.     At all times relevant hereto, Defendant Red Valley Partners was a client of the IA Business. Red Valley Partners opened its first account with BLMIS through Sterling in August of 1997.

300.     As set forth more fully in Section XII below, BLMIS made transfers directly to Red Valley Partners totaling $3,296,336 in Fictitious Profits from the opening dates of its Sterling BLMIS Accounts to the Filing Date and $275,000 in principal during the six years prior to the Filing Date, totaling approximately $3,571,336. Appendix II, Red Valley Partners Exhibit B. In addition, Red Valley Partners received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $249,172 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $3,317,769 in principal during the six years prior to the Filing Date, totaling approximately $3,566,941. Appendix II, Red Valley Partners Exhibit C.

## Robbinsville Park LLC

301.     Upon information and belief, Defendant Robbinsville Park LLC is a limited liability company formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its

registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

302.    The members of Robbinsville Park LLC are Sterling Rte 130 LLC and SC Acquisition Corp.  The managers of Robbinsville Park LLC are Saul Katz, Richard Wilpon, Michael Katz, and Fred Wilpon.

303.    Sterling Rte 130 LLC is a New York limited liability company whose members are the Fred Wilpon Family Trust, Saul Katz, the Saul B. Katz Family Trust, Richard Wilpon, Michael Katz, the Estate of Leonard Schreier, Marvin Tepper, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz, and Robin and Philip Wachtler as joint tenants.

304.    SC Acquisition Corp. is a New York corporation whose sole shareholder is Sterling Argent, Inc.

305.    Sterling Argent, Inc. is a New York corporation whose shareholders are the Fred Wilpon Family Trust, Saul Katz, the Saul B. Katz Family Trust, Richard Wilpon, Michael Katz, the Estate of Leonard Schreier, Marvin Tepper, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz, and Robin and Philip Wachtler as joint tenants.

306.    Upon information and belief, the Sterling Partners owned, operated and controlled Robbinsville Park LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Robbinsville Park LLC's name.

307.    At all times relevant hereto, Defendant Robbinsville Park LLC was a client of the IA Business.  Robbinsville Park LLC opened its first account with BLMIS through Sterling in October of 2001.

308.    As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Robbinsville Park LLC totaling $2,279,000 during the six years prior to the Filing Date.  Appendix II, Robbinsville Park LLC Exhibit B.

### Ruskin Garden Apartments LLC

309.    Upon information and belief, Defendant Ruskin Garden Apartments LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

310.    The members of Ruskin Garden Apartments LLC are Fred Wilpon and Saul Katz, among others who are not named as defendants herein.  Fred Wilpon and Saul Katz are the managing members of Ruskin Garden Apartments LLC.

311.    Upon information and belief, the Sterling Partners owned, operated and controlled Ruskin Garden Apartments LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Ruskin Garden Apartments LLC's name.

312.    At all times relevant hereto, Defendant Ruskin Garden Apartments LLC was a client of the IA Business.  Ruskin Garden Apartments LLC opened its first account with BLMIS through Sterling in June of 1997.

313.    As set forth more fully in Section XII below, BLMIS made transfers directly to Ruskin Garden Apartments LLC totaling $117,623 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date.  Appendix II, Ruskin Garden Apartments LLC Exhibit B.

## SEE HoldCo LLC

314.     Upon information and belief, Defendant SEE HoldCo LLC is a limited liability company formed under the laws of the state of Delaware.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

315.     The members of SEE HoldCo LLC are SEE Management LLC, SEE Holdings I, and SEE Holdings II.  SEE Management LLC is the managing member of SEE HoldCo LLC.

316.     SEE Management LLC is a Delaware limited liability company whose members and managers are Fred Wilpon and Saul Katz.  Upon information and belief, SEE Management LLC owns 1.99% of SEE HoldCo LLC.

317.     SEE Holdings I is a New York general partnership whose partners are Fred Wilpon, Jeffrey Wilpon, Saul Katz, Scott Wilpon, Richard Wilpon, Michael Katz, Marvin Tepper, Thomas Osterman, Arthur Friedman, Gregory Katz, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust.  Fred Wilpon is the managing partner of SEE Holdings I.  Upon information and belief, SEE Holdings I owns 49.005% of SEE HoldCo LLC.

318.     SEE Holdings II is a New York general partnership whose partners are Fred Wilpon, Jeffrey Wilpon, Saul Katz, David Katz, Scott Wilpon, Marvin Tepper, Thomas Osterman, Arthur Friedman, the Thomas Osterman 2002 Grantor Trust, the Fred Wilpon Family Trust, the Saul B. Katz Family Trust, the Wilpon 2002 Descendants' Trust, and the Katz 2002 Descendants' Trust.  Fred Wilpon is the managing partner of SEE Holdings II.  Upon information and belief, SEE Holdings II owns 49.005% of SEE HoldCo LLC.

319.    Upon information and belief, the Sterling Partners owned, operated and controlled SEE HoldCo LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in SEE HoldCo LLC's name.

320.    At all times relevant hereto, Defendant SEE HoldCo LLC was a client of the IA Business.  SEE HoldCo LLC opened its first account with BLMIS through Sterling in January of 2007.

321.    As set forth more fully in Section XII below, BLMIS made transfers directly to SEE HoldCo LLC totaling $60,000 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date and $6,600,000 in principal during the six years prior to the Filing Date, totaling approximately $6,660,000.  Appendix II, SEE HoldCo LLC Exhibit B.

### SEE Holdings I

322.    Upon information and belief, Defendant SEE Holdings I is a general partnership formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

323.    The partners of SEE Holdings I are Fred Wilpon, Jeffrey Wilpon, Saul Katz, Scott Wilpon, Richard Wilpon, Michael Katz, Marvin Tepper, Thomas Osterman, Arthur Friedman, Gregory Katz, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust.  Fred Wilpon is the managing partner of SEE Holdings I.

324.    Upon information and belief, the Sterling Partners owned, operated and controlled SEE Holdings I and authorized, directed, controlled, and administered the Sterling BLMIS Account in which SEE Holdings I held an interest.

325.    Defendant SEE Holdings I received transfers from one or more Sterling BLMIS Accounts as early as January of 2007.

326. As set forth more fully in Section XII below, SEE Holdings I received avoidable and recoverable Subsequent Transfers from a Sterling BLMIS Account held by another Sterling Defendant totaling $29,403 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $3,234,330 in principal during the six years prior to the Filing Date, totaling approximately $3,263,733. Appendix II, SEE Holdings I Exhibit C.

## SEE Holdings II

327. Upon information and belief, Defendant SEE Holdings II is a general partnership formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

328. The partners of SEE Holdings II are Fred Wilpon, Jeffrey Wilpon, Saul Katz, David Katz, Scott Wilpon, Marvin Tepper, Thomas Osterman, Arthur Friedman, the Thomas Osterman 2002 Grantor Trust, the Fred Wilpon Family Trust, the Saul B. Katz Family Trust, the Wilpon 2002 Descendants' Trust, and the Katz 2002 Descendants' Trust. Fred Wilpon is the managing partner of SEE Holdings II.

329. Upon information and belief, the Sterling Partners owned, operated and controlled SEE Holdings II and authorized, directed, controlled, and administered the Sterling BLMIS Account in which SEE Holdings II held an interest.

330. Defendant SEE Holdings II received transfers from one or more Sterling BLMIS Accounts as early as January of 2007.

331. As set forth more fully in Section XII below, SEE Holdings II received avoidable and recoverable Subsequent Transfers from a Sterling BLMIS Account held by another Sterling Defendant totaling $29,403 in Fictitious Profits from the opening date of such Sterling BLMIS

Account to the Filing Date and $3,234,330 in principal during the six years prior to the Filing Date, totaling approximately $3,263,733.  Appendix II, SEE Holdings II Exhibit C.

## Sterling 10 LLC

332.    Upon information and belief, Defendant Sterling 10 LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

333.    The members of Sterling 10 LLC include Richard Wilpon, Robin & Philip Wachtler as joint tenants, Robin Wilpon Wachtler, the Scott Wilpon 2000 Trust, the Jessica Wilpon 2000 Trust, Daniel Wilpon, David Katz, Michael Katz, Gregory Katz, Natalie Katz O'Brien, Todd Katz, Daniel and Heather Katz Knopf, Howard Katz, Amy Beth Katz, Dayle Katz, the Dayle & Michael Katz Foundation, Ruth Friedman, Elise C. Tepper, and the Tepper Family Foundation, among others not named as defendants herein.

334.    The managing members of Sterling 10 LLC are Richard Wilpon, Michael Katz, Arthur Friedman, and David Katz.

335.    Upon information and belief, the Sterling Partners owned, operated and controlled Sterling 10 LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling 10 LLC's name.

336.    At all times relevant hereto, Defendant Sterling 10 LLC was a client of the IA Business.  Sterling 10 LLC opened its first account with BLMIS through Sterling in September of 2003.

337.     As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Sterling 10 LLC totaling $15,470,000 during the six years prior to the Filing Date. Appendix II, Sterling 10 LLC Exhibit B.

### Sterling 15C LLC

338.     Upon information and belief, Defendant Sterling 15C LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

339.     The members of Sterling 15C LLC are Saul Katz, Richard Wilpon, Fred Wilpon, Michael Katz, the Estate of Leonard Schreier, Thomas Osterman, Jeffrey Wilpon, David Katz, Arthur Friedman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, and Robin and Philip Wachtler as joint tenants.

340.     Michael Katz and Richard Wilpon are the managing members of Sterling 15C LLC.

341.     Upon information and belief, the Sterling Partners owned, operated and controlled Sterling 15C LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Sterling 15C LLC's name.

342.     At all times relevant hereto, Defendant Sterling 15C LLC was a client of the IA Business.  Sterling 15C LLC opened its first account with BLMIS through Sterling in March of 1996.

343.     As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling 15C LLC totaling $17,731,193 in Fictitious Profits from the opening date of its Sterling

BLMIS Accounts to the Filing Date and $5,683,798 in principal during the six years prior to the Filing Date, totaling approximately $23,414,991. Appendix II, Sterling 15C LLC Exhibit B.

### Sterling 20 LLC

344. Upon information and belief, Defendant Sterling 20 LLC is a limited liability company formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

345. The members of Sterling 20 LLC include Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, Marvin Tepper, Elise C. Tepper, David Katz, the Fred Wilpon Family Trust, Daniel Wilpon, the Jessica Wilpon 2000 Trust, and the Scott Wilpon 2000 Trust, among others not named as defendants herein.

346. The managing members of Sterling 20 LLC are Fred Wilpon, Saul Katz, Richard Wilpon, and Michael Katz.

347. Upon information and belief, the Sterling Partners owned, operated and controlled Sterling 20 LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling 20 LLC's name.

348. At all times relevant hereto, Defendant Sterling 20 LLC was a client of the IA Business. Sterling 20 LLC opened its first account with BLMIS through Sterling in February of 2002.

349. As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling 20 LLC totaling $181,023 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date and $24,773,977 in principal during the six years prior to the Filing Date, totaling approximately $24,955,000. Appendix II, Sterling 20 LLC Exhibit B.

## Sterling American Advisors II LP

350. Upon information and belief, Defendant Sterling American Advisors II LP is a limited partnership formed under the laws of the state of Delaware. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

351. The partners of Sterling American Advisors II LP include Sterling Advisors II Corp., Sterling American Advisors II Corp., Sterling R. I. II LLC, Sterling Internal II LLC, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust, among others not listed as defendants herein.

352. Sterling Advisors II Corp. is a Delaware corporation whose shareholders are Fred Wilpon and Saul Katz.

353. Sterling American Advisors II Corp. is a Delaware corporation whose shareholders are Fred Wilpon and Saul Katz.

354. Sterling R.I. II LLC is a New York limited liability company whose members include Arthur Friedman, David Katz, Fred Wilpon, Jeffrey Wilpon, Thomas Osterman, Marvin Tepper, Michael Katz, Richard Wilpon, and Saul Katz, among others not listed as defendants herein.

355. Sterling Internal II LLC is a New York limited liability company whose members include Arthur Friedman, David Katz, Michael Katz, Saul Katz, Thomas Osterman, Leonard Schreier, Marvin Tepper, Fred Wilpon, Jeffrey Wilpon, and Richard Wilpon, among others not listed as defendants herein.

356. Upon information and belief, the Sterling Partners owned, operated and controlled Sterling American Advisors II LP and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling American Advisors II LP's name.

357. At all times relevant hereto, Defendant Sterling American Advisors II LP was a client of the IA Business. Sterling American Advisors II LP opened its first account with BLMIS through Sterling in September of 2006.

358. As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling American Advisors II LP totaling $177,415 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date and $1,300,000 in principal during the six years prior to the Filing Date, totaling approximately $1,477,415. Appendix II, Sterling American Advisors II LP Exhibit B.

## Sterling Brunswick Corporation

359. Upon information and belief, Defendant Sterling Brunswick Corporation is a corporation formed under the laws of the state of New Jersey. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

360. The shareholders of Sterling Brunswick Corporation are Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, David Katz, Arthur Friedman, Jeffrey Wilpon, Marvin Tepper, and Edward M. Tepper.

361. Richard Wilpon and Michael Katz are officers and/or directors of Sterling Brunswick Corporation.

362.    Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Brunswick Corporation and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Sterling Brunswick Corporation's name and in which Sterling Brunswick Corporation held an interest.

363.    At all times relevant hereto, Defendant Sterling Brunswick Corporation was a client of the IA Business.  Sterling Brunswick Corporation opened its first account with BLMIS through Sterling in March of 2000.

364.    As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Brunswick Corporation of a minimal amount in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date.   Appendix II, Sterling Brunswick Corporation Exhibit B.  In addition, Sterling Brunswick Corporation received avoidable and recoverable Subsequent Transfers of principal from a Sterling BLMIS Account held by another Sterling Defendant totaling $5,716,000 during the six years prior to the Filing Date.  Appendix II, Sterling Brunswick Corporation Exhibit C.

### Sterling Brunswick Seven LLC

365.    Upon information and belief, Defendant Sterling Brunswick Seven LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

366.    The sole member of Sterling Brunswick Seven LLC is Sterling Brunswick Corporation.

367.    Sterling Brunswick Corporation is a New Jersey corporation whose shareholders are Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Estate of Leonard Schreier, L.

Thomas Osterman, the Saul B. Katz Family Trust, David Katz, Arthur Friedman, Jeffrey Wilpon, Marvin Tepper, and Edward M. Tepper.

368.    The managers of Sterling Brunswick Seven LLC are Richard Wilpon and Michael Katz.

369.    Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Brunswick Seven LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling Brunswick Seven LLC's name.

370.    At all times relevant hereto, Defendant Sterling Brunswick Seven LLC was a client of the IA Business.  Sterling Brunswick Seven LLC opened its first account with BLMIS through Sterling in March of 2005.

371.    As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Sterling Brunswick Seven LLC totaling $5,716,000 during the six years prior to the Filing Date.  Appendix II, Sterling Brunswick Seven LLC Exhibit B.

**Sterling DIST Properties LLC**

372.    Upon information and belief, Defendant Sterling DIST Properties LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

373.    The members of Sterling DIST Properties LLC include Fred Wilpon, the Wilpon 2002 Descendants' Trust, Jeffrey Wilpon, Richard Wilpon, Saul Katz, the Saul B. Katz Family Trust, the Katz 2002 Descendants' Trust, David Katz, Gregory Katz, Arthur Friedman, Marvin Tepper, and Thomas Osterman, among others.

374. The managers of Sterling DIST Properties LLC are Michael Katz, Arthur Friedman, and Richard Wilpon.

375. Upon information and belief, the Sterling Partners owned, operated and controlled Sterling DIST Properties LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling DIST Properties LLC's name.

376. At all times relevant hereto, Defendant Sterling DIST Properties LLC was a client of the IA Business. Sterling DIST Properties LLC opened its first account with BLMIS through Sterling in June of 2008.

377. As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Sterling DIST Properties LLC totaling $736,139 during the six years prior to the Filing Date. Appendix II, Sterling DIST Properties LLC Exhibit B.

**Sterling Equities**

378. Upon information and belief, Defendant Sterling Equities is a general partnership formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

379. The current general partners of Sterling Equities are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, David Katz, Arthur Friedman, Gregory Katz, Thomas Osterman, and Jeffrey Wilpon. Marvin Tepper is a former Sterling Partner who maintains his partnership interests, though he has retired from Sterling Equities. The late Leonard Schreier was a Sterling Partner until 2001 and his partnership interests, upon information and belief, are held by his estate.

380. Upon information and belief, all of the above-listed Sterling Partners authorized, directed, and/or managed the Sterling BLMIS Account in Sterling Equities' name.

381. Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Equities and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling Equities' name. All Sterling Partner Defendants, Sterling Entity Defendants, and Katz/Wilpon Trust Defendants transact business through Sterling Equities.

382. At all times relevant hereto, Defendant Sterling Equities was a client of the IA Business. Sterling Equities opened its first account with BLMIS through Sterling in October of 1985.

383. As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Equities totaling $38,499 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date and $171,273 in principal during the six years prior to the Filing Date, totaling approximately $209,772. Appendix II, Sterling Equities Exhibit B.

### Sterling Equities Associates

384. Upon information and belief, Defendant Sterling Equities Associates is a general partnership formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

385. The general partners of Sterling Equities Associates are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, David Katz, Arthur Friedman, Marvin Tepper, Gregory Katz, Thomas Osterman, and Jeffrey Wilpon.

386. Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Equities Associates and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling Equities Associates' name.

387. At all times relevant hereto, Defendant Sterling Equities Associates was a client of the IA Business. Sterling Equities Associates opened its first account with BLMIS through Sterling in July of 2000.

388. As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Equities Associates totaling $800,000 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date and $14,400,000 in principal during the six years prior to the Filing Date, totaling approximately $15,200,000. Appendix II, Sterling Equities Associates Exhibit B.

## Sterling Equities Investors

389. Upon information and belief, Defendant Sterling Equities Investors is a general partnership formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

390. The general partners of Sterling Equities Investors are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Thomas Osterman, Jeffrey Wilpon, Arthur Friedman, David Katz, Marvin Tepper, and the Estate of Leonard Schreier.

391. Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Equities Investors and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Sterling Equities Investors' name.

392. At all times relevant hereto, Defendant Sterling Equities Investors was a client of the IA Business. Sterling Equities Investors opened its first account with BLMIS through Sterling in February of 1997.

393.    As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Equities Investors totaling $316,371 in Fictitious Profits from the opening dates of its Sterling BLMIS Accounts to the Filing Date.  Appendix II, Sterling Equities Investors Exhibit B.

## Sterling Heritage LLC

394.    Upon information and belief, Defendant Sterling Heritage LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

395.    The members of Sterling Heritage LLC are Fred Wilpon, Saul Katz, Richard A. Wilpon, Michael Katz, Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz, and Marvin Tepper.

396.    The managing members of Sterling Heritage LLC are Fred Wilpon, Richard Wilpon, Saul Katz, Michael Katz, and Arthur Friedman.

397.    Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Heritage LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Sterling Heritage LLC's name and in which Sterling Heritage LLC held an interest.

398.    At all times relevant hereto, Defendant Sterling Heritage LLC was a client of the IA Business.  Sterling Heritage LLC opened its first account with BLMIS through Sterling in May of 2000.

399.    As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Heritage LLC totaling $79,325 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date.  Appendix II, Sterling Heritage LLC Exhibit B.  In addition, Sterling Heritage LLC received avoidable and recoverable Subsequent Transfers from Sterling

BLMIS Accounts held by other Sterling Defendants totaling $358,780 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $10,343,000 in principal during the six years prior to the Filing Date, totaling approximately $10,701,780. Appendix II, Sterling Heritage LLC Exhibit C.

## Sterling Internal V LLC

400.     Upon information and belief, Defendant Sterling Internal V LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

401.     The members of Sterling Internal V LLC include Fred Wilpon, the Fred Wilpon Family Trust, the Wilpon 2002 Descendants' Trust, Jeffrey Wilpon, Richard Wilpon, Saul Katz, the Saul B. Katz Family Trust, the Katz 2002 Descendants' Trust, Michael Katz, Gregory Katz, Arthur Friedman, Marvin Tepper, and Thomas Osterman, among others not named as defendants herein.

402.     Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Internal V LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling Internal V LLC's name.

403.     At all times relevant hereto, Defendant Sterling Internal V LLC was a client of the IA Business.  Sterling Internal V LLC opened its first account with BLMIS through Sterling in July of 2006.

404.     As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Sterling Internal V LLC totaling $51,102,500 during the six years prior to the Filing Date.  Appendix II, Sterling Internal V LLC Exhibit B.

**Sterling Jet Ltd.**

405.     Upon information and belief, Defendant Sterling Jet Ltd. is a corporation formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

406.     Fred Wilpon is the sole shareholder of Sterling Jet Ltd.

407.     Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Jet Ltd. and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling Jet Ltd.'s name.

408.     At all times relevant hereto, Defendant Sterling Jet Ltd. was a client of the IA Business.  Sterling Jet Ltd. opened its first account with BLMIS through Sterling in May of 1999.

409.     As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Jet Ltd. totaling $316,058 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date.  Appendix II, Sterling Jet Ltd. Exhibit B.

**Sterling Jet II Ltd.**

410.     Upon information and belief, Defendant Sterling Jet II Ltd. is a corporation formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

411.     Saul Katz and Marvin Tepper are the shareholders of Sterling Jet II Ltd.

412.     Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Jet II Ltd. and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling Jet II Ltd.'s name.

413.	At all times relevant hereto, Defendant Sterling Jet Ltd. II was a client of the IA Business.  Sterling Jet II Ltd. opened its first account with BLMIS through Sterling in May of 1999.

414.	As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Jet II Ltd. totaling $144,007 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date.  Appendix II, Sterling Jet II Ltd. Exhibit B.

## Sterling PathoGenesis Company

415.	Upon information and belief, Defendant Sterling PathoGenesis Company ("Sterling PathoGenesis") is a general partnership formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Great Neck, NY 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

416.	The general partners of Sterling PathoGenesis are Arthur Friedman, David Katz, Michael Katz, Saul Katz, Thomas Osterman, Leonard Schreier, Marvin Tepper, Fred Wilpon, Richard Wilpon, Jeffrey Wilpon, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust.

417.	Upon information and belief, the Sterling Partners owned, operated and controlled Sterling PathoGenesis and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling PathoGenesis' name.

418.	At all times relevant hereto, Defendant Sterling PathoGenesis was a client of the IA Business.  Sterling PathoGenesis opened its first account with BLMIS through Sterling in November of 1996.

419.     As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling PathoGenesis totaling $19,037,261 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date.  Appendix II, Sterling PathoGenesis Exhibit B.

**Sterling Third Associates**

420.     Upon information and belief, Defendant Sterling Third Associates is a general partnership formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

421.     The general partners of Sterling Third Associates are Richard Wilpon, Michael Katz, Thomas Osterman, the Estate of Leonard Schreier, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, and Valley Harbor Associates.

422.     Valley Harbor Associates is a New York general partnership whose general partners are Fred Wilpon, Saul Katz, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust.

423.     Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Third Associates and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling Third Associates' name.

424.     At all times relevant hereto, Defendant Sterling Third Associates was a client of the IA Business.  Sterling Third Associates opened its first account with BLMIS through Sterling in May of 1986.

425.     As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Third Associates totaling $6,868,419 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date.  Appendix II, Sterling Third Associates Exhibit B.

### Sterling Thirty Venture LLC

426.     Upon information and belief, Defendant Sterling Thirty Venture LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road Suite 408, Great Neck, New York 11021.

427.     The managing members of Sterling Thirty Venture LLC are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Arthur Friedman, and David Katz.

428.     The members of Sterling Thirty Venture LLC are Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Arthur Friedman, David Katz, the Estate of Leonard Schreier, Thomas Osterman, Jeffrey Wilpon, Valerie Wilpon, Marvin Tepper, Gregory Katz, Todd Katz, Howard Katz, Dayle Katz, and Red Valley Partners.  Elise C. Tepper is a former member of Sterling Thirty Venture LLC.

429.     Red Valley Partners is a New York general partnership whose partners are David Katz, Heather Katz Knopf, and Natalie Katz O'Brien.

430.     Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Thirty Venture LLC and authorized, directed, controlled, and administered the Sterling BLMIS Accounts in Sterling Thirty Venture LLC's name.

431.     At all times relevant hereto, Defendant Sterling Thirty Venture LLC was a client of the IA Business.  Sterling Thirty Venture LLC opened its first account with BLMIS through Sterling in November of 2000.

432.     As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Thirty Venture LLC totaling $3,559,601 in Fictitious Profits from the opening dates of its Sterling BLMIS Accounts to the Filing Date and $47,396,706 in principal during the six years

prior to the Filing Date, totaling approximately $50,956,307. Appendix II, Sterling Thirty Venture LLC Exhibit B.

## Sterling Tracing LLC

433.     Upon information and belief, Defendant Sterling Tracing LLC is a limited liability company formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

434.     The members of Sterling Tracing LLC are Michael Katz, Richard Wilpon, Gregory Katz, Scott Wilpon, Jeffrey Wilpon, Thomas Osterman, Arthur Friedman, Ruth Friedman, and Arthur and Ruth Friedman as joint tenants.

435.     Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Tracing LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling Tracing LLC's name.

436.     At all times relevant hereto, Defendant Sterling Tracing LLC was a client of the IA Business. Sterling Tracing LLC opened its first account with BLMIS through Sterling in April of 2007.

437.     As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Sterling Tracing LLC totaling $4,095,000 during the six years prior to the Filing Date. Appendix II, Sterling Tracing LLC Exhibit B.

## Sterling Twenty Five LLC

438.     Upon information and belief, Defendant Sterling Twenty Five LLC is a limited liability company formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its

registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

439.     The members of Sterling Twenty Five LLC include FFB Aviation LLC, Michael Katz, Howard Katz, Arthur and Ruth Friedman as joint tenants, the Dayle H. and Michael Katz Foundation, the Katz 2002 Descendants' Trust, the Wilpon 2002 Descendants' Trust, Dayle Katz, the Thomas Osterman 1999 Trust, the Thomas Osterman Family 2006 Guarantor Trust, Richard Wilpon, Marvin Tepper, Robin and Philip Wachtler as joint tenants, Gregory and Amy Beth Katz as joint tenants, Todd Katz, the Jessica Wilpon 2000 Trust, the Scott Wilpon 2000 Trust, and Daniel Wilpon, among others not named as defendants herein.

440.     FFB Aviation LLC is a New York limited liability company whose members include Saul Katz and Michael Katz, among others not named as defendants herein.

441.     Upon information and belief, the Sterling Partners owned, operated and controlled Sterling Twenty Five LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling Twenty Five LLC's name.

442.     At all times relevant hereto, Defendant Sterling Twenty Five LLC was a client of the IA Business.  Sterling Twenty Five LLC opened its first account with BLMIS through Sterling in January of 2007.

443.     As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Sterling Twenty Five LLC totaling $7,762,450 during the six years prior to the Filing Date.  Appendix II, Sterling Twenty Five LLC Exhibit B.

## Sterling VC IV LLC

444.     Upon information and belief, Defendant Sterling VC IV LLC is a limited liability company formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent

for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

445. The members of Sterling VC IV LLC include Fred Wilpon, the Fred Wilpon Family Trust, Jeffrey Wilpon, Richard Wilpon, Saul Katz, the Saul B. Katz Family Trust, the Katz 2002 Descendants' Trust, David Katz, Michael Katz, Gregory Katz, Natalie Katz O'Brien, Heather Katz Knopf, the Iris & Saul B. Katz Family Foundation, Arthur Friedman, Marvin Tepper, and Thomas Osterman, among others not named as defendants herein.

446. Upon information and belief, the Sterling Partners owned, operated and controlled Sterling VC IV LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling VC IV LLC's name.

447. At all times relevant hereto, Defendant Sterling VC IV LLC was a client of the IA Business. Sterling VC IV LLC opened its first account with BLMIS through Sterling in June of 2008.

448. As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Sterling VC IV LLC totaling $825,000 during the six years prior to the Filing Date. Appendix II, Sterling VC IV LLC Exhibit B.

### Sterling VC V LLC

449. Upon information and belief, Defendant Sterling VC V LLC is a limited liability company formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

450. The members of Sterling VC V LLC include Fred Wilpon, the Fred Wilpon Family Trust, the Wilpon 2002 Descendants' Trust, Jeffrey Wilpon, Richard Wilpon, Scott

Wilpon, Saul Katz, the Saul B. Katz Family Trust, the Katz 2002 Descendants' Trust, David Katz, Michael Katz, Gregory Katz, Arthur Friedman, Marvin Tepper, and Thomas Osterman, among others not named as defendants herein.

451.　The managers of Sterling VC V LLC are Michael Katz, Arthur Friedman, and Richard Wilpon.

452.　Upon information and belief, the Sterling Partners owned, operated and controlled Sterling VC V LLC and authorized, directed, controlled, and administered the Sterling BLMIS Account in Sterling VC V LLC's name.

453.　At all times relevant hereto, Defendant Sterling VC V LLC was a client of the IA Business.　Sterling VC V LLC opened its first account with BLMIS through Sterling in June of 2008.

454.　As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Sterling VC V LLC totaling $633,556 during the six years prior to the Filing Date. Appendix II, Sterling VC V LLC Exhibit B.

### Valley Harbor Associates

455.　Upon information and belief, Defendant Valley Harbor Associates is a general partnership formed under the laws of the state of New York.　Upon information and belief, its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.　Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

456.　The general partners of Valley Harbor Associates are Fred Wilpon, Saul Katz, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust.

457.     Upon information and belief, the Sterling Partners owned, operated and controlled Valley Harbor Associates and authorized, directed, controlled, and administered the Sterling BLMIS Account in which Valley Harbor Associates held an interest.

458.     Defendant Valley Harbor Associates received transfers from one or more Sterling BLMIS Accounts as early as May of 1986.

459.     As set forth more fully in Section XII below, BLMIS made transfers directly to Valley Harbor Associates totaling $6,868,419 in Fictitious Profits from the opening date of its Sterling BLMIS Account to the Filing Date.  Appendix II, Valley Harbor Associates Exhibit B.

D.     **Katz/Wilpon Trust Defendants**

**<u>Saul B. Katz Family Trust</u>**

460.     Upon information and belief, the Saul B. Katz Family Trust is a trust formed under the laws of the state of New York.  The settlor of the Saul B. Katz Family Trust is Saul Katz and the trustees of the Saul B. Katz Family Trust are Michael Katz, Richard Wilpon, Iris Katz, David Katz, Natalie Katz O'Brien and Heather Katz Knopf.  The former trustee of the Saul B. Katz Family Trust is Fred Wilpon.  The Saul B. Katz Family Trust, trustees and former trustee are collectively referred to herein as the "Saul B. Katz Family Trust."  Upon information and belief, the beneficiaries of the Saul B. Katz Family Trust are David Katz, Natalie Katz O'Brien and Heather Katz Knopf.

461.     At all times relevant hereto, the Saul B. Katz Family Trust was a client of the IA Business.  The Saul B. Katz Family Trust opened its first account with BLMIS through Sterling in December of 1986.

462.     The Saul B. Katz Family Trust held an interest in approximately thirty-five (35) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.

463.     As set forth more fully in Section XII below, BLMIS made transfers directly to the Saul B. Katz Family Trust totaling $6,484,806 in Fictitious Profits from the opening dates of its Sterling BLMIS Accounts to the Filing Date and $19,117,079 in principal during the six years prior to the Filing Date, totaling approximately $25,601,884.  Appendix II, Saul B. Katz Family Trust Exhibit B.  In addition, the Saul B. Katz Family Trust received avoidable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $23,623,899 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $84,650,760 in principal during the six years prior to the Filing Date, totaling approximately $108,274,659.  Appendix II, Saul B. Katz Family Trust Exhibit C.

### Fred Wilpon Family Trust

464.     Upon information and belief, the Fred Wilpon Family Trust is a trust formed under the laws of the state of New York.  The settlor of the Fred Wilpon Family Trust is Fred Wilpon and the trustees of the Fred Wilpon Family Trust are Judith Wilpon, Debra Wilpon and Richard Wilpon.  The former trustees of the Fred Wilpon Family Trust are Saul Katz, Michael Katz, and Marvin Tepper.  The Fred Wilpon Family Trust, trustees, and former trustees are collectively referred to herein as the "Fred Wilpon Family Trust."  Upon information and belief, the beneficiaries of the Fred Wilpon Family Trust are Jeffrey Wilpon, Bruce N. Wilpon, MINOR 1, MINOR 2, Robin Wilpon Wachtler, and Kimberly Wilpon Wachtler.

465.     At all times relevant hereto, the Fred Wilpon Family Trust was a client of the IA Business.  The Fred Wilpon Family Trust opened its first account with BLMIS through Sterling in December of 1986.

466.     The Fred Wilpon Family Trust held approximately thirty-seven (37) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.

467.    As set forth more fully in Section XII below, BLMIS made transfers directly to the Fred Wilpon Family Trust totaling $7,947,258 in Fictitious Profits from the opening dates of its Sterling BLMIS Accounts to the Filing Date and $29,274,240 in principal during the six years prior to the Filing Date, totaling approximately $37,221,498.  Appendix II, Fred Wilpon Family Trust Exhibit B.  In addition, the Fred Wilpon Family Trust received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $22,339,808 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $86,170,395 in principal during the six years prior to the Filing Date, totaling approximately $108,510,203.  Appendix II, Fred Wilpon Family Trust Exhibit C.

### Katz 2002 Descendants' Trust

468.    Upon information and belief, Defendant Katz 2002 Descendants' Trust is a trust formed under the laws of the state of New York.  The settlor of the Katz 2002 Descendants' Trust is Michael Katz and the trustees of the Katz 2002 Descendants' Trust are Saul Katz and Dayle Katz.  The Katz 2002 Descendants' Trust and trustees are collectively referred to herein as the "Katz 2002 Descendants' Trust."  Upon information and belief, the beneficiaries of the Katz 2002 Descendants' Trust are Dayle Katz, Gregory Katz, Howard Katz and Todd Katz.

469.    At all times relevant hereto, the Katz 2002 Descendants' Trust was a client of the IA Business.  The Katz 2002 Descendants' Trust opened its first account with BLMIS through Sterling in August of 2003.

470.    The Katz 2002 Descendants' Trust held approximately seventeen (17) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder and as a partner, member, and/or shareholder in various Sterling entities.

471.    As set forth more fully in Section XII below, BLMIS made transfers directly to the Katz 2002 Descendants' Trust totaling $396,003 in Fictitious Profits from the opening dates

of its Sterling BLMIS Accounts to the Filing Date and $2,393,648 in principal during the six

years prior to the Filing Date, totaling approximately $2,789,652. Appendix II, Katz 2002

Descendants' Trust Exhibit B. In addition, the Katz 2002 Descendants' Trust received avoidable

and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling

Defendants totaling $1,894,747 in Fictitious Profits from the opening dates of such Sterling

BLMIS Accounts to the Filing Date and $17,056,931 in principal during the six years prior to the

Filing Date, totaling approximately $18,951,678. Appendix II, Katz 2002 Descendants' Trust

Exhibit C.

## Wilpon 2002 Descendants' Trust

472.     Upon information and belief, Defendant Wilpon 2002 Descendants' Trust is a

trust formed under the laws of the state of New York. The settlor of the Wilpon 2002

Descendants' Trust is Richard Wilpon and the trustees of the Wilpon 2002 Descendants' Trust

are Fred Wilpon and Debra Wilpon. The Wilpon 2002 Descendants' Trust and trustees are

collectively referred to herein as the "Wilpon 2002 Descendants' Trust." Upon information and

belief, the beneficiaries of the Wilpon 2002 Descendants' Trust are Jessica Wilpon, Daniel

Wilpon, and Scott Wilpon.

473.     At all times relevant hereto, the Wilpon 2002 Descendants' Trust was a client of

the IA Business. The Wilpon 2002 Descendants' Trust opened its first account with BLMIS

through Sterling in January of 2007.

474.     The Wilpon 2002 Descendants' Trust held approximately sixteen (16) Sterling

BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a

partner, member, and/or shareholder in various Sterling entities.

475.     As set forth more fully in Section XII below, BLMIS made transfers directly to

the Wilpon 2002 Descendants' Trust totaling $528,446 in Fictitious Profits from the opening

dates of its Sterling BLMIS Accounts to the Filing Date and $2,025,303 in principal during the six years prior to the Filing Date, totaling approximately $2,553,749. Appendix II, Wilpon 2002 Descendants' Trust Exhibit B. In addition, the Wilpon 2002 Descendants' Trust received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $2,528,442 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $20,374,004 in principal during the six years prior to the Filing Date, totaling approximately $22,902,446. Appendix II, Wilpon 2002 Descendants' Trust Exhibit C.

### E. Sterling Family Member Defendants

### Iris Katz

476. Upon information and belief, Defendant Iris Katz maintains her residence in Glen Cove, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

477. Defendant Iris Katz is the wife of Sterling Partner Saul Katz.

478. At all times relevant hereto, Defendant Iris Katz was a client of the IA Business. Iris Katz opened her first account with BLMIS through Sterling in December of 1986.

479. Iris Katz held an interest in approximately six (6) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder and as trustee and/or director of various trusts and/or foundations related to Sterling.

480. Iris Katz is named as a Defendant in this action in her individual capacity, and as trustee of the Saul B. Katz Family Trust.

481. As set forth more fully in Section XII below, BLMIS made transfers directly to Iris Katz totaling $34,997,051 in Fictitious Profits from the opening dates of her Sterling BLMIS

Accounts to the Filing Date and $2,198,313 in principal during the six years prior to the Filing Date, totaling approximately $37,195,364. Appendix II, Iris Katz Exhibit B.

## Judith Wilpon

482. Upon information and belief, Defendant Judith Wilpon maintains her residence in Locust Valley, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

483. Defendant Judith Wilpon is the wife of Sterling Partner Fred Wilpon.

484. At all times relevant hereto, Defendant Judith Wilpon was a client of the IA Business. Judith Wilpon opened her first account with BLMIS through Sterling in December of 1986.

485. Judith Wilpon held an interest in approximately six (6) Sterling BLMIS Accounts in different capacities, including as a direct interest-holder, as trustee and/or director of various trusts and/or foundations, and as tenant-in-common.

486. Judith Wilpon is named as a Defendant in this action in her individual capacity, as trustee of the Fred Wilpon Family Trust, and as tenant-in-common in the accounts identified in Section XII below.

487. As set forth more fully in Section XII below, BLMIS made transfers directly to Judith Wilpon totaling $24,679,509 in Fictitious Profits from the opening dates of her Sterling BLMIS Accounts to the Filing Date and $4,796,698 in principal during the six years prior to the Filing Date, totaling approximately $29,476,207. Appendix II, Judith Wilpon Exhibit B.

## Dayle Katz

488. Upon information and belief, Defendant Dayle Katz maintains her residence in Old Westbury, New York and, for purposes of the Sterling BLMIS Accounts at issue, received

correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

489. Defendant Dayle Katz is the wife of Sterling Partner Michael Katz.

490. At all times relevant hereto, Defendant Dayle Katz was a client of the IA Business. Dayle Katz opened her first account with BLMIS through Sterling in December of 1986.

491. Dayle Katz held an interest in approximately twenty-two (22) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.

492. Dayle Katz is named as a Defendant in this action in her individual capacity, as trustee of the Katz 2002 Descendants' Trust, as beneficiary of the Katz 2002 Descendants' Trust, and as joint tenant in the accounts identified in Section XII below.

493. As set forth more fully in Section XII below, BLMIS made transfers directly to Dayle Katz totaling $553,483 in Fictitious Profits from the opening dates of her Sterling BLMIS Accounts to the Filing Date and $3,645,267 in principal during the six years prior to the Filing Date, totaling approximately $4,198,750. Appendix II, Dayle Katz Exhibit B. In addition, Dayle Katz received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $2,011,040 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $21,798,502 in principal during the six years prior to the Filing Date, totaling approximately $23,809,542. Appendix II, Dayle Katz Exhibit C.

### **Debra Wilpon**

494. Upon information and belief, Defendant Debra Wilpon maintains her residence in Port Washington, New York and, for purposes of the Sterling BLMIS Accounts at issue,

received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

495.    Defendant Debra Wilpon is the wife of Sterling Partner Richard Wilpon.

496.    At all times relevant hereto, Defendant Debra Wilpon was a client of the IA Business.  Debra Wilpon opened her first account with BLMIS through Sterling in December of 1986.

497.    Debra Wilpon held an interest in approximately three (3) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder and as trustee of various Sterling-related trusts.

498.    Debra Wilpon is named as a Defendant in this action in her individual capacity, as trustee of the Fred Wilpon Family Trust and the Wilpon 2002 Descendants' Trust, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

499.    As set forth more fully in Section XII below, BLMIS made transfers directly to Debra Wilpon totaling $2,020,180 in Fictitious Profits from the opening dates of her Sterling BLMIS Accounts to the Filing Date and $12,739,443 in principal during the six years prior to the Filing Date, totaling approximately $14,759,623.  Appendix II, Debra Wilpon Exhibit B.

**Valerie Wilpon**

500.    Upon information and belief, Defendant Valerie Wilpon maintains her residence in Greenwich, Connecticut and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

501.    Defendant Valerie Wilpon is the wife of Sterling Partner Jeffrey Wilpon.

502.     At all times relevant hereto, Defendant Valerie Wilpon was a client of the IA Business.  Valerie Wilpon opened her first account with BLMIS through Sterling in March of 1990.

503.     Valerie Wilpon held an interest in approximately four (4) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, as a director of a Sterling-related foundation, and as a member in a Sterling entity.

504.     Valerie Wilpon is named as a Defendant in this action in her individual capacity and as joint tenant in the accounts identified in Section XII below.

505.     As set forth more fully in Section XII below, BLMIS made transfers of principal directly to Valerie Wilpon totaling $8,182,163 during the six years prior to the Filing Date.  Appendix II, Valerie Wilpon Exhibit B.  In addition, Valerie Wilpon received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $117,111 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $1,559,352 in principal during the six years prior to the Filing Date, totaling approximately $1,676,463.  Appendix II, Valerie Wilpon Exhibit C.

**Amy Beth Katz**

506.     Upon information and belief, Defendant Amy Beth Katz maintains her residence in Syosset, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

507.     Defendant Amy Beth Katz is the wife of Sterling Partner Gregory Katz.

508.     At all times relevant hereto, Defendant Amy Beth Katz was a client of the IA Business.  Amy Beth Katz opened her first account with BLMIS through Sterling in October of 2001.

509. Amy Beth Katz held an interest in approximately four (4) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder and as a member in various Sterling entities.

510. Amy Beth Katz is named as a Defendant in this action in her individual capacity, and as joint tenant in the accounts identified in Section XII below.

511. As set forth more fully in Section XII below, BLMIS made transfers directly to Amy Beth Katz totaling $40,460 in Fictitious Profits from the opening dates of her Sterling BLMIS Accounts to the Filing Date and $874,544 in principal during the six years prior to the Filing Date, totaling approximately $915,005. Appendix II, Amy Beth Katz Exhibit B. In addition, Amy Beth Katz received avoidable and recoverable Subsequent Transfers of principal from Sterling BLMIS Accounts held by other Sterling Defendants totaling $357,136 during the six years prior to the Filing Date. Appendix II, Amy Beth Katz Exhibit C.

### Heather Katz Knopf

512. Upon information and belief, Defendant Heather Katz Knopf maintains her residence in Glen Cove, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

513. Defendant Heather Katz Knopf is the daughter of Sterling Partner Saul Katz.

514. At all times relevant hereto, Defendant Heather Katz Knopf was a client of the IA Business. Heather Katz Knopf opened her first account with BLMIS, or such account was opened on her behalf, through Sterling in March of 1989.

515. Heather Katz Knopf held an interest in approximately forty-four (44) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, trustee, director

and/or beneficiary of various Sterling-related trusts and/or foundations, and as a partner, member, and/or shareholder in various Sterling entities.

516.     Heather Katz Knopf is named as a Defendant in this action in her individual capacity, as trustee of the Saul B. Katz Family Trust, as beneficiary of the Saul B. Katz Family Trust, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

517.     As set forth more fully in Section XII below, BLMIS made transfers directly to Heather Katz Knopf totaling $117,977 in Fictitious Profits from the opening dates of her Sterling BLMIS Accounts to the Filing Date and $104,500 in principal during the six years prior to the Filing Date, totaling approximately $222,477.  Appendix II, Heather Katz Knopf Exhibit B.  In addition, Heather Katz Knopf received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $33,107,927 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $120,498,256 in principal during the six years prior to the Filing Date, totaling approximately $153,606,184.  Appendix II, Heather Katz Knopf Exhibit C.

### Howard Katz

518.     Upon information and belief, Defendant Howard Katz maintains his residence in New York, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

519.     Defendant Howard Katz is the son of Sterling Partner Michael Katz.

520.     At all times relevant hereto, Defendant Howard Katz was a client of the IA Business.  Howard Katz opened his first account with BLMIS through Sterling in March of 1991.

521.     At all times relevant hereto, Defendant Howard Katz was a client of the IA Business.  Howard Katz opened his first account with BLMIS, or such account was opened on his behalf, through Sterling in March of 1991.

522.     Howard Katz held an interest in approximately twenty-three (23) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder and as a member in various Sterling entities.

523.     Howard Katz is named as a Defendant in this action in his individual capacity, as beneficiary of the Katz 2002 Descendants' Trust, and as tenant-in-common in the accounts identified in Section XII below.

524.     As set forth more fully in Section XII below, BLMIS made transfers directly to Howard Katz totaling $7,589 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $180,000 in principal during the six years prior to the Filing Date, totaling approximately $187,589.  Appendix II, Howard Katz Exhibit B.  In addition, Howard Katz received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $1,907,525 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $19,918,881 in principal during the six years prior to the Filing Date, totaling approximately $21,826,406.  Appendix II, Howard Katz Exhibit C.

### Natalie Katz O'Brien

525.     Upon information and belief, Defendant Natalie Katz O'Brien maintains her residence in Glen Cove, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

526.     Defendant Natalie Katz O'Brien is the daughter of Sterling Partner Saul Katz.

527.     At all times relevant hereto, Defendant Natalie Katz O'Brien was a client of the IA Business.  Natalie Katz O'Brien opened her first account with BLMIS, or such account was opened on her behalf, through Sterling in January 1989.

528.     Natalie Katz O'Brien held an interest in approximately forty-six (46) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, as a director and/or beneficiary of various Sterling-related trusts and/or foundations, and as a partner, member, and/or shareholder in various Sterling entities.

529.     Natalie Katz O'Brien is named as a Defendant in this action in her individual capacity, as trustee of the Saul B. Katz Family Trust, as beneficiary of the Saul B. Katz Family Trust, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

530.     As set forth more fully in Section XII below, BLMIS made transfers directly to Natalie Katz O'Brien totaling $98,827 in Fictitious Profits from the opening dates of her Sterling BLMIS Accounts to the Filing Date and $288,000 in principal during the six years prior to the Filing Date, totaling approximately $386,827.  Appendix II, Natalie Katz O'Brien Exhibit B.  In addition, Natalie Katz O'Brien received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $28,745,384 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $103,070,726 in principal during the six years prior to the Filing Date, totaling approximately $131,816,109.  Appendix II, Natalie Katz O'Brien Exhibit C.

**Todd Katz**

531.     Upon information and belief, Defendant Todd Katz maintains his residence in Old Westbury, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

532.    Defendant Todd Katz is the son of Sterling Partner Michael Katz.

533.    At all times relevant hereto, Defendant Todd Katz was a client of the IA Business. Todd Katz opened his first account with BLMIS, or such account was opened on his behalf, through Sterling in March 1991.

534.    Todd Katz held an interest in approximately twenty-three (23) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder and as a partner, member, and/or shareholder in various Sterling entities.

535.    Todd Katz is named as a Defendant in this action in his individual capacity, as beneficiary of the Katz 2002 Descendants' Trust, and as tenant-in-common in the accounts identified in Section XII below.

536.    As set forth more fully in Section XII below, BLMIS made transfers directly to Todd Katz of a minimal amount in Fictitious Profits from the opening date of his Sterling BLMIS Account to the Filing Date.  Appendix II, Todd Katz Exhibit B.  In addition, Todd Katz received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $1,913,327 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $20,173,591 in principal during the six years prior to the Filing Date, totaling approximately $22,086,917.  Appendix II, Todd Katz Exhibit C.

### Bruce N. Wilpon

537.    Upon information and belief, Defendant Bruce N. Wilpon maintains his residence in New York, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

538.    Defendant Bruce N. Wilpon is the son of Sterling Partner Fred Wilpon.

539.     At all times relevant hereto, Defendant Bruce N. Wilpon was a client of the IA Business.  Bruce N. Wilpon opened his first account with BLMIS, or such account was opened on his behalf, through Sterling in February of 1994.

540.     Bruce N. Wilpon held an interest in approximately thirty-seven (37) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder.

541.     Bruce N. Wilpon is named as a Defendant in this action in his individual capacity, as beneficiary of the Fred Wilpon Family Trust, and as tenant-in-common in the accounts identified in Section XII below.

542.     As set forth more fully in Section XII below, BLMIS made transfers directly to Bruce N. Wilpon totaling $349,880 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date.  Appendix II, Bruce N. Wilpon Exhibit B.  In addition, Bruce N. Wilpon received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $27,442,966 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $114,909,334 in principal during the six years prior to the Filing Date, totaling approximately $142,352,300. Appendix II, Bruce N. Wilpon Exhibit C.

### Daniel Wilpon

543.     Upon information and belief, Defendant Daniel Wilpon maintains his residence in New York, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

544.     Defendant Daniel Wilpon is the son of Sterling Partner Richard Wilpon.

545.     At all times relevant hereto, Defendant Daniel Wilpon was a client of the IA Business.  Daniel Wilpon opened his first account with BLMIS, or such account was opened on his behalf, through Sterling in December 1994.

546.     Daniel Wilpon held an interest in approximately eighteen (18) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.

547.     Daniel Wilpon is named as a Defendant in this action in his individual capacity, and as beneficiary of the Wilpon 2002 Descendants' Trust.

548.     As set forth more fully in Section XII below, Daniel Wilpon received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $2,530,194 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $23,396,254 in principal during the six years prior to the Filing Date, totaling approximately $25,926,448.  Appendix II, Daniel Wilpon Exhibit C.

### Jessica Wilpon

549.     Upon information and belief, Defendant Jessica Wilpon maintains her residence in New York, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

550.     Defendant Jessica Wilpon is the daughter of Sterling Partner Richard Wilpon.

551.     At all times relevant hereto, Defendant Jessica Wilpon was a client of the IA Business.  Jessica Wilpon opened her first account with BLMIS, or such account was opened on her behalf, through Sterling in December of 1994.

552.     Jessica Wilpon held an interest in approximately sixteen (16) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.

553.     Jessica Wilpon is named as a Defendant in this action in her individual capacity, and as beneficiary of the Wilpon 2002 Descendants' Trust.

554.     As set forth more fully in Section XII below, Jessica Wilpon received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $2,528,442 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $21,892,973 in principal during the six years prior to the Filing Date, totaling approximately $24,421,415.  Appendix II, Jessica Wilpon Exhibit C.

### Robin Wilpon Wachtler

555.     Upon information and belief, Defendant Robin Wilpon Wachtler maintains her residence in Oyster Bay, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

556.     Defendant Robin Wilpon Wachtler is the daughter of Sterling Partner Fred Wilpon.

557.     At all times relevant hereto, Defendant Robin Wilpon Wachtler was a client of the IA Business.  Robin Wilpon Wachtler opened her first account with BLMIS, or such account was opened on her behalf, through Sterling in July of 1988.

558.     Robin Wilpon Wachtler held an interest in approximately forty-three (43) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.

559.     Robin Wilpon Wachtler is named as a Defendant in this action in her individual capacity, as beneficiary of the Fred Wilpon Family Trust, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

560.     As set forth more fully in Section XII below, BLMIS made transfers directly to Robin Wilpon Wachtler totaling $729,120 in Fictitious Profits from the opening dates of her Sterling BLMIS Accounts to the Filing Date and $2,367,500 in principal during the six years prior to the Filing Date, totaling approximately $3,096,620.  Appendix II, Robin Wilpon Wachtler Exhibit B.  In addition, Robin Wilpon Wachtler received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $27,913,548 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $113,932,794 in principal during the six years prior to the Filing Date, totaling approximately $141,846,342.  Appendix II, Robin Wilpon Wachtler Exhibit C.

### Philip Wachtler

561.     Upon information and belief, Defendant Philip Wachtler maintains his residence in Oyster Bay, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

562.     Defendant Philip Wachtler is the husband of Robin Wilpon Wachtler, daughter of Sterling Partner Fred Wilpon.

563.     At all times relevant hereto, Defendant Philip Wachtler was a client of the IA Business.  Philip Wachtler opened his first account with BLMIS through Sterling in July of 1988.

564.    Philip Wachtler held an interest in approximately twelve (12) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder and as partner, member, and/or shareholder in various Sterling entities.

565.    Philip Wachtler is named as a Defendant in this action in his individual capacity, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

566.    As set forth more fully in Section XII below, BLMIS made transfers directly to Philip Wachtler totaling $351,137 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $2,367,500 in principal during the six years prior to the Filing Date, totaling approximately $2,718,637.  Appendix II, Philip Wachtler Exhibit B.  In addition, Philip Wachtler received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $545,062 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $1,289,780 in principal during the six years prior to the Filing Date, totaling approximately $1,834,842. Appendix II, Philip Wachtler Exhibit C.

**Kimberly Wachtler**

567.    Upon information and belief, Defendant Kimberly Wachtler maintains her residence in Oyster Bay, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

568.    Defendant Kimberly Wachtler is the daughter of Robin Wilpon Wachtler, and the granddaughter of Sterling Partner Fred Wilpon.

569.    Kimberly Wachtler held an interest in approximately thirty-five (35) Sterling BLMIS Accounts in her capacity as beneficiary of the Fred Wilpon Family Trust.

570.    Kimberly Wachtler is named as a Defendant in this action in her individual capacity, and as beneficiary of the Fred Wilpon Family Trust.

571.    As set forth more fully in Section XII below, Kimberly Wachtler received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $27,368,486 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $112,643,014 in principal during the six years prior to the Filing Date, totaling approximately $140,011,500. Appendix II, Kimberly Wachtler Exhibit C.

### Scott Wilpon

572.    Upon information and belief, Defendant Scott Wilpon maintains his residence in New York, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

573.    Defendant Scott Wilpon is the son of Sterling Partner Richard Wilpon.

574.    At all times relevant hereto, Defendant Scott Wilpon was a client of the IA Business. Scott Wilpon opened his first account with BLMIS, or such account was opened on his behalf, through Sterling in November of 1992.

575.    Scott Wilpon held an interest in approximately seventeen (17) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, as beneficiary of the Wilpon 2002 Descendants' Trust, and as a partner, member, and/or shareholder in various Sterling entities.

576.    Scott Wilpon is named as a Defendant in this action in his individual capacity, and as beneficiary of the Wilpon 2002 Descendants' Trust.

577.     As set forth more fully in Section XII below, Scott Wilpon received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $2,530,805 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $22,201,046 in principal during the six years prior to the Filing Date, totaling approximately $24,731,852.  Appendix II, Scott Wilpon Exhibit C.

## MINOR 1

578.     Upon information and belief, Defendant MINOR 1 is a minor who maintains her residence at her parents' address in Greenwich, Connecticut and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

579.     Defendant MINOR 1 is the daughter of Sterling Partner Jeffrey Wilpon.

580.     At all times relevant hereto, Defendant MINOR 1 was a client of the IA Business. MINOR 1 opened her first account with BLMIS, or such account was opened on her behalf, through Sterling in May of 1997.

581.     MINOR 1 held an interest in approximately thirty-six (36) Sterling BLMIS Accounts in her capacity as beneficiary of the Fred Wilpon Family Trust.

582.     MINOR 1 is named as a Defendant in this action as beneficiary of the Fred Wilpon Family Trust.

583.     As set forth more fully in Section XII below, MINOR 1 received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $27,510,896 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $114,249,900 in principal during the six years prior to the Filing Date, totaling approximately $141,760,796.  Appendix II, MINOR 1 Exhibit C.

## MINOR 2

584.     Upon information and belief, Defendant MINOR 2 is a minor who maintains his residence at his parents' address in Greenwich, Connecticut and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

585.     Defendant MINOR 2 is the son of Sterling Partner Jeffrey Wilpon.

586.     At all times relevant hereto, Defendant MINOR 2 was a client of the IA Business. MINOR 2 opened his first account with BLMIS, or such account was opened on his behalf, through Sterling in September of 1995.

587.     MINOR 2 held an interest in approximately thirty-six (36) Sterling BLMIS Accounts in his capacity as beneficiary of the Fred Wilpon Family Trust.

588.     MINOR 2 is named as a Defendant in this action as beneficiary of the Fred Wilpon Family Trust.

589.     As set forth more fully in Section XII below, MINOR 2 received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $27,510,896 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $114,249,900 in principal during the six years prior to the Filing Date, totaling approximately $141,760,796.  Appendix II, MINOR 2 Exhibit C.

### Ruth Friedman

590.     Upon information and belief, Defendant Ruth Friedman maintains her residence in Glen Cove, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

591.     Defendant Ruth Friedman is the wife of Sterling Partner Arthur Friedman.

592.     At all times relevant hereto, Defendant Ruth Friedman was a client of the IA Business.  Ruth Friedman opened her first account with BLMIS through Sterling in May of 1991.

593.     Ruth Friedman held an interest in approximately five (5) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, as a director of a Sterling-related foundation, and as partner, member, and/or shareholder in various Sterling entities.

594.     Ruth Friedman is named as a Defendant in this action in her individual capacity, and as joint tenant in the accounts identified in Section XII below.

595.     As set forth more fully in Section XII below, BLMIS made transfers directly to Ruth Friedman totaling $539,437 in Fictitious Profits from the opening dates of her Sterling BLMIS Accounts to the Filing Date and $387,963 in principal during the six years prior to the Filing Date, totaling approximately $927,400.  Appendix II, Ruth Friedman Exhibit B.  In addition, Ruth Friedman received avoidable and recoverable Subsequent Transfers of principal from Sterling BLMIS Accounts held by other Sterling Defendants totaling $960,526 during the six years prior to the Filing Date.  Appendix II, Ruth Friedman Exhibit C.

### Phyllis Rebell Osterman

596.     Upon information and belief, Defendant Phyllis Rebell Osterman maintains her residence in Stamford, Connecticut and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

597.     Defendant Phyllis Rebell Osterman is the wife of Sterling Partner Thomas Osterman.

598.     At all times relevant hereto, Defendant Phyllis Rebell Osterman was a client of the IA Business.  Phyllis Rebell Osterman opened her first account with BLMIS through Sterling in October of 1999.

599.     Phyllis Rebell Osterman held an interest in approximately one (1) Sterling BLMIS Account as a direct interest-holder.

600.     Phyllis Rebell Osterman is named as a Defendant in this action in her individual capacity in the account identified in Section XII below.

601.     As set forth more fully in Section XII below, BLMIS made transfers directly to Phyllis Rebell Osterman totaling $107,000 in Fictitious Profits from the opening date of her Sterling BLMIS Account to the Filing Date and $426,000 in principal during the six years prior to the Filing Date, totaling approximately $533,000.  Appendix II, Phyllis Rebell Osterman Exhibit B.

### Elise C. Tepper

602.     Upon information and belief, Defendant Elise C. Tepper maintains her residence in Sands Point, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

603.     Defendant Elise C. Tepper is the wife of Sterling Partner Marvin Tepper.

604.     At all times relevant hereto, Defendant Elise C. Tepper was a client of the IA Business.  Elise C. Tepper opened her first account with BLMIS through Sterling in December of 1990.

605.     Elise C. Tepper held an interest in approximately eight (8) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.

606.    Elise C. Tepper is named as a Defendant in this action in her individual capacity, as joint tenant, and as tenant-in-common in the accounts identified in Section XII below.

607.    As set forth more fully in Section XII below, BLMIS made transfers directly to Elise C. Tepper totaling $854,441 in Fictitious Profits from the opening dates of her Sterling BLMIS Accounts to the Filing Date and $579,043 in principal during the six years prior to the Filing Date, totaling approximately $1,433,484.  Appendix II, Elise C. Tepper Exhibit B.  In addition, Elise C. Tepper received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $525,904 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $4,780,230 in principal during the six years prior to the Filing Date, totaling approximately $5,306,134. Appendix II, Elise C. Tepper Exhibit C.

### Jacqueline G. Tepper

608.    Upon information and belief, Defendant Jacqueline G. Tepper maintains her residence in Stamford, Connecticut and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

609.    Defendant Jacqueline G. Tepper is the daughter of Sterling Partner Marvin Tepper.

610.    At all times relevant hereto, Defendant Jacqueline G. Tepper was a client of the IA Business.  Jacqueline G. Tepper opened her first account with BLMIS, or such account was opened on her behalf, through Sterling in April of 2005.

611.    Jacqueline G. Tepper held an interest in approximately three (3) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder and as a general partner.

612.     Jacqueline G. Tepper is named as a Defendant in this action in her individual capacity, and as tenant-in-common in the accounts identified in Section XII below.

613.     As set forth more fully in Section XII below, BLMIS made transfers directly to Jacqueline G. Tepper totaling $363,292 in Fictitious Profits from the opening dates of her Sterling BLMIS Accounts to the Filing Date and $329,123 in principal during the six years prior to the Filing Date, totaling approximately $692,415.  Appendix II, Jacqueline G. Tepper Exhibit B.  In addition, Jacqueline G. Tepper received avoidable and recoverable Subsequent Transfers from a Sterling BLMIS Account held by another Sterling Defendant totaling $92,807 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date. Appendix II, Jacqueline G. Tepper Exhibit C.

### Edward M. Tepper

614.     Upon information and belief, Defendant Edward M. Tepper maintains his residence in Madison, New Jersey and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

615.     Defendant Edward M. Tepper is the son of Sterling Partner Marvin Tepper.

616.     At all times relevant hereto, Defendant Edward M. Tepper was a client of the IA Business.  Edward M. Tepper opened his first account with BLMIS, or such account was opened on his behalf, through Sterling in April of 1995.

617.     Edward M. Tepper held an interest in approximately seven (7) Sterling BLMIS Accounts in one or more capacities, including as a direct interest-holder, and as a partner, member, and/or shareholder in various Sterling entities.

618.     Edward M. Tepper is named as a Defendant in this action in his individual capacity, and as tenant-in-common in the accounts identified in Section XII below.

619.     As set forth more fully in Section XII below, BLMIS made transfers directly to Edward M. Tepper totaling $652,238 in Fictitious Profits from the opening dates of his Sterling BLMIS Accounts to the Filing Date and $490,238 in principal during the six years prior to the Filing Date, totaling approximately $1,142,476.  Appendix II, Edward M. Tepper Exhibit B.  In addition, Edward M. Tepper received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $92,837 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $114,320 in principal during the six years prior to the Filing Date, totaling approximately $207,157.  Appendix II, Edward M. Tepper Exhibit C.

### Deyva Schreier Arthur

620.     Upon information and belief, Defendant Deyva Schreier Arthur maintains her residence in Troy, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

621.     Defendant Deyva Schreier Arthur is the daughter of the late Leonard Schreier, a former Sterling Partner, whose Sterling BLMIS Account interests after his death through the Filing Date were held by his estate.

622.     At all times relevant hereto, Defendant Deyva Schreier Arthur was a client of the IA Business.  Deyva Schreier Arthur opened her first account with BLMIS, or such account was opened on her behalf, through Sterling in December of 1991.

623.     Deyva Schreier Arthur held an interest in approximately forty-six (46) Sterling BLMIS Accounts.

624.     Deyva Schreier Arthur is named as a Defendant in this action in her individual capacity, as beneficiary of the Estate of Leonard Schreier, and as tenant-in-common in the accounts identified in Section XII below.

625.     As set forth more fully in Section XII below, BLMIS made transfers directly to Deyva Schreier Arthur totaling $20 in Fictitious Profits from the opening dates of her Sterling BLMIS Accounts to the Filing Date and $74,000 in principal during the six years prior to the Filing Date, totaling approximately $74,020.  Appendix II, Deyva Schreier Arthur Exhibit B.  In addition, Deyva Schreier Arthur received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $18,124,884 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $16,476,268 in principal during the six years prior to the Filing Date, totaling approximately $34,601,152.  Appendix II, Deyva Schreier Arthur Exhibit C.

## Michael Schreier

626.     Upon information and belief, Defendant Michael Schreier maintains his residence in New York, New York and, for purposes of the Sterling BLMIS Accounts at issue, received correspondence at Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

627.     Defendant Michael Schreier is the son of the late Leonard Schreier, a former Sterling Partner, whose Sterling BLMIS Account interests after his death through the Filing Date were held by his estate.

628.     At all times relevant hereto, Defendant Michael Schreier was a client of the IA Business.  Michael Schreier opened his first account with BLMIS, or such account was opened on his behalf, through Sterling in December of 1991.

629. Michael Schreier held an interest in approximately forty-five (45) Sterling BLMIS Accounts.

630. Michael Schreier is named as a Defendant in this action in his individual capacity, as beneficiary of the Estate of Leonard Schreier, and as tenant-in-common in the accounts identified in Section XII below.

631. As set forth more fully in Section XII below, BLMIS made transfers directly to Michael Schreier of a minimal amount in Fictitious Profits from the opening date of his Sterling BLMIS Account to the Filing Date. Appendix II, Michael Schreier Exhibit B.  In addition, Michael Schreier received avoidable and recoverable Subsequent Transfers from Sterling BLMIS Accounts held by other Sterling Defendants totaling $18,124,904 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $16,476,268 in principal during the six years prior to the Filing Date, totaling approximately $34,601,172. Appendix II, Michael Schreier Exhibit C.

## F.  Madoff Investment Entity Defendants

### Realty Associates Madoff II

632. Upon information and belief, Defendant Realty Associates Madoff II is a general partnership formed under the laws of the state of New York.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

633. The general partners of Realty Associates Madoff II are Ruth Madoff, the Saul B. Katz Family Trust, and the Fred Wilpon Family Trust.

634. Realty Associates Madoff II was an investment vehicle designed to enable Madoff's investment in Sterling American Property II. *See infra* Section VII.E.

635. Upon information and belief, Madoff, Ruth Madoff and/or Peter Madoff made transfers using BLMIS funds, comprised of other people's money, to Realty Associates Madoff II.

636. As set forth more fully in Section XII below, BLMIS made transfers directly to Realty Associates Madoff II totaling $983,420. Appendix II, Realty Associates Madoff II Exhibit B.

### Sterling Acquisitions LLC

637. Upon information and belief, Defendant Sterling Acquisitions LLC is a limited liability corporation formed under the laws of the state of New York. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

638. The members of Sterling Acquisitions LLC include Ruth Madoff, the Saul B. Katz Family Trust, Fred Wilpon, Richard Wilpon, Michael Katz, Arthur Friedman, Marvin Tepper, Saul Katz, the Fred Wilpon Family Trust, Gregory Katz, Howard Katz, Todd Katz, the Thomas Osterman 1999 Trust, Jeffrey Wilpon, David Katz, Jacqueline G. Tepper, Edward M. Tepper, Heather Katz Knopf, Natalie Katz O'Brien, and the Estate of Leonard Schreier, among others not listed as defendants herein.

639. Upon information and belief, Sterling Acquisitions LLC was an investment vehicle through which Madoff, Ruth Madoff and/or Peter Madoff invested in Pathogenesis Corporation. *See infra* Section VII.E.

640. Upon information and belief, Madoff, Ruth Madoff and/or Peter Madoff made transfers using BLMIS funds, comprised of other people's money, to Sterling Acquisitions LLC.

641.     As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling Acquisitions LLC totaling $592,521.  Appendix II, Sterling Acquisitions LLC Exhibit B.

### Sterling American Property III LP

642.     Upon information and belief, Defendant Sterling American Property III LP is a limited partnership formed under the laws of the state of Delaware.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

643.     The limited partners of Sterling American Property III LP include Ruth Madoff and Peter Madoff, among others not named as defendants herein.  The general partner of Sterling American Property III LP is Sterling American Advisors III LLC.

644.     Upon information and belief, Sterling American Property III LP was a Sterling real estate investment vehicle in which Madoff, Ruth Madoff and/or Peter Madoff invested using BLMIS funds, comprised of other people's money.  *See infra* Section VII.E.

645.     As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling American Property III LP totaling $4,848,408.  Appendix II, Sterling American Property III LP Exhibit B.

### Sterling American Property IV LP

646.     Upon information and belief, Defendant Sterling American Property IV LP is a limited partnership formed under the laws of the state of Delaware.  Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021.  Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

647. The limited partners of Sterling American Property IV LP are Ruth Madoff and Peter Madoff, among others not named as defendants herein. The general partner of Sterling American Property IV LP is Sterling American Advisors IV LLC.

648. Upon information and belief, Sterling American Property IV LP was a Sterling real estate investment vehicle in which Ruth Madoff and/or Peter Madoff invested using BLMIS funds comprised of other people's money. *See infra* Section VII.E.

649. As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling American Property IV LP totaling $3,102,156. Appendix II, Sterling American Property IV LP Exhibit B.

### Sterling American Property V LP

650. Upon information and belief, Defendant Sterling American Property V LP is a limited partnership formed under the laws of the state of Delaware. Its principal place of business is located at 111 Great Neck Road, Suite 408, Great Neck, New York 11021. Its registered agent for service of process is Sterling Equities, 111 Great Neck Road, Suite 408, Great Neck, New York 11021.

651. The limited partners of Sterling American Property V LP include Ruth Madoff and Peter Madoff, among others not listed as defendants herein. The general partner of Sterling American Property V LP is Sterling American Advisors V LLC.

652. Upon information and belief, Sterling American Property V LP was a Sterling real estate investment vehicle in which Madoff, Ruth Madoff and/or Peter Madoff invested using BLMIS funds, comprised of other people's money. *See infra* Section VII.E.

653. As set forth more fully in Section XII below, BLMIS made transfers directly to Sterling American Property V LP totaling $2,504,752. Appendix II, Sterling American Property V LP Exhibit B.

## VI. STERLING'S INVESTMENTS WITH MADOFF WERE PART OF ITS REAL ESTATE, PROFESSIONAL BASEBALL, PRIVATE EQUITY AND HEDGE FUND BUSINESS

654. Sterling Equities (as defined above "Sterling")—collectively, the partners and the entities that they own, operate, and control—was founded in 1972 as a partnership between brothers-in-law Saul Katz, a Certified Public Accountant ("CPA"), and Fred Wilpon to manage and acquire real estate. Within a year of founding Sterling, they were joined by Fred Wilpon's brother, Richard Wilpon, and Saul Katz's brother, Michael Katz, a CPA who also holds a master's degree in business administration. These four partners—Fred Wilpon, Saul Katz, Richard Wilpon and Michael Katz—have been with Sterling from the beginning and form the core of the partnership with close to 40 years of extensive business experience.

655. The Katz-Wilpon brothers were followed into the Sterling partnership by Thomas Osterman, who holds two master's degrees in urban and regional planning and public administration, Leonard Schreier, Marvin Tepper, who holds a law degree with over 30 years of private practice experience, and Arthur Friedman, a CPA who also holds a law degree. Around the same time that Arthur Friedman became a partner in 1986, the next generation of Katz-Wilpon family members began to join the ranks of the partnership, including Jeffrey Wilpon, David Katz, and Gregory Katz, sons of Fred Wilpon, Saul Katz and Michael Katz, respectively.

656. The Sterling Partners stand at the helm of a group of businesses with interests across numerous asset classes. The Sterling businesses have evolved over the last four decades into a diverse network of companies focused on the creation of wealth and preservation of capital. What began as a modest two-man real estate partnership transformed over time into a multi-tiered business that includes (a) the purchase, development and management of over 23 million square feet of commercial and residential real estate; (b) a real estate investment fund, Sterling American Property ("SAP"), formed and operated by Sterling and American Securities

Capital Partners, LLC ("American Securities"), a leveraged buyout firm; (c) a professional sports and entertainment business comprised of full ownership of the New York Mets (the "Mets"), the Major League Baseball franchise, and majority ownership of SportsNet New York ("SNY"), the network responsible for broadcasting New York-based sporting events, including all Mets games; (d) many private equity and venture capital investments; and (e) part ownership of a hedge fund with reportedly over $6 billion in assets under management, Sterling Stamos.[4]

657.    The Sterling Partners operate and control a network of privately-held entities that they created, including the Sterling Entity Defendants.  The Sterling Partners are officers, principals, members, and/or partners of all the Sterling-related entities, including the Sterling Entity Defendants, which they operate for their benefit.

658.    The Sterling Partners operate most of the Sterling-related entities, including the Sterling Entity Defendants, out of the same office in Great Neck, NY, where many of the same personnel provide services to all Sterling-related entities.

659.    Sterling remains a closely-held partnership and all aspects of the Sterling business are overseen by members of the Katz-Wilpon family and, ultimately, the Sterling Partners. Founding partners Saul Katz and Fred Wilpon play a leadership role with respect to each and every Sterling business; however, all major decisions concerning any of the Sterling businesses and Sterling-related entities, including the Sterling Entity Defendants, are made on a partnership level in the ordinary course of business after discussion among the Sterling Partners collectively, including where to invest and how much to allocate to each particular investment, such as BLMIS.

---

[4] Sterling Stamos is comprised of Sterling Stamos Capital Management, LP and Sterling Stamos Associates GP - LLC. *See infra* ¶ 711.  Upon information and belief, Sterling Stamos was formerly known as Stamos Partners Capital, Stamos Partners Management, Stamos Partners Capital, and/or SP Capital Management.  All references hereinafter to "Sterling Stamos" refer to Sterling Stamos Capital Management, LP, Sterling Stamos Associates GP LLC, and any predecessor entity.

660.     As early as about October 1985—when the Sterling Partners made their first BLMIS investments—through December 2008, the Sterling Partners treated their BLMIS investments, including those made in their own names, the names of their family members, and in the names of certain Sterling-related entities and trusts, as an integral component of Sterling's core business.

661.     Over their near quarter-century business relationship with Madoff, the Sterling Partners decided collectively to invest much of their and their businesses' excess cash with Madoff, which resulted in them holding interests in hundreds of BLMIS accounts individually, as joint tenants, tenants-in-common, or through trusts and Sterling-related entities that they owned, operated and controlled.  *See infra* Section VI.B.1.

662.     The Sterling Partners also decided collectively to open and administer BLMIS accounts not only on behalf of themselves, their family members, related trusts, and Sterling-related entities, but also on behalf of their friends, employees, and business acquaintances—483 BLMIS accounts in total.  *See id.*

663.     The Sterling Partners' investments with Madoff anchored Sterling's business empire whereby the hundreds of millions of Fictitious Profits they withdrew from BLMIS, as well as the capital they accessed as a result of their purported equity in their BLMIS accounts, supported their many businesses.

664.     All Defendants named herein, including the Sterling Partners, their family members, their related trusts, and the various entities they own, operate and control, including the Mets, benefited greatly from Madoff's massive Ponzi scheme, collectively withdrawing from BLMIS approximately $300 million of Fictitious Profits, and over $700 million in principal during the six years prior to the Filing Date.

**A.** **The Sterling Partners Are Sophisticated Investors With A Deep Bench Of Financial And Business Experience Across Numerous Asset Classes**

    **1.** **Real estate.**

665.    Before Sterling got into professional baseball, its calling card was real estate. Over the years, Sterling has purchased or developed more than 23 million square feet of commercial property, 57,000 residential units, eight million square feet of retail property and four major sports complexes. Sterling has also owned and managed an additional 1,900 residential properties and 1.2 million square feet of commercial real estate, wherein it relied on its expertise in managing, developing, marketing and repositioning real estate to maximize the value of each asset. Moreover, the Sterling Project Development Group has supervised and coordinated over $4 billion of construction and development of properties throughout Manhattan and beyond, including the "Lipstick Building" located at 885 Third Avenue, Madoff's former office space.

666.    Richard Wilpon, Michael Katz and Thomas Osterman are the Sterling Partners and senior management most closely involved in the real estate management and development portion of Sterling's business; however, upon information and belief, any major items concerning this aspect of the business are discussed at every bi-weekly Sterling Partners meeting.

667.    In addition to developing and managing real estate properties, starting in or around 1990, Sterling and American Securities partnered to form SAP, which operates multiple real estate investment funds that acquire and manage multi-family and commercial properties in at least 43 states. To date, SAP has launched at least five funds—SAP I in or around 1991, SAP II in 1996, SAP III in 1999, SAP IV in 2002 and SAP V in 2006. Collectively, these five SAP funds have invested in over $4.5 billion of real estate assets.

668.     Richard Wilpon, Michael Katz, Gregory Katz and Thomas Osterman are the Sterling Partners and senior management directly responsible for managing the various SAP funds; however, upon information and belief any major items concerning this aspect of the business are discussed at every bi-weekly Sterling Partners meeting.

### 2.     Professional baseball and sports media.

669.     Sterling has held an interest in the Mets since 1980 when it initially shared ownership with Nelson Doubleday ("Doubleday").  In 2002, Sterling purchased Doubleday's 50% interest and acquired full ownership of the Mets.  The Sterling Partners and the Katz/Wilpon Trust Defendants, through various holding companies, including Mets Limited Partnership, own 100% of Sterling Mets LP, the entity through which the Sterling Partners control and operate the Mets.  Sterling also owns and operates the Mets' Class A affiliate, the Brooklyn Cyclones.

670.     Fred Wilpon, Jeffrey Wilpon, and Saul Katz are the Sterling Partners and senior management most closely involved in the business operations of the Mets and Brooklyn Cyclones; however, upon information and belief, any major items concerning this aspect of the business are discussed at every bi-weekly Sterling Partners meeting.

671.     In or around 2004, Sterling branched into the sports and entertainment media industry when it exercised its option under its agreement with Cablevision to purchase the cable and broadcast rights of the Mets.  This decision eventually led to the creation of SNY, a regional sports and entertainment network launched in 2006 that produces sports-related programming, including all regular season Mets baseball games and other local sporting events programming, such as the New York Jets and the Big East conference.  SNY is available to viewers throughout New York, Connecticut, New Jersey and northeastern Pennsylvania, and nationally on DIRECTV, Dish Network and AT&T U-Verse.  SNY is operated by Sterling Entertainment

Enterprises, LLC ("SEE"), which was formed in August 2004 and is majority-owned by Sterling through SEE HoldCo, LLC.

672. Fred Wilpon, Jeffrey Wilpon and Saul Katz are the Sterling Partners and senior management most closely involved in the business operations of SNY; however, upon information and belief, any major items concerning this aspect of the business are discussed at every bi-weekly Sterling Partners meeting.

### 3. Private equity.

673. Sterling also has invested and continues to invest in various private equity ventures across a diverse range of early stage to completed companies. For example, Sterling owns or owned substantial interests in Changing World Technologies, a company that identifies and develops emerging technologies, and PathoGenesis Corporation, a pharmaceutical research company dedicated to developing drug treatments for human infectious diseases. Sterling also holds investments in Twistage, a web-based service that enables businesses to rapidly deploy massively scalable video applications on their websites, as well as certain middle market leveraged buyout vehicles through American Securities.

674. Saul Katz and David Katz are the Sterling Partners and senior management most closely involved in the business operations of Sterling's private equity ventures; however, upon information and belief, any major items concerning this aspect of the business are discussed at every bi-weekly Sterling Partners meeting.

### B. The Sterling Partners Relied On Madoff To Assist The Growth Of Their Businesses

675. After their initial investments with Madoff in 1985, the Sterling Partners structured—and in some cases leveraged—their BLMIS investments to assist the overall growth of their businesses and ensure that they, their family members, related trusts, and virtually every

Sterling-related entity they owned, operated and controlled benefited as much as possible from Madoff's guaranteed positive returns.

676.    Sterling's BLMIS investments provided a ready cash flow in the form of steady, consistent, non-volatile returns for its real estate, professional baseball and private equity businesses.

        **1.    The Sterling Partners exploited their Madoff access by opening and administering 483 BLMIS accounts for themselves, their families, various related trusts and entities, their friends and employees.**

677.    For most of the near quarter-century long business relationship between the Sterling Partners and Madoff, Sterling maintained approximately 90% of its securities investments in BLMIS.  Starting with a handful of accounts and $3 million in 1985, the Sterling Partners eventually opened and administered 483 BLMIS accounts (the "KW BLMIS Accounts"), the vast majority of which were given a unique identifier by Madoff— "Katz/Wilpon" or "KW" for short—followed by three distinct digits.

678.    The Sterling Partners, their family members, related trusts and Sterling-related entities controlled and operated by the Sterling Partners held approximately 305 out of the 483 KW BLMIS Accounts, 185 of which are the subject of this action and identified in Exhibit A to Appendix I.

679.    The remaining approximately 178 KW BLMIS Accounts were opened on behalf of referrals, including friends, business acquaintances, and Sterling employees, all of whom were steered by the Sterling Partners to invest with Madoff.

680.    The Sterling Partners collectively decided to internally track and administer all 483 KW BLMIS Accounts, including those held by individuals whom Sterling referred to Madoff.

681.     As part of this tracking process, Sterling tasked one of its partners, Arthur Friedman ("Friedman"), with the primary responsibility of administering all 483 KW BLMIS Accounts. As part of his duties, Friedman opened and closed accounts, communicated all BLMIS transaction requests, such as deposits and withdrawals, maintained all BLMIS account paperwork, monitored account balances, and tracked the movement of funds into and out of BLMIS. Friedman also performed tax-related tasks and a monthly analysis of the average performance across all of the KW BLMIS Accounts. To accomplish these tasks, Friedman enlisted the help of his assistant and the staff within Sterling's Partners' Accounting Department. *See infra* Section VII.D.1.

682.     The Sterling Partners and their family members held approximately 196 KW BLMIS Accounts from which they withdrew approximately $133 million in Fictitious Profits, and approximately $140 million in principal during the six years prior to the Filing Date. These accounts were held individually or structured as joint tenancies (wherein two family members held interests), or tenancies-in-common (wherein various Sterling Partners together with their family members and/or friends pooled their investments and maintained a fixed percentage interest that corresponded to the proportion of funds initially invested).

683.     For example, Saul Katz's wife, Iris, and her children (excluding Sterling Partner David Katz) held approximately 30 KW BLMIS Accounts from which approximately $40 million in Fictitious Profits, and approximately $5 million in principal during the six years prior to the Filing Date, were withdrawn. Similarly, Fred Wilpon's wife, Judith, and her children (excluding Sterling Partner Jeffrey Wilpon) held approximately 24 KW BLMIS Accounts from which approximately $30 million in Fictitious Profits, and approximately $7.5 million in principal during the six years prior to the Filing Date, were withdrawn.

684. The Sterling Partners, including Saul Katz and Fred Wilpon, had access to the KW BLMIS Accounts held in the names of their wives and children. Saul Katz and Fred Wilpon, and, upon information and belief, the rest of the Sterling Partners, counted the purported equity in their wives' accounts toward their own total net worth, and also used funds withdrawn from their wives' accounts to meet their personal and/or business financial obligations.

685. The Sterling Partners also opened approximately 44 KW BLMIS Accounts in the names of various trusts. Four of these trusts—the Katz/Wilpon Trust Defendants—held interests across many Sterling businesses, including the Mets, and functioned essentially as entities for the benefit of the Sterling Partners, including those who acted as their settlors, namely Saul Katz, Fred Wilpon, Richard Wilpon, and Michael Katz, and those who acted as their Trustees, namely Saul Katz, Fred Wilpon, David Katz, Richard Wilpon, Michael Katz, and Marvin Tepper. *See supra* Section V.D. Overall, at the direction of the Sterling Partners, the Katz/Wilpon Trust Defendants received approximately $15 million in Fictitious Profits, and almost $54 million in principal during the six years prior to the Filing Date, from BLMIS.

686. Upon information and belief, each Sterling Partner who acted as a settlor of each Katz/Wilpon Trust Defendant retained beneficial use of his respective trust by counting its assets as his own; directing the movement funds into and out of the BLMIS accounts it held for his benefit; and engaging in self-dealing by "selling" it his interests in certain Sterling-related entities at discounted prices. Further, under the direction of the Sterling Partners, certain of the Katz/Wilpon Trust Defendants also leveraged their BLMIS investments in the same way as many Sterling-related entities by borrowing funds to invest with Madoff using their BLMIS accounts as collateral. *See infra* Section VIII.D.

687.    Further, the Sterling Partners collectively decided to open approximately 65 KW BLMIS Accounts in the name of certain entities that they owned, formed, funded, operated, and controlled.  At the direction of the Sterling Partners, approximately $153 million in Fictitious Profits, and approximately $537 million in principal during the six years prior to the Filing Date were withdrawn from these 65 KW BLMIS Accounts for the benefit of the Sterling Partners and/or other Sterling-related entities that they owned, operated, and controlled.

688.    In many cases, the Sterling Partners benefitted from such Fictitious Profits and withdrawals of principal by receiving pro rata portions based on their fixed percentage interests in particular Sterling-related entities, which was commensurate with the amount of funds they initially invested in those Sterling-related entities.

689.    Moreover, some of the approximately 65 Sterling-related entity KW BLMIS Accounts were opened by the Sterling Partners in the names of limited liability corporations they created for the sole purpose of investing with Madoff and, in many instances, structured to use the existing equity in the account as collateral to borrow funds to invest in the account and double their BLMIS returns with no additional capital outlay.

690.    The Sterling Partners, their family members, related trusts, and Sterling-related entities benefitted tremendously from the complex structure of the 305 KW BLMIS Accounts opened on their behalf.

691.    By December 11, 2008, approximately $300 million in Fictitious Profits, and approximately $700 million in principal during the six years prior to the Filing Date, had been withdrawn from the 305 KW BLMIS Accounts held by the Sterling Partners, their family members, related trusts and Sterling-related entities.  In other words, the Sterling Partners, their families, related trusts and Sterling-related entities benefitted from Madoff's fraud with

approximately $300 million of other people's money and withdrawals of over $700 million in principal during the six years prior to the Filing Date.

**2. The Sterling Partners structured their Madoff investments to ensure that Madoff money flowed through every arm of their business.**

692. Upon information and belief, a substantial portion of the BLMIS funds withdrawn by the Sterling Partners, their family members, related trusts and entities out of their 305 KW BLMIS Accounts, including approximately $300 million in Fictitious Profits and, during the six years prior to the Filing Date, over $700 million in principal, was used to develop, grow and sustain Sterling's business. In fact, every aspect of Sterling's business—real estate, professional baseball, and private equity—held investments with Madoff through approximately 65 BLMIS accounts, which benefitted from Madoff's Ponzi scheme.

693. Specifically, Sterling opened at least a dozen KW BLMIS Accounts with Madoff related to its real estate ventures, including, but not limited to, 157 J.E.S. LLC (1KW348), which was related to property located at 157 Second Avenue, New York, NY; Charles 15 Associates (1KW134) and other associated accounts (1KW156, 1KW180, 1KW341, 1KW413, and 1KW414), which were related to residential, retail and garage condominium units located at 15 Charles Street, New York, NY; Ruskin Gardens (1KW189), which was related to Ruskin Gardens apartments located in Kansas City, Missouri; College Place Enterprises (1KW003, 1KW084, and 1KW466), which were related to a Sterling company that owned and operated property located at 48 Love Lane in Brooklyn, NY; and Robbinsville Park LLC (1KW346), which was related to property located in Robbinsville, NJ.

694. Moreover, Sterling created KW BLMIS Accounts to house the Sterling Partners' capital commitments to various SAP funds while at the same time earning steady returns. For instance, Sterling opened a KW BLMIS Account in the name of Sterling Internal V LLC

(1KW435), which was funded with $75 million in loan proceeds and subsequently used to meet a substantial portion of Sterling Partners' capital commitments to SAP V. *See infra* Section VIII.B.

695.     Sterling's real estate business had an additional tie to Madoff. Along with the Sterling Partners, Madoff—through his wife Ruth—invested millions of dollars in all five SAP funds, and Peter Madoff, Madoff's brother, invested millions of dollars in at least three of the five SAP funds. *See infra* Section VII.E. Upon information and belief, at least $11.4 million of the Madoffs' investments in SAP were funded by other people's money as they were transferred to Sterling from Madoff's business-related bank accounts.

696.     Sterling's professional baseball and sports media business also benefited from the Madoff fraud. *See infra* Section VIII.A. The Mets and the Brooklyn Cyclones had approximately 16 BLMIS accounts (the "Mets-related KW BLMIS Accounts").

697.     Sterling withdrew over $94 million of Fictitious Profits from the opening dates of the Mets-related KW BLMIS Accounts to the Filing Date and approximately $344 million in principal during the six years prior to the Filing Date from the Mets-related KW BLMIS Accounts.

698.     Thus, almost one-third of the approximate $300 million in Fictitious Profits Sterling made from its Madoff investments supported Sterling's professional baseball and sports media business and, specifically, the Mets. Upon information and belief, a significant amount of the $94 million Sterling received of other people's money went to fund the day-to-day operations of this Major League Baseball franchise. *Id.*

699.     Madoff money played other more nuanced roles in Sterling's professional baseball and sports media business. For instance, upon information and belief, to help secure

refinancing of the Mets' debt in 2004, Sterling cited Madoff's near-perfect returns and steady, impressive gains as proof of the organization's financial stability. *See infra* Section VIII.E.

700. Sterling's private equity investments also benefitted from KW BLMIS Accounts. For example, one of Sterling's most profitable private equity investments was PathoGenesis Corporation; Sterling held a KW BLMIS Account called Sterling Pathogenesis (1KW175) from which it withdrew approximately $19 million in Fictitious Profits before it closed in 2001. The Sterling Pathogenesis BLMIS account was also one of the first so-called "double up" accounts wherein the Sterling Partners used their BLMIS accounts as collateral to borrow funds to double the amount invested in these accounts and thereby double their returns. *See infra* Section VIII.D.1.

701. Finally, Sterling used its internal bank, Sterling Equities Funding ("SEF"), which is 100% owned by the Sterling Partners, to move Madoff funds to many of its business ventures. Upon information and belief, between 2003 and 2008 alone, at least $135 million in withdrawn funds from Sterling's KW BLMIS Accounts passed through SEF, which thereafter fueled Sterling's diverse businesses. *See infra* Section VIII.C.

### C. Sterling Partners Expanded Their Business To Include Their Own Hedge Fund—Sterling Stamos—As An Alternative To Madoff

702. In June 2002, Sterling entered the hedge fund business creating Sterling Stamos, a partnership between Sterling and Peter Stamos ("Stamos"), a highly sophisticated, educated, and experienced businessman with personal ties to Saul Katz.

703. Sterling Stamos was formed to provide the Sterling Partners with an alternative to investing with Madoff.

704.     In just six years, by September 2008, Sterling had moved millions of dollars out of BLMIS to Sterling Stamos, leaving a little over $400 million with Madoff and approximately $393 million with Sterling Stamos, a roughly equal division of Sterling's liquid assets.

705.     Upon information and belief, over the period from June 2002 to December 2008, the Sterling Partners became familiar with the business and investment operations and management of a hedge fund, including due diligence requirements and the various investment industry red flags typically associated with potentially fraudulent investment funds or managers.

706.     Upon information and belief, as early as the late 1990s, Sterling Partner and Saul Katz's son, David Katz, expressed concerns to the Sterling partnership about the large concentration of Sterling's securities investments in one single investment manager, Madoff, especially in light of Madoff's non-transparent black box strategy.

707.     In 2001, on the heels of Sterling learning about various financial industry players' concerns about Madoff and BLMIS (*see infra* Section IX.A), as well as the Sterling Partners' futile attempt to obtain fraud insurance to cover the full breadth of their Madoff investments (*see infra* Section IX.A.4), upon information and belief, Saul Katz finally agreed with David Katz's recommendation.

708.     David and Saul Katz began discussing in earnest the possibility of creating an alternative investment vehicle to Madoff that could house some of the Katz-Wilpon family's liquid investments.  The end result was the creation of a fund of funds hedge fund that invested capital into numerous funds run by a variety of managers headed by Stamos.[5]

_____

[5] Stamos has a wide array of professional experience, including forming his own health care consulting company, Stamos Associates, Inc., which he sold in 1997, Senior Management Consultant at consulting firm, McKinsey & Co., Chief of Staff and Chief Economist to former U.S. Senator Bill Bradley, and Professor of Economics at both Harvard University and Stanford University.  Stamos currently serves on Major League Baseball's investment advisory board, on which he has served as the inaugural Chairman since 2007.

709.     Stamos met Saul Katz in the mid-1990s through Stamos' involvement with North Shore Long Island Jewish Health System ("North Shore LIJ")—where Stamos worked as a health care consultant and Katz served as Chairman of the North Shore LIJ Board.  Through Saul Katz, Stamos came to know David Katz, Fred Wilpon and the other Sterling Partners.

710.     In June 2002, Stamos and Sterling created Sterling Stamos as the vehicle for the Sterling Partners to move money out of Madoff.

711.     Sterling Stamos was formed as a 50-50 partnership between Stamos and Sterling, with all of the Sterling Partners contributing a pro rata share of that 50% interest.  Sterling and Stamos formed Sterling Stamos Capital Management, LP ("SSCM") to provide management and administrative services to the various private investment funds.  At the time SSCM was formed, Sterling and Stamos each had a 50% interest in SSCM.  Sterling Stamos Associates GP, LLC ("SSA GP") served as the general partner for the funds.  As the general partner, SSA GP is responsible for the management and investment strategy for the investment funds.  Upon the creation of Sterling Stamos, the Sterling Partners were investors in SSCM and also general partners in SSA GP.  As general partners, the Sterling Partners were ultimately responsible for the management and investment strategy for the funds.

712.     The Sterling Partners provided much of the start-up capital for the venture.  Upon information and belief, at least a portion of that funding was derived from withdrawals from various KW BLMIS Accounts.

713.     In addition to providing start up capital as general partners, the Sterling Partners invested substantial capital into the various Sterling Stamos funds as limited partners.  Upon information and belief, a substantial portion of these contributions were funded by withdrawals from various KW BLMIS Accounts.

714. From 2002 through July 2005, Sterling Stamos ran its business out of Sterling's New York City office, located at 575 Fifth Avenue, where it shared office space and operational capabilities, such as information technology, with Sterling.

715. Sterling Stamos had an informal investment committee that discussed and evaluated potential managers and funds in which to invest. In addition to Stamos, Saul Katz, and David Katz, other members of this informal investment committee included Chuck Klein, head of American Securities, and Ezra Merkin, who managed his own hedge funds, some of which invested with Madoff.

716. Many Sterling Stamos investors were also invested in BLMIS, including some of the same friends and business acquaintances whom the Sterling Partners had referred to BLMIS.

717. Shortly after Sterling Stamos was established, it attracted the interest of Merrill Lynch ("Merrill"). In or around June 2004, Merrill became a distribution agent for Sterling Stamos and marketed Sterling Stamos' funds to its institutional clients. In early 2007, Merrill first expressed an interest in acquiring a stake in Sterling Stamos.

718. On or about July 1, 2007, Sterling Stamos sold Merrill a 50% non-controlling interest in the company half of Sterling's 50% interest, and half of Stamos' 50% interest. For its stake, Sterling received $115 million. After the acquisition, Merrill added three representatives to the Sterling Stamos Board of Directors, including one of its senior executives who raised serious concerns about Madoff and BLMIS. *See infra* Section IX.A.2. In connection with the acquisition, Merrill also insisted that Sterling Stamos undergo certain structural changes, such as improving its due diligence policies and protocols to conform with Merrill's standards.

719.     Upon information and belief, Sterling Stamos' partnership with Merrill exposed the Sterling Partners, especially Saul Katz and David Katz, to Merrill's due diligence standards and opinions concerning certain investment managers, including Madoff.  *Id.*

720.     As discussed in more detail below, various Merrill officers, including one senior executive in particular, communicated concerns about Madoff and BLMIS to members of the Sterling partnership.  Indeed, as explained in Sections IX.A.1 and 2, the Sterling Partners' ownership of and involvement in Sterling Stamos exposed them to a litany of red flags concerning Madoff and BLMIS, including those raised by Stamos and Merrill.  *Id.*

721.     While Stamos served as President and Chief Executive Officer of Sterling Stamos, Saul Katz and David Katz had significant roles in running and growing the business.

722.     Upon information and belief, between approximately June 2002 and June 2005, Saul Katz and David Katz were involved in the operational and business management, as well as certain investment decisions of Sterling Stamos, including, but not limited to, the selection of certain funds and fund managers.

723.     Prior to June 2005, Saul Katz and David Katz were identified in Sterling Stamos marketing materials as part of the "Senior Investment Team," along with CEO Stamos and chief investment strategist, Ashok Chachra ("Chachra").

724.     Prior to June 2005, Saul Katz and David Katz were also identified in hedge fund questionnaire responses as two of the four primary portfolio decision makers for Sterling Stamos, the other two being Stamos and Chachra.

725.     Upon information and belief, prior to June 2005, no significant business decision at Sterling Stamos was made without Saul Katz's approval.

726. David Katz managed one of Sterling Stamos' funds, SP Trading, for approximately one year.

727. Upon information and belief, in their roles at Sterling Stamos, Saul Katz and David Katz became familiar with indicators often tracked by hedge funds to gauge fund performance, including average rate of return, percentage of positive months, standard deviation, and Sharpe Ratio (i.e., an investment's risk-to-return trade off). Sterling—through Saul Katz and David Katz—had access to, and on occasion received, sophisticated analyses by Sterling Stamos that compared the performance of various Sterling Stamos funds to BLMIS and included the commonly used hedge fund indicators listed above.

728. Upon information and belief, Saul Katz and David Katz were familiar with Sterling Stamos' due diligence processes for vetting potential investment managers.

729. Upon information and belief, as both general partners and limited partners of Sterling Stamos, all the Sterling Partners also became familiar with Sterling Stamos' due diligence process.

730. And as discussed in detail in Section IX.A.1 below, upon information and belief, the Sterling Partners were aware that Madoff did not and, in fact, could not pass Sterling Stamos' due diligence standards.

731. Despite having access to these resources, Sterling conducted no diligence in response to the serious concerns raised about Madoff and BLMIS. *See infra* Section X.

## VII.  STERLING'S QUARTER-CENTURY RELATIONSHIP WITH MADOFF

### A.  The Madoffs, Wilpons And Katzes Had A Close Friendship And Business Relationship

732. The beginning of Madoff's and Sterling's relationship dates back to the late 1970s when the Madoff and Wilpon families lived in Roslyn, Long Island. Fred Wilpon's son, Jeffrey,

and Madoff's sons, Mark and Andrew, attended school together and became close friends. Through their children's friendship, Fred and Judith Wilpon became close friends with Madoff and his wife, Ruth. Fred Wilpon knew at that time that Madoff was in the investment business and, thereafter, Madoff learned that Fred Wilpon's family-run business, Sterling, invested in real estate, held a partnership interest in the Mets, and had venture capital investments.

733. It was not long before Madoff and Fred Wilpon formed a mutually beneficial relationship whereby Madoff invested in some of Sterling's real estate ventures and Fred Wilpon invested in BLMIS.

734. As the business relationship with Madoff grew, so did the personal relationship between the Madoff and Katz/Wilpon families. Fred Wilpon and his wife, Judith, frequently socialized with Madoff and his wife, Ruth. Madoff also became integrated into the close family network at Sterling. For example, Madoff was often invited to and attended family events of the Katz and Wilpon families, such as Jeffrey Wilpon's wedding and the bar mitzvahs of the Sterling Partners' children and grandchildren, where many members of the Sterling partnership were often present. Madoff, in turn, often invited the Katz and Wilpon families to family celebrations, such as the weddings of his sons and cocktail parties and dinners at his home.

735. Madoff held Mets season tickets with seats close to Saul Katz and Fred Wilpon. Madoff and his wife, Ruth, even accompanied Saul Katz and Fred Wilpon (and their wives) to Japan one year when the Mets played exhibition games overseas.

736. Sterling assisted Madoff with moving into the now infamous Lipstick Building. At the time, Sterling was involved in the development of the Lipstick Building. Wanting to move uptown, Madoff approached Fred Wilpon regarding renting available office space and Madoff eventually negotiated a deal with Sterling and Sterling's partner, Hines.

737. Madoff and his wife Ruth also worked with Katz and Wilpon family members and other Madoff investors on boards of various charitable organizations. For example, Fred Wilpon was a board member of a charity called "Gift of Life," along with Madoff (who was Chairman of the Board), Ruth Madoff, and other individuals closely associated with Madoff, including Edward Blumenfeld, Maurice Cohen, Robert Jaffe, and Ezra Merkin. Indeed, this group held a meeting at Madoff's office on December 8, 2008, merely days before the collapse of BLMIS.

738. Saul Katz and Fred Wilpon were also members of a charity called "Partners for Life," together with Madoff, Ruth Madoff, members of Madoff's family, Robert Jaffe and his wife, Ellen, Edward Blumenfeld and his wife, Susan, Maurice Cohen and his wife Marilyn, Stanley Chais and his wife, Pamela, and Carl Shapiro.

739. BLMIS and/or Madoff also frequently donated to charitable organizations in which Saul Katz, Fred Wilpon, and their family members participated. For example, BLMIS donated funds to City Center, a charity for which Judith Wilpon was co-chair of the board and to the National Center for Disability Services, with which Iris Katz was involved. Madoff made large donations to the North Shore LIJ, in which Saul Katz was intimately involved.

740. Based on the deep personal relationship between Saul Katz and Fred Wilpon and Madoff, Sterling had unique and direct access to Madoff and his staff whenever necessary—a privilege very few enjoyed.

741. Fred Wilpon and Saul Katz had meetings with Madoff in his office at least once a year to discuss the status of Sterling's investments and projected returns. Upon information and belief, Saul Katz also spoke directly with Madoff frequently—for certain periods of time, on a

daily basis.  With few exceptions, when Saul Katz called BLMIS, he did not speak to anyone other than Madoff.

**B.      The Sterling Partners, Families, Trusts And Entities Withdrew Approximately $300 Million Of Other People's Money From Their BLMIS Accounts**

742.    Between 1985 and 2001—before the creation of Sterling Stamos—Sterling's Madoff investments grew exponentially both in terms of the amount invested and the number of accounts.  Since at least 1994 through 2001, Sterling held approximately 90% of its securities investments in BLMIS.

743.    The Sterling Partners first opened a handful of KW BLMIS Accounts in or around October 1985: one in Fred Wilpon's name, one in Saul Katz's name, and one in the name of Sterling Equities Funding c/o Michael Katz.

744.    Within a little over a year, the Sterling Partners had opened an additional 12 KW BLMIS Accounts, including accounts in the name of at least one real estate venture, and those held as joint tenancies between various Sterling Partners and their wives, family trust accounts for Fred Wilpon and Saul Katz, and tenant-in-common ("TIC") accounts with various Sterling Partners and family members holding fixed percentage interests.

745.    By 1990, Sterling had opened approximately 58 KW BLMIS Accounts with about $50 million invested, and by 2001, Sterling had opened approximately 246 KW BLMIS Accounts with about $798 million invested.  This constituted an increase of almost 1,500% in just over 10 years.

746.    Over the course of Sterling's and Madoff's almost quarter-century business relationship, the Sterling Partners opened at least 305 KW BLMIS Accounts on behalf of themselves, their family members, trusts, and Sterling-related entities.  By December of 2008, the Sterling Partners, family members, trusts and entities had withdrawn approximately $300

million of Fictitious Profits, and over $700 million in principal during the six years prior to the Filing Date, from BLMIS.

## C. Sterling Steered Dozens Of Friends, Business Associates, And Their Own Employees To Madoff

747.    Soon after the Sterling Partners opened their own KW BLMIS Accounts, they began opening KW BLMIS Accounts for friends, close business acquaintances, and Sterling employees—all of whom they referred to Madoff.

748.    By December 2008, Sterling had referred approximately 178 "outsider" investor accounts to Madoff.  The list of outsiders with KW BLMIS Accounts opened by Sterling is as varied as it is long.  Sterling's referrals of outsiders provided Madoff with hundreds of millions of dollars in additional capital to further his fraud.  Moreover, these outsiders profited from the fraud as they withdrew approximately $67 million in Fictitious Profits from BLMIS.

749.    To obtain a coveted BLMIS account through Sterling, however, was not easy. Sterling internally needed to approve the account, and Saul Katz had the final say.  Far more outsiders were turned down than actually got into the elite pool of Madoff investors through Sterling.

750.    Sterling took great strides to insulate the outsider account-holders from Madoff, as one of the requirements to obtain a BLMIS account through Sterling was that all communications regarding the account had to go through Sterling; never directly through Madoff or anyone else at BLMIS.

751.    Sterling also used the ability to obtain a Madoff account as an employee incentive.  Upon commencing employment with Sterling, many employees were told that they could have an opportunity to open a BLMIS account.

752.     Similarly, Sterling also offered its employees the opportunity to invest with BLMIS through its 401(k) plan.  *See infra* Section IX.B.3.  By December 2008, approximately 90% of the Sterling 401(k) plan was invested in BLMIS.

753.     Despite referring its friends, business acquaintances, and employees to BLMIS—indeed, even offering BLMIS as a 401(k) plan investment option—Sterling performed no diligence on Madoff or BLMIS in response to any of the various red flags to which it was exposed.  *See infra* Section X.

**D.      Sterling Administered 483 BLMIS Accounts On Behalf Of The Sterling Partners, Families, Trusts, Entities, Friends, Business Associates, and Employees**

**1.      Sterling Partner Arthur Friedman tracked, monitored, and acted as BLMIS liaison for all 483 BLMIS Accounts.**

754.     Madoff requested that Sterling have a single point person with respect to its hundreds of KW BLMIS Accounts.  In response to Madoff's request, Sterling developed an elaborate system to monitor and administer the KW BLMIS Accounts.  This system was run by Sterling Partner Arthur Friedman ("Friedman")—the individual designated by Sterling as the intermediary between Sterling and BLMIS.

755.     Friedman was responsible for opening and closing all Sterling-related BLMIS accounts, as well as communicating to BLMIS all transaction requests, including deposits, transfers and withdrawals.  Friedman had frequent contact on a weekly, if not daily, basis with BLMIS and, typically, Frank DiPascali ("DiPascali"), Sterling's assigned point of contact with respect to the day-to-day administration of its hundreds of accounts.  Over the course of Sterling's investment relationship with Madoff, Friedman wrote hundreds of letters to DiPascali detailing transaction requests with respect to the KW BLMIS Accounts.

756.    Friedman maintained the paperwork provided by BLMIS concerning all Sterling-related KW BLMIS Accounts, including account opening statements, trade confirmations, monthly statements, and portfolio management reports.

757.    Friedman supervised Sterling's tracking of KW BLMIS Account balances and transactions, such as deposits, withdrawals and transfers using Sterling's internal accounting system.  Friedman worked with the Partners' Accounting Department to ensure that it received the BLMIS-related data to be tracked on the internal accounting system.

758.    Friedman monitored rates of return for Sterling's KW BLMIS Accounts. Friedman calculated average monthly and yearly rates of return across all Sterling-related KW BLMIS Accounts typically using a random sampling of accounts, and then reported this information to the Sterling Partners.

759.    Friedman had the responsibility of reporting on Madoff's performance at the bi-weekly Sterling Partners meetings where Madoff was always its own agenda topic.

760.    In addition to monitoring Madoff's rates of return, Friedman closely tracked the balances within the KW BLMIS Accounts and calculated each Sterling Partner's purported equity in BLMIS taking into account the varying interests held in each of their dozens of accounts with Madoff.

761.    Friedman and the Partners' Accounting Department created what was known at Sterling as the monthly "Hell Sheet," which calculated the balances of the hundreds of KW BLMIS Accounts held by each Sterling Partner or family member, and the percentage of that balance held by each Sterling Partner or family member based on his or her interest in a particular account.

762.     Friedman oversaw the year-end tax reporting process for all the KW BLMIS Accounts, including the "outsider" referral accounts. This entailed, among other things, receiving information from BLMIS and reconciling that information with each Sterling Partner's interests across a multitude of accounts.

763.     Friedman even devised a calculus to maximize the "efficiency" factor of the KW BLMIS Accounts. This efficiency factor was based on his understanding of Madoff's alleged strategy and the number of puts Madoff claimed to purchase based on the funds in a particular account. Friedman calculated the amount of money necessary to purchase one put and then often notified accountholders—Sterling Partners, family members, employees, and "outsiders"—of the money required to be added to their BLMIS accounts to ensure that they maximized the number of puts Madoff would purchase and, in doing so, received the most beneficial returns on their investments.

764.     Moreover, in or around the late 1980s, Friedman tried—unsuccessfully—to replicate Madoff's split-strike conversion strategy by mimicking the transactions reflected on BLMIS' trade confirmations. Friedman carefully applied the strategy as Madoff had described it, but he always lagged behind Madoff by a significant percentage return. Friedman communicated the results of his analysis to the Sterling Partners, yet Sterling in response failed to undertake any diligence regarding Madoff.

765.     Years later, Friedman enlisted the help of others to try to reverse engineer Madoff's strategy—again to no avail. Specifically, in or around mid-2005, Friedman tasked his executive assistant ("Friedman's Executive Assistant")—a Series 6 licensee who formerly worked as a financial consultant—with the job of trying to understand how Madoff applied the split-strike conversion strategy. Despite her financial background and detailed knowledge of the

KW BLMIS Accounts, Friedman's Executive Assistant was never able to fully understand or duplicate Madoff's strategy.

**2. Sterling manipulated tenant-in-common BLMIS Accounts to maximize SIPC protection.**

766.    Very early on, many of Sterling's KW BLMIS Accounts were formed as TIC accounts.  These TIC accounts typically were funded with the partners' (and sometimes their family members' and/or related trusts') excess cash on hand, and thereafter each partner's fixed percentage interest in that particular TIC account corresponded to the percentage of his initial investment.  Every time a withdrawal was made from a TIC account, each TIC interest-holder received his or her corresponding percentage interest.  Over time, the Sterling Partners opened and invested in close to 100 TIC accounts.

767.    At the outset, Sterling created the TIC accounts as a method to maximize the protections provided by the Securities Investment Protection Corporation ("SIPC").

768.    As administrator of the KW BLMIS Accounts, one of Friedman's early assignments was to verify that Madoff was a SIPC member and clarify its coverage rules.  In or around February and March 1987, Friedman confirmed with the Sterling Partners his understanding that SIPC provided protection of up to $500,000 for each realistically different BLMIS account and that each joint and/or TIC account would be separately covered by SIPC protection so long as each co-owner of the account possessed the authority to act with respect to the entire account.

769.    Friedman communicated the results of this inquiry to the Sterling Partners in writing and also wrote a letter to Annette Bongiorno at BLMIS informing her that with respect to the Sterling accounts currently open at BLMIS, for every account with more than one owner, each co-owner possessed the authority to act with respect to the entire account.

770.     Initially, the Sterling Partners intentionally structured their BLMIS accounts to be under $500,000 so the accounts could receive what they believed to be the maximum amount of SIPC coverage.  For example, in May 1986, Sterling withdrew $838,000 and $72,000 from two Prudential accounts, respectively, in the name of Sterling Third Associates and College Place Enterprises Profit Sharing Plan, each of which were associated with real estate ventures, with the intention of investing these assets with Madoff.  Sterling then opened KW BLMIS Accounts in the same names as the Prudential accounts; however, rather than deposit $838,000 into the Sterling Third Associates KW BLMIS Account and $72,000 into the College Place KW BLMIS Account, Sterling transferred approximately $430,000 into the Sterling Third Associates KW BLMIS Account and approximately $480,000 into the College Place KW BLMIS Account so that each of these two accounts would fall under $500,000, thereby maximizing the SIPC protection as understood by Friedman.

771.     This practice informed the opening and administration of many subsequent KW BLMIS Accounts.  It only ended when Sterling's investments in BLMIS became too large to break up into discrete $500,000 incremental TIC accounts.

**E.     Madoff Invested Approximately $12 Million In Sterling Business Ventures**

772.     In the early stages of Sterling's and Madoff's relationship, Madoff was offered the opportunity to invest in Sterling's lucrative real estate deals and business ventures.  When the Sterling Partners looked for outside investors, they often turned to Madoff as a potential source of capital.

773.     Over the years, Madoff invested at least $12 million in half a dozen Sterling investment vehicles.  Upon information and belief, Madoff used other people's money to make most—if not all—of these Sterling-related investments.

774. The only time Sterling offered Madoff an opportunity to invest that he declined was in the Mets, when in 2002, Doubleday sold its 50% ownership of the Mets and Sterling offered Madoff partial ownership interests in the franchise.

775. Madoff first invested in Sterling in or around 1991 when Sterling formed the first of five SAP real estate investment funds. To execute this investment in SAP I, a Sterling-related entity called "Madoff Realty Associates" was formed as a partnership between two Sterling-related trusts and Madoff, wherein Madoff owned 60%. This investment proved lucrative to Madoff, who made over $2 million off of his initial contribution of just over $4 million—a rate of return of over 50%.

776. Madoff invested in each of the four subsequent SAP funds: (a) SAP II in December of 1996 through a Sterling-related entity called "Realty Assoc Madoff II," in which two Sterling-related trusts owned 20% and Madoff owned 60%; (b) SAP III in April 1999; (c) SAP IV in July 2002; and (d) SAP V in 2006.

777. Madoff's brother, Peter Madoff, also invested in SAP III, SAP IV, and SAP V.

778. Approximately $11.4 million of the Madoffs' investments in SAP—including those in the name of Ruth Madoff and Peter Madoff—were funded out of BLMIS bank accounts.

779. Madoff also held an interest of more than 4% in a Sterling-related entity called Sterling Acquisitions, which invested venture capital in various companies, including an energy business called Changing World Technologies. In connection with this investment, Madoff transferred over $592,000 to Sterling from BLMIS bank accounts. Additionally, Madoff invested in at least one other Sterling venture capital business, a medical research company called PathoGenesis Corporation. Further, Madoff invested in two Sterling-related entities called

Sterling Carl Marks Capital, a small business investment company, and Sterling Vessels, an entity created to invest in various maritime carriers.

780.    Each of Madoff's investments in Sterling-related businesses, ventures, or entities was placed in Ruth Madoff's name, even though none of the Sterling Partners ever had any business dealings with Ruth Madoff; their dealings were always with Madoff himself.

781.    Although Madoff placed these investments in Ruth Madoff's name, the funds for each of these investments never came from Ruth Madoff, but instead from BLMIS.

**VIII.    MADOFF MONEY AIDED THE GROWTH OF THE STERLING BUSINESSES, WHICH PROVIDED EVERY INCENTIVE TO IGNORE INDICIA OF FRAUD**

782.    Sterling treated its millions of dollars in BLMIS investments as the fourth arm of its business.  In addition to Sterling's long-term investments with Madoff, the Sterling partners regularly put excess cash into BLMIS and moved money in and out on a short-term basis, often using BLMIS withdrawals to fund business operations.  Implicit in this use of BLMIS for short-term cash management was the assumption that Madoff would consistently generate positive, non-volatile, and essentially risk-free returns.  Typically, such an assumption can only be made for FDIC-insured savings and checking accounts—not for investment accounts purportedly invested in volatile securities and options.

783.    Rather than follow a traditional cash management strategy, the Sterling Partners relied on BLMIS accounts as a primary source of liquidity—even though the funds in these BLMIS accounts were purportedly invested in inherently volatile and risky securities and options.

784.    To implement this strategy, Sterling opened approximately 65 KW BLMIS Accounts in the name of dozens of different Sterling-related entities, including many of the Sterling Entity Defendants, across all lines of Sterling's business.

785. Upon information and belief, the Sterling Partners directed and controlled the Sterling Entity Defendants and their KW BLMIS Accounts and retained the beneficial use of the funds in such accounts.

786. The Sterling Partners directed the Sterling Entity Defendants' BLMIS investments, including the withdrawal and disbursement of funds from their KW BLMIS Accounts, as well as the transfer of funds between and among such accounts and the other KW BLMIS Accounts in which they, their family members, trusts and other related entities held interests.

787. Under the direction and control of the Sterling Partners, many of the Sterling Entity Defendants' KW BLMIS Accounts were used as the primary sources of liquidity out of which many business expenses were paid, while others were created for the specific purpose of investing in BLMIS.

788. Over the course of its almost quarter-century investment relationship with Madoff, Sterling withdrew over $153 million in Fictitious Profits from the Sterling Entity Defendants' KW BLMIS Accounts. Such funds benefitted both new and existing Sterling ventures, including the Mets and various real estate ventures, and also provided cash flow to Sterling's internal bank—SEF, a clearing house for the movement of inter-mingled funds and obligations among the Sterling Partners, their family members, trusts, and Sterling-related entities.

789. The Sterling Partners also utilized certain KW Entity Accounts to leverage Sterling's BLMIS investments by exploiting the purported equity within the accounts as collateral for a multitude of bank loans, the proceeds of which were either invested in other facets of the Sterling business or re-invested into BLMIS. The Sterling Partners also used the

purported equity in Sterling's BLMIS accounts to support their net worth and creditworthiness and convince banks to extend them other business loans thereby allowing them access to the capital needed to consummate key business deals that might not have been otherwise available.

790.    Sterling was so dependent upon Madoff's investment returns to fund its operations, provide collateral on vital loans, and support its creditworthiness that upon revelation of Madoff's fraud, Sterling faced a severe and immediate liquidity crisis.  Because Sterling considered its BLMIS investments so highly liquid, when BLMIS collapsed, it had very little actual cash on hand.  This prompted a complete and comprehensive restructuring of Sterling's debt facilities, not just the millions of dollars of debt secured by KW BLMIS Accounts.

A.    **Sterling Used BLMIS Accounts To Support The Operations Of The New York Mets**

791.    The quintessential example of the intertwined nature of Sterling's business and its investments with Madoff, as well as Sterling's unorthodox use of its BLMIS accounts in lieu of a traditional cash management strategy, is the Mets.

792.    As discussed earlier, the Sterling Partners withdrew over $94 million in Fictitious Profits from the opening dates of the Mets-related KW BLMIS Accounts to the Filing Date and approximately $344 million in principal during the six years prior to the Filing Date from the Mets-related KW BLMIS Accounts.

793.    Many of these Mets-related KW BLMIS Accounts were used to provide the cash flow necessary to run the day-to-day operations of the Mets.  Specifically, the cash withdrawals from Sterling's Mets-related KW BLMIS Accounts, which included Fictitious Profits, were critical to Sterling's ability to run the Mets because they were used to cover significant expenses, such as payroll, players' deferred compensation, and stadium operations.  In fact, the estimated

returns from the Mets-related KW BLMIS Accounts were consistently built into the Mets' cash flow projections and budget analyses.

794.     The pattern of Sterling's deposits and withdrawals into and out of the Mets-related KW BLMIS Accounts reflect the seasonality of the Mets' business. Approximately 80% of the total deposits into the Mets-related KW BLMIS Accounts were during baseball's off-season months of October through March. Conversely, approximately 75% of the total withdrawals from the Mets-related KW BLMIS Accounts were during baseball's regular season months of April through September.

795.     When the Mets needed money, the Sterling Partners withdrew funds from the Mets-related KW BLMIS Accounts. For example, when faced with liquidity issues, such as lags in ticket sales, Sterling frequently "scraped" from these accounts to address the cash shortages.

796.     In addition, the withdrawals from the Mets-related KW BLMIS Accounts were so important to the smooth operation of the Mets that Sterling often provided Madoff with advance notice of these withdrawals, specifying dates and amounts. This process ensured that Madoff had adequate time to make the cash available to the Mets—regardless of whether he was supposedly in or out of the market.

797.     Sterling's use of the Mets-related KW BLMIS Accounts in lieu of traditional cash management practices evidences the Sterling Partners' willingness to ignore the risks and volatility normally associated with owning stocks and options, as well as their unrealistic confidence in Madoff's high and consistent returns. Despite this reliance and the implausibility of such consistent returns month after month and year after year—including during periods of significant fluctuations in the market—Sterling conducted no diligence on Madoff or BLMIS in response to the red flags of which it was aware. *See infra* Section X.

**B.    Sterling Employed BLMIS Accounts To Meet Capital Commitments**

798.    SAP V, the fifth real estate fund created out of Sterling's partnership with American Securities, is another example of how the Sterling Partners funded and grew one of their key businesses using their BLMIS investments.

799.    SAP V was formed in April 2006 by Sterling and American Securities as general partners holding a 90% and 10% interest, respectively. SAP V was comprised of limited partner capital commitments of $150 million from Sterling, at least $15 million from American Securities, and approximately $444 million from third-party investors.

800.    Upon information and belief, undisclosed to the third-party limited partner investors, however, Sterling used very little of its own money to meet this $150 million commitment and instead relied on borrowed funds and BLMIS investment proceeds. In fact, upon information and belief, Sterling was only able to meet this funding commitment because of its investments with Madoff.

801.    Specifically, in or around June 2006, Sterling funded at least half of its $150 million commitment through Sterling Internal V LLC, an entity in which various Sterling-related trusts, partners, and employees held membership interests and that, upon information and belief, invested exclusively with Madoff.

802.    Sterling Internal V LLC borrowed $75 million—half of Sterling's $150 million commitment—from Bank of America via a syndicated loan. Upon information and belief, in evaluating this loan, Bank of America was influenced by both the large purported balances in BLMIS accounts held by the Sterling Partners and related entities, and the consistent returns generated by those accounts.

803.    In or around July 2006, Sterling opened a KW BLMIS Account in the name of Sterling Internal V LLC (1KW435) to house the proceeds of this loan for safekeeping. Upon

information and belief, Sterling withdrew funds from this account—including the Fictitious Profits generated by its purported rate of return of approximately 10%—to cover both the interest payments on the loan, as well as half of the funds necessary to meet SAP V's capital calls. To accomplish this objective, the Sterling Partners withdrew over $51 million from the Sterling Internal V LLC BLMIS account between December 2006 and July 2008.

804. Upon information and belief, the other half of Sterling's portion of SAP V's capital calls were typically advanced by SEF, which was then reimbursed by various Sterling Partners and related entities, at least in part, via withdrawals from various KW BLMIS Accounts.

805. Indeed, upon information and belief, every mechanism in place to enable Sterling to meet its $150 million capital commitment to SAP V touched BLMIS directly or indirectly and allowed the Sterling Partners to claim that they made a substantial commitment without having to put up much of their own capital.

806. As of the first quarter of 2010, SAP V acquired approximately 4,600 residential units and 2.8 million square feet of office space. Sterling derived significant income from SAP V as a result of its 90% general partnership interest, which entitled it to 90% of the general partners' management fee of 1.5% of the capital committed during the investment period. For example, in 2009 alone, Sterling received approximately $9 million in management fees as a result of its general partner interest in SAP V.

**C.      Sterling Depended On BLMIS Accounts To Provide Cash Flow To Its Businesses Through Its Internal Bank, Sterling Equities Funding**

807. An integral part of the funding strategy for expanding Sterling's businesses over the last three decades was Madoff's purported earnings. Over the history of the Madoff/Sterling relationship, the BLMIS investments made by the Sterling Partners, their family members, related trusts and entities collectively netted approximately $300 million in Fictitious Profits, and

over $700 million in principal withdrawals during the six years prior to the Filing Date, which were, in part, used as fuel for Sterling's businesses. A core component of this funding strategy was SEF, Sterling's internal bank that is 100% owned by the Sterling Partners and acts as a clearing house for the movement of inter-mingled personal and business funds used to meet various obligations among the Sterling Partners, their family members, related trusts, including the Katz/Wilpon Trust Defendants, and entities, including the Sterling Entity Defendants.

808.  SEF funds were used to develop and grow Sterling's businesses because they were used for Sterling's business-related expenses, including starting new businesses or investments, meeting capital commitments necessary to grow existing businesses or investments, paying operating expenses for existing businesses, and servicing debt held by both established and newly-created businesses.

809.  SEF operated with available credit lines from at least six banks totaling over $90 million, which were available to Sterling Partners and certain Sterling-related entities to enable them to borrow funds quickly and conveniently without having to approach a bank in every instance to negotiate separate lines of credit.

810.  Upon information and belief, one factor in extending the credit lines to the Sterling Partners and certain Sterling-related entities was the value of the purported equity in their KW BLMIS Accounts.

811.  Sterling Partners bypassed business formalities in their treatment of SEF. SEF routinely extended loans to the Sterling Partners and certain Sterling-related entities and, occasionally, certain Sterling Partners and Sterling-related entities extended loans to SEF. These loans, however, were not properly documented and were simply tracked by Sterling internally. Although interest may have been charged for the loans SEF extended to the Sterling Partners, the

interest rates were set internally by the Sterling Partners themselves, typically allowing for a relatively small profit to SEF, which they wholly owned.

812. Further, SEF endorsed and deposited checks from BLMIS that were made payable to various tenancies-in-common, which pooled the investments of the Sterling Partners, often with the investments of their family members, friends, and/or trusts.

813. SEF benefitted from a constant stream of capital from BLMIS. Sterling Partners, family members, related trusts or entities often withdrew funds from their KW BLMIS Accounts, which were then deposited directly into SEF and, upon information and belief, subsequently used as capital to fund various Sterling business-related expenses. Upon information and belief, at least $135 million in withdrawals from KW BLMIS Accounts passed directly through SEF between 2003 and 2008.

814. In certain circumstances, Sterling entities or Sterling Partners needed quick access to capital and had to draw on SEF's many credit lines to advance the necessary funds to a Sterling entity or individual partner(s). In such cases, the Sterling entity or individual partner(s) receiving the loan(s) would owe a corresponding debt to SEF. Therefore, it was not uncommon for some Sterling entities or individual Sterling Partners to incur substantial debts to SEF. Often, the indebted Sterling entities or individual Sterling Partners would pay down their debts to SEF by withdrawing funds from their KW BLMIS Accounts.

**D.** **Sterling Used BLMIS Accounts As Leverage To Borrow Capital And Double Its Returns**

**1.** **Sterling's leveraged BLMIS accounts relied upon Madoff's implausible returns.**

815. Another way the Sterling Partners capitalized on their BLMIS investments was through the use of leverage. At the time Madoff's fraud was revealed, Sterling had approximately $216 million in outstanding debt secured by KW BLMIS Accounts.

816. Specifically, at least 28 KW BLMIS Accounts in which Sterling Partners, family members, trusts and related entities held interests were used as collateral for bank loans, the proceeds of which were used for the specific purpose of investing in BLMIS (the "Leveraged KW BLMIS Accounts").

817. The Leveraged KW BLMIS Accounts were funded by credit agreements between the various Sterling Partners, family members, trusts and entities (collectively, the "Sterling Borrowers") on the one hand, and Fleet National Bank or Bank of America, which later acquired Fleet National Bank—on the other.

818. Madoff requested that the Sterling Borrowers use only Fleet National Bank (and then Bank of America) as their lender.

819. At the direction of the Sterling Partners, approximately $84 million in Fictitious Profits were withdrawn from the Leveraged KW BLMIS Accounts.

820. The Sterling Partners referred to many of the Leveraged KW BLMIS Accounts as "double up" accounts because they received borrowed funds that doubled the amount invested in the accounts and thereby doubled their returns (the "Double Up Accounts"). For each Double Up Account, the Sterling Borrowers entered into a loan agreement to borrow up to 50% of the amount held in a particular Double Up Account and invest the proceeds into the same Double Up Account (the "Double Up Loans").

821. For example, Sterling 20 LLC, an entity that was created by the Sterling Partners for the sole purpose of investing with Madoff, held a Double Up Account: 1KW358. The various members of Sterling 20 LLC pooled approximately $20 million into 1KW358. Sterling 20 LLC then used that $20 million as collateral to borrow an additional $20 million to invest into

1KW358.  The Double Up Loan enabled the Sterling Borrowers for Sterling 20 LLC to invest $40 million in 1KW358 and double their investment gains purportedly generated by Madoff.

822.    As conditions to the Double Up Loans, BLMIS, the Sterling Borrowers and Fleet National Bank or Bank of America entered into pledged collateral account control agreements that required, among other things, that: (a) the Sterling Borrowers maintain minimum balances in their Double Up Accounts; (b) BLMIS deliver monthly reports to the lender on the Double Up Accounts; and (c) BLMIS or Sterling notify the lender if the market value of the Double Up Accounts fell below the minimum required balance for any given day.  Many of the Double Up Loans also required the Sterling Borrowers to provide personal and unconditional guarantees.

823.    Because the credit agreements in connection with the Double Up Loans required that a minimum amount of funds—typically two-times the amount of funds borrowed—remain invested in BLMIS, the "double up" strategy assisted Madoff to perpetuate his Ponzi scheme by ensuring millions of dollars remain invested in BLMIS without the risk of redemption

824.    The first Sterling Borrowers to "double up" their investments were Judith Wilpon and Iris Katz, who on March 8, 1996 obtained Double Up Loans from Fleet National Bank relating to their respective KW BLMIS Accounts, 1KW014 and 1KW077.  In connection with these Double Up Loans, both Judith Wilpon and Iris Katz granted Fleet National Bank security interests in their respective KW BLMIS Accounts as collateral for the loans and borrowed up to 50% of the value in their respective BLMIS accounts.

825.    In October 2000, the Sterling Partners began to form limited liability companies for the sole purpose of investing Double Up Loan proceeds into BLMIS.  By 2008, the Sterling Partners had created at least seven entities for the express purpose of investing in BLMIS (collectively, the "Double Up Entities") and had opened at least nine Double Up Accounts to

house Double Up Loan proceeds. The Double Up Entities and their respective Double Up Accounts include: Sterling Thirty Venture LLC (1KW313, 1KW314, and 1KW315), Sterling 20 LLC (1KW358), Sterling 10 LLC (1KW402), Sterling Brunswick Seven LLC (1KW420), Sterling Twenty Five LLC (1KW447), Sterling Tracing LLC (1KW455), and RV-RJW LLC (1KW467).

826. Between 2000 and 2008, the Sterling Borrowers used the Double Up Entities' Double Up Accounts as collateral to borrow in the aggregate approximately $114 million from Fleet (and later Bank of America), which was then deposited into BLMIS in order to "double" their returns.

827. Typically, the Double Up Entities were formed when the Sterling Partners accumulated excess funds and then made a collective decision to create an entity for the sole purpose of investing Double Up Loan proceeds with Madoff.

828. Generally, the Double Up Entities were owned, dominated, and controlled by the Sterling Partners, many of whom served as their officers, directors, and/or members.

829. Upon information and belief, the Double Up Entities operated without corporate formalities. The Double Up Entities did not conduct any business other than investing in BLMIS. The Double Up Entities' "officers" had no responsibilities. The Double Up Entities did not have separate corporate records, office space, addresses, telephone numbers or personnel. Upon information and belief, the Sterling Partners withdrew the purported profits from certain Double Up Accounts held by Double Up Entities to cover miscellaneous expenses for individual Sterling Partners or Sterling-related businesses with no relation to the respective Double Up Entity.

830.     The Double Up Entities were investment vehicles through which the Sterling

Partners, and sometimes their family members and trusts, leveraged their investments with

Madoff to double their returns.

831.     The Sterling Borrowers provided overlapping guarantees across a number of the

Double Up Loans issued to the various Double Up Entities, effectively tying these entities

together.

832.     Significantly, Sterling managed its Double Up Accounts as if Madoff's returns

were guaranteed.  The Sterling Partners made frequent withdrawals from the Double Up

Accounts consisting of both automatic monthly withdrawals and large periodic withdrawals of

the "excess" funds above the minimum account balance mandated by the lender bank under the

Double Up Loan agreements.  This withdrawal pattern often left razor thin margins between the

Double Up Account balance and the minimum balance required under the Double Up Loan

agreement, which—as discussed below—was extremely risky due to the volatility typically

associated with equity investments and the substantial financial consequences for Sterling if

Madoff had a down month.

833.     For each Double Up Entity's Double Up Account, Sterling routinely and

methodically plotted the amount of excess cash above the required minimum balance under the

corresponding Double Up Loan agreement.  Sterling then "swept" the excess funds out of the

Double Up Accounts.  Upon information and belief, Sterling often deposited the excess funds

into Sterling's internal bank, SEF, which thereafter were used to support Sterling's businesses.

834.     For example, on or about April 26, 2005, SAP IV, one of SAP's real estate funds

that had no ownership interest in any Double Up Entity, made a capital call to its partners to raise

money to fund its operations.  SEF sent the funds to SAP IV to meet the capital call; however,

the funds sent consisted of "excesses" above the required minimum account balances withdrawn from the Double Up Accounts associated with two Double Up Entities: Sterling Thirty Ventures LLC and Sterling 20 LLC.

835.     By making automatic monthly withdrawals, as well as sweeping the "excess" funds from the Double Up Accounts, the Sterling Partners kept the Double Up Account balances at or slightly above their required minimum despite the fact that they were purportedly invested in volatile equities and options.  By doing so, the Sterling Partners, along with the rest of the Sterling Borrowers, assumed the risk that they would breach the Double Up Loan agreements if the Double Up Accounts suffered even a modicum of loss and fell below their required minimum balance.

836.     By maintaining such thin margins, the Sterling Partners relied on the implausible assumption that their Madoff returns would always be positive and never experience even short term volatility.

837.     Consistent with this assumption, the Double Up Accounts rarely experienced a loss that resulted in a breach of their minimum balance requirement.  For example, the Sterling Brunswick Seven LLC Double Up Account, 1KW420, experienced only two down months during its four years of activity and was consistently maintained at or very slightly above its required $14 million minimum account balance.  The Sterling Tracing LLC Double Up Account, 1KW455, experienced no down months during its existence from April 2007 through December 2008, a time when the Standard and Poor's 100 Index ("S&P 100") lost more than 250 points. The Sterling Partners knew or should have known that the implausibly consistent returns were too good to be true and in no way characteristic of investments in equities.

838.    Despite borrowing millions to invest in BLMIS using their Leveraged KW BLMIS Accounts as collateral—and often even providing personal and unconditional guarantees—the Sterling Partners conducted no diligence on Madoff in connection with their use of Double Up Loans.

839.    Overall, the Sterling Partners' double up strategy was yet another way they structured their BLMIS investments to exploit the implausibly low volatility of the returns fabricated by Madoff and further increase their profits.

**2.    Sterling used other forms of leverage across various BLMIS accounts.**

840.    At least five KW BLMIS Accounts in the name of Sterling entities, including Sterling Mets LP (1KW218) and Mets LP (1KW192, 1KW423), were used as collateral for loans, the proceeds of which were used to fund the business needs of those entities.

841.    Sterling also pledged at least one of its Mets-related KW BLMIS Accounts as collateral to obtain a loan from Bank of America in July 2005 on behalf of Mets LP, which was integral to Sterling's ability to terminate its broadcasting agreement with Cablevision and eventually form SNY.

842.    In addition to accepting at least one of Sterling's KW BLMIS Accounts as collateral for this loan, upon information and belief, Bank of America justified extending the loan based upon the balances and consistent earnings from all of Sterling's related KW BLMIS Accounts.  This justification also supported Bank of America's agreement to reduce the amount of the Sterling Partners' individual guarantees of the loan.

843.    At least three Sterling entities without BLMIS accounts, Sterling Twenty Sub LLC, Sterling Thirty Venture Sub LLC, and Charles 15 Associates LLC, used their parent entities' BLMIS accounts as collateral for loans, the proceeds of which were purported used for business purposes.

844. Finally, at least four KW BLMIS Accounts, including Sterling Internal V LLC (1KW435), Sterling VC IV LLC (1KW463), Sterling VC V LLC (1KW464), and Sterling DIST Properties LLC (1KW465), were held by Sterling-related entities that entered into loan agreements specifying that the loan proceeds could be invested with BLMIS, even though no BLMIS accounts were used as collateral.

**E.      Sterling Depended On Its BLMIS Investments To Consummate Key Deals And Secure Access To Capital Under Favorable Lending Terms**

845. In addition to leveraging many KW BLMIS Accounts, the Sterling Partners received many other benefits by taking advantage of the sizeable purported equity in their KW BLMIS Accounts.

846. First, Sterling took out loans where its BLMIS accounts were not used as the collateral, but rather were required to maintain minimum balances to meet the liquidity mandates of the loan.

847. Moreover, upon information and belief, Sterling used the purported equity in its BLMIS accounts as leverage when negotiating loans for major business deals.  Specifically, upon information and belief, Sterling used its BLMIS account balances to prove its net worth, as well as the value of its business.  In fact, upon information and belief, Sterling's total assets invested with Madoff were a major consideration in lender evaluations of its creditworthiness.

848. Upon information and belief, these loans—many of which were extended, in part, based on an evaluation of the Sterling Partners' BLMIS investments—assisted the growth of Sterling's businesses.

849. For example, upon information and belief, Sterling's investments with Madoff were a factor in the subsequent re-financing of the Mets' credit facilities in or around 2004.

850.     Specifically, upon information and belief, the Sterling Partners used the purported equity in their BLMIS accounts to convince the participating lenders of their creditworthiness when extending the credit facilities necessary to re-finance certain loans that enabled Sterling to purchase full ownership of the Mets in 2002.

851.     In or around 2004, when Sterling re-financed the Mets credit facilities, upon information and belief, the Sterling Partners made representations to the participating lenders concerning the purported equity in their BLMIS Accounts and the consistently high and steady nature of Madoff's returns.  Sterling touted that Madoff "provide[d] a safe alternative to unattractive money market yields" and that over the previous 25-year period, Madoff's average returns were 18% with an extremely low standard deviation of 4%.  Further, the Sterling Partners pointed out that these "statistics predict positive annual returns 99.9% of the time."

852.     The overall Fictitious Profits Sterling received from its BLMIS investments—although staggering in their own right—do not fully reflect the true breadth of the benefits Sterling enjoyed as a result of being heavily invested with Madoff.  BLMIS funds were a driving force behind the expansion of Sterling's businesses and this reality only further deepened the Sterling Partners' dependency on Madoff.

**F.     Post-12/11/08 Debt Restructuring Proves Sterling's Dependency on Madoff**

853.     Perhaps the most telling evidence of Sterling's dependency on Madoff is the mere fact that post-revelation of Madoff's fraud, the Sterling Partners were forced to negotiate with at least seven lender banks, including Bank of America, JPMorgan Chase, Citibank, HSBC, M&T, Wachovia, and Bank of New York (the "Lender Banks"), to restructure over half a billion dollars in collective debt—not just the millions of dollars of debt secured by the Leveraged KW BLMIS Accounts.

854. Because the Sterling Partners had invested most—if not all—of their and their entities' available cash in BLMIS, after Madoff's fraud was exposed, Sterling faced a liquidity crisis. BLMIS' collapse also caused the Sterling Partners, their trusts, and/or Sterling-related entities to breach numerous loan agreements for which their KW BLMIS Accounts served as collateral and, upon information and belief, called into question the liquidity representations made by the Sterling Partners to certain Lender Banks in connection with several other loans.

855. During the restructuring negotiations it was determined that the finances, debt and structures of the numerous Sterling-related entities and trusts, along with the financial condition of the Sterling Partners, were simply too interrelated for their debt to be treated separately. For example, the Sterling Partners had provided many guarantees across a multitude of loans extended to numerous trusts and Sterling-related entities, which effectively linked together the Sterling Partners and these trusts and Sterling-related entities.

856. As such, upon information and belief, in order to accomplish the restructuring, the Sterling Partners decided to remove the facade of separate entities and trusts that they had attempted to construct over the decades of their relationship with Madoff.

857. As a result, the final restructuring plan consolidated at least forty loans owed by the Sterling Partners, their trusts, and Sterling-related entities into five new secured credit facilities.

858. Upon information and belief, two of these five new credit facilities involved the Katz/Wilpon Trust Defendants, as these two facilities were comprised of $100 million each in new debt owed to the banks by the Saul Katz Family Trust and the Fred Wilpon Family Trust with the Katz 2002 Descendants' Trust and the Wilpon 2002 Descendants' Trust providing limited guarantees. Upon information and belief, by taking on debt previously owed to the

banks by various Sterling Partners and Sterling-related entities, the Saul Katz Family Trust and the Fred Wilpon Family Trust more than doubled the amount of their previously outstanding debt for no apparent value.

859.    Notably, upon information and belief, a joint and several payment guaranty for the two new $100 million facilities owed by the Saul Katz Family Trust and the Fred Wilpon Family Trust was provided by SEF, certain entities created in connection with the restructuring, and the vast majority of the Sterling Partners, including Fred Wilpon, Richard Wilpon, Saul Katz, Michael Katz, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, and David Katz.

860.    Notwithstanding both Sterling's and the Lender Banks' full notice of the potential liability to the Trustee faced by the Sterling Partners, their trusts, and Sterling-related entities in this case, the restructuring credit facilities entered into by these parties and the Lender Banks attempted to circumvent, or at the very least, mitigate the effects of any potential recovery action initiated by the Trustee.  Specifically, the restructuring credit facilities provide, among other things, that "one or more final, nonappealable judgments or orders, and/or one or more settlements or agreements to settle, in connection with any Madoff Action or Actions" by or against certain Sterling Partners, Sterling-related entities and trusts in aggregate amounts of $50,000,000 or more in certain circumstances and $100,000,000 or more in others constitutes an event of default under those facilities (a "Madoff EOD").

861.    In addition, the Lender Banks, with Sterling's concurrence, knew that a Madoff-related judgment could be far in excess of $100,000,000 and protected themselves with conditional guarantees.  Various Sterling Mets and SNY related entities entered into guarantees with the Lender Banks, which are triggered by, among other things, a Madoff EOD.  These guarantees provide that, in the event of a Madoff EOD and the disposition of any direct or

indirect interest of certain Sterling entities in the Mets or SNY, the amount of the net cash proceeds or net consideration received by the guarantors from a sale of such interest(s) are to be paid over to the Lender Banks upon demand to satisfy the obligations incurred under the restructuring credit facilities.

862. Upon information and belief, the provisions of the restructuring credit facilities set forth in paragraphs 860 and 861 herein evidence Sterling's and the Lender Banks' knowledge of, and serious concerns with, potential avoidance actions by the Trustee against the Sterling Defendants.

863. In short, despite being on full notice of the Trustee's claims, Sterling and the Lender Banks attempted to elevate the payment priority of Sterling's restructured debt ahead of the Trustee's recovery of funds on behalf of the Estate – effectively trying to ensure that Sterling's repayment obligations to the Lender Banks are senior to thousands of innocent BLMIS investors waiting to be compensated from Customer Property recovered by the Trustee, as well as Sterling's other unsecured creditors.

864. The across the board restructuring of debt owed by the Sterling Partners, their trusts, and Sterling-related entities after BLMIS' collapse provides even further proof of Sterling's dependency on Madoff, as well as the inextricably intertwined relationship between the Sterling Partners, their trusts, and Sterling-related entities, the vast majority of which benefitted either directly or indirectly from Madoff's fraud.

## IX.  THE STERLING PARTNERS WILLFULLY TURNED A BLIND EYE TO SUBSTANTIAL INDICIA OF MADOFF'S FRAUD

865. The Sterling Partners were well aware of the integral role their investments with Madoff played in growing and sustaining various Sterling businesses—it was this dependency that motivated the Sterling Partners to turn a blind eye to the red flags paraded before them.

866.     The warning signs were many and varied, ranging from cautionary counsel from financial industry experts and trusted advisors, to Madoff's schemes to avoid regulatory scrutiny, to the Sterling Partners' knowledge from their personal experience that Madoff was dishonest in his Investment Advisory business, to the fact that the Sterling Partners—through Sterling Stamos—had even invested in a Ponzi scheme before BLMIS' collapse that bore similar markings to the fraud right under their collective noses.  Sterling was simply in too deep—having supported its substantial business empire with Madoff money and having reaped the benefits of its purported equity in BLMIS—to do anything but ignore the gathering clouds.  Despite being on notice and having every resource at their disposal to investigate the litany of legitimate questions surrounding Madoff, the Sterling Partners did nothing.

### A.     Numerous Financial Industry Professionals Warned Sterling About Madoff

867.     Numerous financial industry professionals warned Sterling about Madoff and even speculated that he was operating a fraud.  The Sterling Partners, however, categorically rejected any criticisms of Madoff—even those voiced by their most trusted, financially-sophisticated advisors and business associates.

### 1.     Sterling Stamos warned Sterling of its Madoff concerns.

868.     As discussed above in Section VI.C, Sterling Stamos was formed as a partnership between Stamos and the Sterling Partners for the purpose of diversifying Sterling's BLMIS investments with the intent to replicate Madoff-like returns.

869.     Upon information and belief, Sterling Stamos personnel repeatedly warned the Sterling Partners that Madoff was "too good to be true" based on a number of factors including, but not limited to: Sterling Stamos' rejection of Madoff on due diligence grounds, Sterling Stamos' inability to duplicate the consistency of Madoff's returns, the lack of transparency associated with Madoff's black box strategy, Madoff's practice of self-clearing and self-

custodying trades, widespread recurring rumors of Madoff illegally front-running (*i.e.,* stepping in front of incoming trades from market making customers and placing trades on behalf of his investment advisory customers), Madoff's access to the very information that would allow one to front-run, and BLMIS' three-person audit shop, Friehling & Horowitz.

870. Upon information and belief, some or all of these warnings were discussed between or among the Sterling Partners, including, but not limited to, at one or more bi-weekly Sterling Partners meetings.

871. Emails sent by Sterling Stamos employees following Madoff's arrest on December 11, 2008 demonstrate that Sterling Stamos openly questioned Madoff's legitimacy for years and recommended to the Sterling Partners that they should redeem their BLMIS investments.

872. For instance, in a telling December 12, 2008 email exchange, one Sterling Stamos employee confirmed that Sterling Stamos' Chief Investment Officer had fingered Madoff as a fraud for years:

> [A] lot of our investors gave us crap about not generating returns like Madoff's[…]and I guess our CIO always said it was a scam, 'too good to be true[.]' Well there u [sic] go, it was too good to be true[.]

The Chief Investment Officer that this employee referred to in her email is Chachra, who had the official title of Chief Investment Strategist and worked at Sterling Stamos from its inception in June 2002 through late 2009.

873. In a December 13, 2008 email, Chachra confirmed that since shortly after Sterling Stamos' formation in 2002, Sterling Stamos persistently told the Katz and Wilpon families that Sterling Stamos had concerns about Madoff and that BLMIS had failed Sterling Stamos' due diligence process. Chachra's email provides, in pertinent part:

In fact, we turned down the Madoff Funds more then [sic] 6 years ago and told many of our investors including the Wilpon and Katz families about our concerns.

Notwithstanding our concerns, the Wilpon and Katz families continued to invest with Madoff Securities.

Please let me know if you would like to discuss this further as we are trying to inform all of our investors that our due diligence process rejected Madoff but, unfortunately, the Katz and Wilpon families maintained their investment independent of our advice.

874.    In a December 15, 2008 email, Stamos stated that Sterling Stamos would not invest with Madoff because BLMIS would not pass Sterling Stamos' due diligence requirements and that he had warned Saul Katz and Fred Wilpon not to invest.  Despite Stamos' advice, Saul Katz, Fred Wilpon, and Sterling as a whole defied his recommendations to withdraw their money from BLMIS.  Stamos states in his email:

Fortunately, our firm did not invest with Madoff.  That firm and fund wouldn't make it through our risk and ops controls--lack of transparency, no third party administrator, etc.  Unfortunately, our partners--Saul and Fred--against our recommendations invested as individuals and through their real estate firm.

875.    As these and other emails confirm, Sterling Stamos alerted the Sterling Partners to its concerns about Madoff for years and despite that advice, they continued to invest with Madoff.

876.    For starters, there was the simple fact that Sterling Stamos could never quite match Madoff's consistently high returns and improbable lack of volatility.

877.    The Sterling Partners compared the performance of BLMIS against that of Sterling Stamos on a regular basis—usually every month.

878.    Upon information and belief, these comparisons were discussed between or among the Sterling Partners, including, but not limited to, at bi-weekly Sterling Partners

meetings wherein Saul Katz and/or David Katz would typically present these comparisons to the other Sterling Partners.

879.     Upon information and belief, Sterling Stamos continually failed to live up to the Madoff standard expected by Sterling.  The Sterling Stamos funds were never able to duplicate the non-volatile, positive returns Madoff purportedly generated month after month and year after year.  Some of the Sterling Partners, including Saul Katz and Michael Katz, often expressed disappointment to Stamos and other Sterling Stamos employees about their inability to generate Madoff-like returns.

880.     The inability of Sterling Stamos—the hedge fund created by the Sterling Partners and entrusted with a substantial amount of their assets—to generate similarly high and consistent returns as compared to BLMIS should have caused Sterling to question the legitimacy of Madoff's enterprise.  Yet the Sterling Partners refused to conduct any inquiry into why Madoff's returns could not be duplicated or, more pointedly, why, when Sterling Stamos was suffering like everyone else during periods of market dislocation, Madoff was still able to generate consistent, positive returns.

881.     Upon information and belief, beginning with the formation of Sterling Stamos in June 2002 and frequently thereafter, Stamos had candid discussions with Saul Katz regarding not only his concerns about Madoff, but the astounding amount of cash Sterling had invested in BLMIS that was potentially at risk.  Over the years, Stamos frequently pointed out to Saul Katz that because he and the rest of the Sterling Partners were so heavily invested with Madoff, they assumed the "single manager risk."  Stamos specifically warned that all of the capital Sterling invested with Madoff could be frozen indefinitely if Madoff was investigated for wrong-doing.

882. Stamos' concerns about Madoff, however, went much further. First, Stamos expressed concern to Saul Katz about Madoff's overall lack of transparency, especially as it related to his mysterious black box strategy.

883. Stamos informed Saul Katz that black box funds were inherently risky because the investor cannot determine the precise strategy being employed. Further, other problematic characteristics of BLMIS, such as the single manager risk, compounded the risks associated with Madoff's black box strategy.

884. In addition to Madoff's black box strategy, Stamos and Saul Katz discussed the lack of transparency concerning the structure of BLMIS' various business operations. Specifically, insofar as Madoff was both a broker-dealer and an investment manager, Madoff purportedly initiated, executed and cleared his own trades. Because Madoff cleared and maintained custody of the securities he purportedly traded, there was no independent safeguard in place to verify that Madoff was actually making the trades he reported.

885. Although Saul Katz was well aware of the risks associated with BLMIS' operational deficiencies, he never once attempted to confirm through any third party that Madoff actually traded the securities identified on his or other Sterling-related monthly BLMIS account statements.

886. In addition to the self-executing, self-clearing, and self-custodying issues discussed above, the operational structure of BLMIS gave rise to other risks. For example, Madoff's roles as an investment manager, a broker-dealer and a market maker not only created a conflict of interest, it raised fundamental questions about the legality of Madoff's operation.

887. On multiple occasions, Stamos discussed with Saul Katz the frequent rumor that Madoff engaged in illegal front-running. Other Sterling Stamos employees, including Chachra, also discussed with Saul Katz the possibility that Madoff was front-running.

888. Upon information and belief, Saul Katz informed the other Sterling Partners about his discussions concerning Madoff with various Sterling Stamos employees, including, but not limited to, at one or more bi-weekly Sterling Partners meetings.

889. As a result, Sterling knew that because Madoff was an investment manager, a broker-dealer and a market maker, Madoff had access to the very information that would allow a person to front-run.

890. In light of Madoff's remarkable market timing and inexplicably smooth positive returns, the frequent front-running rumors should have given Sterling pause. Moreover, the Sterling Partners—unlike most BLMIS investors—had easy personal access to Madoff and an array of internal staff and outside consultants to verify, or at the very least, investigate the rumors. Yet the Sterling Partners conducted absolutely no diligence to determine whether Madoff was breaking the law.

891. Upon information and belief, another red flag identified by Stamos and shared with the Sterling Partners related to BLMIS' three-person audit shop, Friehling & Horowitz.[6] As discussed in Section IX.D below, upon information and belief, as of approximately August 2005 when the Bayou Ponzi was revealed, a key component of Sterling Stamos' due diligence

---

[6] Friehling & Horowitz was purportedly a three-person operation in Rockland County, New York, consisting of David Friehling, a Certified Public Accountant, a semi-retired accountant living in Florida, and an assistant. No experienced business person could have reasonably believed it possible for any such firm to have competently audited an entity the size of BLMIS. In fact, on November 3, 2009, David Friehling pled guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue laws, and making false filings with the SEC in connection with the services he performed for Madoff and BLMIS. In addition, Friehling & Horowitz had reported to the American Institute of Certified Public Accountants or "AICPA" for 15 years prior to the collapse of Madoff's scheme that it did not conduct audits. Meanwhile, Friehling & Horowitz pretended to do just that for BLMIS.

protocol was the investigation of a hedge fund's audit firm. Upon information and belief, Saul Katz and the other Sterling Partners were aware of that protocol.

892. Upon information and belief, Sterling knew that Friehling & Horowitz was BLMIS' auditor and knew or should have known that Friehling & Horowitz was not a legitimate auditor for an institution as large as BLMIS.

893. Sterling was on notice that Friehling & Horowitz was BLMIS' auditor as early as 1991 when Sterling received written correspondence from BLMIS that identified this three-person audit shop. In addition, at least for the years 1994 through 1997, Sterling received BLMIS financial statements identifying Friehling & Horowitz as BLMIS' auditor. Finally, as recently as August 2008, Sterling communicated directly with Friehling & Horowitz regarding Madoff's investments with Sterling.

894. Upon information and belief, Stamos expressed concerns to Sterling regarding Madoff's use of Friehling & Horowitz as an auditor.

895. Rather than undertake a reasonable inquiry into the red flags identified by Stamos or his colleagues at Sterling Stamos—all highly sophisticated, trusted advisors—Sterling categorically dismissed each and every one of them without undertaking any diligence.

896. Upon information and belief, in addition to Saul Katz, the rest of the Sterling Partners had knowledge of Sterling Stamos' warnings about Madoff. Upon information and belief, at least as early as March 2006, Stamos' concerns about Madoff were discussed between or amongst the Sterling Partners, including, but not limited to, at one or more bi-weekly Sterling Partners meetings. Upon information and belief, the various Madoff concerns discussed between Saul Katz and Stamos were relayed to the other Sterling Partners by either Saul Katz and/or Stamos.

### 2. Merrill Lynch confirmed Stamos' concerns and rejected Saul Katz's proposal to invest with Madoff.

897. Many—if not all—of Stamos' concerns about Madoff gained even more credibility and significance when echoed by Merrill Lynch ("Merrill"), Sterling's eventual business partner in Sterling Stamos. Despite Merrill's confirmation of many of Stamos' warnings about Madoff, Sterling again chose to look the other way.

898. Upon information and belief, Merrill had concerns regarding Madoff as early as 1998. At that time, Merrill flatly refused to deal with BLMIS because of concerns that Madoff's investment advisory business operations were not legitimate. Such concerns were well-known and widespread throughout Merrill. Merrill did not permit its own money to be invested directly or indirectly through BLMIS. Merrill's internal prohibition on conducting trades involving exposure to Madoff or any Madoff feeder fund dates back to the late 1990s and was enforced by the highest authorities at Merrill. Not only did Merrill not allow its own money to be invested in Madoff, it also refused to recommend that its customers expose themselves to Madoff and did not include Madoff or any Madoff feeder funds on its "approved" list for investment recommendations.

899. Merrill's relationship with Sterling Stamos began in or around June 2004, when Merrill become a distribution agent for Sterling Stamos and agreed to market Sterling Stamos to investors.

900. In or around February 2007, Merrill commenced formal discussions to acquire an interest in Sterling Stamos. In or around July 2007, after conducting months of additional due diligence of both Sterling Stamos and Sterling, Merrill acquired a 50% non-controlling interest in Sterling Stamos.

901.    As early as 2007, at least one Senior Merrill executive at the time (the "Merrill Executive") discussed numerous red flags regarding Madoff with Saul Katz and Stamos.

902.    The Merrill Executive expressed to Saul Katz and Stamos his concern that Madoff was both an investment manager and a broker-dealer who cleared his own trades.  He also pointed out that Merrill's due diligence requirements would reject such a manager because independent checks on the manager's truthfulness were lacking.  A related concern that the Merrill Executive raised with both Stamos and Saul Katz was the possibility that Madoff was front-running by using information he gained as a market maker inappropriately to the benefit of the investment management side of his business.  He also communicated his opinion to both Saul Katz and Stamos that Sterling simply had too much capital invested with Madoff.

903.    Although the Merrill Executive echoed and reinforced Stamos' criticisms of Madoff, Saul Katz rejected the Merrill Executive's concerns.

904.    Upon information and belief, the Merrill Executive's concerns with Madoff were discussed between and amongst the Sterling Partners, including, but not limited to, at one or more bi-weekly Sterling Partners meetings.

905.    Neither Saul Katz nor any other Sterling Partner conducted any diligence on Madoff despite the Merrill Executive's confirmation of serious red flags questioning the legitimacy of BLMIS.

906.    The Sterling Partners were further apprised of red flags regarding Madoff during Merrill's acquisition of the interest in Sterling Stamos.  During the acquisition, Merrill mandated several changes to Sterling Stamos' due diligence process.  One of these changes involved requiring all investment managers to complete a transparency report disclosing, among other things, details about their investment strategy.  By instituting this requirement, Merrill

effectively prevented Sterling Stamos from investing with any investment managers who refused to disclose their trading strategy and employed black box strategies, like Madoff.

907. Saul Katz was aware of this new due diligence requirement. In fact, the Merrill Executive told Saul Katz that such a requirement would disallow any investments in BLMIS.

908. During a Sterling Stamos board meeting in early 2008, given the uncertainty in the market and Madoff's miraculously consistent returns, Saul Katz proposed that Sterling Stamos create a fund to invest in BLMIS.

909. Although Sterling Stamos at the time was facing increased pressure from Sterling to match Madoff's high returns and consistency during a challenging period of market volatility, the Merrill Executive rejected Saul Katz's proposal and told him that Madoff would not pass Merrill's due diligence requirements.

910. Stamos similarly rejected Saul Katz's proposal and told him that a black box like Madoff's would not pass Sterling Stamos' due diligence process because of its lack of transparency and operational deficiencies.

911. Upon information and belief, the Sterling Partners discussed Sterling Stamos' new due diligence protocol, the fact that Madoff could not pass Merrill's or Sterling Stamos' due diligence processes, and that the Sterling Stamos board rejected Saul Katz's proposal to invest in BLMIS, including, but not limited to, at one or more bi-weekly Sterling Partners meetings.

912. Despite this knowledge, their abundant resources, and special access to Madoff, neither Saul Katz nor any of the Sterling Partners undertook any diligence on BLMIS.

### 3. Other financial institutions and industry professionals advised Sterling of additional concerns, including that Madoff's "math ... wasn't right."

913. Sterling Stamos, and Stamos in particular, and the Merrill Executive were not the first financial industry professionals to caution the Sterling Partners about the questionable nature of Madoff's business.

914. Indeed, in or around 1996, multiple banks declined to serve as custodian of Sterling's 401(k) plan—which included a BLMIS investment option—because of concerns about BLMIS. Specifically, these financial institutions refused to serve as custodian due to Madoff's lack of transparency and inability to provide account balance information on a daily basis. Friedman—one of the Trustees of Sterling's 401(k) plan—and, upon information and belief, the rest of the Sterling Partners were well aware of the potential custodian banks' sentiments. Despite this early warning sign about the legitimacy of Madoff's business, the Sterling Partners did not conduct any diligence on BLMIS in response.

915. Moreover, prior to the formation of Sterling Stamos in June 2002, the investment advisory firm Ivy Asset Management ("Ivy") expressed concerns about Madoff to Saul Katz, David Katz and Arthur Friedman.

916. In addition to offering investment advice to other investment advisers and asset managers, Ivy managed proprietary funds of funds that began investing with Madoff in or about October 1987. However, upon information and belief, Ivy redeemed all of its proprietary investments with Madoff by 2000.

917. Upon information and belief, by no later than December 1998, Ivy knew or should have known of Madoff's fraud based on numerous red flags it had observed, including, but not limited to, the following: Ivy had determined that there were insufficient Standard & Poor's 100 Index options ("OEX options") available in the marketplace to support Madoff's

purported strategy; when Ivy confronted Madoff regarding this discrepancy, Ivy caught Madoff in a lie—Madoff tried to explain that he traded OEX options over the counter on exchanges other than the Chicago Board Options Exchange, which was impossible because OEX options do not trade on any other exchange; Ivy theorized that Madoff was conducting illegal activity at BLMIS, such as using money from his investment advisory clients as subordinated loans to his market making operation; and Ivy was aware of troubling inconsistencies in BLMIS account statements.

918.    Moreover, upon information and belief, by January 2002, Ivy told current and prospective clients that it did not recommend any investment with Madoff.  In fact, as far back as 1998, the indicia of fraud surrounding Madoff were so strong that Ivy's co-founder Howard Wohl ("Wohl") concluded he could not "justify any investments with Madoff."

919.    In or around April and/or May 2002, Saul Katz, David Katz, and Arthur Friedman met with representatives of Ivy, including Wohl, to discuss Sterling's plan to form a fund of funds that later became Sterling Stamos.  During the meeting, Saul Katz explained that Sterling wanted to create a fund of funds to diversify away from Madoff.  In response, Wohl told Saul Katz, David Katz, and Arthur Friedman about the concerns he had regarding Madoff and cautioned that Ivy had redeemed all of its proprietary investments in BLMIS years earlier.

920.    Further, a successful venture capitalist retained as a consultant by Sterling Stamos and Sterling who had strategy consulting experience across a variety of industries, including investment management, high-technology, and energy (the "Sterling Consultant"), warned Saul Katz about Madoff's inexplicable returns.

921.    In or around 2003, the Sterling Consultant informed Saul Katz that Madoff's returns did not make sense.  In an email to Stamos, the Sterling Consultant specifically recounted

that he had told Saul Katz that he "couldn't make Bernie's math work and something wasn't right."

922. Moreover, upon information and belief, Saul Katz and Richard Wilpon were aware that the chair of the Brooklyn College Foundation's investment committee (the "Investment Committee Chair") believed that BLMIS was not a legitimate investment.

923. Saul Katz is an Honorary Governor of the Brooklyn College Foundation and Richard Wilpon is a Trustee.

924. The Investment Committee Chair, who is the CEO of a prominent investment management firm, advised the Brooklyn College Foundation that he "considered [Madoff's] fund a 'black box' and [his investment management] firm was very skeptical due to Madoff's unwillingness to provide transparency or discuss his Philosophy, Process or Strategy which produced unrealistically high positive returns every year."[7]

925. Many of the foregoing concerns raised by Sterling's financial industry partners and associates were previewed in May 2001 *MAR/Hedge* and *Barron's* articles.

926. Upon information and belief, in May 2001, the Sterling Partners read two trade articles that questioned Madoff's unusually consistent returns and secretive operations. On their dates of publication, at least one Sterling Partner received: (a) the article in the May 2001 issue of *MAR/Hedge*, a semi-monthly newsletter, that was widely read by hedge fund industry professionals, entitled "Madoff Tops Charts; Skeptics Ask How;" and (b) the May 27, 2001 article in *Barron's* entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum." Both articles were then circulated to all of the Sterling Partners.

---

[7] In 1991, pursuant to a gift agreement, the Saul Katz Family Foundation made a conditional donation to the Brooklyn College Foundation, which required that the donated funds be invested with Madoff through Sterling. Consequently, although the Brooklyn College Foundation did have an account with Madoff, the Brooklyn College Foundation lacked the authority to redeem that investment in spite of the Investment Committee Chair's skepticism regarding Madoff.

927. Upon information and belief, the two articles were discussed between or among the Sterling Partners, including, but not limited to, at one or more bi-weekly Sterling Partners meetings.

928. The two articles cited numerous hedge fund professionals, including options specialists, and current and former BLMIS traders, who questioned why no one using the same strategy could duplicate Madoff's consistent, non-volatile returns month after month. The articles also raised questions concerning BLMIS' operational structure, specifically that Madoff used revenue from his market making operation to subsidize or smooth the returns of his investment advisory clients.

929. Additionally, the *MAR/Hedge* and *Barron's* articles noted the skepticism of many hedge fund professionals regarding Madoff's compensation structure. As the Sterling Partners were aware, Madoff did not charge any management fees or performance fees. Although hedge fund managers typically charge their clients an annual management fee of 1% to 2% of assets under management and an annual performance fee of 10% to 20% of the fund's profit, Madoff charged no fees for his investment management services. The Sterling Partners believed Madoff only charged them small "commission equivalents" for trades he placed on their behalf, which were related to the bid-ask spreads he collected as a market maker.

930. Madoff's decision not to collect fees should have seemed suspicious to the Sterling Partners given the sheer amount of revenues that Madoff was foregoing annually. By failing to charge industry standard management fees and performance fees, Madoff left huge amounts of money on the table each year. For example, rather than charge a 1% to 2% management fee and a 10% to 20% performance fee—the industry standard—Madoff charged a commission of $0.04 per share and $1 per option contract. Just with respect to the KW BLMIS

Accounts active in 2001, Madoff conceded approximately $8 to $20 million in fees in that year alone.

931.     The Sterling Partners should have known based on their BLMIS investments alone that Madoff was unrealistically giving up millions of dollars in fees with no legitimate explanation.

932.     Notwithstanding the concerns raised by the *MAR/Hedge* and *Barron's* articles and the fact that these concerns were later validated by Sterling's own advisors and business partners, the Sterling Partners did not conduct any diligence on Madoff in response.

933.     Upon information and belief, financial professionals also questioned the archaic technology being employed by Madoff on the investment advisory side of his business, which should have raised concerns and prompted additional inquiry by Sterling.

934.     In fact, in connection with one or more of Sterling's Double Up Loans, on October 30, 2000, Steven Kenny of Fleet National Bank (and later Bank of America) faxed Arthur Friedman a copy of the company profile page of BLMIS' website, and specifically directed Friedman's attention to a paragraph describing BLMIS' advanced technological capabilities, which stated: "Moreover, Madoff Securities' computerized processing means that the firm can customize client reports and deliver them electronically in whatever format best meets the needs of customers."

935.     However, the BLMIS investment advisory business could not generate electronic trade tickets, had no website where investors could view their accounts and assets in real-time, and could only deliver paper confirmations by mail several business days after trades were supposedly executed.  These attributes were commonly recognized in the financial industry to be rife with the risk of fraud.

936. The Sterling Partners should have been particularly concerned by the investment advisory business' primitive technology systems because they knew that BLMIS touted its market making business as one of the most technologically advanced financial institutions in the world. Indeed, Sterling retained a file containing articles about BLMIS that included, among others, articles discussing the advanced technology being employed by its market making business.

937. The Sterling Partners never made any inquiry to determine why Madoff's investment advisory business used primitive technology systems, especially while his market making operation was well-known for its cutting-edge technology.

### 4. American Securities' Chuck Klein recommended that Sterling obtain fraud insurance for its investments with Madoff.

938. As discussed in Section VI.A.1 above, Sterling and American Securities have had a longstanding business relationship dating back to approximately 1990 when they partnered to form the first of many SAP real estate investment funds. American Securities was founded in the 1940s as a family office to manage the wealth of William Rosenwald, heir to the Sears Roebuck & Company fortune.

939. Since its inception, in addition to managing investments for the Rosenwalds and other high net worth families, American Securities has grown to become a leading middle-market private equity firm. In addition to partnering with American Securities in connection with the SAP funds, Sterling has also invested in a number of American Securities' private equity funds, including more than $22 million in at least four American Securities' leveraged buyout funds, as well as the affiliated American Securities Opportunities Fund.

940. Charles "Chuck" Klein is American Securities' managing director and also played a prominent role with many of the firm's affiliates, including two entities—PJ Administrator

LLC and PJ Associates Group LP (collectively, the "PJ Entities")—which held KW BLMIS Accounts through Sterling dating back to approximately September 1996.

941.     Throughout their relationship, Klein remained a trusted advisor to Sterling.  In 2001, when David Katz and Saul Katz began discussing the possibility of forming a fund of funds business, they first considered a potential partnership with American Securities and Klein. Although David Katz and Saul Katz chose not to partner with American Securities, they continued to consult with Klein regarding the creation of a fund of funds business to manage the family's fortune.  After the formation of Sterling Stamos, upon information and belief, Klein served as a member of Sterling Stamos' informal investment committee.

942.     Over the years, Klein at various times raised certain concerns about Madoff with Saul Katz, including the fact that Madoff was the sole manager at BLMIS, which carried various risks, such as complications in the event Madoff were to die, retire, or be investigated.

943.     Klein's concerns regarding Madoff were apparently profound.  In approximately March 2000, American Securities procured a specialized one-of-a-kind insurance to protect its Madoff investments from fraud.

944.     Upon information and belief, in or around February 2001, Klein recommended American Securities' Madoff fraud insurance policy to Saul Katz and Sterling.

945.     In an internal memorandum to Fred Wilpon and Saul Katz dated February 26, 2001, Friedman summarized his conversation with Klein regarding the Madoff fraud insurance American Securities obtained.  Handwritten notes on the memorandum state, "how to define fraud," and also indicate that Sterling wanted to meet with the Senior Managing Director of the insurance brokerage firm that American Securities had used.

946.     Shortly after the May 2001 *MAR/Hedge* and *Barron's* articles, Friedman and Michael Katz met with the Senior Managing Director of the insurance brokerage firm that American Securities had used to discuss purchasing fraud insurance for Sterling's BLMIS investments.  Based on their meeting, Friedman prepared a memorandum dated June 13, 2001, which noted that a fraud insurance policy for Sterling's investments with Madoff would cover "1) Fraud & Fidelity [and] 2) Insolvency for any reason."

947.     Notably, in the course of Sterling's possible procurement of fraud insurance for its BLMIS investments, Friedman prepared handwritten notes that specifically stated that coverage would include a Ponzi scheme.  Friedman described the scope of coverage as: "1- Fraud or Fidelity (Ponzie) [sic] 2- Insolvency for whatever reason….Only investment losses not covered."

948.     Upon information and belief, the Sterling Partners ultimately decided against obtaining the fraud insurance because they determined that due to unfavorable coverage limits that were dwarfed by the vast sums they invested in BLMIS, the bulk of their Madoff exposure was an uninsurable risk.

> **B.**     **Sterling Was Aware Of—And Even Enabled—Madoff's Attempts To Avoid Regulatory And Other Third Party Scrutiny**
>
> > **1.**     **Madoff's concerns regarding SEC disclosures forced Sterling Stamos to reorganize its business prior to registering as an investment adviser.**

949.     In or around July 2003, Sterling Stamos began to consider registering with the SEC as an investment adviser for the purpose of growing its business and expanding its customer base to include institutional clients.  There was one major roadblock standing in Sterling Stamos' way: Madoff's insistence on avoiding regulatory scrutiny.

950.     After learning that Sterling Stamos was considering registering as an investment adviser with the SEC, Madoff informed Saul Katz of his concern that the Sterling Partners may have to disclose information related to their investments with BLMIS and his investments in Sterling ventures.

951.     Further, as discussed in Section IX.B.2 below, upon information and belief, an additional concern for Madoff was that Sterling Stamos' registration would result in the disclosure of information that could lead to BLMIS having to register as well.  Because registration meant greater regulatory scrutiny, Madoff did not register with the SEC as an investment adviser until the SEC forced him to do so in 2006.

952.     Due to Madoff's preference for secrecy and ongoing concern that this level of disclosure might trigger further scrutiny into his operations, upon information and belief, Madoff specifically communicated to Saul Katz that he had concerns about Sterling Stamos registering as an investment adviser.

953.     Sometime before October 2003, Saul Katz—on behalf of Sterling—informed Peter Stamos and others at Sterling Stamos of Madoff's concerns regarding Sterling Stamos' potential registration as an investment adviser.  Saul Katz explained that it would complicate Madoff's business and require Madoff—given Saul Katz's role at Sterling Stamos—to disclose certain information he was otherwise disposed to keep secret.

954.     Sometime before October 2003, Saul Katz also informed individuals at Sterling Stamos that its registration would interfere with his close relationship with Madoff and cause all of Sterling's related BLMIS investments to be disclosed against Madoff's wishes.

955.     Accordingly, to appease Madoff's concerns and avoid certain Madoff-related disclosure requirements, Sterling, together with Sterling Stamos, undertook substantial steps to

restructure Sterling Stamos and attempted to institute a formal separation between Sterling and Sterling Stamos that would obviate the requirement to disclose details about Sterling's and Madoff's business dealings, including the amount of Sterling's investments with Madoff.

956. Because many disclosure requirements related to registration were connected to those individuals at Sterling Stamos who were involved in its investment decision-making, the most important step in this formal separation was attempting to draw a distinct line—or at least the appearance of one—between the respective management and investment decision-making sides of Sterling Stamos' business.

957. To accomplish this, the initial integral role that Saul Katz and David Katz played with respect to investment decisions at Sterling Stamos changed dramatically. Saul Katz and David Katz allegedly could no longer participate on Sterling Stamos' investment committee or attend any other meetings wherein certain investment managers and funds were considered or discussed.

958. Further, because at the time Saul Katz and David Katz were both members of the company's board of directors, Sterling Stamos had to establish separate board meetings to discuss business issues and investment committee meetings to discuss investment issues—again, a distinction that did not previously exist. This action was a necessary attempt to create the appearance that Saul Katz and David Katz were not involved in the investment decisions of Sterling Stamos as they had been before.

959. Similarly, whereas before Saul Katz and David Katz were identified as part of the "Senior Investment Team" in Sterling Stamos' marketing materials and as "key" individuals with respect to Sterling Stamos' investment decisions in hedge fund questionnaires, these references were removed in post-registration materials.

960.     In addition, Sterling Stamos underwent physical changes to its business in an attempt to further separate its day-to-day operations from Sterling.

961.     Whereas prior to registering as an investment adviser, Sterling Stamos shared an office with Sterling, upon registration Sterling Stamos moved to a different location at 450 Park Avenue, New York, NY.

962.     Whereas prior to registering as an investment adviser, Sterling Stamos shared its information technology system with Sterling, upon registration Sterling Stamos created and then utilized its own system.

963.     Sterling Stamos also ensured that its legal structure was changed to reflect its more formal physical and internal separation from Sterling, which included instituting changes in how documents were presented, written, and signed.

964.     All of these steps were taken to accommodate Madoff's insistence on avoiding certain disclosures and potential regulatory scrutiny.

965.     Indeed, by the time Sterling Stamos finally registered as an investment adviser in or around July 2005, the Sterling Partners concluded that no disclosures related to their business relationship with Madoff were necessary.

966.     This is not to say, however, that Saul Katz and David Katz and the rest of the Sterling Partners played no role at Sterling Stamos after registration.  As general partners of Sterling Stamos, the Sterling Partners were still involved in the major issues concerning the company.  Further, Sterling Stamos' affairs remained an agenda item at every bi-weekly Sterling Partners meeting.

967.     Sterling, however, had placed enough distance—at least physically and on paper—between itself and Sterling Stamos to assuage Madoff's concerns and, in the Sterling Partners' minds, avoid any Madoff-related SEC disclosure requirements.

> **2.     By February 2006, Sterling knew or should have known that Madoff was evading his requirement to register with the SEC as an investment adviser.**

968.     Upon information and belief, in connection with Sterling Stamos' registration as an investment adviser and Madoff's concerns with the same, the Sterling Partners became familiar with the SEC's registration and disclosure rules for investment advisers and hedge funds and, by February 2006, knew or should have known that Madoff was in violation of the SEC's registration rules.

969.     Upon information and belief, between July 2003, when Sterling Stamos first considered registering as an investment adviser, and July 2005, when it did in fact register, the Sterling Partners became familiar with the SEC rules governing hedge fund advisers' registration obligations.  During that same time period, the Sterling Partners received consultation from counsel and others concerning these rules, as well as how best to address Madoff's disclosure-related concerns in connection with Sterling Stamos' pending registration.  *See supra* Section IX.B.1.

970.     Upon information and belief, the Sterling Partners knew about the SEC rules adopted in October 2004 that, in effect, required hedge funds with 15 or more investors and over $30 million in assets under management to register with the SEC.  According to Sterling's bi-weekly partner meeting minutes, the "Registered Investment Advisor Issue" at Sterling Stamos was a re-occurring agenda topic beginning October 18, 2004 and continuing through July 25, 2005.  In fact, at their November 1, 2004 bi-weekly Sterling Partners meeting, the Sterling

Partners discussed the passage of "Hedge Fund Regulations," which, upon information and belief, refers to the adoption of the aforementioned SEC rules.

971.     Upon information and belief, the Sterling Partners were aware that the SEC's hedge fund registration rules had a compliance date of February 1, 2006.

972.     Upon information and belief, the Sterling Partners were aware that Madoff did not comply with the SEC's registration rules until August 2006, and only then after investigation and direction from the SEC. Indeed, the Sterling Partners knew that BLMIS fell squarely within the requirements mandating registration because BLMIS obviously had more than 15 investors and far more than $30 million in assets under management based on the KW BLMIS Accounts alone. The Sterling Partners, therefore, knew that between February and August 2006, Madoff was in violation of the SEC's registration rules.

973.     Despite knowing that Madoff was in violation of the SEC's hedge fund registration requirements, the Sterling Partners did nothing.

**3.     Sterling insulated Madoff from scrutiny in connection with its BLMIS 401(k) plan investment option.**

974.     Sterling further demonstrated a pattern of enabling Madoff to avoid scrutiny in connection with the formation and administration of Sterling's 401(k) plan which, as discussed in Section VIII.C above, was heavily invested with Madoff since it was created in or around 1997.

975.     As trustees of the Sterling employee 401(k) plan, Arthur Friedman and Michael Katz had a fiduciary duty to conduct due diligence on Madoff, but failed to satisfy this duty.

976.     As they did with other "outsider" investors they referred to Madoff, Sterling purposefully maintained a layer of separation between Madoff and their employees by

prohibiting them from contacting BLMIS directly. Sterling employees were required to direct all inquiries regarding BLMIS through Sterling.

977. Sterling also structured the 401(k) plan to avoid drawing unnecessary attention to Madoff. Sterling had the choice of creating either a participant directed plan, which would include BLMIS and several other investment options, or a trustee directed plan under which all investments would be made with Madoff. Upon information and belief, the Sterling Partners decided against a trustee directed plan because they thought it would increase their fiduciary liability exposure and if BLMIS were the only investment option offered, "everyone [would] ask and know about [Bernard Madoff]."

978. Sterling also coordinated with Madoff to assume many administrative responsibilities related to the 401(k) plan's BLMIS investment option that would typically be handled by a third party administrator, thereby minimizing scrutiny of BLMIS. When the 401(k) plan was first established in 1997, Madoff was involved in drafting and approving the BLMIS description that Sterling distributed to 401(k) plan participants along with enrollment materials. The BLMIS description stated:

> The partners of Sterling Equities have been investing with Madoff since October 1985. Their returns in any year have never averaged lower than 16.5% and have averaged in excess of 19% during this eleven year period. Their average return on this strategy was 18.3% for 1996. There are no management fees or expenses with regard to this mode of investment.

979. From 1997 until approximately 2005, Sterling circulated to its employees a similar version of the original BLMIS description touting Madoff's historical returns and stating that Madoff did not charge any management fees or expenses.

980.     In approximately 2005, Sterling revised the BLMIS description after a consultant retained by Sterling pointed out that several aspects of the description might increase Sterling's fiduciary liability exposure.

981.     In an April 28, 2005 email to the head of Sterling's human resources department, the consultant recommended that Sterling "be careful" with any statements that "could be construed as an endorsement of [the BLMIS] investment by the [Sterling P]artners." Specifically, the consultant recommended amending the portion of the BLMIS description that read: "The partners of Sterling Equities have been investing with Madoff since October of 1985." Moreover, the consultant pointed out that the BLMIS description's statement, "There are no management fees or expenses with regard to this mode of investment," should be revised because it appeared to misrepresent Madoff's compensation arrangement. Finally, the consultant issued a general caveat about the BLMIS 401(k) plan investment option in line with the constant drumbeat of red flags of which Sterling was aware, stating that "this is an unusual fund from a 401(k) perspective in that it isn't publicly traded and, therefore, there is little information to go by and no independent analysis of this investment to follow."

982.     Having been advised that the wording of the BLMIS description distributed to 401(k) plan participants could increase its fiduciary liability exposure, Sterling revised the description to eliminate references to the Sterling Partners' investments with Madoff, as well as the statements regarding Madoff's lack of fees and expenses.

### 4.     Sterling protected Madoff by insulating referral accounts.

983.     As discussed in Section VII.A above, based on the Sterling Partner's close relationship with Madoff, they were in the unique position to open KW BLMIS Accounts for their friends, close business acquaintances, and other Sterling employees—all of whom they referred to Madoff. To obtain a coveted KW BLMIS Account through Sterling, however, was

not easy. The Sterling Partners needed to approve the account internally and Saul Katz, in particular, had the final say. Indeed, there were far more outsiders who were turned down than actually got into the elite pool of Madoff investors with KW BLMIS Accounts opened through Sterling.

984. Sterling took great strides to insulate the outsider account-holders from Madoff, as one of the requirements to obtain a KW BLMIS Account through Sterling was that all communication regarding any account had to go through Sterling; never directly to Madoff.

985. Sterling further protected Madoff from scrutiny by carefully screening certain types of sophisticated investors who were denied access to BLMIS. Similar to Madoff's request that Sterling Stamos not register as an investment adviser, Madoff also told Sterling that he did not accept investments from anyone who was a registered representative or investment adviser.

986. The Sterling Partners, however, never took any steps to independently investigate why Madoff refused to accept investments from registered representatives or investment advisers.

### 5. Sterling only used Madoff's approved bank for Double Up Loans.

987. Sterling also took steps to limit scrutiny of BLMIS from third party financial institutions. As discussed in Section VIII.D above, Sterling borrowed millions of dollars via Double Up Loans to "double up" its investments with Madoff. However, Madoff requested that Sterling procure these Double Up Loans only from Fleet National Bank (and then Bank of America), with whom Madoff had an existing relationship. When Sterling's CFO inquired about securing Double Up Loans from other banks, upon information and belief, the Sterling Partners rejected his proposal due to Madoff's unwillingness to deal with any bank other than Fleet National Bank (and then Bank of America).

988.   Madoff's Double Up Loan bank request—which amounted to a limitation—was financially disadvantageous to Sterling because it prevented Sterling from contacting other lending institutions to seek out more favorable loan terms, such as lower interest rates. Nonetheless, Sterling complied with Madoff's limitation by only taking out Double Up Loans from Fleet National Bank (and then Bank of America).

989.   Madoff's reluctance to work with banks other than Fleet National Bank (and then Bank of America) should have caused Sterling to question whether Madoff was attempting to avoid subjecting his firm to stricter scrutiny from new lenders.

**C.   The Sterling Partners Knew That Madoff Was Dishonest In His Investment Advisory Business**

        **1.   Madoff and Sterling falsely documented a $54 million bridge loan.**

990.   The Sterling Partners had such a close relationship with Madoff that they were willing – together with Madoff – to create a fraudulent letter agreement that falsely described an interest- and cost- free $54 million loan from Madoff as an "investment" by his wife, Ruth.

991.   In May 2004, Sterling sought to buy-out the broadcast rights of the New York Mets from Cablevision to launch the television network SNY.  To finance the buy-out, Sterling applied to two banks for loans totaling $54 million.  However, as the deadline for closing the buy-out approached, the Sterling Partners grew concerned that the bank loans would not provide funding in time, so they turned to Madoff.

992.   On or about May 25, 2004, the Sterling Partners inquired with Madoff about making a large redemption from their BLMIS accounts.  In response, Madoff told Saul Katz, Fred Wilpon, and Marvin Tepper, in particular, that Sterling's BLMIS accounts were "in the market" and, as a result, redeeming funds at that time would lower their returns.  As an

alternative to such a large redemption from Sterling's BLMIS accounts, Madoff offered to send Sterling the $54 million needed to finance the buy-out of the broadcast rights.

993.    On or about May 26, 2004, Madoff wired to Sterling $54 million, which was comprised of other people's money.

994.    Shortly thereafter, the bank loans totaling $54 million closed.

995.    On or about May 27, 2004, Sterling repaid the $54 million it had borrowed from Madoff and instead used the bank loan proceeds to finance the buy-out of the broadcast rights.

996.    Although Madoff and Sterling agreed that the $54 million transfer from Madoff was a loan, Sterling prepared on Mets letterhead a letter agreement dated May 25, 2004 from Fred Wilpon and Saul Katz to Ruth Madoff that falsely described the transaction as an investment by Ruth Madoff in the company that would later become SNY.

997.    Sterling Partner Marvin Tepper was involved in the drafting of the May 25, 2004 letter agreement.

998.    The May 25, 2004 letter agreement characterized Madoff's loan to Sterling as an "investment" by Madoff's wife, Ruth.

999.    The May 25, 2004 letter agreement provided, in relevant part:

This will confirm the conversations with respect to an investment by you [Ruth Madoff] in the Network.  Over the years you have invested with us in, among other things, real estate funds; and we contemplate extending this relationship to the Network. . . . You are simultaneously wiring to Sterling Equities Associates the sum of $54 million which is expected to be the approximate amount of your proposed investment with the Network.

1000.    The May 25, 2004 letter agreement also provided for the payment of a premium of some undetermined amount to Ruth Madoff in the event she, Fred Wilpon, or Saul Katz terminated the agreement:

If at any time you [Ruth Madoff] or the undersigned [Fred Wilpon and Saul Katz] elect to terminate this arrangement in the sole discretion of the terminating party,

the terminating party shall give written notice to the other party and in either of such events, the undersigned shall pay to you the sum of $54 million.  In addition, the undersigned shall pay to you a premium to be mutually agreed, having due regard to all the circumstances including, but not limited to, our long and beneficial business and personal relationships.

1001.    The May 25, 2004 letter agreement was signed by Fred Wilpon, Saul Katz, and Ruth Madoff.

1002.    Fred Wilpon and Saul Katz, and, upon information and belief, Marvin Tepper knew that the letter falsely described the transaction as an "investment" by Ruth Madoff when in fact it was a no interest, no cost loan from Madoff.

1003.    Furthermore, although the letter agreement stated that Fred Wilpon and Saul Katz had conversations with Ruth Madoff regarding the "investment," neither Fred Wilpon nor Saul Katz ever actually spoke to Ruth Madoff about any investment related to SNY or the predecessor company.

1004.    Fred Wilpon, Saul Katz, and Marvin Tepper knew or should have known that it was highly unusual for such a sizable transaction to be supported by only minimal documentation, such as the May 25, 2004 letter agreement.

1005.    Fred Wilpon, Saul Katz, and Marvin Tepper knew or should have known that it was even more suspect for the only documentation of such a substantial transaction to not even accurately reflect the true nature of the deal.

1006.    The $54 million loan transaction between Sterling and Madoff and the accompanying letter agreement between Saul Katz, Fred Wilpon and Ruth Madoff demonstrate that Saul Katz, Fred Wilpon, and Marvin Tepper were on notice that Madoff would work with them to knowingly falsify a significant business transaction.

### 2. Madoff and Sterling misled regulators in an inquiry by the New York Attorney General's office.

1007.  Sterling concealed Madoff's identity and role with respect to certain foundations in response to an inquiry by the New York Attorney General's office ("NYAG").

1008.  On or about July 6, 2000, the NYAG sent separate letters to the Iris & Saul Katz Family Foundation, Inc. and the Judy & Fred Wilpon Family Foundation, Inc.—both Sterling Defendants that had investments with Madoff—noting that their 1998 annual report was overdue and requesting certain documents and information regarding the foundations' investment activity, which engaged in a high volume of securities trading.

1009.  The NYAG specifically requested an explanation of each respective foundation's investment strategy, who makes the investment decisions, whether commissions are paid on trades, to whom, and the amount of those commissions.

1010.  Sterling faxed both of these letters to BLMIS, and upon information and belief, Madoff and/or other BLMIS employees were involved in drafting the responses.

1011.  The Iris & Saul Katz Family Foundation responded via letter dated August 21, 2000 and signed by Saul Katz (the "August 21st Katz Foundation Letter"), which generally described Madoff's investment strategy but failed to identify either Madoff or BLMIS by name in response to NYAG's request for the Foundation's investment decision–maker and to whom commissions were paid.

1012.  The August 21st Katz Foundation Letter identified Saul Katz and Iris Katz as responsible for all investment decisions when, in fact, it was Madoff who determined when he would allegedly enter or exit the market and what securities he would buy—none of these decisions were made by Saul Katz or Iris Katz.

1013.   The August 21st Katz Foundation Letter also stated that commissions are paid to the "executing broker" of the Iris & Saul Katz Family Foundation's transactions, but it did not identify Madoff by name.

1014.   The Judy & Fred Wilpon Family Foundation responded via letter dated July 20, 2000 and signed by Fred Wilpon (the "July 20th Wilpon Foundation Letter").

1015.   Like the August 21st Katz Foundation Letter, the July 20th Wilpon Foundation Letter: generally described Madoff's investment strategy but failed to identify either Madoff or BLMIS by name; identified Fred Wilpon and Judy Wilpon as responsible for all investment decisions; and stated that commissions are paid to the "executing broker" of the Judy & Fred Wilpon Family Foundation without identifying Madoff by name.

### 3.    The Sterling Partners knew that Madoff lied about not accepting investments from funds of funds.

1016.   While Sterling Stamos was in its infancy, Stamos and Saul Katz discussed creating one large portfolio for Sterling and the Sterling Partners comprised of investments with at least 10 different managers, one of whom Saul Katz insisted would be Madoff.  This plan would enable Sterling Stamos to manage and oversee all of Sterling's and the Sterling Partners' assets.

1017.   Saul Katz raised this proposal to Madoff, who rejected it, noting that he did not accept investments from funds of funds, such as Sterling Stamos.

1018.   Upon information and belief, Saul Katz explained Madoff's response to this proposal to the other Sterling partners, including, but not limited to, at one or more bi-weekly Sterling Partners meetings.

1019.   Saul Katz and the rest of the Sterling Partners knew or should have known that Madoff—as he had done before—was attempting to avoid scrutiny by industry professionals who may challenge him or ask him questions.

1020.   At some point later, Stamos learned that Madoff did in fact accept investments from funds of funds.  Indeed, there were several funds of funds profiting substantially off of Madoff's fraudulent scheme, including Fairfield Sentry and Kingate.

1021.   Stamos advised Saul Katz that Madoff had funds of funds investors and that Madoff's claim that he would not accept Sterling Stamos on that basis was inaccurate.  Saul Katz had no explanation for the Madoff lie that was revealed.

1022.   Upon information and belief, Saul Katz informed the other Sterling Partners that Madoff in fact had funds of funds investors, including, but not limited to, at one or more bi-weekly Sterling Partners meetings.

1023.   Saul Katz and, upon information and belief, the rest of the Sterling Partners knew that Madoff lied when he said to Saul Katz that he would not accept investments from funds of funds.

1024.   Rather than conduct additional diligence to uncover some further explanation for the blatant lie told by Madoff, Saul Katz and the rest of the Sterling Partners did nothing to investigate yet another indication of Madoff's dishonesty in conducting his Investment Advisory business.

**D.      Sterling Was Aware Of The Indicia Of Fraud In The Bayou Ponzi Scheme And Chose To Ignore Them When It Came To Madoff**

1025.   Madoff was not the first Ponzi scheme in which the Sterling Partners were involved.

1026.   In or around October 2003, Sterling Stamos invested in certain funds managed by Bayou Superfund LLC ("Bayou").  In or around March 2005, Sterling Stamos redeemed its investments in Bayou because of concerns identified during its extensive due diligence process. Several months later, Bayou collapsed under the revelation that it was a $400 million Ponzi scheme.

1027.   On May 30, 2006, various Bayou entities filed petitions for relief under Chapter 11 of the Bankruptcy Code.  Sterling Stamos was sued by the bankruptcy trustee in the Bayou matter on or about September 8, 2006, and settled in or around May 2009 for $12.9 million. That settlement amount included 100% of the fictitious profits and approximately 44% of the principal Sterling Stamos withdrew from Bayou just months before it was revealed to be a Ponzi scheme.

1028.   In addition to being general partners of Sterling Stamos during its involvement with Bayou, upon information and belief, the Sterling Partners were also limited partners in the Sterling Stamos funds that invested in Bayou.  As a result, the Sterling Partners were put on notice of core red flags present in a Ponzi scheme, many of which equally applied to Madoff.

1029.   Specifically, during the course of its investments in Bayou, Sterling Stamos' due diligence process identified various red flags that were cause for serious concern.  This diligence process, which evolved and became more formalized over time, consisted of three components: (1) investment due diligence, which analyzed a given investment manager's style, strategy, and process; (2) operational due diligence, which investigated the internal processes of a business (often through on-site checks) and emphasized an appropriate segregation of duties, the use of an external auditor (preferably, a large, reputable one) and an external, third-party administrator and broker-dealer; and (3) risk due diligence, which performed various analyses to understand a

given fund manager's underlying strategy, trades, volatility, and return spread and flagged unusual characteristics like super-steady returns and no negative months.

1030.   As general partners and limited partners of Sterling Stamos, upon information and belief, the Sterling Partners were familiar with this process and each of its three components.

1031.   The Bayou red flags identified by the Sterling Stamos due diligence process included an extremely high single man risk together with the following: (1) a style drift (i.e., an abrupt change in investment strategy); (2) the use of a non-traditional audit firm; (3) a fund manager who lacked transparency and was not receptive to Stamos' inquiries and suggestions; (4) low volatility and positive returns; (5) non-standard legal documentation, including a lack of an offering memorandum; (6) a lack of organizational strength, including an incompetent back office; and (7) a huge jump in the amount of assets under management.

1032.   These issues became so disconcerting to Sterling Stamos that it requested a full redemption of its investments in Bayou in or around late February through early March 2005.

1033.   Further, as a result of the revelation of the Bayou Ponzi scheme in 2005, Sterling Stamos made several significant changes to its formal due diligence procedures.  First, given Bayou's use of a non-traditional audit firm, Sterling Stamos added a requirement to its due diligence checklist that if it was not familiar with the audit firm used by a given fund manager, it must conduct an on-site visit to the particular audit firm.  Second, Sterling Stamos afforded the operational due diligence team full veto power over an investment.

1034.   The Sterling Partners were aware of the reasons why Sterling Stamos made a full redemption of its investment in Bayou, as well as the changes Sterling Stamos implemented to its due diligence protocol following Bayou.

1035.  Specifically, Saul Katz had discussions with Stamos and other Sterling Stamos personnel regarding the specific reasons for the Bayou redemptions.  In fact, during the course of these discussions, Stamos explained to Saul Katz that it was Sterling Stamos' ongoing due diligence that exposed enough red flags about Bayou to cause him to request full redemption of their investments.

1036.  Moreover, prior to Bayou's collapse, Sterling Stamos' Chachra met with Saul Katz to discuss why Sterling Stamos redeemed its Bayou investments.  Chachra explained to Saul Katz the reasons for the redemption, including, but not limited to, Bayou's style drift, plan to drastically increase the amount of assets under management, and deficiencies in its back office infrastructure.

1037.  Upon information and belief, Sterling Stamos' redemption of funds from Bayou and the bases for doing so were discussed between or amongst the Sterling Partners, including, but not limited to, at one or more bi-weekly Sterling Partners meetings.

1038.  Upon information and belief, the Sterling Stamos Bayou litigation was discussed between or amongst the Sterling Partners, including, but not limited to, at one or more bi-weekly Sterling Partners meetings.

1039.  Sterling Stamos' involvement in the Bayou litigation put the Sterling Partners on notice of the indicia of fraud associated with a Ponzi scheme, many of which were easily applicable to Madoff.

1040.  For example, despite purporting to have hundreds of millions, or billions, of dollars of assets under management, neither Bayou nor BLMIS was audited by a large, well-known accounting firm—Bayou's auditor was a fictitious organization and BLMIS' auditor was a three-person shop, Friehling & Horowitz.  Both Bayou and BLMIS provided their customers

unusually consistent, positive, but not necessarily spectacular, returns, with no volatility despite the condition of the market. In addition, neither investment manager charged a management fee, which is how most investment managers earn money.

1041. Moreover, Madoff also exhibited the same style drift that was deemed a red flag with respect to Bayou when he offered Sterling the "special" investment opportunity in November 2005, which involved managing funds pursuant to a new, radically different strategy. In fact, Madoff—who in November 2005 was facing liquidity problems—represented to Sterling that this "special" investment opportunity would involve experimenting with a new way of trading options and generate returns of up to 50% more than usual. Madoff mandated, however, that Sterling fund the investment with new capital rather than via transfers from existing BLMIS accounts.

1042. Despite the fact that the Sterling Partners neither understood Madoff's new strategy nor his mandate for only new capital—and even questioned the legality of the investment opportunity—on or about November 30, 2005, they wired $22 million to Madoff to fund their new "special" KW BLMIS Account (1KW427).

1043. Upon information and belief, prior to making this investment, the Sterling Partners knew that one reason Sterling Stamos had redeemed its Bayou investments was due to a style drift.

1044. Even well after they had opened their "special" KW BLMIS Account—despite Friedman noticing that the special account traded a much larger number of options than usual—the Sterling Partners never understood Madoff's new "special" strategy or why it could not be employed with respect to their other hundreds of KW BLMIS Accounts.

1045.  Madoff's "special" investment opportunity involved a dramatic change in strategy that should have stood out to the Sterling Partners not only after approximately 20 years of investing with Madoff, but especially in light of the similar red flag that was raised by Bayou. Yet despite Madoff's style drift and the other suspicious circumstances surrounding the "special" investment opportunity, the Sterling Partners failed to conduct any diligence to determine the nature of Madoff's new strategy or whether it was legitimate.

1046.  Despite being on notice of the foregoing, including the remarkable similarity between the red flags applicable to Bayou and Madoff, the Sterling Partners ignored yet further indicia of fraud at BLMIS and conducted no diligence of Madoff in response.

### E.  Madoff's Returns Were Too Good To Be True And Sterling Knew It

1047.  As discussed above, several of Sterling's most trusted advisors cautioned the Sterling Partners to be skeptical of Madoff's returns.  As one Sterling Stamos employee put it shortly after Madoff's arrest, "our CIO always said it was a scam, 'too good to be true[.]'  Well there [you] go, it was too good to be true[.]"  *See supra* Section IX.A.1.

1048.  Sterling's own observations about Madoff's strategy and performance only corroborated those concerns.  The Sterling Partners knew or should have known that Madoff's returns were implausible based on their knowledge of the split-strike conversion strategy and meticulous observation of Madoff's returns.  The BLMIS performance data tracked by Sterling confirmed that Madoff's non-volatile, positive returns were sharply at odds with the strategy he claimed to employ.

1049.  The Sterling Partners knew or should have known that Madoff's fund was too good to be true because it consistently yielded positive gains coupled with ultra low volatility. Between 1998 and 2008—a period during which the S&P 100 produced negative returns for nearly 60 months—Sterling's KW BLMIS Accounts rarely reported negative monthly rates of

return.  During that same ten-year period, of the 483 KW BLMIS Accounts administered by Sterling, none purportedly experienced more than five down months, and many purportedly never had a single down month.

1050.   Upon information and belief, Saul Katz even confessed to his friends that he could not figure out how Madoff generated such smooth positive returns.  According to an internal Sterling memorandum dated January 6, 2004, during a telephone conversation, Friedman asked Madoff about the BLMIS investment committee that purportedly executed Madoff's strategy—a committee that the Sterling Partners had just learned about on or around January 6, 2004.  During the call, Madoff reportedly became annoyed and complained to Friedman about how Saul Katz told his "country club friends" that "nobody knows how Madoff does it."

1051.   Moreover, given Sterling's knowledge of the split-strike conversion strategy Madoff claimed to employ, the Sterling Partners knew or should have known that Madoff's returns were compromised.  Sterling understood that the split-strike conversion strategy was an equity-based one that involved using options to hedge investments in stock.  More particularly, Sterling knew that Madoff claimed the strategy first consisted of purchasing baskets of stock from approximately 35 of the top 50 S&P 100 stocks and, second, involved applying an options-based "collar" around the underlying equities position by purchasing out-of-the-money S&P 100 puts and selling out-of-the-money S&P 100 calls.

1052.   Because Madoff purportedly traded baskets of stocks that were highly correlated to the S&P 100, the S&P 100 formed the core tenet of Madoff's split-strike conversion strategy.  However, based on their analysis of Madoff's performance, the Sterling Partners knew that there was essentially no correlation between Madoff's returns and the equity market.

1053. The Sterling Partners were intimately familiar with Madoff's historical performance. From as early as the mid-1980s, Sterling spent countless hours monitoring the performance of its Madoff investments. Using account statements, trade confirmations and quarterly portfolio management reports, Sterling regularly input investment performance data into spreadsheets to determine its rates of return and gain an understanding of Madoff's performance, which was reported and discussed at the bi-weekly Sterling Partners meetings.

1054. Sterling also tracked Madoff's historical performance over longer periods. For example, in or around November 2005, the Sterling Partners prepared charts and tables comparing nearly two decades worth of performance data for their BLMIS accounts against certain benchmarks, including U.S. Treasuries and the Dow Jones Industrial Average ("DJIA")—an equity market index that is highly correlated to the S&P 100 and comprised of many of the stocks Madoff purported to trade. These and other analyses performed by Sterling confirmed that there was virtually no correlation between Madoff's returns and either the DJIA or the S&P 100.

1055. The disconnect between Madoff's returns and the equity market was particularly obvious during periods of market dislocation, which should have caused the Sterling Partners to question Madoff's prophetic market timing. Remarkably, Sterling's BLMIS investments were effectively immune from any number of market catastrophes, enjoying steady rates of return at times when the rest of the market was experiencing financial crises.

1056. Sterling's BLMIS accounts maintained suspiciously consistent positive rates of return even during events that otherwise devastated financial markets. For example, even in the face of the Black Monday crash in 1987, the bursting of the dotcom bubble in 2000, the terrorist

attacks of September 11, 2001, and the recession and housing crisis of 2008—just to name a few—Sterling's KW BLMIS Accounts produced positive returns.

1057.   This lack of correlation should have caused Sterling to question whether Madoff was actually applying the strategy he claimed to employ.  Nonetheless, the Sterling Partners did not perform any independent diligence or follow-up to determine how Madoff produced such smooth positive returns even during periods of market turmoil.

1058.   Just as the Sterling Partners should have been concerned that Madoff was virtually never in the market during adverse market events and almost always in the market as it rallied, they should have been equally concerned by Madoff's practice of selling all equity positions shortly before the end of each quarter regardless of underlying market conditions, especially given that market timing played such a prominent role in Madoff's strategy.  If the market were to have jumped shortly before the end of each quarter, Madoff's habitual practice of selling all equity positions at quarter-end would have detrimentally impacted returns and, thus, would have been inconsistent with a strategy that relied so heavily on market timing.  Because Sterling closely monitored whether and when Madoff had purportedly moved in or out of the market, it knew that Madoff would artificially take his customers' investments out of the market near the end of each quarter for reasons having nothing to do with his split-strike conversion strategy.

1059.   Indeed, Sterling knew or should have known that Madoff's behavior was yet another example of avoiding regulatory scrutiny into his investment advisory business because as a broker-dealer, he was required to file quarterly financial statements with regulators.  By liquidating all of his equity positions at quarter-end, Madoff effectively avoided reporting the

true financial condition of his investment advisory business, including its assets under management.

1060. Year after year, throughout Sterling's near quarter-century business relationship with Madoff, it was no accident that Madoff was conveniently out of the market at the end of each quarter, when he would have had reporting obligations to the regulators had he remained in the market. Madoff's departure from the market at the end of each quarter regardless of market conditions should have been a clear indication to Sterling that he was seeking to conceal his trading activities from regulators and that Madoff's operation was possibly fraudulent.

1061. Notwithstanding the foregoing, Sterling did not perform any diligence regarding Madoff's practice of moving out of the market near the end of each quarter.

1062. Similarly, Sterling should have questioned the legitimacy of Madoff's operation based on an utterly nonsensical explanation he gave regarding how his returns were derived. As a "rule of thumb," Madoff repeatedly assured Sterling that, no matter what happened in the equity market, his future annual returns would be about two and a half times the yield of U.S. Treasuries.

1063. The Sterling Partners tested Madoff's "rule of thumb" against the historical performance of their own KW BLMIS Accounts. Internal Sterling documents calculated Madoff's returns as a multiple of the 10-year U.S. Treasury bond and compared Madoff's performance to various short and long term U.S. Treasuries over a period of approximately 15 years. Sterling's analysis showed that Madoff's returns were generally about two and a half times the yield of the 10-year U.S. Treasury bond in any market environment.

1064. The fact that Madoff's reported returns correlated not with the equity market, but with risk-free U.S. Treasuries made no sense whatsoever. However, Sterling failed to perform

any independent diligence to try to understand why Madoff's returns correlated to U.S. Treasuries and not the S&P 100.

1065. Madoff's nonsensical "rule of thumb" should have caused the Sterling Partners to question whether Madoff's operation was fraudulent. Instead, as discussed in Section VIII.D *supra*, the Sterling Partners accepted it as a guarantee of positive future returns upon which they heavily levered their BLMIS investments.

1066. The Sterling Partners also knew or should have known that Madoff's returns were too good to be true based on their access to sophisticated quantitative information showing that Madoff's historical performance was almost impossible statistically. By way of example, in connection with its efforts to re-finance a $136.9 million Mets loan in 2004, Sterling prepared a presentation for its bank lenders that emphasized the strength of the organization's cash management and working capital positions as a result of its BLMIS investments. Citing Madoff's average annual return of 18% with a standard deviation of 4% over a 25 year period, Sterling represented to the lenders that future annual returns with Madoff were predicted to be positive 99.9% of the time.

1067. Finally, the simple fact that Sterling Stamos could never quite match Madoff's consistently high returns and improbable lack of volatility was an early and obvious sign that should have alerted the Sterling Partners to a high likelihood of illegality at BLMIS.

1068. Because one of the main goals of Sterling Stamos was to re-create Madoff-like returns, the Sterling Partners at all times compared the performance of Madoff against that of Sterling Stamos.

1069.   On a regular basis—usually monthly—Sterling Stamos provided Sterling—typically Saul Katz or David Katz—with rate of return information for various Sterling Stamos funds, which was then compared against Madoff's performance.

1070.   Saul Katz or David Katz analyzed the performance of Sterling Stamos versus Madoff, and presented the results to the Sterling Partners at their bi-weekly meetings.  To supplement this analysis, Stamos or another member of Sterling Stamos had a conversation with Saul Katz or David Katz about the results of this comparison.

1071.   More often than not, Madoff outperformed similar highly liquid funds at Sterling Stamos.  In addition, the Sterling Stamos funds achieved rates of return nowhere near the consistency of Madoff's.  In fact, some of the Sterling Partners, including Saul Katz and Michael Katz, would often express disappointment to Stamos and other Sterling Stamos employees about their inability to generate Madoff-like returns.  While Madoff returns were always solid and steady, Sterling Stamos' returns lacked the same consistency.  The inability of Sterling Stamos—the hedge fund created by Sterling itself with which it entrusted a substantial amount of its assets—to generate similarly high and consistent returns as compared to Madoff should have been a basic red flag.  Yet, the Sterling Partners refused to conduct any inquiry into why Madoff's returns were so unbelievably consistent and could not be replicated.

1072.   All of the BLMIS performance data that the Sterling Partners monitored and analyzed pointed to the same conclusion reached by Stamos and others—Madoff's returns were simply too good to be true.

1073.   Although the Sterling Partners knew that Madoff's returns were almost statistically impossible and sharply at odds with his split-strike conversion strategy, they willfully disregarded any criticisms of Madoff and simply buried their heads in the sand.

## X. THE STERLING PARTNERS' INEXCUSABLE LACK OF DILIGENCE ON MADOFF AND BLMIS AFTER REPEATED INDICIA OF FRAUD

1074.   Unlike the majority of BLMIS investors, Sterling had the sophistication and resources, unique access to Madoff, and hedge fund experience to conduct meaningful due diligence on Madoff.  This fact alone makes it all the more egregious that in the face of the parade of red flags, the Sterling Partners chose to do nothing.

1075.   As discussed above, the Sterling Partners are not your average investors.  They are a team of sophisticated professionals who built a business empire spanning four major industries, including real estate, professional baseball and sports media, private equity, and hedge funds.  Notably, very early on in their almost quarter-century long business relationship with Madoff, the Sterling Partners discovered Madoff's anomalous and implausibly high and consistent returns, and then found endless ways to exploit those returns.  In doing so, the Sterling Partners, their families, related trusts and entities profited from the Madoff fraud by approximately $300 million of other people's money.  Yet despite the availability of these vast resources, the Sterling Partners never used them to conduct any diligence on Madoff and his illegitimate business operations in response to the roster of red flags to which they were exposed.

1076.   Further, unlike most BLMIS investors, the Sterling Partners had unique direct access to Madoff and BLMIS staff whenever necessary.  Indeed, Fred Wilpon and Saul Katz had meetings with Madoff himself in his office at least once a year to discuss the status of their investments and his projected returns—a privilege few BLMIS investors enjoyed.  Moreover, Saul Katz spoke directly with Madoff at some points in time at least once a day, and Friedman was in constant daily contact with various BLMIS employees in connection with his administration of the 483 KW BLMIS Accounts.  Despite ample opportunities to question

Madoff and other BLMIS employees about various indicia of fraud, Sterling chose to do nothing and look the other way.

1077.    The Sterling Partners' lack of diligence on Madoff is even more indefensible considering their ownership of their very own hedge fund, Sterling Stamos.  Upon information and belief, as both general partners and limited partners of Sterling Stamos, the Sterling Partners were knowledgeable of the due diligence process developed and utilized by Sterling Stamos to vet potential investment managers, which should have prompted their own due diligence on Madoff.

1078.    Upon information and belief, the Sterling Partners were not only aware that Sterling Stamos' due diligence process had uncovered another Ponzi scheme, Bayou, but also that it would have rejected Madoff.  *See supra* Section IX.A.1.  Indeed, Madoff would have failed every level of due diligence in place at Sterling Stamos.  As owners of Sterling Stamos, the Sterling Partners were aware of the types of information and issues that this due diligence process would monitor.  Given their unique role at Sterling Stamos and involvement in investment decisions, Saul Katz and David Katz, in particular, should have been even more aware that Madoff did not stand a chance of passing any level of Sterling Stamos' due diligence process.  *See supra* Section VI.C.

1079.    The Sterling Partners' inside access to a hedge fund due diligence process that vetted—and often rejected—potential investment managers further enhanced their financial industry expertise and should have informed their analysis and diligence in connection with their Madoff investments.  Rather than use the extensive due diligence process applied to other investment managers by the very hedge fund they created or their abundant resources and access to industry liaisons to inquire further, the Sterling Partners instead chose to continue their almost

quarter-century pattern of burying their heads in the sand to the clarion calls of Madoff's potential fraud.

## XI. THE STERLING PARTNERS' KNOWLEDGE AND/OR INQUIRY NOTICE MUST BE IMPUTED TO ALL DEFENDANTS

1080.   Under the circumstances set forth above, the Sterling Partners either knew, or should have known, that the returns they received from their BLMIS investment accounts were being manipulated, and were not the product of legitimate trading activity.  Alternatively, under Section 23 of New York Partnership Law, the knowledge and/or inquiry notice of any Sterling Partner should be imputed to all of the Sterling Partners.  Despite being aware of such facts and red flags as detailed above, the Sterling Partners failed to conduct any reasonable diligence.  *See supra* Section X.  For the reasons set forth below, the Sterling Partners' knowledge and/or inquiry notice must be imputed to all of the Defendants.

1081.   Sterling is a closely-held, family business, and all aspects of the business are overseen by the Katz-Wilpon family and the Sterling partnership.

1082.   The Sterling Partners are the ultimate controlling principals, managing members, or partners of all the Sterling-related entities, including the Sterling Entity Defendants, which they operate for their benefit.

1083.   The Sterling Partners effectively dominated and controlled the Sterling Entity Defendants, operating and directing all day-to-day decisions for the entities, including all decisions related to the Sterling Entity Defendants' BLMIS accounts.

1084.   Every major decision concerning Sterling and the Sterling Entity Defendants were and are made on a partnership level after discussion amongst the Sterling Partners collectively including, in particular, decisions regarding their investments in BLMIS.

1085.    Because the Sterling Partners were agents of all of the Sterling Entity Defendants, their knowledge and/or inquiry notice in connection with their investments in BLMIS should be imputed to the Sterling Entity Defendants.

1086.    As detailed above, the Sterling Partners were also the equitable owners of the Sterling Entity Defendants and retained beneficial use over the Sterling Entity Defendants and all of their assets, including their BLMIS accounts.

1087.    The Sterling Partners freely transferred funds between and among the hundreds of inter-connected KW BLMIS Accounts in which they, their families, related trusts and entities that they controlled held interests.

1088.    Upon information and belief, the Sterling Partners used the Sterling Entity Defendants' assets for their own purposes including, in particular, for the financial restructuring of Sterling's collective debt after the revelation of Madoff's fraud.

1089.    The Sterling Partners and the Sterling Entity Defendants are effectively one and the same, thus the Sterling Partners' knowledge and/or inquiry notice of irregular and/or fraudulent activity at BLMIS is attributable to the Sterling Entity Defendants.

1090.    Furthermore, the corporate form of the Sterling Entity Defendants should be disregarded because, as set forth above, they were dominated and/or controlled by the Sterling Partners and/or through other entities controlled and owned by the Sterling Partners.

1091.    The Sterling Partners are thus the alter egos of the Sterling Entity Defendants, and their knowledge and inquiry notice must be imputed to the Sterling Entity Defendants.

1092.    Accordingly, under principles of agency, equitable ownership and veil piercing, the Sterling Partners' knowledge and/or inquiry notice must be imputed to the Sterling Entity Defendants.

1093.   Similarly, the Sterling Partners' knowledge and inquiry notice must also be imputed to the Katz/Wilpon Trust Defendants.

1094.   The Sterling Partners dominated and controlled the Katz/Wilpon Trust Defendants, including the Saul B. Katz Family Trust, Katz 2002 Descendants' Trust, Fred Wilpon Family Trust, and Wilpon 2002 Descendants' Trust.

1095.   The Sterling Partners were also the equitable owners of the Katz/Wilpon Trust Defendants.  As noted above, every Sterling Partner who was a settlor of each Katz/Wilpon Trust Defendant funded the trust entities, directed the movement of funds into and out of each trust's BLMIS account(s), and even directed the leveraging of the BLMIS accounts held by each Katz/Wilpon Trust Defendant.  Upon information and belief, each Sterling Partner that was a settlor of a Katz/Wilpon Trust Defendant treated the trust's assets as his own, and the Sterling Partners even used the assets of the Katz/Wilpon Trust Defendants in Sterling's collective financial restructuring.

1096.   Upon information and belief, the Sterling Partners also used the Katz/Wilpon Trust Defendants to shield from their creditors—including from the Plaintiff herein—the Fictitious Profits and other fraudulent transfers from BLMIS, which the Sterling Partners knew, or should have known, were the product of illegitimate trading activity.

1097.   Accordingly, under principles of equitable ownership and veil piercing, the Sterling Partners' knowledge and/or inquiry notice must be imputed to the Katz/Wilpon Trust Defendants.

1098.   Agency and equitable ownership principles similarly require the imputation of the Sterling Partners' knowledge and/or inquiry notice to the Sterling Family Member Defendants.

1099. The Sterling Family Member Defendants expressly authorized the Sterling Partners, Arthur Friedman, and/or each Family Member Defendant's respective related family member Sterling Partner to act as their agents in opening, administering, and/or otherwise managing their BLMIS accounts. All actions undertaken by any Sterling Partner related to each Sterling Family Member Defendants' BLMIS account fell within the scope of the Sterling Partners' responsibilities, and the facts giving rise to the Sterling Partners' knowledge and/or inquiry notice in connection with BLMIS were acquired within the scope of the Sterling Partners' agency relationship.

1100. Likewise, each Sterling Partner who held an interest in a BLMIS account as tenant-in-common and/or a joint-tenant acted as the agent of the other co-tenant(s), including certain Sterling Family Member Defendant(s). Accordingly, the knowledge and/or inquiry notice of the Sterling Partners acquired in the course of the Sterling Partners' responsibilities as agents in connection with tenant-in-common and/or joint tenant BLMIS accounts must be imputed to the other co-tenant(s), including certain Sterling Family Member Defendants.

1101. Alternatively, upon information and belief, each of the Sterling Partners was otherwise the equitable or beneficial owner of the BLMIS accounts held by their wives and children named as Sterling Family Member Defendants herein.

## XII. TRANSFERS

### A. Overview

1102. According to BLMIS' and Sterling's records, a number of Sterling Defendants maintained multiple accounts with BLMIS, including, but not limited to, the accounts set forth in Appendix I, Exhibit A (collectively, the "Sterling BLMIS Accounts").

1103. Upon information and belief, for each Sterling BLMIS Account, a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and

Sales of Securities and Options (collectively, the "Sterling BLMIS Account Agreements") was executed and delivered to BLMIS at its headquarters located at 885 Third Avenue, New York, New York.

1104.  The Sterling BLMIS Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Sterling BLMIS Accounts were held in New York, New York, and from their account opening dates to December 11, 2008, a number of Sterling Defendants—through the Sterling Partners and/or Arthur Friedman—sent funds to BLMIS and/or to BLMIS' account at JPMorgan Chase & Co., Account #XXXXXXXXXXX1703 (the "BLMIS Bank Account") in New York, New York for application to the Sterling BLMIS Accounts and the conducting of purported trading activities.  From at least 23 years prior to December 11, 2008, a number of Sterling Defendants—through the Sterling Partners and/or Arthur Friedman—made deposits to BLMIS and/or into the BLMIS Bank Account for application to the Sterling BLMIS Accounts.

1105.  Prior to the Filing Date, BLMIS made direct transfers to a number of Sterling Defendants totaling $1,018,098,199 (collectively, the "Total Initial Transfers").  Of the Total Initial Transfers, approximately (a) $295,465,565 constitutes Fictitious Profits comprised of other people's money received by certain Sterling Defendants from the opening dates of their Sterling BLMIS Accounts to the Filing Date; (b) $710,601,377 constitutes principal received by certain Sterling Defendants within the six years prior to the Filing Date, including $14,191,667 of principal in the ninety day Preference Period prior to the Filing Date; and (c)  $12,031,257 of investments by Madoff, Ruth Madoff, and/or Peter Madoff constituting BLMIS Customer Property, i.e., other people's money, received by the Madoff Investment Entity Defendants.

1106.   The Total Initial Transfers to the Sterling Defendants were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery by the Trustee pursuant to sections 544(b), 547, 548, and 550(a) of the Bankruptcy Code, sections 273-279 of the DCL, and NY CPLR sections 203(g) and 213(8).

1107.   Of the Total Initial Transfers, during the six years prior to the Filing Date, BLMIS made direct transfers to the Sterling Defendants of approximately (a) $162,726,768 in Fictitious Profits;  (b) $710,601,377 in principal; and (c) $6,608,642 in BLMIS Customer Property received by the Madoff Investment Entity Defendants (the "Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.

1108.   Of the Total Initial Transfers, during the two years prior to the Filing Date, BLMIS made direct transfers to the Sterling Defendants of approximately (a) $83,309,162 in Fictitious Profits; (b) $301,027,523 in principal; and (c) $2,371,478 in BLMIS Customer Property received by the Madoff Investment Entity Defendants (the "Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).

1109.   In the ninety-day Preference Period prior to the Filing Date, BLMIS transferred approximately $14,191,667 of principal to a number of Sterling Defendants (the "Preference Period Transfers").  The total Preference Period Transfers are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).

1110.   A number of Sterling Defendants received Subsequent Transfers that are recoverable under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).

1111.   To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

1112.   Appendix I, Exhibit A to this Complaint identifies the 185 Sterling BLMIS Accounts that received Initial Transfers from BLMIS.

1113.   Appendix I, Exhibit B provides the Initial Transfers for each Sterling BLMIS Account identified in Exhibit A to Appendix I.

1114.   Appendix II, Exhibit A lists the Sterling Defendants that received Initial and/or Subsequent Transfers from the Sterling BLMIS Accounts.

1115.   Appendix II, Exhibits B and C identify the Initial and Subsequent Transfers, respectively, for each Sterling Defendant.

1116.   The Initial Transfers received by any Sterling Defendant and related information are identified in each Sterling Defendant's corresponding Exhibit B to Appendix II.

1117.   The Preference Period Transfers received by any Sterling Defendant are identified in Column 4 of each Sterling Defendant's corresponding Exhibit B to Appendix II.

1118.   The Subsequent Transfers received by any Sterling Defendant are identified in each Sterling Defendant's corresponding Exhibit C to Appendix II.

1119.   To the extent applicable, the internal records of BLMIS and/or Sterling identify each Sterling Defendant's fixed percentage interest in the Sterling BLMIS Accounts opened in their name or for their benefit.  Such Sterling Defendant's applicable percentage interest in each Sterling BLMIS Account is identified in Column 3 of Exhibits B and C to Appendix II.  Upon

information and belief, each Sterling Defendant received Initial Transfers and/or Subsequent Transfers from each Sterling BLMIS Account equal to that Sterling Defendant's percentage ownership interest in the applicable Sterling BLMIS Account.

1120.   In a minority of cases, neither BLMIS' nor Sterling's records identify the applicable percentage interest of a Sterling Defendant in a particular Sterling BLMIS Account. Pending discovery, such Sterling Defendants are attributed the maximum percentage ownership interest allocable in these Sterling BLMIS Accounts as identified in Exhibit B and/or Exhibit C of Appendix II for such Sterling Defendants.

1121.   The following section provides the relevant Sterling BLMIS Account(s) and avoidable transfer information for each Sterling Partner Defendant, Sterling Entity Defendant, Katz/Wilpon Trust Defendant, Sterling Family Member Defendant, and Madoff Investment Entity Defendant, *ad seriatim*.

1122.   With respect to Initial Transfers, the section below provides for each Sterling Defendant, to the extent applicable: (a) the Sterling BLMIS Account(s) from which the Sterling Defendant received Initial Transfers; (b) the total Initial Transfers; (c) the total Six Year Initial Transfers; (d) the total Two Year Initial Transfers; and (e) the total Preference Period Transfers. Further information for each Sterling Defendant's Initial Transfers is provided in each Sterling Defendant's corresponding Exhibit B to Appendix II.

1123.   With respect to Subsequent Transfers, the section below provides for each Sterling Defendant: (a) the Sterling BLMIS Account(s) from which the Sterling Defendant received Subsequent Transfers; and (b) the total Subsequent Transfers from each Sterling BLMIS Account.  Further information regarding each Sterling Defendant's Subsequent Transfers is provided in each Sterling Defendant's corresponding Exhibit C to Appendix II.

1124.  The Trustee's investigation is ongoing and the Trustee reserves the right to: (a) supplement the information regarding the total and each Sterling Defendant's Initial Transfers and Subsequent Transfers, and any additional transfers; and (b) seek avoidance and recovery of such additional transfers.

### B.      Sterling Partners

### Saul Katz

1125.  According to BLMIS' and Sterling's records, Defendant Saul Katz received Initial Transfers from approximately twenty-one (21) Sterling BLMIS Accounts: Nos. 1KW024, 1KW089, 1KW098, 1KW120, 1KW121, 1KW197, 1KW220, 1KW222, 1KW238, 1KW278, 1KW289, 1KW329, 1KW336, 1KW337, 1KW362, 1KW363, 1KW376, 1KW412, 1KW427, 101149, and 1KW007.  Appendix II, Saul B. Katz Exhibit B.

a.      BLMIS made direct transfers to Defendant Saul Katz totaling $13,960,991 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $17,874,068 in principal during the six years prior to the Filing Date, totaling approximately $31,835,059 (the "Saul Katz Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Saul B. Katz Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Saul Katz of approximately $29,382,183 (the "Saul Katz Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Of the Saul Katz Six Year Initial Transfers,

$11,508,115 were Fictitious Profits and the remaining $17,874,068 constituted the return of principal. Appendix II, Saul B. Katz Exhibit B.

      c.       During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Saul Katz of approximately $9,572,831 (the "Saul Katz Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Of the Saul Katz Two Year Initial Transfers, $6,778,120 were Fictitious Profits and the remaining $2,794,710 constituted the return of principal. Appendix II, Saul B. Katz Exhibit B.

1126.   Upon information and belief, Defendant Saul Katz is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately forty-seven (47) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW040, 1KW057, 1KW084, 1KW134, 1KW156, 1KW175, 1KW178, 1KW180, 1KW189, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW255, 1KW259, 1KW279, 1KW287, 1KW300, 1KW313, 1KW314, 1KW315, 1KW323, 1KW328, 1KW339, 1KW341, 1KW346, 1KW347, 1KW348, 1KW349, 1KW358, 1KW374, 1KW378, 1KW413, 1KW420, 1KW423, 1KW434, 1KW435, 1KW436, 1KW447, 1KW449, 1KW463, 1KW464, 1KW465, 1KW466, 1KW059, and 1KW359 (collectively, the "Saul Katz Subsequent Transfer Accounts"). Appendix II, Saul B. Katz Exhibit C.

      a.       Defendant Saul Katz received Subsequent Transfers from the Saul Katz Subsequent Transfer Accounts totaling $31,143,050 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $57,106,710 in principal during the six years prior to the Filing Date, totaling approximately $88,249,759 (the "Saul Katz Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property

within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Saul Katz pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Saul B. Katz Exhibit C.

**Fred Wilpon**

1127.   According to BLMIS' and Sterling's records, Defendant Fred Wilpon received Initial Transfers from approximately twelve (12) Sterling BLMIS Accounts: Nos. 1KW067, 1KW098, 1KW220, 1KW222, 1KW288, 1KW329, 1KW337, 1KW362, 1KW392, 1KW412, 1KW427, and 102343.  Appendix II, Fred Wilpon Exhibit B.

a.      BLMIS made direct transfers to Defendant Fred Wilpon totaling $8,094,733 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $32,483,062 in principal during the six years prior to the Filing Date, totaling approximately $40,577,796 (the "Fred Wilpon Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Fred Wilpon Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Fred Wilpon of approximately $37,628,174 (the "Fred Wilpon Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Of the Fred Wilpon Six Year Initial Transfers, $5,145,111 were Fictitious Profits and the remaining $32,483,062 constituted the return of principal.  Appendix II, Fred Wilpon Exhibit B.

c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Fred Wilpon of approximately $26,866,384 (the "Fred Wilpon Two Year

Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Of the Fred Wilpon Two Year Initial Transfers, $4,649,562 were Fictitious Profits and the remaining $22,216,822 constituted the return of principal. Appendix II, Fred Wilpon Exhibit B.

1128. Upon information and belief, Defendant Fred Wilpon is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately forty-five (45) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW040, 1KW057, 1KW084, 1KW134, 1KW156, 1KW175, 1KW178, 1KW180, 1KW189, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW255, 1KW257, 1KW279, 1KW287, 1KW300, 1KW313, 1KW314, 1KW315, 1KW323, 1KW328, 1KW339, 1KW341, 1KW346, 1KW347, 1KW348, 1KW349, 1KW358, 1KW374, 1KW378, 1KW413, 1KW420, 1KW423, 1KW435, 1KW436, 1KW449, 1KW463, 1KW464, 1KW465, 1KW466, 1KW059, and 1KW359 (collectively, the "Fred Wilpon Subsequent Transfer Accounts"). Appendix II, Fred Wilpon Exhibit C.

a. Defendant Fred Wilpon received Subsequent Transfers from the Fred Wilpon Subsequent Transfer Accounts totaling $44,818,855 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $82,056,209 in principal during the six years prior to the Filing Date, totaling approximately $126,875,064 (the "Fred Wilpon Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Fred Wilpon pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Fred Wilpon Exhibit C.

**Richard Wilpon**

1129.   According to BLMIS' and Sterling's records, Defendant Richard Wilpon received Initial Transfers from approximately seventeen (17) Sterling BLMIS Accounts: Nos. 1KW022, 1KW080, 1KW098, 1KW161, 1KW207, 1KW208, 1KW209, 1KW220, 1KW250, 1KW290, 1KW337, 1KW362, 1KW403, 1KW412, 1KW427, 102343, and 1KW081.  Appendix II, Richard Wilpon Exhibit B.

   a.   BLMIS made direct transfers to Defendant Richard Wilpon totaling $6,925,067 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $14,961,751 in principal during the six years prior to the Filing Date, totaling approximately $21,886,818 (the "Richard Wilpon Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Richard Wilpon Exhibit B.

   b.   During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Richard Wilpon of approximately $16,871,186 (the "Richard Wilpon Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Of the Richard Wilpon Six Year Initial Transfers, $1,909,436 were Fictitious Profits and the remaining $14,961,751 constituted the return of principal.  Appendix II, Richard Wilpon Exhibit B.

   c.   During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Richard Wilpon of approximately $11,929,467 (the "Richard Wilpon Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-

2(c)(3). Of the Richard Wilpon Two Year Initial Transfers, $1,909,436 were Fictitious Profits and the remaining $10,020,032 constituted the return of principal. Appendix II, Richard Wilpon Exhibit B.

d. In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Richard Wilpon totaling $368,533 (the "Richard Wilpon Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Richard Wilpon Exhibit B.

1130. Upon information and belief, Defendant Richard Wilpon is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately forty-three (43) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW040, 1KW057, 1KW134, 1KW156, 1KW175, 1KW178, 1KW180, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW255, 1KW279, 1KW287, 1KW300, 1KW313, 1KW314, 1KW315, 1KW323, 1KW325, 1KW339, 1KW341, 1KW346, 1KW347, 1KW348, 1KW349, 1KW358, 1KW378, 1KW402, 1KW413, 1KW420, 1KW423, 1KW435, 1KW436, 1KW447, 1KW449, 1KW455, 1KW463, 1KW464, 1KW465, 1KW059, and 1KW359 (collectively, the "Richard Wilpon Subsequent Transfer Accounts"). Appendix II, Richard Wilpon Exhibit C.

a. Defendant Richard Wilpon received Subsequent Transfers from the Richard Wilpon Subsequent Transfer Accounts totaling $16,241,651 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $33,207,078 in principal during the six years prior to the Filing Date, totaling approximately $49,448,729 (the "Richard Wilpon Subsequent Transfers"). Such Subsequent Transfers were and continue to be

Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Richard Wilpon pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Richard Wilpon Exhibit C.

## Michael Katz

1131. According to BLMIS' and Sterling's records, Defendant Michael Katz received Initial Transfers from approximately seventeen (17) Sterling BLMIS Accounts: Nos. 1KW019, 1KW022, 1KW098, 1KW109, 1KW110, 1KW121, 1KW161, 1KW220, 1KW291, 1KW337, 1KW345, 1KW354, 1KW362, 1KW412, 1KW427, 101149, and 1KW020. Appendix II, Michael Katz Exhibit B.

      a. BLMIS made direct transfers to Defendant Michael Katz totaling $4,901,745 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $9,180,758 in principal during the six years prior to the Filing Date, totaling approximately $14,082,503 (the "Michael Katz Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Michael Katz Exhibit B.

      b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Michael Katz of approximately $10,450,928 (the "Michael Katz Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Of the Michael Katz Six Year Initial Transfers, $1,270,170 were Fictitious Profits and the remaining $9,180,758 constituted the return of principal. Appendix II, Michael Katz Exhibit B.

c.	During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Michael Katz of approximately $4,428,938 (the "Michael Katz Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Of the Michael Katz Two Year Initial Transfers, $689,187 were Fictitious Profits and the remaining $3,739,751 constituted the return of principal.  Appendix II, Michael Katz Exhibit B.

d.	In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Michael Katz totaling $1,500,000 (the "Michael Katz Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Michael Katz Exhibit B.

1132.	Upon information and belief, Defendant Michael Katz is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately forty-two (42) Sterling BLMIS Accounts held by other Sterling-related individuals: Nos. 1KW040, 1KW057, 1KW134, 1KW156, 1KW175, 1KW178, 1KW180, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW255, 1KW279, 1KW287, 1KW300, 1KW313, 1KW314, 1KW315, 1KW323, 1KW339, 1KW341, 1KW346, 1KW347, 1KW348, 1KW349, 1KW358, 1KW378, 1KW402, 1KW413, 1KW420, 1KW423, 1KW434, 1KW435, 1KW436, 1KW447, 1KW449, 1KW455, 1KW463, 1KW464, 1KW059, and 1KW359 (collectively, the "Michael Katz Subsequent Transfer Accounts").  Appendix II, Michael Katz Exhibit C.

a.	Defendant Michael Katz received Subsequent Transfers from the Michael Katz Subsequent Transfer Accounts totaling $14,209,601 in Fictitious Profits from the opening

dates of such Subsequent Transfer Accounts to the Filing Date and $29,504,875 in principal during the six years prior to the Filing Date, totaling approximately $43,714,476 (the "Michael Katz Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Michael Katz pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Michael Katz Exhibit C.

**Jeffrey Wilpon**

1133.   According to BLMIS' and Sterling's records, Defendant Jeffrey Wilpon received Initial Transfers from approximately ten (10) Sterling BLMIS Accounts: Nos. 1KW098, 1KW161, 1KW195, 1KW220, 1KW295, 1KW337, 1KW412, 1KW427, 101149, and 1KW076. Appendix II, Jeffrey Wilpon Exhibit B.

a.      BLMIS made direct transfers to Defendant Jeffrey Wilpon totaling $3,339,296 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $9,434,973 in principal during the six years prior to the Filing Date, totaling approximately $12,774,269 (the "Jeffrey Wilpon Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Jeffrey Wilpon Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Jeffrey Wilpon of approximately $10,349,364 (the "Jeffrey Wilpon Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279  Of the Jeffrey Wilpon Six Year Initial

Transfers, $914,391 were Fictitious Profits and the remaining $9,434,973 constituted the return of principal.  Appendix II, Jeffrey Wilpon Exhibit B.

c.    During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Jeffrey Wilpon of approximately $2,737,364 (the "Jeffrey Wilpon Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Of the Jeffrey Wilpon Two Year Initial Transfers, $914,391 were Fictitious Profits and the remaining $1,822,973 constituted the return of principal.  Appendix II, Jeffrey Wilpon Exhibit B.

1134.   Upon information and belief, Defendant Jeffrey Wilpon is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately fifty-five (55) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW040, 1KW057, 1KW134, 1KW156, 1KW175, 1KW178, 1KW180, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW255, 1KW279, 1KW287, 1KW300, 1KW313, 1KW314, 1KW315, 1KW323, 1KW325, 1KW339, 1KW341, 1KW346, 1KW347, 1KW348, 1KW349, 1KW358, 1KW374, 1KW378, 1KW413, 1KW420, 1KW423, 1KW435, 1KW436, 1KW449, 1KW455, 1KW463, 1KW464, 1KW465, 1KW037, 1KW059, 1KW063, 1KW072, 1KW074, 1KW075, 1KW082, 1KW220, 1KW260, 1KW298, 1KW337, 1KW359, 1KW362, 1KW408, and 1KW427 (collectively, the "Jeffrey Wilpon Subsequent Transfer Accounts").  Appendix II, Jeffrey Wilpon Exhibit C.

a.    Defendant Jeffrey Wilpon received Subsequent Transfers from the Jeffrey Wilpon Subsequent Transfer Accounts totaling $33,731,951 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $148,480,979 in

principal during the six years prior to the Filing Date, totaling approximately $182,212,930 (the "Jeffrey Wilpon Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Jeffrey Wilpon pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Jeffrey Wilpon Exhibit C.

### David Katz

1135. According to BLMIS' and Sterling's records, Defendant David Katz received Initial Transfers from approximately fourteen (14) Sterling BLMIS Accounts: Nos. 1KW012, 1KW017, 1KW063, 1KW119, 1KW161, 1KW201, 1KW220, 1KW296, 1KW337, 1KW362, 1KW412, 1KW427, 1KW011, and 1KW037. Appendix II, David Katz Exhibit B.

     a. BLMIS made direct transfers to Defendant David Katz totaling $4,039,917 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $1,674,656 in principal during the six years prior to the Filing Date, totaling approximately $5,714,572 (the "David Katz Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, David Katz Exhibit B.

     b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant David Katz of approximately $2,814,265 (the "David Katz Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Of the David Katz Six Year Initial Transfers, $1,139,609 were Fictitious Profits and the remaining $1,674,656 constituted the return of principal. Appendix II, David Katz Exhibit B.

c.    During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant David Katz of approximately $2,361,605 (the "David Katz Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Of the David Katz Two Year Initial Transfers, $738,609 were Fictitious Profits and the remaining $1,622,996 constituted the return of principal. Appendix II, David Katz Exhibit B.

1136.    Upon information and belief, Defendant David Katz is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately forty-nine (49) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW057, 1KW134, 1KW156, 1KW175, 1KW178, 1KW180, 1KW192, 1KW198, 1KW218, 1KW223, 1KW247, 1KW254, 1KW255, 1KW279, 1KW287, 1KW300, 1KW313, 1KW314, 1KW315, 1KW323, 1KW346, 1KW347, 1KW348, 1KW349, 1KW358, 1KW374, 1KW378, 1KW402, 1KW413, 1KW420, 1KW423, 1KW427, 1KW436, 1KW449, 1KW463, 1KW464, 1KW465, 1KW030, 1KW037, 1KW059, 1KW220, 1KW242, 1KW299, 1KW337, 1KW341, 1KW359, 1KW362, 1KW407, and 1KW435 (collectively, the "David Katz Subsequent Transfer Accounts"). Appendix II, David Katz Exhibit C.

a.    Defendant David Katz received Subsequent Transfers from the David Katz Subsequent Transfer Accounts totaling $31,797,164 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $116,297,142 in principal during the six years prior to the Filing Date, totaling approximately $148,094,306 (the "David Katz Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof,

are recoverable from Defendant David Katz pursuant to section 550(a) of the Bankruptcy Code. Appendix II, David Katz Exhibit C.

## Gregory Katz

1137.  According to BLMIS' and Sterling's records, Defendant Gregory Katz received Initial Transfers from approximately seven (7) Sterling BLMIS Accounts: Nos. 1KW037, 1KW072, 1KW108, 1KW427, 1KW453, 1KW345, and 1KW426.  Appendix II, Gregory Katz Exhibit B.

a.  BLMIS made direct transfers to Defendant Gregory Katz totaling $98,488 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $1,426,939 in principal during the six years prior to the Filing Date, totaling approximately $1,525,427 (the "Gregory Katz Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Gregory Katz Exhibit B.

b.  During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Gregory Katz of approximately $1,517,658 (the "Gregory Katz Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Of the Gregory Katz Six Year Initial Transfers, $90,718 were Fictitious Profits and the remaining $1,426,939 constituted the return of principal. Appendix II, Gregory Katz Exhibit B.

c.  During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Gregory Katz of approximately $1,235,593 (the "Gregory Katz Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of

the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Of the Gregory Katz Two Year Initial Transfers, $90,718 were Fictitious Profits and the remaining $1,144,874 constituted the return of principal. Appendix II, Gregory Katz Exhibit B.

1138. Upon information and belief, Defendant Gregory Katz is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately twenty-four (24) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW063, 1KW300, 1KW313, 1KW314, 1KW315, 1KW402, 1KW435, 1KW449, 1KW455, 1KW463, 1KW464, 1KW465, 1KW057, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW359, 1KW374, 1KW378, 1KW391, 1KW423, and 1KW447 (collectively, the "Gregory Katz Subsequent Transfer Accounts"). Appendix II, Gregory Katz Exhibit C.

a. Defendant Gregory Katz received Subsequent Transfers from the Gregory Katz Subsequent Transfer Accounts totaling $1,962,314 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $21,564,999 in principal during the six years prior to the Filing Date, totaling approximately $23,527,313 (the "Gregory Katz Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Gregory Katz pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Gregory Katz Exhibit C.

### Arthur Friedman

1139. According to BLMIS' and Sterling's records, Defendant Arthur Friedman received Initial Transfers from approximately twelve (12) Sterling BLMIS Accounts: Nos. 1KW005, 1KW098, 1KW161, 1KW220, 1KW294, 1KW337, 1KW412, 1KW427, 100625, 101149, 1KW004, and 1KW388. Appendix II, Arthur Friedman Exhibit B.

a.     BLMIS made direct transfers to Defendant Arthur Friedman totaling $1,325,671 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $1,929,814 in principal during the six years prior to the Filing Date, totaling approximately $3,255,485 (the "Arthur Friedman Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Arthur Friedman Exhibit B.

b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Arthur Friedman of approximately $2,177,039 (the "Arthur Friedman Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Of the Arthur Friedman Six Year Initial Transfers, $247,225 were Fictitious Profits and the remaining $1,929,814 constituted the return of principal.  Appendix II, Arthur Friedman Exhibit B.

c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Arthur Friedman of approximately $444,906 (the "Arthur Friedman Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Of the Arthur Friedman Two Year Initial Transfers, $181,635 were Fictitious Profits and the remaining $263,271 constituted the return of principal.  Appendix II, Arthur Friedman Exhibit B.

1140.   Upon information and belief, Defendant Arthur Friedman is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from

approximately forty-two (42) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW040, 1KW057, 1KW134, 1KW156, 1KW175, 1KW178, 1KW180, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW255, 1KW279, 1KW287, 1KW300, 1KW313, 1KW314, 1KW315, 1KW323, 1KW339, 1KW341, 1KW346, 1KW347, 1KW348, 1KW349, 1KW358, 1KW374, 1KW378, 1KW402, 1KW413, 1KW420, 1KW423, 1KW435, 1KW436, 1KW449, 1KW455, 1KW463, 1KW464, 1KW465, 1KW001, and 1KW359 (collectively, the "Arthur Friedman Subsequent Transfer Accounts"). Appendix II, Arthur Friedman Exhibit C.

      a.     Defendant Arthur Friedman received Subsequent Transfers from the Arthur Friedman Subsequent Transfer Accounts totaling $929,732 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $4,607,244 in principal during the six years prior to the Filing Date, totaling approximately $5,536,976 (the "Arthur Friedman Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Arthur Friedman pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Arthur Friedman Exhibit C.

### Thomas Osterman

1141.   According to BLMIS' and Sterling's records, Defendant Thomas Osterman received Initial Transfers from approximately fourteen (14) Sterling BLMIS Accounts: Nos. 1KW044, 1KW062, 1KW098, 1KW161, 1KW190, 1KW220, 1KW292, 1KW337, 1KW362, 1KW365, 1KW384, 1KW412, 1KW427, and 101149. Appendix II, Thomas Osterman Exhibit B.

      a.     BLMIS made direct transfers to Defendant Thomas Osterman totaling $3,313,813 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the

Filing Date and $578,741 in principal during the six years prior to the Filing Date, totaling approximately $3,892,555 (the "Thomas Osterman Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Thomas Osterman Exhibit B.

        b.        During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Thomas Osterman of approximately $2,203,989 (the "Thomas Osterman Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Of the Thomas Osterman Six Year Initial Transfers, $1,625,247 were Fictitious Profits and the remaining $578,741 constituted the return of principal. Appendix II, Thomas Osterman Exhibit B.

        c.        During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Thomas Osterman of approximately $984,407 (the "Thomas Osterman Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Of the Thomas Osterman Two Year Initial Transfers, $515,995 were Fictitious Profits and the remaining $468,411 constituted the return of principal. Appendix II, Thomas Osterman Exhibit B.

        d.        In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Thomas Osterman constituting a minimal amount (the "Thomas Osterman Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a),

and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Thomas Osterman Exhibit B.

1142. Upon information and belief, Defendant Thomas Osterman is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately forty-one (41) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW040, 1KW057, 1KW134, 1KW156, 1KW175, 1KW178, 1KW180, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW255, 1KW279, 1KW287, 1KW300, 1KW313, 1KW314, 1KW315, 1KW323, 1KW339, 1KW341, 1KW346, 1KW347, 1KW348, 1KW349, 1KW358, 1KW374, 1KW378, 1KW413, 1KW420, 1KW423, 1KW435, 1KW436, 1KW449, 1KW455, 1KW463, 1KW464, 1KW465, 1KW059, and 1KW359 (collectively, the "Thomas Osterman Subsequent Transfer Accounts"). Appendix II, Thomas Osterman Exhibit C.

a. Defendant Thomas Osterman received Subsequent Transfers from the Thomas Osterman Subsequent Transfer Accounts totaling $10,181,803 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $12,973,496 in principal during the six years prior to the Filing Date, totaling approximately $23,155,299 (the "Thomas Osterman Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Thomas Osterman pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Thomas Osterman Exhibit C.

**Marvin Tepper**

1143. According to BLMIS' and Sterling's records, Defendant Marvin Tepper received Initial Transfers from approximately sixteen (16) Sterling BLMIS Accounts: Nos. 1KW063, 1KW098, 1KW112, 1KW161, 1KW211, 1KW220, 1KW263, 1KW322, 1KW337, 1KW362,

1KW366, 1KW412, 1KW427, 1KW064, 1KW168, and 1KW297.  Appendix II, Marvin B. Tepper Exhibit B.

        a.        BLMIS made direct transfers to Defendant Marvin Tepper totaling $4,091,935 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $4,352,853 in principal during the six years prior to the Filing Date, totaling approximately $8,444,788 (the "Marvin Tepper Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Marvin B. Tepper Exhibit B.

        b.        During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Marvin Tepper of approximately $5,583,550 (the "Marvin Tepper Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Of the Marvin Tepper Six Year Initial Transfers, $1,230,697 were Fictitious Profits and the remaining $4,352,853 constituted the return of principal.  Appendix II, Marvin B. Tepper Exhibit B.

        c.        During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Marvin Tepper of approximately $4,369,006 (the "Marvin Tepper Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Of the Marvin Tepper Two Year Initial Transfers, $1,203,690 were Fictitious Profits and the remaining $3,165,316 constituted the return of principal.  Appendix II, Marvin B. Tepper Exhibit B.

d.  In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Marvin Tepper totaling $120,000 (the "Marvin Tepper Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Marvin B. Tepper Exhibit B.

1144.  Upon information and belief, Defendant Marvin Tepper is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately forty-two (42) Sterling BLMIS Accounts held by other Sterling-related entities and/or individual: Nos. 1KW040, 1KW057, 1KW134, 1KW156, 1KW175, 1KW178, 1KW180, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW255, 1KW259, 1KW279, 1KW287, 1KW300, 1KW313, 1KW314, 1KW315, 1KW323, 1KW325, 1KW339, 1KW341, 1KW346, 1KW347, 1KW348, 1KW349, 1KW358, 1KW374, 1KW378, 1KW413, 1KW420, 1KW423, 1KW435, 1KW436, 1KW447, 1KW449, 1KW463, 1KW464, 1KW465, and 1KW359 (collectively, the "Marvin Tepper Subsequent Transfer Accounts").  Appendix II, Marvin B. Tepper Exhibit C.

a.  Defendant Marvin Tepper received Subsequent Transfers from the Marvin Tepper Subsequent Transfer Accounts totaling $5,562,276 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $24,709,145 in principal during the six years prior to the Filing Date, totaling approximately $30,271,421 (the "Marvin Tepper Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Marvin Tepper pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Marvin B. Tepper Exhibit C.

**Estate of Leonard Schreier**

1145. According to BLMIS' and Sterling's records, Defendant Estate of Leonard Schreier and/or Leonard Schreier received Initial Transfers from approximately fourteen (14) Sterling BLMIS Accounts: Nos. 1KW052, 1KW053, 1KW056, 1KW063, 1KW098, 1KW161, 1KW220, 1KW293, 1KW337, 1KW412, 1KW427, 102343, 1KW054, and 1KW372. Appendix II, Estate of Leonard Schreier Exhibit B.

    a.    BLMIS made direct transfers to Defendant Estate of Leonard Schreier or Leonard Schreier totaling $6,963,209 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $7,813,322 in principal during the six years prior to the Filing Date, totaling approximately $14,776,531 (the "Estate of Leonard Schreier Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Estate of Leonard Schreier Exhibit B.

    b.    During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Estate of Leonard Schreier of approximately $8,412,770 (the "Estate of Leonard Schreier Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Of the Estate of Leonard Schreier Six Year Initial Transfers, $599,448 were Fictitious Profits and the remaining $7,813,322 constituted the return of principal. Appendix II, Estate of Leonard Schreier Exhibit B.

    c.    During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Estate of Leonard Schreier of approximately $1,622,130 (the "Estate of Leonard Schreier Two Year Initial Transfers"), which are avoidable and recoverable under

sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Of the Estate of Leonard Schreier Two Year Initial Transfers, $599,448 were Fictitious Profits and the remaining $1,022,682 constituted the return of principal. Appendix II, Estate of Leonard Schreier Exhibit B.

1146. Upon information and belief, Defendant Estate of Leonard Schreier and/or Leonard Schreier is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately thirty-one (31) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW040, 1KW057, 1KW059, 1KW134, 1KW156, 1KW175, 1KW178, 1KW180, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW255, 1KW279, 1KW287, 1KW313, 1KW314, 1KW315, 1KW323, 1KW339, 1KW341, 1KW346, 1KW347, 1KW348, 1KW349, 1KW378, 1KW413, 1KW420, 1KW423, and 1KW449 (collectively, the "Estate of Leonard Schreier Subsequent Transfer Accounts"). Appendix II, Estate of Leonard Schreier Exhibit C.

a. Defendant Estate of Leonard Schreier and/or Leonard Schreier received Subsequent Transfers from the Estate of Leonard Schreier Subsequent Transfer Accounts totaling $11,161,695 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $8,662,947 in principal during the six years prior to the Filing Date, totaling approximately $19,824,641 (the "Estate of Leonard Schreier Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from the Estate of Leonard Schreier pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Estate of Leonard Schreier Exhibit C.

1147.   Upon information and belief, some or all of the Estate of Leonard Schreier transfers were subsequently transferred by Defendant Estate of Leonard Schreier to the following subsequent transferees: Deyva Schreier and Michael Schreier (collectively, the "Estate of Leonard Schreier Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the Estate of Leonard Schreier Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### C.    Sterling Entity Defendants

### 1.    New York Mets and Related Entities

### Mets Limited Partnership

1148.   According to BLMIS' and Sterling's records, Defendant Mets Limited Partnership received Initial Transfers from approximately four (4) Sterling BLMIS Accounts: Nos. 1KW040, 1KW192, 1KW247, and 1KW423.  Appendix II, Mets Limited Partnership Exhibit B.

a.    BLMIS made direct transfers to Defendant Mets Limited Partnership totaling $84,618,667 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $282,878,055 in principal during the six years prior to the Filing Date, totaling approximately $367,496,722 (the "Mets Limited Partnership Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Mets Limited Partnership Exhibit B.

b.    During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Mets Limited Partnership of approximately $336,800,000 (the "Mets Limited Partnership Six Year Initial Transfers"), which are avoidable and recoverable under sections 544,

550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Mets Limited Partnership Exhibit B.  Of the Mets Limited Partnership Six Year Initial Transfers, $53,921,945 were Fictitious Profits and the remaining $282,878,055 constituted the return of principal.

c.    During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Mets Limited Partnership of approximately $111,000,000 (the "Mets Limited Partnership Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Mets Limited Partnership Exhibit B.  Of the Mets Limited Partnership Two Year Initial Transfers, $27,770,108 were Fictitious Profits and the remaining $83,229,892 constituted the return of principal.

1149.   Upon information and belief, Defendant Mets Limited Partnership is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately five (5) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: 1KW254, 1KW057, 1KW218, 1KW223, and 1KW378 (collectively, the "Mets Limited Partnership Subsequent Transfer Accounts").  Appendix II, Mets Limited Partnership Exhibit C.

a.    Defendant Mets Limited Partnership received Subsequent Transfers from the Mets Limited Partnership Subsequent Transfer Accounts totaling $9,388,295 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $37,429,289 in principal during the six years prior to the Filing Date, totaling approximately $46,817,584 (the "Mets Limited Partnership Subsequent Transfers").  Such Subsequent

Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Mets Limited Partnership pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Mets Limited Partnership Exhibit C.

1150.  Upon information and belief, some or all of the Mets Limited Partnership transfers were subsequently transferred by Defendant Mets Limited Partnership to the following subsequent transferees: C.D.S. Corp., Mets One LLC, Mets II LLC, Sterling Mets Associates, and Sterling Mets Associates II. Upon information and belief, such transfers were subsequently transferred to the ultimate owners of the Mets Limited Partnership, including: Fred Wilpon, Saul Katz, Richard Wilpon, David Katz, Michael Katz, Jeffrey Wilpon, Thomas Osterman, Arthur Friedman, Marvin Tepper, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, the Saul B. Katz Family Trust, the Wilpon 2002 Descendants' Trust, and the Katz 2002 Descendants' Trust (collectively, the "Mets Limited Partnership Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. Such Subsequent Transfers, or the value thereof, are recoverable from the Mets Limited Partnership Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Sterling Mets LP

1151.  According to BLMIS' and Sterling's records, Defendant Sterling Mets LP received Initial Transfers from approximately five (5) Sterling BLMIS Accounts: Nos. 1KW057 and 1KW223, which were held under the partnership's former name, Sterling Doubleday Enterprises LP; and Nos. 1KW218, 1KW254, and 1KW378, which were held under the name Sterling Mets LP. Appendix II, Sterling Mets LP Exhibit B.

a.  BLMIS made direct transfers to Defendant Sterling Mets LP totaling $9,388,295 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the

Filing Date and $37,429,289 in principal during the six years prior to the Filing Date, totaling approximately $46,817,584 (the "Sterling Mets LP Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling Mets LP Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Mets LP of approximately $39,450,000 (the "Sterling Mets LP Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling Mets LP Exhibit B. Of the Sterling Mets LP Six Year Initial Transfers, $2,020,711 were Fictitious Profits and the remaining $37,429,289 constituted the return of principal.

c. During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Mets LP of approximately $11,500,000 (the "Sterling Mets LP Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling Mets LP Exhibit B. Of the Sterling Mets LP Two Year Initial Transfers, $1,670,711 were Fictitious Profits and the remaining $9,829,289 constituted the return of principal.

1152. Upon information and belief, some or all of the Sterling Mets LP transfers were subsequently transferred by Defendant Sterling Mets LP to the following subsequent transferees: Mets Partners, Inc., Mets Limited Partnership, C.D.S. Corp., Mets One LLC, Mets II LLC, Sterling Mets Associates, and Sterling Mets Associates II. Upon information and belief, such

transfers were subsequently transferred to the ultimate owners of Sterling Mets LP, including: Fred Wilpon, Saul Katz, Richard Wilpon, David Katz, Michael Katz, Jeffrey Wilpon, Thomas Osterman, Arthur Friedman, Marvin Tepper, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, the Saul B. Katz Family Trust, the Wilpon 2002 Descendants' Trust, and the Katz 2002 Descendants' Trust (collectively, the "Sterling Mets LP Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Mets LP Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling Mets Associates

1153. According to BLMIS' and Sterling's records, Defendant Sterling Mets Associates received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW339. Appendix II, Sterling Mets Associates Exhibit B.

      a.       BLMIS made direct transfers to Defendant Sterling Mets Associates totaling $111,653 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Sterling Mets Associates Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling Mets Associates Exhibit B.

1154. Upon information and belief, Defendant Sterling Mets Associates is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately ten (10) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW040, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW328, 1KW378, 1KW423, and 1KW057 (collectively, the "Sterling Mets Associates Subsequent Transfer Accounts"). Appendix II, Sterling Mets Associates Exhibit C.

a.     Defendant Sterling Mets Associates received Subsequent Transfers from the Sterling Mets Associates Subsequent Transfer Accounts totaling $46,550,814 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $158,552,135 in principal during the six years prior to the Filing Date, totaling approximately $205,102,949 (the "Sterling Mets Associates Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Sterling Mets Associates  pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Sterling Mets Associates Exhibit C.

1155.   Upon information and belief, some or all of the Sterling Mets Associates transfers were subsequently transferred by Defendant Sterling Mets Associates to the following subsequent transferees: Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Jeffrey Wilpon, Thomas Osterman, Arthur Friedman, Marvin Tepper, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust (collectively, the "Sterling Mets Associates Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Mets Associates Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Sterling Mets Associates II

1156.   Upon information and belief, Defendant Sterling Mets Associates II is a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately ten (10) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW040, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW378,

1KW423, 1KW057, and 1KW374 (collectively, the "Sterling Mets Associates II Subsequent Transfer Accounts"). Appendix II, Sterling Mets Associates II Exhibit C.

      a.     Defendant Sterling Mets Associates II received Subsequent Transfers from the Sterling Mets Associates II Subsequent Transfer Accounts totaling $46,533,446 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $165,394,999 in principal during the six years prior to the Filing Date, totaling approximately $211,928,445 (the "Sterling Mets Associates II Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Sterling Mets Associates II pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Sterling Mets Associates II Exhibit C.

      1157.   Upon information and belief, some or all of the Sterling Mets Associates II transfers were subsequently transferred by Defendant Sterling Mets Associates II to the following subsequent transferees: Fred Wilpon, Saul Katz, Jeffrey Wilpon, David Katz, Thomas Osterman, Marvin Tepper, Arthur Friedman, the Fred Wilpon Family Trust, the Saul B. Katz Family Trust, the Wilpon 2002 Descendants' Trust, and the Katz 2002 Descendants' Trust (collectively, the "Sterling Mets Associates II Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Mets Associates II Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Mets One LLC

      1158.   Upon information and belief, Defendant Mets One LLC is a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately nine (9) Sterling BLMIS Accounts held by other Sterling-related entities and/or

individuals: Nos. 1KW040, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW378, 1KW423, and 1KW057 (collectively, the "Mets One LLC Subsequent Transfer Accounts"). Appendix II, Mets One LLC Exhibit C.

a. Defendant Mets One LLC received Subsequent Transfers from the Mets One LLC Subsequent Transfer Accounts totaling $46,533,446 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $158,552,135 in principal during the six years prior to the Filing Date, totaling approximately $205,085,581 (the "Mets One LLC Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Mets One LLC pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Mets One LLC Exhibit C.

1159. Upon information and belief, some or all of the Mets One LLC transfers were subsequently transferred by Defendant Mets One LLC to the following subsequent transferee: Sterling Mets Associates. Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Mets One LLC, including: Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Jeffrey Wilpon, Thomas Osterman, Arthur Friedman, Marvin Tepper, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust (collectively, the "Mets One LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Mets One LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Mets II LLC

1160. According to BLMIS' and Sterling's records, Defendant Mets II LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW374. Appendix II, Mets II LLC Exhibit B.

    a. BLMIS made transfers of principal directly to Defendant Mets II LLC totaling $6,842,864 during the six years prior to the Filing Date (the "Mets II LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Mets II LLC Exhibit B.

    b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Mets II LLC of approximately $6,842,864 in principal (the "Mets II LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Mets II LLC Exhibit B.

1161. Upon information and belief, Defendant Mets II LLC is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately nine (9) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW040, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW378, 1KW423, and 1KW057 (collectively, the "Mets II LLC Subsequent Transfer Accounts"). Appendix II, Mets II LLC Exhibit C.

    a. Defendant Mets II LLC received Subsequent Transfers from the Mets II LLC Subsequent Transfer Accounts totaling $46,533,446 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $158,552,135 in principal during the six years prior to the Filing Date, totaling approximately $205,085,581 (the "Mets II

248

LLC Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Mets II LLC pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Mets II LLC Exhibit C.

1162. Upon information and belief, some or all of the Mets II LLC transfers were subsequently transferred by Defendant Mets II LLC to the following subsequent transferee: Sterling Mets Associates II. Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Mets II LLC, including: Fred Wilpon, Saul Katz, Jeffrey Wilpon, David Katz, Thomas Osterman, Marvin Tepper, Arthur Friedman, the Wilpon 2002 Descendants' Trust, the Katz 2002 Descendants' Trust, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust (collectively, the "Mets II LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Mets II LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Mets Partners, Inc.

1163. Upon information and belief, Defendant Mets Partners, Inc. is a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately five (5) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW057, 1KW218, 1KW223, 1KW254, and 1KW378 (collectively, the "Mets Partners, Inc. Subsequent Transfer Accounts"). Appendix II, Mets Partners, Inc. Exhibit C.

a. Defendant Mets Partners, Inc. received Subsequent Transfers from the Mets Partners, Inc. Subsequent Transfer Accounts totaling $9,388,295 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $37,429,289 in principal during the six years prior to the Filing Date, totaling approximately $46,817,584 (the

"Mets Partners, Inc. Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Mets Partners, Inc. pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Mets Partners, Inc. Exhibit C.

1164. Upon information and belief, some or all of the Mets Partners, Inc. transfers were subsequently transferred by Defendant Mets Partners, Inc. to Fred Wilpon (the "Mets Partners, Inc. Subsequent Transferee Defendant"). Appendix II, Fred Wilpon Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Mets Partners, Inc. Subsequent Transferee Defendant pursuant to section 550(a) of the Bankruptcy Code.

### C.D.S. Corp.

1165. Upon information and belief, Defendant C.D.S. Corp. is a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately nine (9) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW040, 1KW192, 1KW247, 1KW423, 1KW057, 1KW218, 1KW223, 1KW254, and 1KW378 (collectively, the "C.D.S. Corp. Subsequent Transfer Accounts"). Appendix II, C.D.S. Corp. Exhibit C.

    a.    Defendant C.D.S. Corp. received Subsequent Transfers from the C.D.S. Corp. Subsequent Transfer Accounts totaling $940,070 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $3,203,073 in principal during the six years prior to the Filing Date, totaling approximately $4,143,143 (the "C.D.S. Corp. Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant C.D.S. Corp. pursuant to section 550(a) of the Bankruptcy Code. Appendix II, C.D.S. Corp. Exhibit C.

1166. Upon information and belief, some or all of the C.D.S. Corp. transfers were subsequently transferred by Defendant C.D.S. Corp. to Fred Wilpon (the "C.D.S. Corp. Subsequent Transferee Defendant"). Appendix II, Fred Wilpon Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the C.D.S. Corp. Subsequent Transferee Defendant pursuant to section 550(a) of the Bankruptcy Code.

### Coney Island Baseball LLC

1167. According to BLMIS' and Sterling's records, Defendant Coney Island Baseball LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW349. Appendix II, Coney Island Baseball LLC Exhibit B.

      a.      BLMIS made direct transfers to Defendant Coney Island Baseball LLC constituting a minimal amount of Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Coney Island Baseball LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Coney Island Baseball LLC Exhibit B.

      b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Coney Island Baseball LLC constituting a minimal amount of Fictitious Profits (the "Coney Island Baseball LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Coney Island Baseball LLC Exhibit B.

1168. Upon information and belief, Defendant Coney Island Baseball LLC is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately one (1) Sterling BLMIS Account held by another Sterling-related entity: No.

1KW323 (the "Coney Island Baseball LLC Subsequent Transfer Account").  Appendix II, Coney Island Baseball LLC Exhibit C.

a.        Defendant Coney Island Baseball LLC received Subsequent Transfers from the Coney Island Baseball LLC Subsequent Transfer Account totaling $329,354 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $700,000 in principal during the six years prior to the Filing Date, totaling approximately $1,029,354 (the "Coney Island Baseball LLC Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Coney Island Baseball LLC pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Coney Island Baseball LLC Exhibit C.

1169.   Upon information and belief, some or all of the Coney Island Baseball LLC transfers were subsequently transferred by Defendant Coney Island Baseball LLC to the following subsequent transferee: FS Company LLC.  Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Coney Island Baseball LLC, including: Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, the Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz, and Marvin Tepper (collectively, the "Coney Island Baseball LLC Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the Coney Island Baseball LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

**Brooklyn Baseball LLC**

1170.  According to BLMIS' and Sterling's records, Defendant Brooklyn Baseball LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW323. Appendix II, Brooklyn Baseball LLC Exhibit B.

a.  BLMIS made direct transfers to Defendant Brooklyn Baseball LLC totaling $329,354 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $700,000 in principal during the six years prior to the Filing Date, totaling approximately $1,029,354 (the "Brooklyn Baseball LLC Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Brooklyn Baseball LLC Exhibit B.

b.  During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Brooklyn Baseball LLC of approximately $1,029,354 (the "Brooklyn Baseball LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Brooklyn Baseball LLC Exhibit B.  Of the Brooklyn Baseball LLC Six Year Initial Transfers, $329,354 were Fictitious Profits and the remaining $700,000 constituted the return of principal.

1171.  Upon information and belief, some or all of the Brooklyn Baseball LLC transfers were subsequently transferred by Defendant Brooklyn Baseball LLC to the following subsequent transferees: Coney Island Baseball LLC, FS Company LLC, and Sterling Heritage LLC.  Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Brooklyn Baseball LLC, including: Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, the Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz,

and Marvin Tepper (collectively, the "Brooklyn Baseball LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Brooklyn Baseball LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### FS Company LLC

1172. According to BLMIS' and Sterling's records, Defendant FS Company LLC received Initial Transfers from at least one (1) Sterling BLMIS Account: No. 1KW347. Appendix II, FS Company LLC Exhibit B.

    a. BLMIS made transfers of principal directly to Defendant FS Company LLC totaling $9,643,000 during the six years prior to the Filing Date (the "FS Company LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, FS Company LLC Exhibit B.

    b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant FS Company LLC of approximately $9,643,000 in principal (the "FS Company LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, FS Company LLC Exhibit B.

    c. During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant FS Company LLC of approximately $4,200,000 in principal (the "FS Company LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, FS Company LLC Exhibit B.

d.    In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant FS Company LLC totaling $75,000 (the "FS Company LLC Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, FS Company LLC Exhibit B.

1173.   Upon information and belief, Defendant FS Company LLC is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately two (2) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW323 and 1KW349 (collectively, the "FS Company LLC Subsequent Transfer Accounts").  Appendix II, FS Company LLC Exhibit C.

a.    Defendant FS Company LLC received Subsequent Transfers from the FS Company LLC Subsequent Transfer Accounts totaling $358,780 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $700,000 in principal during the six years prior to the Filing Date, totaling approximately $1,058,780 (the "FS Company LLC Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant FS Company LLC pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, FS Company LLC Exhibit C.

1174.   Upon information and belief, some or all of the FS Company LLC transfers were subsequently transferred by Defendant FS Company LLC to the following subsequent transferees: Sterling Heritage LLC, Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, the Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz, and Marvin Tepper (collectively, the "FS Company LLC Subsequent Transferee Defendants").

Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the FS Company LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### 2. Other Sterling Entities

### 157 J.E.S. LLC

1175. According to BLMIS' and Sterling's records, Defendant 157 J.E.S. LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW348. Appendix II, 157 J.E.S. LLC Exhibit B.

a. BLMIS made direct transfers to Defendant 157 J.E.S. LLC totaling $389,682 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $695,000 in principal during the six years prior to the Filing Date, totaling approximately $1,084,682 (the "157 J.E.S. LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, 157 J.E.S. LLC Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant 157 J.E.S. LLC of approximately $1,084,682 (the "157 J.E.S. LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, 157 J.E.S. LLC Exhibit B. Of the 157 J.E.S. LLC Six Year Initial Transfers, $389,682 were Fictitious Profits and the remaining $695,000 constituted the return of principal.

1176. Upon information and belief, some or all of the 157 J.E.S. LLC transfers were subsequently transferred by Defendant 157 J.E.S. LLC to the following subsequent transferees:

Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, the Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz, Marvin Tepper, Fred Wilpon Family Trust, and Saul B. Katz Family Trust (collectively, the "157 J.E.S. LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the 157 J.E.S. LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Air Sterling LLC

1177. According to BLMIS' and Sterling's records, Defendant Air Sterling LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW328. Appendix II, Air Sterling LLC Exhibit B.

      a.      BLMIS made direct transfers to Defendant Air Sterling LLC constituting a minimal amount of Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Air Sterling LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Air Sterling LLC Exhibit B.

1178. Upon information and belief, some or all of the Air Sterling LLC transfers were subsequently transferred by Defendant Air Sterling LLC to the following subsequent transferee: Sterling Mets Associates. Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Air Sterling LLC, including: Fred Wilpon, the Fred Wilpon Family Trust, Saul Katz, the Saul B. Katz Family Trust, Richard Wilpon, Michael Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman and Marvin Tepper (collectively, the "Air Sterling LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are

recoverable from the Air Sterling LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## BAS Aircraft LLC

1179.   According to BLMIS' and Sterling's records, Defendant BAS Aircraft LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW325. Appendix II, BAS Aircraft LLC Exhibit B.

a.      BLMIS made direct transfers to Defendant BAS Aircraft LLC constituting a minimal amount of Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "BAS Aircraft LLC Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, BAS Aircraft LLC Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant BAS Aircraft LLC constituting a minimal amount of Fictitious Profits (the "BAS Aircraft LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, BAS Aircraft LLC Exhibit B.

1180.   Upon information and belief, some or all of the BAS Aircraft LLC transfers were subsequently transferred by Defendant BAS Aircraft LLC to the following subsequent transferees: Richard Wilpon, Marvin Tepper, and Jeffrey Wilpon (collectively, the "BAS Aircraft LLC Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from

the BAS Aircraft LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Bon Mick Family Partners LP

1181. According to BLMIS' and Sterling's records, Defendant Bon Mick Family Partners LP received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW001. Appendix II, Bon Mick Family Partners LP Exhibit B.

    a. BLMIS made transfers of principal directly to Defendant Bon Mick Family Partners LP totaling $107,000 during the six years prior to the Filing Date (the "Bon Mick Family Partners LP Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Bon Mick Family Partners LP Exhibit B.

    b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Bon Mick Family Partners LP of approximately $107,000 in principal (the "Bon Mick Family Partners LP Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Bon Mick Family Partners LP Exhibit B.

1182. Upon information and belief, some or all of the Bon Mick Family Partners LP transfers were subsequently transferred by Defendant Bon Mick Family Partners LP to the following subsequent transferees: Bon-Mick, Inc. Upon information and belief, Bon-Mick, Inc. subsequently transferred such funds to Arthur Friedman (the "Bon Mick Family Partners LP Subsequent Transferee Defendant"). Appendix II, Arthur Friedman Exhibit C. The Subsequent

Transfers, or the value thereof, are recoverable from the Bon Mick Family Partners LP Subsequent Transferee Defendant pursuant to section 550(a) of the Bankruptcy Code.

### **Bon-Mick, Inc.**

1183.   According to BLMIS' and Sterling's records, Defendant Bon-Mick, Inc. received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW001.  Appendix II, Bon-Mick, Inc. Exhibit B.

      a.   BLMIS made transfers of principal directly to Defendant Bon-Mick, Inc. totaling $107,000 during the six years prior to the Filing Date (the "Bon-Mick, Inc. Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Bon-Mick, Inc. Exhibit B.

      b.   During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Bon-Mick, Inc. of approximately $107,000 in principal (the "Bon-Mick, Inc. Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Bon-Mick, Inc. Exhibit B.

1184.   Upon information and belief, some or all of the Bon-Mick, Inc. transfers were subsequently transferred by Defendant Bon-Mick, Inc. to the following subsequent transferee: Arthur Friedman (the "Bon-Mick, Inc. Subsequent Transferee Defendant").  Appendix II, Arthur Friedman Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the Bon-Mick, Inc. Subsequent Transferee Defendant pursuant to section 550(a) of the Bankruptcy Code.

## Charles 15 Associates

1185.  According to BLMIS' and Sterling's records, Defendant Charles 15 Associates received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW134. Appendix II, Charles 15 Associates Exhibit B.

    a.    BLMIS made direct transfers to Defendant Charles 15 Associates totaling $437,531 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Charles 15 Associates Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Charles 15 Associates Exhibit B.

1186.  Upon information and belief, some or all of the Charles 15 Associates transfers were subsequently transferred by Defendant Charles 15 Associates to the following subsequent transferees: Charles 15 LLC, Charles Sterling Sub LLC, and Charles Sterling, Inc.  Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Charles 15 Associates, including: Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, Robin Wilpon Wachtler, and Philip Wachtler (collectively, the "Charles 15 Associates Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the Charles 15 Associates Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Charles 15 LLC

1187.  Upon information and belief, Defendant Charles 15 LLC is a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from

approximately one (1) Sterling BLMIS Account held by another Sterling-related entity: No. 1KW134 (the "Charles 15 LLC Subsequent Transfer Account"). Appendix II, Charles 15 LLC Exhibit C.

a. Defendant Charles 15 LLC received Subsequent Transfers from the Charles 15 LLC Subsequent Transfer Account of $437,093 in Fictitious Profits from the opening date of such Subsequent Transfer Account to the Filing Date (the "Charles 15 LLC Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Charles 15 LLC pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Charles 15 LLC Exhibit C.

1188. Upon information and belief, some or all of the Charles 15 LLC transfers were subsequently transferred by Defendant Charles 15 LLC to the following subsequent transferees: Charles Sterling Sub LLC, Charles Sterling LLC, Charles Sterling 15 LLC and Charles Sterling, Inc. Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Charles 15 LLC, who are Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz, Jeffrey Wilpon, the Estate of Leonard J. Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin B. Tepper, and Robin and Philip Wachtler as joint tenants (collectively, the "Charles 15 LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Charles 15 LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

**Charles Sterling LLC**

1189.   According to BLMIS' and Sterling's records, Defendant Charles Sterling LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW341. Appendix II, Charles Sterling LLC Exhibit B.

      a.      BLMIS made transfers of principal directly to Defendant Charles Sterling LLC totaling $489,000 during the six years prior to the Filing Date (the "Charles Sterling LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Charles Sterling LLC Exhibit B.

      b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Charles Sterling LLC of approximately $489,000 in principal (the "Charles Sterling LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Charles Sterling LLC Exhibit B.

1190.   Upon information and belief, Defendant Charles Sterling LLC is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately two (2) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW134 and 1KW413 (collectively, the "Charles Sterling LLC Subsequent Transfer Accounts"). Appendix II, Charles Sterling LLC Exhibit C.

      a.      Defendant Charles Sterling LLC received Subsequent Transfers from the Charles Sterling LLC Subsequent Transfer Accounts totaling $437,531 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $8,977,000 in principal during the six years prior to the Filing Date, totaling approximately $9,414,531 (the

"Charles Sterling LLC Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Charles Sterling LLC pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Charles Sterling LLC Exhibit C.

1191. Upon information and belief, some or all of the Charles Sterling LLC transfers were subsequently transferred by Defendant Charles Sterling LLC to the following subsequent transferees: Charles Sterling 15 LLC and Charles Sterling, Inc. Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Charles Sterling LLC, including Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, Robin Wilpon Wachtler and Philip Wachtler (collectively, the "Charles Sterling LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Charles Sterling LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Charles Sterling Sub LLC

1192. According to BLMIS' and Sterling's records, Defendant Charles Sterling Sub LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW413. Appendix II, Charles Sterling Sub LLC Exhibit B.

a. BLMIS made transfers of principal directly to Defendant Charles Sterling Sub LLC prior to the Filing Date totaling $8,977,000 during the six years prior to the Filing Date (the "Charles Sterling Sub LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to

avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Charles Sterling Sub LLC Exhibit B.

b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Charles Sterling Sub LLC of approximately $8,977,000 in principal (the "Charles Sterling Sub LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Charles Sterling Sub LLC Exhibit B.

c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Charles Sterling Sub LLC of approximately $5,300,000 in principal (the "Charles Sterling Sub LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Charles Sterling Sub LLC Exhibit B.

d.     In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Charles Sterling Sub LLC totaling $850,000 (the "Charles Sterling Sub LLC Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Charles Sterling Sub LLC Exhibit B.

1193.   Upon information and belief, Defendant Charles Sterling Sub LLC is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately one (1) Sterling BLMIS Account held by another Sterling-related entity: No. 1KW134 (the "Charles Sterling Sub LLC Subsequent Transfer Account"). Appendix II, Charles Sterling Sub LLC Exhibit C.

a.    Defendant Charles Sterling Sub LLC received Subsequent Transfers from the Charles Sterling Sub LLC Subsequent Transfer Account totaling $437,531 in Fictitious Profits from the opening date of such BLMIS Account to the Filing Date (the "Charles Sterling Sub LLC Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Charles Sterling Sub LLC pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Charles Sterling Sub LLC Exhibit C.

1194.    Upon information and belief, some or all of the Charles Sterling Sub LLC transfers were subsequently transferred by Defendant Charles Sterling Sub LLC to the following subsequent transferees: Charles Sterling LLC, Charles Sterling 15 LLC, and Charles Sterling, Inc.  Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Charles Sterling Sub LLC, including Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Arthur Friedman, David Katz, Jeffrey Wilpon, the Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Marvin Tepper, Robin Wilpon Wachtler, and Philip Wachtler (collectively, the "Charles Sterling Sub LLC Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the Charles Sterling Sub LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### College Place Enterprises LLC

1195.    According to BLMIS' and Sterling's records, Defendant College Place Enterprises LLC received Initial Transfers from approximately two (2) Sterling BLMIS Accounts: Nos. 1KW084 and 1KW466.  Appendix II, College Place Enterprises LLC Exhibit B.

a.    BLMIS made direct transfers to Defendant College Place Enterprises LLC totaling $5,492,275 in Fictitious Profits from the opening dates of such Sterling BLMIS

Accounts to the Filing Date and $601,932 in principal during the six years prior to the Filing Date, totaling approximately $6,094,207 (the "College Place Enterprises LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, College Place Enterprises LLC Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant College Place Enterprises LLC of approximately $6,094,207 (the "College Place Enterprises LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, College Place Enterprises LLC Exhibit B. Of the College Place Enterprises LLC Six Year Initial Transfers, $5,492,275 were Fictitious Profits and the remaining $601,932 constituted the return of principal.

c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant College Place Enterprises LLC of approximately $6,009,358 (the "College Place Enterprises LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, College Place Enterprises LLC Exhibit B. Of the College Place Enterprises LLC Two Year Initial Transfers, $5,492,275 were Fictitious Profits and the remaining $517,083 constituted the return of principal.

d.      In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant College Place Enterprises LLC totaling $305,711 (the "College Place Enterprises LLC Preference Period Transfers"), which are avoidable and recoverable under

sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, College Place Enterprises LLC Exhibit B.

1196. Upon information and belief, some or all of the College Place Enterprises LLC transfers were subsequently transferred by Defendant College Place Enterprises LLC to the following subsequent transferees: Fred Wilpon and Saul Katz (collectively, the "College Place Enterprises LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the College Place Enterprises LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## FFB Aviation LLC

1197. According to BLMIS' and Sterling's records, Defendant FFB Aviation LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW434. Appendix II, FFB Aviation LLC Exhibit B.

a. BLMIS made direct transfers to Defendant FFB Aviation LLC totaling $112,975 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $400,000 in principal during the six years prior to the Filing Date, totaling approximately $512,975 (the "FFB Aviation LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, FFB Aviation LLC Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant FFB Aviation LLC of approximately $512,975 (the "FFB Aviation LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3),

and applicable provisions of DCL sections 273-279. Appendix II, FFB Aviation LLC Exhibit B. Of the FFB Aviation LLC Six Year Initial Transfers, $112,975 were Fictitious Profits and the remaining $400,000 constituted the return of principal.

c.    During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant FFB Aviation LLC of approximately $512,975 (the "FFB Aviation LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, FFB Aviation LLC Exhibit B. Of the FFB Aviation LLC Two Year Initial Transfers, $112,975 were Fictitious Profits and the remaining $400,000 constituted the return of principal.

1198.    Upon information and belief, Defendant FFB Aviation LLC is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately one (1) Sterling BLMIS Account held by another Sterling-related entity: No. 1KW447 (the "FFB Aviation LLC Subsequent Transfer Account"). Appendix II, FFB Aviation LLC Exhibit C.

a.    Defendant FFB Aviation LLC received Subsequent Transfers of principal from the FFB Aviation LLC Subsequent Transfer Account totaling $725,479 during the six years prior to the Filing Date. Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant FFB Aviation LLC pursuant to section 550(a) of the Bankruptcy Code. Appendix II, FFB Aviation LLC Exhibit C.

1199.    Upon information and belief, some or all of the FFB Aviation LLC transfers were subsequently transferred by Defendant FFB Aviation LLC to the following subsequent

transferees: Saul Katz and Michael Katz (collectively, the "FFB Aviation LLC Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the FFB Aviation LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Iris J. Katz and Saul B. Katz Family Foundation

1200.   According to BLMIS' and Sterling's records, the Iris J. Katz and Saul B. Katz Family Foundation received Initial Transfers from approximately five (5) Sterling BLMIS Accounts: Nos. 1KW016, 1KW017, 1KW083, 1KW252, and 1KW427.  Appendix II, Iris J. Katz and Saul B. Katz Family Foundation Exhibit B.

      a.      BLMIS made direct transfers to Defendant Iris J. Katz and Saul B. Katz Family Foundation totaling $3,272,382 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $3,009,403 in principal during the six years prior to the Filing Date, totaling approximately $6,281,785 (the "Iris J. Katz and Saul B. Katz Family Foundation Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Iris J. Katz and Saul B. Katz Family Foundation Exhibit B.

      b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Iris J. Katz and Saul B. Katz Family Foundation of approximately $5,579,106 (the "Iris J. Katz and Saul B. Katz Family Foundation Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Iris J. Katz and Saul B. Katz Family Foundation Exhibit

B. Of the Iris J. Katz and Saul B. Katz Family Foundation Six Year Initial Transfers, $2,569,703 were Fictitious Profits and the remaining $3,009,403 constituted the return of principal.

c. During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Iris J. Katz and Saul B. Katz Family Foundation of approximately $1,905,368 (the "Iris J. Katz and Saul B. Katz Family Foundation Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Iris J. Katz and Saul B. Katz Family Foundation Exhibit B. Of the Iris J. Katz and Saul B. Katz Family Foundation Two Year Initial Transfers, $505,288 were Fictitious Profits and the remaining $1,400,080 constituted the return of principal.

1201. Upon information and belief, the Iris J. Katz and Saul B. Katz Family Foundation is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from the following approximately one (1) Sterling BLMIS Account held by another Sterling-related entity: No. 1KW463 (the "Iris J. Katz and Saul B. Katz Family Foundation Subsequent Transfer Account"). Appendix II, Iris J. Katz and Saul B. Katz Family Foundation Exhibit C.

a. Defendant Iris J. Katz and Saul B. Katz Family Foundation received Subsequent Transfers of principal from the Iris J. Katz and Saul B. Katz Family Foundation Subsequent Transfer Account constituting a minimal amount during the six years prior to the Filing Date. Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from the Iris J. Katz and Saul B. Katz Family Foundation pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Iris J. Katz and Saul B. Katz Family Foundation Exhibit C.

1202.   Upon information and belief, some or all of the Iris J. Katz and Saul B. Katz Family Foundation transfers were subsequently transferred by the Iris J. Katz and Saul B. Katz Family Foundation to the following Defendants: Saul Katz, Iris J. Katz, and David Katz (collectively, the "Iris J. Katz and Saul B. Katz Family Foundation Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  Such Subsequent Transfers, or the value thereof, are recoverable from the Iris J. Katz and Saul B. Katz Family Foundation Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Judy Wilpon and Fred Wilpon Family Foundation

1203.   According to BLMIS' and Sterling's records, the Judy and Fred Wilpon Family Foundation received Initial Transfers from approximately four (4) Sterling BLMIS Accounts: Nos. 1KW016, 1KW074, 1KW082, and 1KW086.  Appendix II, Judy Wilpon and Fred Wilpon Family Foundation Exhibit B.

a.      BLMIS made direct transfers to Defendant Judy Wilpon and Fred Wilpon Family Foundation totaling $2,230,588 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $398,820 in principal during the six years prior to the Filing Date, totaling approximately $2,629,408 (the "Judy Wilpon and Fred Wilpon Family Foundation Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Judy Wilpon and Fred Wilpon Family Foundation Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Judy Wilpon and Fred Wilpon Family Foundation of approximately $2,587,000 (the "Judy Wilpon and Fred Wilpon Family Foundation Six Year Initial Transfers"), which are

avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Judy Wilpon and Fred Wilpon Family Foundation Exhibit B. Of the Judy Wilpon and Fred Wilpon Family Foundation Six Year Initial Transfers, $2,188,180 were Fictitious Profits and the remaining $398,820 constituted the return of principal.

      c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Judy Wilpon and Fred Wilpon Family Foundation constituting a minimal amount of Fictitious Profits (the "Judy Wilpon and Fred Wilpon Family Foundation Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Judy Wilpon and Fred Wilpon Family Foundation Exhibit B.

1204.    Upon information and belief, some or all of the Judy Wilpon and Fred Wilpon Family Foundation transfers were subsequently transferred by the Judy Wilpon and Fred Wilpon Family Foundation to the following Defendants: Fred Wilpon, Judith Wilpon, Jeffrey Wilpon, Robin Wilpon Wachtler, and Bruce N. Wilpon (collectively, the "Judy and Fred Wilpon Family Foundation Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. Such Subsequent Transfers, or the value thereof, are recoverable from the Judy Wilpon and Fred Wilpon Family Foundation Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Red Valley Partners

1205.    According to BLMIS' and Sterling's records, Defendant Red Valley Partners received Initial Transfers from approximately two (2) Sterling BLMIS Accounts: Nos. 1KW198 and 1KW427. Appendix II, Red Valley Partners Exhibit B.

a.      BLMIS made direct transfers to Defendant Red Valley Partners totaling $3,296,336 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $275,000 in principal during the six years prior to the Filing Date, totaling approximately $3,571,336 (the "Red Valley Partners Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Red Valley Partners Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Red Valley Partners of approximately $579,136 (the "Red Valley Partners Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Red Valley Partners Exhibit B.  Of the Red Valley Partners Six Year Initial Transfers, $304,136 were Fictitious Profits and the remaining $275,000 constituted the return of principal.

c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Red Valley Partners of approximately $346,136 (the "Red Valley Partners Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Red Valley Partners Exhibit B.  Of the Red Valley Partners Two Year Initial Transfers, $71,136 were Fictitious Profits and the remaining $275,000 constituted the return of principal.

1206.   Upon information and belief, Red Valley Partners is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from the following

approximately three (3) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW313, 1KW314, and 1KW315 (collectively, the "Red Valley Partners Subsequent Transfer Accounts"). Appendix II, Red Valley Partners Exhibit C.

      a.    Defendant Red Valley Partners received Subsequent Transfers from the Red Valley Partners Subsequent Transfer Accounts totaling $249,172 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $3,317,769 in principal during the six years prior to the Filing Date, totaling approximately $3,566,941 (the "Red Valley Partners Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Red Valley Partners pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Red Valley Partners Exhibit C.

1207. Upon information and belief, some or all of the Red Valley Partners transfers were subsequently transferred by Defendant Red Valley Partners to the following subsequent transferees: David Katz, Heather Katz Knopf and Natalie Katz O'Brien (collectively, the "Red Valley Partners Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Red Valley Partners Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Robbinsville Park LLC

1208. According to BLMIS' and Sterling's records, Defendant Robbinsville Park LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW346. Appendix II, Robbinsville Park LLC Exhibit B.

      a.    BLMIS made transfers of principal directly to Defendant Robbinsville Park LLC totaling $2,279,000 during the six years prior to the Filing Date (the "Robbinsville

Park LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Robbinsville Park LLC Exhibit B.

b.       During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Robbinsville Park LLC of approximately $2,279,000 in principal (the "Robbinsville Park LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Robbinsville Park LLC Exhibit B.

c.       During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Robbinsville Park LLC of approximately $630,000 in principal (the "Robbinsville Park LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Robbinsville Park LLC Exhibit B.

1209.   Upon information and belief, some or all of the Robbinsville Park LLC transfers were subsequently transferred by Defendant Robbinsville Park LLC to the following subsequent transferees: Sterling Rte 130 LLC and SC Acquisition Corp. Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Robbinsville Park LLC, including the Fred Wilpon Family Trust, Saul Katz, the Saul B. Katz Family Trust, Richard Wilpon, Michael Katz, the Estate of Leonard Schreier, Marvin Tepper, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz, Robin Wilpon Wachtler and Philip Wachtler (collectively, the "Robbinsville Park LLC Subsequent Transferee Defendants"). Appendix II,

Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Robbinsville Park LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Ruskin Garden Apartments LLC

1210. According to BLMIS' and Sterling's records, Defendant Ruskin Garden Apartments LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW189. Appendix II, Ruskin Garden Apartments LLC Exhibit B.

a. BLMIS made direct transfers to Defendant Ruskin Garden Apartments LLC totaling $117,623 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Ruskin Garden Apartments LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Ruskin Garden Apartments LLC Exhibit B.

b. Upon information and belief, some or all of the Ruskin Garden Apartments LLC transfers were subsequently transferred by Defendant Ruskin Garden Apartments LLC to the following subsequent transferees: Fred Wilpon and Saul Katz (collectively, the "Ruskin Garden Apartments LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Ruskin Garden Apartments LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## SEE HoldCo LLC

1211. According to BLMIS' and Sterling's records, Defendant SEE HoldCo LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW449. Appendix II, SEE HoldCo LLC Exhibit B.

a.      BLMIS made direct transfers to Defendant SEE HoldCo LLC totaling $60,000 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $6,600,000 in principal during the six years prior to the Filing Date, totaling approximately $6,660,000 (the "SEE HoldCo LLC Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, SEE HoldCo LLC Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant SEE HoldCo LLC of approximately $6,660,000 (the "SEE HoldCo LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, SEE HoldCo LLC Exhibit B. Of the SEE HoldCo LLC Six Year Initial Transfers, $60,000 were Fictitious Profits and the remaining $6,600,000 constituted the return of principal.

c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant SEE HoldCo LLC of approximately $6,660,000 (the "SEE HoldCo LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, SEE HoldCo LLC Exhibit B.  Of the SEE HoldCo LLC Two Year Initial Transfers, $60,000 were Fictitious Profits and the remaining $6,600,000 constituted the return of principal.

d.      Upon information and belief, some or all of the SEE HoldCo LLC transfers were subsequently transferred by Defendant SEE HoldCo LLC to the following

subsequent transferees: SEE Management LLC, SEE Holdings I, and SEE Holdings II.  Upon

information and belief, such transfers were subsequently transferred to the ultimate owners of

SEE HoldCo LLC, including Fred Wilpon, Jeffrey Wilpon, Richard Wilpon, Saul Katz, Michael

Katz, Gregory Katz, David Katz, Scott Wilpon, Marvin Tepper, Thomas Osterman, Arthur

Friedman, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, the Saul B. Katz

Family Trust, the Wilpon 2002 Descendants' Trust, and the Katz 2002 Descendants' Trust

(collectively, the "SEE HoldCo LLC Subsequent Transferee Defendants").  Appendix II, Each

Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are

recoverable from the SEE HoldCo LLC Subsequent Transferee Defendants pursuant to section

550(a) of the Bankruptcy Code.

### SEE Holdings I

1212.   Upon information and belief, Defendant SEE Holdings I is a Subsequent

Transferee Defendant that received avoidable and recoverable Subsequent Transfers from

approximately one (1) Sterling BLMIS Account held by another Sterling-related entity: No.

1KW449 (the "SEE Holdings I Subsequent Transfer Account").  Appendix II, SEE Holdings I

Exhibit C.

a.      Defendant SEE Holdings I received Subsequent Transfers from the SEE

Holdings I Subsequent Transfer Account totaling $29,403 of Fictitious Profits from the opening

date of such Sterling BLMIS Account to the Filing Date and $3,234,330 in principal during the

six years prior to the Filing Date, totaling approximately $3,263,733 (the "SEE Holdings I

Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property

within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are

recoverable from Defendant SEE Holdings I pursuant to section 550(a) of the Bankruptcy Code.

Appendix II, SEE Holdings I Exhibit C.

1213.  Upon information and belief, some or all of the SEE Holdings I transfers were subsequently transferred by Defendant SEE Holdings I to the following subsequent transferees: Fred Wilpon, Jeffrey Wilpon, Saul Katz, Scott Wilpon, Richard Wilpon, Michael Katz, Marvin Tepper, Thomas Osterman, Arthur Friedman, Gregory Katz, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust (collectively, the "SEE Holdings I Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the SEE Holdings I Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### SEE Holdings II

1214.  Upon information and belief, Defendant SEE Holdings II is a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately one (1) Sterling BLMIS Account held by another Sterling-related entity: No. 1KW449 (the "SEE Holdings II Subsequent Transfer Account").  Appendix II, SEE Holdings II Exhibit C.

a.      Defendant SEE Holdings II received Subsequent Transfers from the SEE Holdings II Subsequent Transfer Account totaling $29,403 of Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $3,234,330 in principal during the six years prior to the Filing Date, totaling approximately $3,263,733 (the "SEE Holdings II Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant SEE Holdings II pursuant to section 550(a) of the Bankruptcy Code. Appendix II, SEE Holdings II Exhibit C.

1215.  Upon information and belief, some or all of the SEE Holdings II transfers were subsequently transferred by Defendant SEE Holdings II to the following subsequent transferees:

Fred Wilpon, Jeffrey Wilpon, Saul Katz, Scott Wilpon, Richard Wilpon, Michael Katz, Marvin Tepper, Thomas Osterman, Arthur Friedman, Gregory Katz, the Estate of Leonard Schreier, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust (collectively, the "SEE Holdings II Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the SEE Holdings II Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Sterling 10 LLC

1216.   According to BLMIS' and Sterling's records, Defendant Sterling 10 LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW402. Appendix II, Sterling 10 LLC Exhibit B.

a.      BLMIS made transfers of principal directly to Defendant Sterling 10 LLC totaling $15,470,000 during the six years prior to the Filing Date (the "Sterling 10 LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling 10 LLC Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling 10 LLC of approximately $15,470,000 in principal (the "Sterling 10 LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling 10 LLC Exhibit B.

c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling 10 LLC of approximately $9,250,000 in principal (the "Sterling 10 LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548,

550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling 10 LLC Exhibit B.

d. In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Sterling 10 LLC totaling $1,510,000 (the "Sterling 10 LLC Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling 10 LLC Exhibit B.

1217. Upon information and belief, some or all of the Sterling 10 LLC transfers were subsequently transferred by Defendant Sterling 10 LLC to the following subsequent transferees: Richard Wilpon, Robin Wilpon Wachtler, Philip Wachtler, Daniel Wilpon, David Katz, Michael Katz, Gregory Katz, Natalie Katz O'Brien, Todd Katz, Heather Katz Knopf, Howard Katz, Amy Beth Katz, Dayle Katz, Ruth Friedman and Elise C. Tepper (collectively, the "Sterling 10 LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling 10 LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Sterling 15C LLC

1218. According to BLMIS' and Sterling's records, Defendant Sterling 15C LLC received Initial Transfers from approximately two (2) Sterling BLMIS Accounts: Nos. 1KW156 and 1KW180. Appendix II, Sterling 15C LLC Exhibit B.

a. BLMIS made direct transfers to Defendant Sterling 15C LLC totaling $17,731,193 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $5,683,798 in principal during the six years prior to the Filing Date, totaling approximately $23,414,991 (the "Sterling 15C LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and

are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling 15C LLC Exhibit B.

b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling 15C LLC of approximately $23,012,800 (the "Sterling 15C LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling 15C LLC Exhibit B. Of the Sterling 15C LLC Six Year Initial Transfers, $17,329,002 were Fictitious Profits and the remaining $5,683,798 constituted the return of principal.

c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling 15C LLC of approximately $ 7,430,000 in Fictitious Profits (the "Sterling 15C LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling 15C LLC Exhibit B.

1219.   Upon information and belief, some or all of the Sterling 15C LLC transfers were subsequently transferred by Defendant Sterling 15C LLC to the following subsequent transferees: Saul Katz, Richard Wilpon, Fred Wilpon, Michael Katz, Thomas Osterman, Jeffrey Wilpon, David Katz, Arthur Friedman, Marvin Tepper, Robin Wilpon Wachtler, Philip Wachtler, the Estate of Leonard Schreier, the Saul B. Katz Family Trust, and the Fred Wilpon Family Trust (collectively, the "Sterling 15C LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling 15C LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling 20 LLC

1220. According to BLMIS' and Sterling's records, Defendant Sterling 20 LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW358. Appendix II, Sterling 20 LLC Exhibit B.

a. BLMIS made direct transfers to Defendant Sterling 20 LLC totaling $181,023 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $24,773,977 in principal during the six years prior to the Filing Date, totaling approximately $24,955,000 (the "Sterling 20 LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling 20 LLC Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling 20 LLC of approximately $24,955,000 (the "Sterling 20 LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling 20 LLC Exhibit B. Of the Sterling 20 LLC Six Year Initial Transfers, $181,023 were Fictitious Profits and the remaining $24,773,977 constituted the return of principal.

c. During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling 20 LLC of approximately $11,685,000 (the "Sterling 20 LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling 20 LLC Exhibit B. Of the Sterling 20 LLC Two Year Initial

Transfers, $181,023 were Fictitious Profits and the remaining $11,503,977 constituted the return of principal.

   d. In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Sterling 20 LLC totaling $1,458,977 (the "Sterling 20 LLC Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling 20 LLC Exhibit B.

  1221. Upon information and belief, some or all of the Sterling 20 LLC transfers were subsequently transferred by Defendant Sterling 20 LLC to the following subsequent transferees: Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, Marvin Tepper, Elise C. Tepper, David Katz, and the Fred Wilpon Family Trust (collectively, the "Sterling 20 LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling 20 LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling American Advisors II LP

  1222. According to BLMIS' and Sterling's records, Defendant Sterling American Advisors II LP received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW436. Appendix II, Sterling American Advisors II LP Exhibit B.

   a. BLMIS made direct transfers to Defendant Sterling American Advisors II LP totaling $177,415 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $1,300,000 in principal during the six years prior to the Filing Date, totaling approximately $1,477,415 (the "Sterling American Advisors II LP Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the

meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling American Advisors II LP Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling American Advisors II LP of approximately $1,477,415 (the "Sterling American Advisors II LP Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling American Advisors II LP Exhibit B. Of the Sterling American Advisors II LP Six Year Initial Transfers, $177,415 were Fictitious Profits and the remaining $1,300,000 constituted the return of principal.

c. During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling American Advisors II LP of approximately $1,402,415 (the "Sterling American Advisors II LP Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling American Advisors II LP Exhibit B. Of the Sterling American Advisors II LP Two Year Initial Transfers, $177,415 were Fictitious Profits and the remaining $1,225,000 constituted the return of principal.

1223. Upon information and belief, some or all of the Sterling American Advisors II LP transfers were subsequently transferred by Defendant Sterling American Advisors II LP to the following subsequent transferees: Sterling Advisors II Corp., Sterling American Advisors II Corp., Sterling R.I. II LLC, American SAP II Associates LP, Sterling Internal II LLC, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust. Upon information and belief, such

transfers were subsequently transferred to the ultimate owners of Sterling American Advisors II LP, including Fred Wilpon, the Fred Wilpon Family Trust, Saul Katz, the Saul B. Katz Family Trust, Jeffrey Wilpon, Richard Wilpon, David Katz, Michael Katz, Arthur Friedman, Marvin Tepper, the Estate of Leonard Schreier, and Thomas Osterman (collectively, the "Sterling American Advisors II LP Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling American Advisors II LP Subsequent Transferee Defendant pursuant to section 550(a) of the Bankruptcy Code.

### Sterling Brunswick Corporation

1224. According to BLMIS' and Sterling's records, Defendant Sterling Brunswick Corporation received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW279. Appendix II, Sterling Brunswick Corporation Exhibit B.

a. BLMIS made direct transfers to Defendant Sterling Brunswick Corporation of a minimal amount in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Sterling Brunswick Corporation Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling Brunswick Corporation Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Brunswick Corporation constituting a minimal amount of Fictitious Profits (the "Sterling Brunswick Corporation Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling Brunswick Corporation Exhibit B.

1225. Upon information and belief, Defendant Sterling Brunswick Corporation is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from the following approximately one (1) Sterling BLMIS Account held by another Sterling-related entity: No. 1KW420 (the "Sterling Brunswick Corporation Subsequent Transfer Account"). Appendix II, Sterling Brunswick Corporation Exhibit C.

a. Defendant Sterling Brunswick Corporation received Subsequent Transfers of principal from the Sterling Brunswick Corporation Subsequent Transfer Account prior to the Filing Date totaling $5,716,000 during the six years prior to the Filing Date (the "Sterling Brunswick Corporation Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Sterling Brunswick Corporation pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Sterling Brunswick Corporation Exhibit C.

1226. Upon information and belief, some or all of the Sterling Brunswick Corporation transfers were subsequently transferred by Defendant Sterling Brunswick Corporation to the following subsequent transferees: Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Estate of Leonard Schreier, Thomas Osterman, Saul B. Katz Family Trust, David Katz, Arthur Friedman, Jeffrey Wilpon, Marvin Tepper, and Edward M. Tepper (collectively, the "Sterling Brunswick Corporation Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Brunswick Corporation Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling Brunswick Seven LLC

1227. According to BLMIS' and Sterling's records, Defendant Sterling Brunswick Seven LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW420. Appendix II, Sterling Brunswick Seven LLC Exhibit B.

a. BLMIS made transfers of principal directly to Defendant Sterling Brunswick Seven LLC totaling $5,716,000 during the six years prior to the Filing Date (the "Sterling Brunswick Seven LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling Brunswick Seven LLC Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Brunswick Seven LLC of approximately $5,716,000 in principal (the "Sterling Brunswick Seven LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling Brunswick Seven LLC Exhibit B.

c. During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Brunswick Seven LLC of approximately $4,500,000 in principal (the "Sterling Brunswick Seven LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling Brunswick Seven LLC Exhibit B.

d. In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Sterling Brunswick Seven LLC totaling $455,000 (the "Sterling

Brunswick Seven LLC Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling Brunswick LLC Exhibit B.

1228.   Upon information and belief, some or all of the Sterling Brunswick Seven LLC transfers were subsequently transferred by Defendant Sterling Brunswick Seven LLC to the following subsequent transferees: Sterling Brunswick Corporation. Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Sterling Brunswick Seven LLC including Fred Wilpon, Saul Katz, Michael Katz, Richard Wilpon, Estate of Leonard Schreier, Thomas Osterman, the Saul B. Katz Family Trust, David Katz, Arthur Friedman, Jeffrey Wilpon, Marvin Tepper, and Edward M. Tepper (collectively, the Sterling Brunswick Seven LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Brunswick Seven LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Sterling DIST Properties LLC

1229.   According to BLMIS' and Sterling's records, Defendant Sterling DIST Properties LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW465. Appendix II, Sterling DIST Properties LLC Exhibit B.

a.      BLMIS made transfers of principal directly to Defendant Sterling DIST Properties LLC totaling $736,139 during the six years prior to the Filing Date (the "Sterling DIST Properties LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling DIST Properties LLC Exhibit B.

b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling DIST Properties LLC of approximately $736,139 in principal (the "Sterling DIST Properties LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling DIST Properties LLC Exhibit B.

c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling DIST Properties LLC of approximately $736,139 in principal (the "Sterling DIST Properties LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Sterling DIST Properties LLC Exhibit B.

d.     In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Sterling DIST Properties LLC totaling $736,139 (the "Sterling DIST Properties LLC Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Sterling DIST Properties LLC Exhibit B.

1230.   Upon information and belief, some or all of the Sterling DIST Properties LLC transfers were subsequently transferred by Defendant Sterling DIST Properties LLC to the following subsequent transferees: Fred Wilpon, the Wilpon 2002 Descendants' Trust, Jeffrey Wilpon, Richard Wilpon, Saul Katz, the Saul B. Katz Family Trust, the Katz 2002 Descendants' Trust, David Katz, Gregory Katz, Arthur Friedman, Marvin Tepper, and Thomas Osterman (collectively, the "Sterling DIST Properties LLC Subsequent Transferee Defendants").

Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling DIST Properties LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling Equities

1231. According to BLMIS' and Sterling's records, Defendant Sterling Equities received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW359. Appendix II, Sterling Equities Exhibit B.

   a.   BLMIS made direct transfers to Defendant Sterling Equities totaling $38,499 of Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $171,273 in principal during the six years prior to the Filing Date, totaling approximately $209,772 (the "Sterling Equities Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling Equities Exhibit B.

   b.   During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Equities of approximately $209,772 (the "Sterling Equities Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling Equities Exhibit B. Of the Sterling Equities Six Year Initial Transfers, $38,499 were Fictitious Profits and the remaining $171,273 constituted the return of principal.

1232. Upon information and belief, some or all of the Sterling Equities transfers were subsequently transferred by Defendant Sterling Equities to the following subsequent transferees: Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, David Katz, Arthur Friedman, Marvin

Tepper, Gregory Katz, Thomas Osterman, and Jeffrey Wilpon (collectively, the "Sterling Equities Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Equities Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Sterling Equities Associates

1233. According to BLMIS' and Sterling's records, Defendant Sterling Equities Associates received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW300. Appendix II, Sterling Equities Associates Exhibit B.

     a.     BLMIS made direct transfers to Defendant Sterling Equities Associates totaling $800,000 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $14,400,000 in principal during the six years prior to the Filing Date, totaling approximately $15,200,000 (the "Sterling Equities Associates Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling Equities Associates Exhibit B.

     b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Equities Associates of approximately $15,200,000 (the "Sterling Equities Associates Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling Equities Associates Exhibit B. Of the Sterling Equities Associates Six Year Initial Transfers, $800,000 were Fictitious Profits and the remaining $14,400,000 constituted the return of principal.

c. During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Equities Associates of approximately $6,300,000 (the "Sterling Equities Associates Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling Equities Associates Exhibit B. Of the Sterling Equities Associates Two Year Initial Transfers, $800,000 were Fictitious Profits and the remaining $5,500,000 constituted the return of principal.

1234. Upon information and belief, some or all of the Sterling Equities Associates transfers were subsequently transferred by Defendant Sterling Equities Associates to the following subsequent transferees: Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, David Katz, Arthur Friedman, Marvin Tepper, Gregory Katz, Thomas Osterman, and Jeffrey Wilpon (collectively, the "Sterling Equities Associates Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Equities Associates Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Sterling Equities Investors

1235. According to BLMIS' and Sterling's records, Defendant Sterling Equities Investors received Initial Transfers from approximately two (2) Sterling BLMIS Accounts: Nos. 1KW178 and 1KW255. Appendix II, Sterling Equities Investors Exhibit B.

a. BLMIS made direct transfers to Defendant Sterling Equities Investors totaling $316,371 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date (the "Sterling Equities Investors Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and

are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling Equities Investors Exhibit B.

1236. Upon information and belief, some or all of the Sterling Equities Investors transfers were subsequently transferred by Defendant Sterling Equities Investors to the following subsequent transferees: Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, Thomas Osterman, Jeffrey Wilpon, Arthur Friedman, David Katz, Marvin Tepper, and the Estate of Leonard Schreier (collectively, the "Sterling Equities Investors Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Equities Investors Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling Heritage LLC

1237. According to BLMIS' and Sterling's records, Defendant Sterling Heritage LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW287. Appendix II, Sterling Heritage LLC Exhibit B.

a. BLMIS made direct transfers to Defendant Sterling Heritage LLC totaling $79,325 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Sterling Heritage LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling Heritage LLC Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Heritage LLC constituting a minimal amount of Fictitious Profits (the "Sterling Heritage LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA,

particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling Heritage LLC Exhibit B.

1238.  Upon information and belief, Defendant Sterling Heritage LLC is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from the following approximately three (3) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW323, 1KW347, and 1KW349 (collectively, the "Sterling Heritage LLC Subsequent Transfer Accounts").  Appendix II, Sterling Heritage LLC Exhibit C.

a.  Defendant Sterling Heritage LLC received Subsequent Transfers from the Sterling Heritage LLC Subsequent Transfer Accounts totaling $358,780 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $10,343,000 in principal during the six years prior to the Filing Date, totaling approximately $10,701,780 (the "Sterling Heritage LLC Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Sterling Heritage LLC pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Sterling Heritage LLC Exhibit C.

1239.  Upon information and belief, some or all of the Sterling Heritage LLC transfers were subsequently transferred by Defendant Sterling Heritage LLC to the following subsequent transferees: Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz, the Estate of Leonard Schreier, Thomas Osterman, Arthur Friedman, Jeffrey Wilpon, David Katz, and Marvin Tepper (collectively, the "Sterling Heritage LLC Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are

recoverable from the Sterling Heritage LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling Internal V LLC

1240.   According to BLMIS' and Sterling's records, Defendant Sterling Internal V LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW435. Appendix II, Sterling Internal V LLC Exhibit B.

a.      BLMIS made transfers of principal directly to Defendant Sterling Internal V LLC totaling $51,102,500 during the six years prior to the Filing Date (the "Sterling Internal V LLC Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Sterling Internal V LLC Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Internal V LLC of approximately $51,102,500 in principal (the "Sterling Internal V LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Sterling Internal V LLC Exhibit B.

c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Internal V LLC of approximately $51,102,500 in principal (the "Sterling Internal V LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Sterling Internal V LLC Exhibit B.

1241.   Upon information and belief, some or all of the Sterling Internal V LLC transfers were subsequently transferred by Defendant Sterling Internal V LLC to the following subsequent transferees: Fred Wilpon, the Fred Wilpon Family Trust, the Wilpon 2002 Descendants' Trust, Jeffrey Wilpon, Richard Wilpon, Saul Katz, the Saul B. Katz Family Trust, the Katz 2002 Descendants' Trust, Michael Katz, Gregory Katz, Arthur Friedman, Marvin Tepper, and Thomas Osterman (collectively, the "Sterling Internal V LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Internal V LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling Jet Ltd.

1242.   According to BLMIS' and Sterling's records, Defendant Sterling Jet Ltd. received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW257.  Appendix II, Sterling Jet Ltd. Exhibit B.

a.      BLMIS made direct transfers to Defendant Sterling Jet Ltd. totaling $316,058 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Sterling Jet Ltd. Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Sterling Jet Ltd. Exhibit B.

1243.   Upon information and belief, some or all of the Sterling Jet Ltd. transfers were subsequently transferred by Defendant Sterling Jet Ltd. to Fred Wilpon (the "Sterling Jet Ltd. Subsequent Transferee Defendant").  Appendix II, Fred Wilpon Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Jet Ltd. Subsequent Transferee Defendant pursuant to section 550(a) of the Bankruptcy Code.

## Sterling Jet II Ltd.

1244.   According to BLMIS' and Sterling's records, Defendant Sterling Jet II Ltd. received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW259. Appendix II, Sterling Jet II Ltd. Exhibit B.

     a.     BLMIS made direct transfers to Defendant Sterling Jet II Ltd. totaling $144,007 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Sterling Jet II Ltd. Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Sterling Jet II Ltd. Exhibit B.

1245.   Upon information and belief, some or all of the Sterling Jet II Ltd. transfers were subsequently transferred by Defendant Sterling Jet II Ltd. to the following subsequent transferees: Saul Katz and Marvin Tepper (collectively, the "Sterling Jet II Ltd. Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Jet II Ltd. Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling PathoGenesis

1246.   According to BLMIS' and Sterling's records, Defendant Sterling PathoGenesis received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW175. Appendix II, Sterling PathoGenesis Exhibit B.

     a.     BLMIS made direct transfers to Defendant Sterling PathoGenesis totaling $19,037,261 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Sterling PathoGenesis Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject

to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling PathoGenesis Exhibit B.

1247. Upon information and belief, some or all of the Sterling PathoGenesis transfers were subsequently transferred by Defendant Sterling PathoGenesis to the following subsequent transferees: Arthur Friedman, David Katz, Michael Katz, Saul Katz, Thomas Osterman, Leonard Schreier, Marvin Tepper, Fred Wilpon, Richard Wilpon, Jeffrey A. Wilpon, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust (collectively, the "Sterling PathoGenesis Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling PathoGenesis Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling Third Associates

1248. According to BLMIS' and Sterling's records, Defendant Sterling Third Associates received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW059. Appendix II, Sterling Third Associates Exhibit B.

a. BLMIS made direct transfers to Defendant Sterling Third Associates totaling $6,868,419 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Sterling Third Associates Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling Third Associates Exhibit B.

1249. Upon information and belief, some or all of the Sterling Third Associates transfers were subsequently transferred by Defendant Sterling Third Associates to the following subsequent transferees: Richard Wilpon, Michael Katz, Thomas Osterman, the Estate of Leonard Schreier, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, and Valley Harbor

Associates.  Upon information and belief, such transfers were subsequently transferred to the ultimate owners of Sterling Third Associates, who are Richard Wilpon, Michael Katz, Thomas Osterman, the Estate of Leonard Schreier, the Saul B. Katz Family Trust, the Fred Wilpon Family Trust, Fred Wilpon, and Saul Katz (collectively, the "Sterling Third Associates Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Third Associates Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Sterling Thirty Venture LLC

1250.   According to BLMIS' and Sterling's records, Defendant Sterling Thirty Venture LLC received Initial Transfers from approximately three (3) Sterling BLMIS Accounts: Nos. 1KW313, 1KW314, and 1KW315).  Appendix II, Sterling Thirty Venture LLC Exhibit B.

a.      BLMIS made direct transfers to Defendant Sterling Thirty Venture LLC totaling $3,559,601 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $47,396,706 in principal during the six years prior to the Filing Date, totaling approximately $50,956,307 (the "Sterling Thirty Venture LLC Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Sterling Thirty Venture LLC Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Thirty Venture LLC of approximately $50,956,307 (the "Sterling Thirty Venture LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II,

Sterling Thirty Venture LLC Exhibit B. Of the Sterling Thirty Venture LLC Six Year Initial

Transfers, $3,559,601 were Fictitious Profits and the remaining $47,396,706 constituted the

return of principal.

c. During the two years prior to the Filing Date, BLMIS made direct

transfers to Defendant Sterling Thirty Venture LLC of approximately $22,741,249 (the "Sterling

Thirty Venture LLC Two Year Initial Transfers"), which are avoidable and recoverable under

sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA,

particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling Thirty Venture LLC Exhibit B.

Of the Sterling Thirty Venture LLC Two Year Initial Transfers, $2,861,249 were Fictitious

Profits and the remaining $19,880,000 constituted the return of principal.

d. In the ninety days before the Filing Date, BLMIS made direct transfers of

principal to Defendant Sterling Thirty Venture LLC totaling $2,193,751 (the "Sterling Thirty

Venture LLC Preference Period Transfers"), which are avoidable and recoverable under sections

547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly

SIPA section 78fff-2(c)(3). Appendix II, Sterling Thirty Venture LLC Exhibit B.

1251. Upon information and belief, some or all of the Sterling Thirty Venture LLC

transfers were subsequently transferred by Defendant Sterling Thirty Venture LLC to the

following subsequent transferees: Fred Wilpon, Saul Katz, Richard Wilpon, Michael Katz,

Arthur Friedman, David Katz, Leonard Schreier, Thomas Osterman, Jeffrey Wilpon, Valerie

Wilpon, Marvin Tepper, Gregory Katz, Todd Katz, Howard Katz, Dayle Katz, and Red Valley

Partners (collectively, the "Sterling Thirty Venture LLC Subsequent Transferee Defendants").

Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the

value thereof, are recoverable from the Sterling Thirty Venture LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Sterling Tracing LLC

1252. According to BLMIS' and Sterling's records, Defendant Sterling Tracing LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW455. Appendix II, Sterling Tracing LLC Exhibit B.

a.     BLMIS made transfers of principal directly to Defendant Sterling Tracing LLC totaling $4,095,000 during the six years prior to the Filing Date (the "Sterling Tracing LLC Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Sterling Tracing LLC Exhibit B.

b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Tracing LLC of approximately $4,095,000 in principal (the "Sterling Tracing LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Sterling Tracing LLC Exhibit B.

c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Tracing LLC of approximately $4,095,000 in principal (the "Sterling Tracing LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Sterling Tracing LLC Exhibit B.

d.     In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Sterling Tracing LLC totaling $895,000 (the "Sterling Tracing LLC

Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Sterling Tracing LLC Exhibit B.

1253.   Upon information and belief, some or all of the Sterling Tracing LLC transfers were subsequently transferred by Defendant Sterling Tracing LLC to the following subsequent transferees: Michael Katz, Richard Wilpon, Gregory Katz, Scott Wilpon, Jeffrey Wilpon, Thomas Osterman, Arthur Friedman, and Ruth Friedman (collectively, the "Sterling Tracing LLC Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the Sterling Tracing LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling Twenty Five LLC

1254.   According to BLMIS' and Sterling's records, Defendant Sterling Twenty Five LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW447.  Appendix II, Sterling Twenty Five LLC Exhibit B.

a.      BLMIS made transfers of principal directly to Defendant Sterling Twenty Five LLC totaling $7,762,450 during the six years prior to the Filing Date (the "Twenty Five LLC Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Sterling Twenty Five LLC Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Twenty Five LLC of approximately $7,762,450 in principal (the "Sterling Twenty Five LLC Six Year Initial Transfers"), which are avoidable and recoverable under

sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling Twenty Five LLC Exhibit B.

c. During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling Twenty Five LLC of approximately $7,762,450 in principal (the "Sterling Twenty Five LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling Twenty Five LLC Exhibit B.

d. In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Sterling Twenty Five LLC totaling $1,930,000 (the "Sterling Twenty Five LLC Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling Twenty Five LLC Exhibit B.

1255. Upon information and belief, some or all of the Sterling Twenty Five LLC transfers were subsequently transferred by Defendant Sterling Twenty Five LLC to the following subsequent transferees: Arthur Freidman, Ruth Friedman, Dayle Katz, Michael Katz, Howard Katz, Gregory Katz, Amy Beth Katz, Todd Katz, Richard Wilpon, Daniel Wilpon, Robin Wilpon Wachtler, Philip Wachtler, Marvin Tepper, the Katz 2002 Descendants' Trust, the Wilpon 2002 Descendants' Trust, and FFB Aviation LLC (which, upon information and belief, transferred such funds to its owners, who include Saul Katz and Michael Katz) (collectively, the "Sterling Twenty Five LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from

the Sterling Twenty Five LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling VC IV LLC

1256.   According to BLMIS' and Sterling's records, Defendant Sterling VC IV LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW463. Appendix II, Sterling VC IV LLC Exhibit B.

a.      BLMIS made transfers of principal directly to Defendant Sterling VC IV LLC totaling $825,000 during the six years prior to the Filing Date (the "Sterling VC IV Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Sterling VC IV LLC Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling VC IV LLC of approximately $825,000 in principal (the "Sterling VC IV LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Sterling VC IV LLC Exhibit B.

c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling VC IV LLC of approximately $825,000 in principal (the "Sterling VC IV LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Sterling VC IV LLC Exhibit B.

d.      In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Sterling VC IV LLC totaling $825,000 (the "Sterling VC IV LLC

Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling VC IV LLC Exhibit B.

1257. Upon information and belief, some or all of the Sterling VC IV LLC transfers were subsequently transferred by Defendant Sterling VC IV LLC to the following subsequent transferees: Fred Wilpon, the Fred Wilpon Family Trust, Jeffrey Wilpon, Richard Wilpon, Saul Katz, the Saul B. Katz Family Trust, the Katz 2002 Descendants' Trust, David Katz, Michael Katz, Gregory Katz, Natalie Katz O'Brien, Heather Katz Knopf, the Iris J. Katz & Saul B. Katz Family Foundation, Arthur Friedman, Marvin Tepper, and Thomas Osterman (collectively, the "Sterling VC IV LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling VC IV LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Sterling VC V LLC

1258. According to BLMIS' and Sterling's records, Defendant Sterling VC V LLC received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW464. Appendix II, Sterling VC V LLC Exhibit B.

a. BLMIS made transfers of principal directly to Defendant Sterling VC V LLC totaling $633,556 during the six years prior to the Filing Date (the "Sterling VC V Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling VC V LLC Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling VC V LLC of approximately $633,556 in principal (the "Sterling VC V

LLC Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Sterling VC V LLC Exhibit B.

        c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Sterling VC V LLC of approximately $633,556 in principal (the "Sterling VC V LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling VC V LLC Exhibit B.

        d.     In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Sterling VC V LLC totaling $633,556 (the "Sterling VC V LLC Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling VC V LLC Exhibit B.

    1259.   Upon information and belief, some or all of the Sterling VC V LLC transfers were subsequently transferred by Defendant Sterling VC V LLC to the following subsequent transferees: Fred Wilpon, the Fred Wilpon Family Trust, the Wilpon 2002 Descendants' Trust, Jeffrey Wilpon, Richard Wilpon, Scott Wilpon, Saul Katz, the Saul B. Katz Family Trust, the Katz 2002 Descendants' Trust, David Katz, Michael Katz, Gregory Katz, Arthur Friedman, Marvin Tepper, and Thomas Osterman (collectively, the "Sterling VC V LLC Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. The Subsequent Transfers, or the value thereof, are recoverable from the Sterling VC V LLC Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Valley Harbor Associates

1260.   Upon information and belief, Defendant Valley Harbor Associates received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW059.  Appendix II, Valley Harbor Associates Exhibit B.

a.      BLMIS made direct transfers to Defendant Valley Harbor Associates totaling $6,868,419 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Valley Harbor Associates Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Valley Harbor Associates Exhibit B.

1261.   Upon information and belief, some or all of the Valley Harbor Associates transfers were subsequently transferred by Defendant Valley Harbor Associates to the following subsequent transferees: Fred Wilpon, Saul Katz, the Fred Wilpon Family Trust, and the Saul B. Katz Family Trust (collectively, the "Valley Harbor Associates Subsequent Transferee Defendants").  Appendix II, Each Defendant's Corresponding Exhibit C.  The Subsequent Transfers, or the value thereof, are recoverable from the Valley Harbor Associates Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### D.      Katz/Wilpon Trust Defendants

## Saul B. Katz Family Trust

1262.   According to BLMIS' and Sterling's records, the Saul B. Katz Family Trust received Initial Transfers from approximately ten (10) Sterling BLMIS Accounts: Nos. 1KW030, 1KW037, 1KW220, 1KW242, 1KW299, 1KW337, 1KW362, 1KW407, 1KW412, and 1KW427. Appendix II, Saul B. Katz Family Trust Exhibit B.

a.     BLMIS made direct transfers to Defendant Saul B. Katz Family Trust totaling $6,484,806 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $19,117,079 in principal during the six years prior to the Filing Date, totaling approximately $25,601,884 (the "Saul B. Katz Family Trust Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Saul B. Katz Family Trust Exhibit B.

b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Saul B. Katz Family Trust of approximately $23,461,074(the "Saul B. Katz Family Trust Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Saul B. Katz Family Trust Exhibit B.  Of the Saul B. Katz Family Trust Six Year Initial Transfers, $4,343,995 were Fictitious Profits and the remaining $19,117,079 constituted the return of principal.

c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Saul B. Katz Family Trust of approximately $13,046,411 (the "Saul B. Katz Family Trust Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Saul B. Katz Family Trust Exhibit B.  Of the Saul B. Katz Family Trust Two Year Initial Transfers, $3,889,233 were Fictitious Profits and the remaining $9,157,178 constituted the return of principal.

d.    In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Saul B. Katz Family Trust totaling $300,000 (the "Saul B. Katz Family Trust Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Saul B. Katz Family Trust Exhibit B.

1263.   Upon information and belief, the Saul B. Katz Family Trust is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately twenty-five (25) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW057, 1KW134, 1KW156, 1KW175, 1KW180, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW279, 1KW341, 1KW346, 1KW348, 1KW374, 1KW378, 1KW413, 1KW420, 1KW423, 1KW435, 1KW449, 1KW463, 1KW464, 1KW465, and 1KW059 (the "Saul B. Katz Family Trust Subsequent Transfer Accounts").  Appendix II, Saul B. Katz Family Trust Exhibit C.

a.    Defendant Saul B. Katz Family Trust received Subsequent Transfers from the Saul B. Katz Family Trust Subsequent Transfer Accounts totaling $23,623,899 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $84,650,760 in principal during the six years prior to the Filing Date, totaling approximately $108,274,659 (the "Saul B. Katz Family Trust Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from the Saul B. Katz Family Trust pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Saul B. Katz Family Trust Exhibit C.

1264. Upon information and belief, some or all of the Saul B. Katz Family Trust transfers were subsequently transferred by the Saul B. Katz Family Trust to the following Defendants: Michael Katz, Richard Wilpon, Iris Katz, David Katz, Natalie Katz O'Brien and Heather Katz Knopf (collectively, the "Saul B. Katz Family Trust Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. Such Subsequent Transfers, or the value thereof, are recoverable from the Saul B. Katz Family Trust Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Fred Wilpon Family Trust

1265. According to BLMIS' and Sterling's records, the Fred Wilpon Family Trust received Initial Transfers from approximately fourteen (14) Sterling BLMIS Accounts: Nos. 1KW037, 1KW063, 1KW072, 1KW074, 1KW075, 1KW082, 1KW220, 1KW260, 1KW298, 1KW337, 1KW362, 1KW408, 1KW412, and 1KW427. Appendix II, Fred Wilpon Family Trust Exhibit B.

a. BLMIS made direct transfers to Defendant Fred Wilpon Family Trust totaling $7,947,258 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $29,274,240 in principal during the six years prior to the Filing Date, totaling approximately $37,221,498 (the "Fred Wilpon Family Trust Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Fred Wilpon Family Trust Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Fred Wilpon Family Trust of approximately $34,702,561 (the "Fred Wilpon Family Trust Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA

section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Fred Wilpon Family Trust Exhibit B. Of the Fred Wilpon Family Trust Six Year Initial Transfers, $5,428,321 were Fictitious Profits and the remaining $29,274,240 constituted the return of principal.

      c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Fred Wilpon Family Trust of approximately $11,019,535 (the "Fred Wilpon Family Trust Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Fred Wilpon Family Trust Exhibit B. Of the Fred Wilpon Family Trust Two Year Initial Transfers, $4,111,737 were Fictitious Profits and the remaining $6,907,798 constituted the return of principal.

      1266.      Upon information and belief, the Fred Wilpon Family Trust is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from the following approximately twenty-three (23) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW057, 1KW134, 1KW156, 1KW175, 1KW180, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW341, 1KW346, 1KW348, 1KW358, 1KW374, 1KW378, 1KW413, 1KW423, 1KW435, 1KW449, 1KW463, 1KW464, and 1KW059 (the "Fred Wilpon Family Trust Subsequent Transfer Accounts"). Appendix II, Fred Wilpon Family Trust Exhibit C.

      a.      Defendant Fred Wilpon Family Trust received Subsequent Transfers from the Fred Wilpon Family Trust Subsequent Transfer Accounts totaling $22,339,808 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $86,170,395 in principal during the six years prior to the Filing Date, totaling approximately

$108,510,203 (the "Fred Wilpon Family Trust Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from the Fred Wilpon Family Trust pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Fred Wilpon Family Trust Exhibit C.

1267.   Upon information and belief, some or all of the Fred Wilpon Family Trust transfers were subsequently transferred by the Fred Wilpon Family Trust to the following Defendants: Fred Wilpon, Judith Wilpon, Debra Wilpon, Richard Wilpon, Jeffrey Wilpon, Robin Wilpon Wachtler, Bruce N. Wilpon, MINOR 1, MINOR 2, and Kimberly Wilpon (collectively, the "Fred Wilpon Family Trust Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. Such Subsequent Transfers, or the value thereof, are recoverable from the Fred Wilpon Family Trust Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

## Katz 2002 Descendants' Trust

1268.   According to BLMIS' and Sterling's records, the Katz 2002 Descendants' Trust received Initial Transfers from approximately two (2) Sterling BLMIS Accounts: Nos. 1KW391 and 1KW412. Appendix II, Katz 2002 Descendants' Trust Exhibit B.

    a.     BLMIS made direct transfers to Defendant Katz 2002 Descendants' Trust totaling $396,003 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $2,393,648 in principal during the six years prior to the Filing Date, totaling approximately $2,789,652 (the "Katz 2002 Descendants' Trust Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Katz 2002 Descendants' Trust Exhibit B.

b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Katz 2002 Descendants' Trust of approximately $2,789,652 (the "Katz 2002 Descendants' Trust Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Katz 2002 Descendants' Trust Exhibit B.  Of the Katz 2002 Descendants' Trust Six Year Initial Transfers, $396,003 were Fictitious Profits and the remaining $2,393,648 constituted the return of principal.

c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Katz 2002 Descendants' Trust of approximately $2,664,072 (the "Katz 2002 Descendants' Trust Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Katz 2002 Descendants' Trust Exhibit B. Of the Katz 2002 Descendants' Trust Two Year Initial Transfers, $396,003 were Fictitious Profits and the remaining $2,268,068 constituted the return of principal.

1269.   Upon information and belief, the Katz 2002 Descendants' Trust is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from the following approximately fifteen (15) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW057, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW374, 1KW378, 1KW423, 1KW435, 1KW447, 1KW449, 1KW463, 1KW464, and 1KW465 (the "Katz 2002 Descendants' Trust Subsequent Transfer Accounts").  Appendix II, Katz 2002 Descendants' Trust Exhibit C.

a.	Defendant Katz 2002 Descendants' Trust received Subsequent Transfers from the Katz 2002 Descendants' Trust Subsequent Transfer Accounts totaling $1,894,747 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $17,056,931 in principal during the six years prior to the Filing Date, totaling approximately $18,951,678 (the "Katz 2002 Descendants' Trust Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from the Katz 2002 Descendants' Trust pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Katz 2002 Descendants' Trust Exhibit C.

1270.	Upon information and belief, some or all of the Katz 2002 Descendants' Trust transfers were subsequently transferred by the Katz 2002 Descendants' Trust to the following Defendants: Michael Katz, Saul Katz, Dayle Katz, Gregory Katz, Howard Katz and Todd Katz (collectively, the "Katz 2002 Descendants' Trust Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. Such Subsequent Transfers, or the value thereof, are recoverable from the Katz 2002 Descendants' Trust Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### Wilpon 2002 Descendants' Trust

1271.	According to BLMIS' and Sterling's records, the Wilpon 2002 Descendants' Trust received Initial Transfers from approximately two (2) Sterling BLMIS Accounts: Nos. 1KW412 and 1KW445. Appendix II, Wilpon 2002 Descendants' Trust Exhibit B.

a.	BLMIS made direct transfers to Defendant Wilpon 2002 Descendants' Trust totaling $528,446 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $2,025,303 in principal during the six years prior to the Filing Date, totaling approximately $2,553,749 (the "Wilpon 2002 Descendants' Trust Initial

Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Wilpon 2002 Descendants' Trust Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Wilpon 2002 Descendants' Trust of approximately $2,553,749 (the "Wilpon 2002 Descendants' Trust Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Wilpon 2002 Descendants' Trust Exhibit B. Of the Wilpon 2002 Descendants' Trust Six Year Initial Transfers, $528,446 were Fictitious Profits and the remaining $2,025,303 constituted the return of principal.

c. During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Wilpon 2002 Descendants' Trust of approximately $2,386,169 (the "Wilpon 2002 Descendants' Trust Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Wilpon 2002 Descendants' Trust Exhibit B. Of the Wilpon 2002 Descendants' Trust Two Year Initial Transfers, $528,446 were Fictitious Profits and the remaining $1,857,723 constituted the return of principal.

1272. Upon information and belief, the Wilpon 2002 Descendants' Trust is also a Subsequent Transferee Defendant that received avoidable and recoverable Subsequent Transfers from approximately fourteen (14) Sterling BLMIS Accounts held by other Sterling-related

entities and/or individuals: Nos. 1KW057, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW374, 1KW378, 1KW423, 1KW435, 1KW447, 1KW449, 1KW464, and 1KW465 (the "Wilpon 2002 Descendants' Trust Subsequent Transfer Accounts"). Appendix II, Wilpon 2002 Descendants' Trust Exhibit C.

      a.      Defendant Wilpon 2002 Descendants' Trust received Subsequent Transfers from the Wilpon 2002 Descendants' Trust Subsequent Transfer Accounts totaling $2,528,442 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $20,374,004 in principal during the six years prior to the Filing Date, totaling approximately $22,902,446 (the "Wilpon 2002 Descendants' Trust Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from the Wilpon 2002 Descendants' Trust pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Wilpon 2002 Descendants' Trust Exhibit C.

1273. Upon information and belief, some or all of the Wilpon 2002 Descendants' Trust transfers were subsequently transferred by the Wilpon 2002 Descendants' Trust to the following Defendants: Richard Wilpon, Fred Wilpon, Debra Wilpon, Jessica Wilpon, Daniel Wilpon, and Scott Wilpon (collectively, the "Wilpon 2002 Descendants' Trust Subsequent Transferee Defendants"). Appendix II, Each Defendant's Corresponding Exhibit C. Such Subsequent Transfers, or the value thereof, are recoverable from the Wilpon 2002 Descendants' Trust Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

### E.    Sterling Family Member Defendants

### <u>Iris Katz</u>

1274.   According to BLMIS' and Sterling's records, Defendant Iris Katz received Initial Transfers from approximately six (6) Sterling BLMIS Accounts: Nos. 1KW014, 1KW154, 1KW235, 1KW236, 1KW237, and 1KW272.  Appendix II, Iris Katz Exhibit B.

a.    BLMIS made direct transfers to Defendant Iris Katz totaling $34,997,051 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $2,198,313 in principal during the six years prior to the Filing Date, totaling approximately $37,195,364 (the "Iris Katz Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Iris Katz Exhibit B.

b.    During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Iris Katz of approximately $24,921,080 (the "Iris Katz Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Iris Katz Exhibit B.  Of the Iris Katz Six Year Initial Transfers, $22,722,767 were Fictitious Profits and the remaining $2,198,313 constituted the return of principal.

c.    During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Iris Katz of approximately $2,223,000 in Fictitious Profits (the "Iris Katz Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Iris Katz Exhibit B.

**Judith Wilpon**

1275. According to BLMIS' and Sterling's records, Defendant Judith Wilpon received Initial Transfers from approximately six (6) Sterling BLMIS Accounts: Nos. 1KW077, 1KW155, 1KW232, 1KW233, 1KW234, and 1KW273. Appendix II, Judith Wilpon Exhibit B.

      a. BLMIS made direct transfers to Defendant Judith Wilpon totaling $24,679,509 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $4,796,698 in principal during the six years prior to the Filing Date, totaling approximately $29,476,207 (the "Judith Wilpon Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Judith Wilpon Exhibit B.

      b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Judith Wilpon of approximately $17,615,000 (the "Judith Wilpon Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Judith Wilpon Exhibit B. Of the Judith Wilpon Six Year Initial Transfers, $12,818,302 were Fictitious Profits and the remaining $4,796,698 constituted the return of principal.

      c. During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Judith Wilpon of approximately $6,000,000 in Fictitious Profits (the "Judith Wilpon Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Judith Wilpon Exhibit B.

**Dayle Katz**

1276.  According to BLMIS' and Sterling's records, Defendant Dayle Katz received Initial Transfers from approximately two (2) Sterling BLMIS Accounts: Nos. 1KW013 and 1KW020.  Appendix II, Dayle Katz Exhibit B.

      a.      BLMIS made direct transfers to Defendant Dayle Katz totaling $553,483 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $3,645,267 in principal during the six years prior to the Filing Date, totaling approximately $4,198,750 (the "Dayle Katz Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Dayle Katz Exhibit B.

      b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Dayle Katz of approximately $4,198,750 (the "Dayle Katz Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Dayle Katz Exhibit B.  Of the Dayle Katz Six Year Initial Transfers, $553,483 were Fictitious Profits and the remaining $3,645,267 constituted the return of principal.

      c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Dayle Katz of approximately $500,000 in principal (the "Dayle Katz Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Dayle Katz Exhibit B.

1277. Upon information and belief, Defendant Dayle Katz is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately twenty (20) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW313, 1KW314, 1KW315, 1KW402, 1KW057, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW374, 1KW378, 1KW391, 1KW423, 1KW435, 1KW447, 1KW449, 1KW463, 1KW464, and 1KW465 (collectively, the "Dayle Katz Subsequent Transfer Accounts"). Appendix II, Dayle Katz Exhibit C.

a. Defendant Dayle Katz received Subsequent Transfers from the Dayle Katz Subsequent Transfer Accounts totaling $2,011,040 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $21,798,502 in principal during the six years prior to the Filing Date, totaling approximately $23,809,542 (the "Dayle Katz Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Dayle Katz pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Dayle Katz Exhibit C.

### Debra Wilpon

1278. According to BLMIS' and Sterling's records, Defendant Debra Wilpon received Initial Transfers from approximately three (3) Sterling BLMIS Accounts: Nos. 1KW066, 1KW307, and 1KW081. Appendix II, Debra Wilpon Exhibit B.

a. BLMIS made direct transfers to Defendant Debra Wilpon totaling $2,020,180 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $12,739,443 in principal during the six years prior to the Filing Date, totaling approximately $14,759,623 (the "Debra Wilpon Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are

subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Debra Wilpon Exhibit B.

b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Debra Wilpon of approximately $13,946,510 (the "Debra Wilpon Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Debra Wilpon Exhibit B. Of the Debra Wilpon Six Year Initial Transfers, $1,207,067 were Fictitious Profits and the remaining $12,739,443 constituted the return of principal.

c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Debra Wilpon of approximately $9,441,710 (the "Debra Wilpon Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Debra Wilpon Exhibit B. Of the Debra Wilpon Two Year Initial Transfers, $1,131,467 were Fictitious Profits and the remaining $8,310,243 constituted the return of principal.

d.      In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Debra Wilpon totaling $368,533 (the "Debra Wilpon Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Debra Wilpon Exhibit B.

**Valerie Wilpon**

1279. According to BLMIS' and Sterling's records, Defendant Valerie Wilpon received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW076. Appendix II, Valerie Wilpon Exhibit B.

      a.      BLMIS made transfers of principal directly to Defendant Valerie Wilpon totaling $8,182,163 during the six years prior to the Filing Date. Such transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Valerie Wilpon Exhibit B.

      b.      During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Valerie Wilpon of approximately $8,182,163 in principal (the "Valerie Wilpon Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Valerie Wilpon Exhibit B.

      c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Valerie Wilpon of approximately $822,163 in principal (the "Valerie Wilpon Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Valerie Wilpon Exhibit B.

1280. Upon information and belief, Defendant Valerie Wilpon is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately three (3) Sterling BLMIS Accounts held by other Sterling-related entities and/or

individuals: Nos. 1KW313, 1KW314, and 1KW315 (collectively, the "Valerie Wilpon Subsequent Transfer Accounts"). Appendix II, Valerie Wilpon Exhibit C.

a. Defendant Valerie Wilpon received Subsequent Transfers from the Valerie Wilpon Subsequent Transfer Accounts totaling $117,111 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $1,559,352 in principal during the six years prior to the Filing Date, totaling approximately $1,676,463 (the "Valerie Wilpon Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Valerie Wilpon pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Valerie Wilpon Exhibit C.

## Amy Beth Katz

1281. According to BLMIS' and Sterling's records, Defendant Amy Beth Katz received Initial Transfers from approximately two (2) Sterling BLMIS Accounts: Nos. 1KW345 and 1KW426. Appendix II, Amy Beth Katz Exhibit B.

a. BLMIS made direct transfers to Defendant Amy Beth Katz totaling $40,460 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $874,544 in principal during the six years prior to the Filing Date, totaling approximately $915,005 (the "Amy Beth Katz Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Amy Beth Katz Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Amy Beth Katz of approximately $915,005 (the "Amy Beth Katz Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the

Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Amy Beth Katz Exhibit B. Of the Amy Beth Katz Six Year Initial Transfers, $40,460 were Fictitious Profits and the remaining $874,544 constituted the return of principal.

c. During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Amy Beth Katz of approximately $915,005 (the "Amy Beth Katz Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Amy Beth Katz Exhibit B. Of the Amy Beth Katz Two Year Initial Transfers, $40,460 were Fictitious Profits and the remaining $874,544 constituted the return of principal.

1282. Upon information and belief, Defendant Amy Beth Katz is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately two (2) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW402 and 1KW447 (collectively, the "Amy Beth Katz Subsequent Transfer Accounts"). Appendix II, Amy Beth Katz Exhibit C.

a. Defendant Amy Beth Katz received Subsequent Transfers of principal from the Amy Beth Katz Subsequent Transfer Accounts totaling $357,136 during the six years prior to the Filing Date (the "Amy Beth Katz Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Amy Beth Katz pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Amy Beth Katz Exhibit C.

**Heather Katz Knopf**

1283. According to BLMIS' and Sterling's records, Defendant Heather Katz Knopf received Initial Transfers from approximately four (4) Sterling BLMIS Accounts: Nos. 1KW012, 1KW116, 1KW037, and 1KW309. Appendix II, Heather Katz Knopf Exhibit B.

    a. BLMIS made direct transfers to Defendant Heather Katz Knopf totaling $117,977 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $104,500 in principal during the six years prior to the Filing Date, totaling approximately $222,477 (the "Heather Katz Knopf Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Heather Katz Knopf Exhibit B.

    b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Heather Katz Knopf of approximately $104,500 in principal (the "Heather Katz Knopf Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Heather Katz Knopf Exhibit B.

1284. Upon information and belief, Defendant Heather Katz Knopf is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately forty-one (41) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW017, 1KW063, 1KW198, 1KW313, 1KW314, 1KW315, 1KW427, 1KW463, 1KW030, 1KW037, 1KW057, 1KW059, 1KW134, 1KW156, 1KW175, 1KW180, 1KW192, 1KW218, 1KW220, 1KW223, 1KW242, 1KW247, 1KW254, 1KW279, 1KW299, 1KW337, 1KW341, 1KW346, 1KW348, 1KW362, 1KW374, 1KW378, 1KW402, 1KW407,

1KW413, 1KW420, 1KW423, 1KW435, 1KW449, 1KW464, and 1KW465 (collectively, the "Heather Katz Knopf Subsequent Transfer Accounts"). Appendix II, Heather Katz Knopf Exhibit C.

a. Defendant Heather Katz Knopf received Subsequent Transfers from the Heather Katz Knopf Subsequent Transfer Accounts totaling $33,107,927 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $120,498,256 in principal during the six years prior to the Filing Date, totaling approximately $153,606,184 (the "Heather Katz Knopf Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Heather Katz Knopf pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Heather Katz Knopf Exhibit C.

### Howard Katz

1285. According to BLMIS' and Sterling's records, Defendant Howard Katz received Initial Transfers from approximately two (2) Sterling BLMIS Accounts: Nos. 1KW072 and 1KW424. Appendix II, Howard Katz Exhibit B.

a. BLMIS made direct transfers to Defendant Howard Katz totaling $7,589 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $180,000 in principal during the six years prior to the Filing Date, totaling approximately $187,589 (the "Howard Katz Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Howard Katz Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Howard Katz of approximately $180,000 in principal (the "Howard Katz Six Year

Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Howard Katz Exhibit B.

1286. Upon information and belief, Defendant Howard Katz is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately twenty-one (21) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW063, 1KW313, 1KW314, 1KW315, 1KW447, 1KW057, 1KW109, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW374, 1KW378, 1KW391, 1KW423, 1KW435, 1KW449, 1KW463, 1KW464, and 1KW465 (collectively, the "Howard Katz Subsequent Transfer Accounts"). Appendix II, Howard Katz Exhibit C.

a. Defendant Howard Katz received Subsequent Transfers from the Howard Katz Subsequent Transfer Accounts totaling $1,907,525 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $19,918,881 in principal during the six years prior to the Filing Date, totaling approximately $21,826,406 (the "Howard Katz Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Howard Katz pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Howard Katz Exhibit C.

**Natalie Katz O'Brien**

1287. According to BLMIS' and Sterling's records, Defendant Natalie Katz O'Brien received Initial Transfers from approximately seven (7) Sterling BLMIS Accounts: Nos. 1KW012, 1KW017, 1KW023, 1KW197, 1KW227, 1KW037, and 1KW458. Appendix II, Natalie Katz O'Brien Exhibit B.

a.     BLMIS made direct transfers to Defendant Natalie Katz O'Brien totaling $98,827 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $288,000 in principal during the six years prior to the Filing Date, totaling approximately $386,827 (the "Natalie Katz O'Brien Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Natalie Katz O'Brien Exhibit B.

b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Natalie Katz O'Brien of approximately $288,000 in principal (the "Natalie Katz O'Brien Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Natalie Katz O'Brien Exhibit B.

c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Natalie Katz O'Brien of approximately $191,000 in principal (the "Natalie Katz O'Brien Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Natalie Katz O'Brien Exhibit B.

1288.   Upon information and belief, Defendant Natalie Katz O'Brien is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately forty (40) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW063, 1KW198, 1KW313, 1KW314, 1KW315, 1KW402, 1KW427, 1KW463, 1KW030, 1KW037, 1KW057, 1KW059, 1KW134, 1KW156, 1KW175, 1KW180,

1KW192, 1KW218, 1KW220, 1KW223, 1KW242, 1KW247, 1KW254, 1KW279, 1KW299, 1KW337, 1KW341, 1KW346, 1KW348, 1KW362, 1KW374, 1KW378, 1KW407, 1KW413, 1KW420, 1KW423, 1KW435, 1KW449, 1KW464, and 1KW465 (collectively, the "Natalie Katz O'Brien Subsequent Transfer Accounts").  Appendix II, Natalie Katz O'Brien Exhibit C.

       a.       Defendant Natalie Katz O'Brien received Subsequent Transfers from the Natalie Katz O'Brien Subsequent Transfer Accounts totaling $28,745,384 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $103,070,726 in principal during the six years prior to the Filing Date, totaling approximately $131,816,109 (the "Natalie Katz O'Brien Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Natalie Katz O'Brien pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Natalie Katz O'Brien Exhibit C.

## Todd Katz

1289.   According to BLMIS' and Sterling's records, Defendant Todd Katz received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW072.  Appendix II, Todd Katz Exhibit B.

       a.       BLMIS made direct transfers to Defendant Todd Katz constituting a minimal amount of Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Todd Katz Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Todd Katz Exhibit B.

1290.   Upon information and belief, Defendant Todd Katz is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately twenty-two (22) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW063, 1KW313, 1KW314, 1KW315, 1KW402, 1KW057, 1KW110, 1KW192, 1KW218, 1KW223, 1KW247, 1KW254, 1KW374, 1KW378, 1KW391, 1KW423, 1KW435, 1KW447, 1KW449, 1KW463, 1KW464, and 1KW465 (collectively, the "Todd Katz Subsequent Transfer Accounts").  Appendix II, Todd Katz Exhibit C.

       a.      Defendant Todd Katz received Subsequent Transfers from the Todd Katz Subsequent Transfer Accounts totaling $1,913,327 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $20,173,591 in principal during the six years prior to the Filing Date, totaling approximately $22,086,917 (the "Todd Katz Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Todd Katz pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Todd Katz Exhibit C.

### Bruce N. Wilpon

1291.   According to BLMIS' and Sterling's records, Defendant Bruce N. Wilpon received Initial Transfers from approximately three (3) Sterling BLMIS Accounts: Nos. 1KW017, 1KW082, and 1KW118.  Appendix II, Bruce N. Wilpon Exhibit B.

       a.      BLMIS made direct transfers to Defendant Bruce N. Wilpon totaling $349,880 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date (the "Bruce N. Wilpon Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to

avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Bruce N. Wilpon Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Bruce N. Wilpon of approximately $236,770 in Fictitious Profits (the "Bruce N. Wilpon Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Bruce N. Wilpon Exhibit B.

1292. Upon information and belief, Defendant Bruce N. Wilpon is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately thirty-five (35) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW037, 1KW057, 1KW059, 1KW063, 1KW074, 1KW075, 1KW082, 1KW134, 1KW156, 1KW175, 1KW180, 1KW192, 1KW218, 1WK220, 1KW223, 1KW247, 1KW254, 1KW260, 1KW298, 1KW337, 1KW341, 1KW346, 1KW348, 1KW358, 1KW362, 1KW374, 1KW378, 1KW408, 1KW413, 1KW423, 1KW427, 1KW435, 1KW449, 1KW463, and 1KW464 (collectively, the "Bruce N. Wilpon Subsequent Transfer Accounts"). Appendix II, Bruce N. Wilpon Exhibit C.

a. Defendant Bruce N. Wilpon received Subsequent Transfers from the Bruce N. Wilpon Subsequent Transfer Accounts totaling $27,442,966 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $114,909,334 in principal during the six years prior to the Filing Date, totaling approximately $142,352,300 (the "Bruce N. Wilpon Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the

value thereof, are recoverable from Defendant Bruce N. Wilpon pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Bruce N. Wilpon Exhibit C.

## Daniel Wilpon

1293.  Upon information and belief, Defendant Daniel Wilpon is a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately eighteen (18) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW358, 1KW402, 1KW447, 1KW057, 1KW192, 1KW209, 1KW218, 1KW223, 1KW247, 1KW254, 1KW374, 1KW378, 1KW423, 1KW435, 1KW445, 1KW449, 1KW464, and 1KW465. Appendix II, Daniel Wilpon Exhibit C.

a.      Defendant Daniel Wilpon received Subsequent Transfers from the Daniel Wilpon Subsequent Transfer Accounts totaling $2,530,194 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $23,396,254 in principal during the six years prior to the Filing Date, totaling approximately $25,926,448 (the "Daniel Wilpon Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Daniel Wilpon pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Daniel Wilpon Exhibit C.

## Jessica Wilpon

1294.  Upon information and belief, Defendant Jessica Wilpon is a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately the following sixteen (16) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW057, 1KW192, 1KW208, 1KW218, 1KW223, 1KW247, 1KW254, 1KW374, 1KW378, 1KW423, 1KW435, 1KW445, 1KW447, 1KW449, 1KW464, and 1KW465. Appendix II, Jessica Wilpon Exhibit C.

a. Defendant Jessica Wilpon received Subsequent Transfers from the Jessica Wilpon Subsequent Transfer Accounts totaling $2,528,442 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $21,892,973 in principal during the six years prior to the Filing Date, totaling approximately $24,421,415 (the "Jessica Wilpon Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Jessica Wilpon pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Jessica Wilpon Exhibit C.

### Robin Wilpon Wachtler

1295.  According to BLMIS' and Sterling's records, Defendant Robin Wilpon Wachtler received Initial Transfers from approximately seven (7) Sterling BLMIS Accounts: Nos. 1KW017, 1KW082, 1KW117, 1KW210, 102352, 1KW096, and 1KW367.  Appendix II, Robin Wilpon Wachtler Exhibit B.

a. BLMIS made direct transfers to Defendant Robin Wilpon Wachtler totaling $729,120 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $2,367,500 in principal during the six years prior to the Filing Date, totaling approximately $3,096,620 (the "Robin Wilpon Wachtler Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Robin Wilpon Wachtler Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Robin Wilpon Wachtler of approximately $2,385,532 (the "Robin Wilpon Wachtler Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA

section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Robin Wilpon Wachtler Exhibit B. Of the Robin Wilpon Wachtler Six Year Initial Transfers, $18,032 were Fictitious Profits and the remaining $2,367,500 constituted the return of principal.

c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Robin Wilpon Wachtler of approximately $1,352,000 in principal (the "Robin Wilpon Wachtler Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Robin Wilpon Wachtler Exhibit B.

d.      In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Robin Wilpon Wachtler constituting a minimal amount (the "Robin Wilpon Wachtler Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Robin Wilpon Wachtler Exhibit B.

1296.   Upon information and belief, Defendant Robin Wilpon Wachtler is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers approximately thirty-seven (37) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW134, 1KW156, 1KW180, 1KW341, 1KW346, 1KW402, 1KW413, 1KW447, 1KW037, 1KW057, 1KW059, 1KW063, 1KW074, 1KW075, 1KW082, 1KW175, 1KW192, 1KW218, 1KW220, 1KW223, 1KW247, 1KW254, 1KW260, 1KW298, 1KW337, 1KW348, 1KW358, 1KW362, 1KW374, 1KW378, 1KW408, 1KW423, 1KW427, 1KW435, 1KW449, 1KW463, and 1KW464 (collectively, the "Robin Wilpon Wachtler Subsequent Transfer Accounts"). Appendix II, Robin Wilpon Wachtler Exhibit C.

a.     Defendant Robin Wilpon Wachtler received Subsequent Transfers from the Robin Wilpon Wachtler Subsequent Transfer Accounts totaling $27,913,548 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $113,932,794 in principal during the six years prior to the Filing Date, totaling approximately $141,846,342 (the "Robin Wilpon Wachtler Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Robin Wilpon Wachtler pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Robin Wilpon Wachtler Exhibit C.

### Philip Wachtler

1297.   According to BLMIS' and Sterling's records, Defendant Philip Wachtler received Initial Transfers from approximately four (4) Sterling BLMIS Accounts: Nos. 1KW210, 102352, 1KW096, and 1KW367.  Appendix II, Philip Wachtler Exhibit B.

a.     BLMIS made direct transfers to Defendant Philip Wachtler totaling $351,137 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $2,367,500 in principal during the six years prior to the Filing Date, totaling approximately $2,718,637 (the "Philip Wachtler Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Philip Wachtler Exhibit B.

b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Philip Wachtler of approximately $2,385,532 (the "Philip Wachtler Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and

applicable provisions of DCL sections 273-279. Appendix II, Philip Wachtler Exhibit B. Of the Philip Wachtler Six Year Initial Transfers, $18,032 were Fictitious Profits and the remaining $2,367,500 constituted the return of principal.

c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Philip Wachtler of approximately $1,352,000 in principal (the "Philip Wachtler Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Philip Wachtler Exhibit B.

d.     In the ninety days before the Filing Date, BLMIS made direct transfers of principal to Defendant Philip Wachtler constituting a minimal amount (the "Philip Wachtler Preference Period Transfers"), which are avoidable and recoverable under sections 547, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Philip Wachtler Exhibit B.

1298.   Upon information and belief, Defendant Philip Wachtler is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately the following eight (8) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW134, 1KW156, 1KW180, 1KW341, 1KW346, 1KW402, 1KW413, and 1KW447 (collectively, the "Philip Wachtler Subsequent Transfer Accounts"). Appendix II, Philip Wachtler Exhibit C.

a.     Philip Wachtler received Subsequent Transfers from the Philip Wachtler Subsequent Transfer Accounts totaling $545,062 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $1,289,780 in principal during the six years prior to the Filing Date, totaling approximately $1,834,842 (the "Philip Wachtler

338

Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Philip Wachtler pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Philip Wachtler Exhibit C.

### Kimberly Wachtler

1299.  Upon information and belief, Defendant Kimberly Wachtler is a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately the following thirty-five (35) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW037, 1KW057, 1KW059, 1KW063, 1KW074, 1KW075, 1KW082, 1KW134, 1KW156, 1KW175, 1KW180, 1KW192, 1KW218, 1KW220, 1KW223, 1KW247, 1KW254, 1KW260, 1KW298, 1KW337, 1KW341, 1KW346, 1KW348, 1KW358, 1KW362, 1KW374, 1KW378, 1KW408, 1KW413, 1KW423, 1KW427, 1KW435, 1KW449, 1KW463, and 1KW464 (collectively, the "Kimberly Wachtler Subsequent Transfer Accounts"). Appendix II, Kimberly Wachtler Exhibit C.

     a.     Defendant Kimberly Wachtler received Subsequent Transfers from the Kimberly Wachtler Subsequent Transfer Accounts totaling $27,368,486 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $112,643,014 in principal during the six years prior to the Filing Date, totaling approximately $140,011,500 (the "Kimberly Wachtler Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Kimberly Wachtler pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Kimberly Wachtler Exhibit C.

## Scott Wilpon

1300.   Upon information and belief, Defendant Scott Wilpon is a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately the following seventeen (17) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW455, 1KW464, 1KW057, 1KW192, 1KW207, 1KW218, 1KW223, 1KW247, 1KW254, 1KW374, 1WK378, 1KW423, 1KW435, 1KW445, 1KW447,1KW449, and 1KW465 (collectively, the "Scott Wilpon Subsequent Transfer Accounts").  Appendix II, Scott Wilpon Exhibit C.

a.      Defendant Scott Wilpon received Subsequent Transfers from the Scott Wilpon Subsequent Transfer Accounts totaling $2,530,805 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $22,201,046 in principal during the six years prior to the Filing Date, totaling approximately $24,731,852 (the "Scott Wilpon Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Scott Wilpon pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Scott Wilpon Exhibit C.

## MINOR 1

1301.   Upon information and belief, Defendant MINOR 1 is a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately the following thirty-six (36) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW037, 1KW057, 1KW059, 1KW063, 1KW072, 1KW074, 1KW075, 1KW082, 1KW134, 1KW156, 1KW175, 1KW180, 1KW192, 1KW218, 1KW220, 1KW223, 1KW247, 1KW254, 1KW260, 1KW298, 1KW337, 1KW341, 1KW346, 1KW348, 1KW358, 1KW362, 1KW374, 1KW378, 1KW408, 1KW413, 1KW423, 1KW427, 1KW435, 1KW449,

1KW463, and 1KW464 (collectively, the "MINOR 1 Subsequent Transfer Accounts").
Appendix II, MINOR 1 Exhibit C.

a.      Defendant MINOR 1 received Subsequent Transfers from the MINOR 1 Subsequent Transfer Accounts totaling $27,510,896 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $114,249,900 in principal during the six years prior to the Filing Date, totaling approximately $141,760,796 (the "MINOR 1 Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant MINOR 1 pursuant to section 550(a) of the Bankruptcy Code. Appendix II, MINOR 1 Exhibit C.

## MINOR 2

1302.   Upon information and belief, Defendant MINOR 2 is a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately the following thirty-six (36) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW037, 1KW057, 1KW059, 1KW063, 1KW072, 1KW074, 1KW075, 1KW082, 1KW134, 1KW156, 1KW175, 1KW180, 1KW192, 1KW218, 1KW220, 1KW223, 1KW247, 1KW254, 1KW260, 1KW298, 1KW337, 1KW341, 1KW346, 1KW348, 1KW358, 1KW362, 1KW374, 1KW378, 1KW408, 1KW413, 1KW423, 1KW427, 1KW435, 1KW449, 1KW463, and 1KW464.  Appendix II, MINOR 2 Exhibit C.

a.      Defendant MINOR 2 received Subsequent Transfers from the MINOR 2 Subsequent Transfer Accounts totaling $27,510,896 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $114,249,900 in principal during the six years prior to the Filing Date, totaling approximately $141,760,796 (the "MINOR 2 Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property

within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant MINOR 2 pursuant to section 550(a) of the Bankruptcy Code. Appendix II, MINOR 2 Exhibit C.

**Ruth Friedman**

1303. According to BLMIS' and Sterling's records, Defendant Ruth Friedman received Initial Transfers from approximately three (3) Sterling BLMIS Accounts: Nos. 1KW006, 1KW302, and 1KW004. Appendix II, Ruth Friedman Exhibit B.

    a.     BLMIS made direct transfers to Defendant Ruth Friedman totaling $539,437 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $387,963 in principal during the six years prior to the Filing Date, totaling approximately $927,400 (the "Ruth Friedman Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Ruth Friedman Exhibit B.

    b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Ruth Friedman of approximately $468,400 (the "Ruth Friedman Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Ruth Friedman Exhibit B. Of the Ruth Friedman Six Year Initial Transfers, $80,437 were Fictitious Profits and the remaining $387,963 constituted the return of principal.

    c.     During the two years prior to the Filing Date, BLMIS made direct transfers of approximately $60,000 in Fictitious Profits to Defendant Ruth Friedman (the "Ruth Friedman Two Year Initial Transfers"), which are avoidable and recoverable under sections 548,

550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Ruth Friedman Exhibit B.

1304. Upon information and belief, Defendant Ruth Friedman is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from the following approximately two (2) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW402 and KW455 (collectively, the "Ruth Friedman Subsequent Transfer Accounts"). Appendix II, Ruth Friedman Exhibit C.

a. Defendant Ruth Friedman received Subsequent Transfers of principal from the Ruth Friedman Subsequent Transfer Accounts totaling $960,526 during the six years prior to the Filing Date (the "Ruth Friedman Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Ruth Friedman pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Ruth Friedman Exhibit C.

### Phyllis Rebell Osterman

1305. According to BLMIS' and Sterling's records, Defendant Phyllis Rebell Osterman received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW269. Appendix II, Phyllis Rebell Osterman Exhibit B.

a. BLMIS made direct transfers to Defendant Phyllis Rebell Osterman totaling $107,000 in Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date and $426,000 in principal during the six years prior to the Filing Date, totaling approximately $533,000 (the "Phyllis Rebell Osterman Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Phyllis Rebell Osterman Exhibit B.

b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Phyllis Rebell Osterman of approximately $533,000 (the "Phyllis Rebell Osterman Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Phyllis Rebell Osterman Exhibit B. Of the Phyllis Rebell Osterman Six Year Initial Transfers, $107,000 were Fictitious Profits and the remaining $426,000 constituted the return of principal.

c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Phyllis Rebell Osterman of approximately $150,000 (the "Phyllis Rebell Osterman Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Phyllis Rebell Osterman Exhibit B. Of the Phyllis Rebell Osterman Two Year Initial Transfers, $107,000 were Fictitious Profits and the remaining $43,000 constituted the return of principal.

### Elise C. Tepper

1306.   According to BLMIS' and Sterling's records, Defendant Elise C. Tepper received Initial Transfers from approximately six (6) Sterling BLMIS Accounts: Nos. 1KW427, 1KW062, 1KW064, 1KW168, 1KW297, and 1KW308. Appendix II, Elise C. Tepper Exhibit B.

a.     BLMIS made direct transfers to Defendant Elise C. Tepper totaling $854,441 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $579,043 in principal during the six years prior to the Filing Date, totaling approximately $1,433,484 (the "Elise C. Tepper Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are

subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Elise C. Tepper Exhibit B.

b.  During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Elise C. Tepper of approximately $1,006,861 (the "Elise C. Tepper Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Elise C. Tepper Exhibit B.  Of the Elise C. Tepper Six Year Initial Transfers, $427,818 were Fictitious Profits and the remaining $579,043 constituted the return of principal.

c.  During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Elise C. Tepper of approximately $1,006,861 (the "Elise C. Tepper Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Elise C. Tepper Exhibit B.  Of the Elise C. Tepper Two Year Initial Transfers, $427,818 were Fictitious Profits and the remaining $579,043 constituted the return of principal.

1307.  Upon information and belief, Defendant Elise C. Tepper is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately two (2) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW175 and 1KW402 (collectively, the "Elise C. Tepper Subsequent Transfer Accounts").  Appendix II, Elise C. Tepper Exhibit C.

a.  Defendant Elise C. Tepper received Subsequent Transfers from the Elise C. Tepper Subsequent Transfer Accounts totaling $525,904 in Fictitious Profits from the opening

dates of such Subsequent Transfer Accounts to the Filing Date and $4,780,230 in principal

during the six years prior to the Filing Date, totaling approximately $5,306,134 (the "Elise C.

Tepper Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer

Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof,

are recoverable from Defendant Elise C. Tepper pursuant to section 550(a) of the Bankruptcy

Code. Appendix II, Elise C. Tepper Exhibit C.

### Jacqueline G. Tepper

1308. According to BLMIS' and Sterling's records, Defendant Jacqueline G. Tepper

received Initial Transfers from approximately two (2) Sterling BLMIS Accounts: Nos. 1KW062

and 1KW308. Appendix II, Jacqueline G. Tepper Exhibit B.

a. BLMIS made direct transfers to Defendant Jacqueline G. Tepper totaling

$363,292 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the

Filing Date and $329,123 in principal during the six years prior to the Filing Date, totaling

approximately $692,415 (the "Jacqueline G. Tepper Initial Transfers"). Such Initial Transfers

were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and

are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.

Appendix II, Jacqueline G. Tepper Exhibit B.

b. During the six years prior to the Filing Date, BLMIS made direct transfers

to Defendant Jacqueline G. Tepper of approximately $692,293 (the "Jacqueline G. Tepper Six

Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and

551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-

2(c)(3), and applicable provisions of DCL sections 273-279. Appendix II, Jacqueline G. Tepper

Exhibit B. Of the Jacqueline G. Tepper Six Year Initial Transfers, $363,170 were Fictitious

Profits and the remaining $329,123 constituted the return of principal.

c.     During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Jacqueline G. Tepper of approximately $692,293 (the "Jacqueline G. Tepper Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Jacqueline G. Tepper Exhibit B.  Of the Jacqueline G. Tepper Two Year Initial Transfers, $363,170 were Fictitious Profits and the remaining $329,123 constituted the return of principal.

1309.   Upon information and belief, Defendant Jacqueline G. Tepper is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from approximately one (1) Sterling BLMIS Account held by other Sterling-related entities and/or individuals: No. 1KW175 (the "Jacqueline G. Tepper Subsequent Transfer Account").  Appendix II, Jacqueline G. Tepper Exhibit C.

a.     Defendant Jacqueline G. Tepper received Subsequent Transfers from the Jacqueline G. Tepper Subsequent Transfer Account totaling $92,807 in Fictitious Profits from the opening date of such BLMIS Account to the Filing Date (the "Jacqueline G. Tepper Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Jacqueline G. Tepper pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Jacqueline G. Tepper Exhibit C.

**Edward M. Tepper**

1310.   According to BLMIS' and Sterling's records, Defendant Edward M. Tepper received Initial Transfers from approximately four (4) Sterling BLMIS Accounts: Nos. 1KW231, 1KW332, 1KW062, and 1KW308.  Appendix II, Edward M. Tepper Exhibit B.

a.  BLMIS made direct transfers to Defendant Edward M. Tepper totaling $652,238 in Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $490,238 in principal during the six years prior to the Filing Date, totaling approximately $1,142,476 (the "Edward M. Tepper Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Edward M. Tepper Exhibit B.

b.  During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Edward M. Tepper of approximately $1,059,754 (the "Edward M. Tepper Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Edward M. Tepper Exhibit B. Of the Edward M. Tepper Six Year Initial Transfers, $569,516 were Fictitious Profits and the remaining $490,238 constituted the return of principal.

c.  During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Edward M. Tepper of approximately $692,293 (the "Edward M. Tepper Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Edward M. Tepper Exhibit B.  Of the Edward M. Tepper Two Year Initial Transfers, $363,170 were Fictitious Profits and the remaining $329,123 constituted the return of principal.

1311.  Upon information and belief, Defendant Edward M. Tepper is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from

approximately three (3) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 1KW175, 1KW279, and 1KW420 (collectively, the "Edward M. Tepper Subsequent Transfer Accounts"). Appendix II, Edward M. Tepper Exhibit C.

      a.     Defendant Edward M. Tepper received Subsequent Transfers from the Edward M. Tepper Subsequent Transfer Accounts totaling $92,837 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $114,320 in principal during the six years prior to the Filing Date, totaling approximately $207,157 (the "Edward M. Tepper Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Edward M. Tepper pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Edward M. Tepper Exhibit C.

### Deyva Schreier

1312.   According to BLMIS' and Sterling's records, Defendant Deyva Schreier Arthur received Initial Transfers from approximately two (2) Sterling BLMIS Accounts: Nos. 1KW396 and 1KW054. Appendix II, Deyva Schreier Arthur Exhibit B.

      a.     BLMIS made direct transfers to Defendant Deyva Schreier Arthur totaling a minimal amount of Fictitious Profits from the opening dates of such Sterling BLMIS Accounts to the Filing Date and $74,000 in principal during the six years prior to the Filing Date, totaling approximately $74,020 (the "Deyva Schreier Initial Transfers"). Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Deyva Schreier Arthur Exhibit B.

      b.     During the six years prior to the Filing Date, BLMIS made direct transfers to Defendant Deyva Schreier Arthur of approximately $74,000 in principal (the "Deyva Schreier

Arthur Six Year Initial Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.  Appendix II, Deyva Schreier Arthur Exhibit B.

        c.      During the two years prior to the Filing Date, BLMIS made direct transfers to Defendant Deyva Schreier Arthur of approximately $56,000 in principal (the "Deyva Schreier Arthur Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Deyva Schreier Arthur Exhibit B.

        1313.   Upon information and belief, Defendant Deyva Schreier Arthur is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from the following approximately forty-four (44) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 102343, 1KW040, 1KW052, 1KW053, 1KW056, 1KW057, 1KW059, 1KW063, 1KW098, 1KW134, 1KW156, 1KW161, 1KW175, 1KW178, 1KW180, 1KW192, 1KW218, 1KW220, 1KW223, 1KW247, 1KW254, 1KW255, 1KW279, 1KW287, 1KW293, 1KW313, 1KW314, 1KW315, 1KW323, 1KW337, 1KW339, 1KW341, 1KW346, 1KW347, 1KW348, 1KW349, 1KW372, 1KW378, 1KW412, 1KW413, 1KW420, 1KW423, 1KW427, and 1KW449. (collectively, the "Deyva Schreier Arthur Subsequent Transfer Accounts").  Appendix II, Deyva Schreier Arthur Exhibit C.

        a.      Defendant Deyva Schreier Arthur received Subsequent Transfers from the Deyva Schreier Arthur Subsequent Transfer Accounts totaling $18,124,884 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $16,476,268 in principal during the six years prior to the Filing Date, totaling approximately

$34,601,152 (the "Deyva Schreier Arthur Subsequent Transfers").  Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Deyva Schreier Arthur pursuant to section 550(a) of the Bankruptcy Code.  Appendix II, Deyva Schreier Arthur Exhibit C.

### Michael Schreier

1314.  According to BLMIS' and Sterling's records, Defendant Michael Schreier received Initial Transfers from approximately one (1) Sterling BLMIS Account: No. 1KW056. Appendix II, Michael Schreier Exhibit B.

> a.  BLMIS made direct transfers to Defendant Michael Schreier constituting a minimal amount of Fictitious Profits from the opening date of such Sterling BLMIS Account to the Filing Date (the "Michael Schreier Initial Transfers").  Such Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Michael Schreier Exhibit B.

1315.  Upon information and belief, Defendant Michael Schreier is also a Subsequent Transferee Defendant who received avoidable and recoverable Subsequent Transfers from the following approximately forty-five (45) Sterling BLMIS Accounts held by other Sterling-related entities and/or individuals: Nos. 102343, 1KW040, 1KW052, 1KW053, 1KW054, 1KW056, 1KW057, 1KW059, 1KW063, 1KW098, 1KW134, 1KW156, 1KW161, 1KW175, 1KW178, 1KW180, 1KW192, 1KW218, 1KW220, 1KW223, 1KW247, 1KW254, 1KW255, 1KW279, 1KW287, 1KW293, 1KW313, 1KW314, 1KW315, 1KW323, 1KW337, 1KW339, 1KW341, 1KW346, 1KW347, 1KW348, 1KW349, 1KW372, 1KW378, 1KW412, 1KW413, 1KW420,

1KW423, 1KW427, and 1KW449 (collectively, the "Michael Schreier Subsequent Transfer Accounts"). Appendix II, Michael Schreier Exhibit C.

        a.        Defendant Michael Schreier received Subsequent Transfers from the Michael Schreier Subsequent Transfer Accounts totaling $18,124,904 in Fictitious Profits from the opening dates of such Subsequent Transfer Accounts to the Filing Date and $16,476,268 in principal during the six years prior to the Filing Date, totaling approximately $34,601,172 (the "Michael Schreier Subsequent Transfers"). Such Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and such transfers, or the value thereof, are recoverable from Defendant Michael Schreier pursuant to section 550(a) of the Bankruptcy Code. Appendix II, Michael Schreier Exhibit C.

### F. Madoff Investment Entity Defendants

### Realty Associates Madoff II

1316. According to BLMIS' and Sterling's records, Defendant Realty Associates Madoff II received payments from BLMIS.

        a.        Prior to the Filing Date, BLMIS made direct transfers to Realty Associates Madoff II totaling approximately $983,420 (the "Realty Associates Madoff II Initial Transfers"). The Realty Associates Madoff II Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Realty Associates Madoff II Exhibit B.

### Sterling Acquisitions LLC

1317. According to BLMIS' and Sterling's records, Defendant Sterling Acquisitions LLC received payments from BLMIS.

        a.        Prior to the Filing Date, BLMIS made direct transfers to Sterling Acquisitions LLC totaling approximately $592,521 (the "Sterling Acquisitions LLC Initial

Transfers"). The Sterling Acquisitions LLC Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL. Appendix II, Sterling Acquisitions LLC Exhibit B.

b. Of the Sterling Acquisitions LLC Transfers, BLMIS made direct transfers to Defendant Sterling Acquisitions LLC of approximately $376,503 during the six years prior to the Filing Date (the "Sterling Acquisitions LLC Six Year Initial Transfers") that are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273–279. Appendix II, Sterling Acquisitions LLC Exhibit B.

c. Of the Sterling Acquisitions LLC Transfers, BLMIS made direct transfers to Defendant Sterling Acquisitions LLC of approximately $211,478 during the two years prior to the Filing Date (the "Sterling Acquisitions LLC Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). Appendix II, Sterling Acquisitions LLC Exhibit B.

**Sterling American Property III LP**

1318. According to BLMIS' and Sterling's records, Defendant Sterling American Property III LP received payments from BLMIS.

a. Prior to the Filing Date, BLMIS made direct transfers to Sterling American Property III LP totaling approximately $4,848,408 (the "Sterling American Property III LP Initial Transfers"). The Sterling American Property III LP Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject

to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Sterling American Property III LP Exhibit B.

b.      Of Sterling American Property III LP Initial Transfers, BLMIS made direct transfers to Defendant Sterling American Property III LP of approximately $708,483 during the six years prior to the Filing Date (the "Sterling American Property III LP Six Year Initial Transfers") that are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273–279.  Appendix II, Sterling American Property III LP Exhibit B.

### Sterling American Property IV LP

1319.   According to BLMIS' and Sterling's records, Defendant Sterling American Property IV LP received payments from BLMIS.

a.      Prior to the Filing Date, BLMIS made direct transfers to Sterling American Property IV LP totaling approximately $3,102,156 (the "Sterling American Property IV LP Initial Transfers").  The Sterling American Property IV LP Initial Transfers were and continue to be Customer Property within the meaning of section 78$lll$(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Sterling American Property IV LP Exhibit B.

b.      Of Sterling American Property IV LP Initial Transfers, BLMIS made direct transfers to Defendant Sterling American Property IV LP of approximately $3,018,904 during the six years prior to the Filing Date (the "Sterling American Property IV LP Six Year Initial Transfers") that are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and

applicable provisions of DCL sections 273–279.  Appendix II, Sterling American Property IV LP Exhibit B.

## Sterling American Property V LP

1320.   According to BLMIS' and Sterling's records, Defendant Sterling American Property V LP received payments from BLMIS.

a.      Prior to the Filing Date, BLMIS made direct transfers to Sterling American Property V LP totaling approximately $2,504,752 (the "Sterling American Property V LP Initial Transfers").  The Sterling American Property V LP Initial Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA, and are subject to avoidance and recovery pursuant to the Bankruptcy Code, SIPA, and the DCL.  Appendix II, Sterling American Property V LP Exhibit B.

b.      Of Sterling American Property V LP Initial Transfers, BLMIS made direct transfers to Defendant Sterling American Property V LP of approximately $2,504,752 during the six years prior to the Filing Date (the "Sterling American Property V LP Six Year Initial Transfers") that are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273–279.  Appendix II, Sterling American Property V LP Exhibit B.

c.      Of the Sterling American Property V LP Initial Transfers, BLMIS made direct transfers to Defendant Sterling American Property V LP of approximately $2,160,000 during the two years prior to the Filing Date (the "Sterling American Property V LP Two Year Initial Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).  Appendix II, Sterling American Property V LP Exhibit B.

1321.  All the foregoing Sterling Defendant Total Initial Transfers in paragraphs 1102-1320 and identified in Exhibits B to Appendix II are hereinafter collectively referred to as the "Total Initial Transfers."

1322.  All the foregoing Sterling Defendant Two Year Transfers in paragraphs 1102-1320 and identified in Exhibits B to Appendix II are hereinafter collectively referred to as the "Total Two Year Initial Transfers."

1323.  All the foregoing Sterling Defendant Six Year transfers in paragraphs 1102-1320 and identified in Exhibits B to Appendix II are hereinafter collectively referred to as the "Total Six Year Initial Transfers."

1324.  All of the foregoing Sterling Defendant Preference Period Transfers in paragraphs 1102-1320 and identified in Exhibits B to Appendix II are hereinafter collectively referred to as the "Total Preference Period Transfers."

1325.  All of the foregoing Sterling Defendant Subsequent Transfers in paragraphs 1102-1320 and identified in Exhibits C to Appendix II are hereinafter collectively referred to as the "Total Subsequent Transfers."

## XIII.  CUSTOMER CLAIMS

1326.  From February 26, 2009 to June 18, 2009, a number of Sterling Defendants and other Sterling-related entities filed 93 customer claims with the Trustee.  These claims are referred to herein as the "Customer Claims" and are identified by BLMIS account number in Exhibit D to Appendix II.

1327.  Exhibit D to Appendix II lists the following information for each Customer Claim: (a) the BLMIS account number to which the Customer Claim refers; (b) the name of the BLMIS account and Customer Claim holder; (c) the date the Customer Claim was filed; (d) the Claim Number designated by the Trustee for each Customer Claim; (e) the status of each

Customer Claim, including whether the claim was denied; and (f) the date an objection, if any, was filed with respect to the Trustee's determination of each Customer Claim.

1328. On December 23, 2008, the Court entered an Order on the Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief (the "Claims Procedures Order," Docket No. 12). The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating. The Trustee intends to resolve the Customer Claims and any related objections to the Trustee's determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

1329. As discussed below, the Trustee seeks to disallow the Customer Claims of the Sterling Defendants and certain Sterling-related entities and trusts in which one or more Sterling Defendants hold an equitable and/or beneficial ownership therein identified in Exhibit D to Appendix II.

## COUNT ONE: STERLING TWO YEAR ACTUAL FRAUD DEFENDANTS FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

1330. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

1331. Each of the Total Two Year Initial Transfers was made on or within two years before the Filing Date.

1332. Each of the Total Two Year Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548 of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

1333.   Each of the Total Two Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS' then existing or future creditors.

1334.   Each of the Total Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Sterling Defendants identified in the Count I column of Appendix II, Exhibit E (the "Sterling Two Year Actual Fraud Defendants") pursuant to section 550(a) of the Bankruptcy Code and section 78fff-(2)(c)(3) of SIPA.

1335.   As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and section 78fff-(2)(c)(3) of SIPA, the Trustee is entitled to a judgment against the Sterling Two Year Actual Fraud Defendants: (a) avoiding and preserving the Total Two Year Initial Transfers; (b) directing that the Total Two Year Initial Transfers be set aside; and (c) recovering the Total Two Year Initial Transfers, or the value thereof, from the Sterling Two Year Actual Fraud Defendants for the benefit of the estate of BLMIS.

## COUNT TWO: STERLING TWO YEAR CONSTRUCTIVE FRAUD DEFENDANTS FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

1336.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

1337.   Each of the Total Two Year Initial Transfers was made on or within two years before the Filing Date.

1338.   Each of the Total Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548 of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

1339.   BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Initial Transfers.

1340. At the time of each of the Total Two Year Initial Transfers, BLMIS was insolvent or became insolvent as a result of the Total Two Year Initial Transfer in question.

1341. At the time of each of the Total Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

1342. At the time of each of the Total Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS' ability to pay as such debts matured.

1343. Each of the Total Two Year Initial Transfers constitutes fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Sterling Defendants identified in the Count II column of Appendix II, Exhibit E (the "Sterling Two Year Constructive Fraud Defendants") pursuant to section 550(a) of the Bankruptcy Code and section 78fff-(2)(c)(3) of SIPA.

1344. As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and section 78fff-(2)(c)(3) of SIPA, the Trustee is entitled to a judgment against the Sterling Two Year Constructive Fraud Defendants: (a) avoiding and preserving the Total Two Year Initial Transfers; (b) directing that the Total Two Year Initial Transfers be set aside; and (c) recovering the Total Two Year Initial Transfers, or the value thereof, from the Sterling Two Year Constructive Fraud Defendants for the benefit of the estate of BLMIS.

**COUNT THREE: STERLING SIX YEAR DCL ACTUAL FRAUD DEFENDANTS FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551**

1345. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

1346.   At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

1347.   Each of the Total Six Year Initial Transfers constitutes a conveyance by BLMIS as defined under DCL section 270.

1348.   Each of the Total Six Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Total Six Year Initial Transfers to or for the benefit of the Sterling Defendants identified in the Count III column of Appendix II, Exhibit E (the "Sterling Six Year DCL Actual Fraud Defendants") in furtherance of a fraudulent investment scheme.

1349.   The Total Six Year Initial Transfers were received by the Sterling Six Year DCL Actual Fraud Defendants with intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers, and/or future creditors of BLMIS.

1350.   As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Sterling Six Year DCL Actual Fraud Defendants: (a) avoiding and preserving the Total Six Year Initial Transfers; (b) directing that the Total Six Year Initial Transfers be set aside; (c) recovering the Total Six Year Initial Transfers, or the value thereof, from the Sterling Six Year DCL Actual Fraud Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Sterling Six Year DCL Actual Fraud Defendants.

## COUNT FOUR: STERLING SIX YEAR DCL CONSTRUCTIVE FRAUD DEFENDANTS (INSOLVENCY)
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 273, 278, AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), 551

1351.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

1352.   At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

1353.   Each of the Total Six Year Initial Transfers constitutes a conveyance by BLMIS as defined under DCL section 270.

1354.   BLMIS did not receive fair consideration for the Total Six Year Initial Transfers.

1355.   BLMIS was insolvent at the time it made each of the Total Six Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Total Six Year Initial Transfers.

1356.   As a result of the foregoing, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Sterling Defendants identified in the Count IV column of Appendix II, Exhibit E (the "Sterling Six Year DCL Constructive Fraud Defendants"): (a) avoiding and preserving the Total Six Year Initial Transfers; (b) directing that the Total Six Year Initial Transfers be set aside; and (c) recovering the Total Six Year Initial Transfers, or the value thereof, from the Sterling Six Year DCL Constructive Fraud Defendants for the benefit of the estate of BLMIS.

**COUNT FIVE: STERLING SIX YEAR DCL CONSTRUCTIVE FRAUD DEFENDANTS (UNREASONABLY SMALL CAPITAL)**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551**

1357.  The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

1358.  At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

1359.  Each of the Total Six Year Initial Transfers constitutes a conveyance by BLMIS as defined under DCL section 270.

1360.  BLMIS did not receive fair consideration for the Total Six Year Initial Transfers.

1361.  At the time BLMIS made each of the Total Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Total Six Year Initial Transfers was an unreasonably small capital.

1362.  As a result of the foregoing, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Sterling Six Year DCL Constructive Fraud Defendants as identified in the Count V column of Appendix II, Exhibit E: (a) avoiding and preserving the Total Six Year Initial Transfers; (b) directing that the Total Six Year Initial Transfers be set aside; and (c) recovering the Total Six Year Initial Transfers, or the value thereof, from the Sterling Six Year DCL Constructive Fraud Defendants for the benefit of the estate of BLMIS.

## COUNT SIX: STERLING SIX YEAR DCL CONSTRUCTIVE FRAUD DEFENDANTS (DEBTS BEYOND ABILITY TO PAY) FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551

1363.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

1364.   At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

1365.   Each of the Total Six Year Initial Transfers constitutes a conveyance by BLMIS as defined under DCL section 270.

1366.   BLMIS did not receive fair consideration for the Total Six Year Initial Transfers.

1367.   At the time BLMIS made each of the Total Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

1368.   As a result of the foregoing, pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Sterling Six Year DCL Constructive Fraud Defendants as identified in the Count VI column of Appendix II, Exhibit E: (a) avoiding and preserving the Total Six Year Initial Transfers; (b) directing that the Total Six Year Initial Transfers be set aside; and (c) recovering the Total Six Year Initial Transfers, or the value thereof, from the Sterling Six Year DCL Constructive Fraud Defendants for the benefit of the estate of BLMIS.

## COUNT SEVEN: STERLING INITIAL TRANSFEREE DEFENDANTS RECOVERY OF ALL FRAUDULENT TRANSFERS – NEW YORK CIVIL PROCEDURE LAW AND RULES §§ 203(g) AND 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551

1369.  The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

1370.  At all times relevant to the Total Initial Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

1371.  At all times relevant to the Total Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

1372.  Each of the Total Initial Transfers constitutes a conveyance by BLMIS as defined under DCL section 270.

1373.  Each of the Total Initial Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Total Initial Transfers to or for the benefit of the Sterling Defendants identified in the Count VII column of Appendix II, Exhibit E (the "Sterling Initial Transferee Defendants") in furtherance of a fraudulent investment scheme.

1374.  Each of the Total Initial Transfers was received by the Sterling Initial Transferee Defendants with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Total Initial Transfers, and /or future creditors of BLMIS.

1375.  As a result of the foregoing, pursuant to NY CPLR sections 203(g) and 213(8), DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy

Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Sterling Initial Transferee Defendants: (a) avoiding and preserving the Total Initial Transfers; (b) directing that the Total Initial Transfers be set aside; (c) recovering the Total Initial Transfers, or the value thereof, from the Sterling Initial Transferee Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Sterling Initial Transferee Defendants.

## COUNT EIGHT: STERLING PREFERENTIAL TRANSFEREE DEFENDANTS PREFERENTIAL TRANSFER – 11 U.S.C. §§ 547(b), 550(a), AND 551

1376.　The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

1377.　At the time of each of the Total Preference Period Transfers, each of the Sterling Defendants identified in the Count VIII column of Appendix II, Exhibit E (the "Sterling Preferential Transferee Defendants") were "creditors" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

1378.　Each of the Total Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

1379.　Each of the Total Preference Period Transfers was to or for the benefit of Sterling Preferential Transferee Defendants.

1380.　Each of the Total Preference Period Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

1381.　Each of the Total Preference Period Transfers was made while BLMIS was insolvent.

1382.　Each of the Total Preference Period Transfers was made within 90 days of the Filing Date.

1383. Each of the Total Preference Period Transfers enabled the Sterling Preferential Transferee Defendants to receive more than they would receive if: (a) this case was a case under chapter 7 of the Bankruptcy Code; (b) the transfers had not been made; and (c) the Sterling Preferential Transferee Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

1384. Each of the Total Preference Period Transfers constituted a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Sterling Preferential Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

1385. To the extent that any of the Sterling Preferential Transferee Defendants is not found to have a valid antecedent debt claim, then such transfers are avoidable and recoverable pursuant to, or inter alia, sections 544(b), 548, 550(a), and 551 of the Bankruptcy Code, sections 273-279 of the DCL, and/or section 78fff-2(c)(3) of SIPA.

1386. As a result of the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Sterling Preferential Transferee Defendants: (a) avoiding and preserving the Total Preference Period Transfers; (b) directing that the Total Preference Period Transfers be set aside; and (c) recovering the Total Preference Period Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**COUNT NINE: STERLING SUBSEQUENT TRANSFEREE DEFENDANTS RECOVERY OF SUBSEQUENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 278 AND 279 AND 11 U.S.C. §§ 544(b) AND 550(a)**

1387. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

1388.   Each of the Total Two Year Initial Transfers, Total Six Year Initial Transfers, Total Initial Transfers, and Total Preference Period Transfers as identified in Appendix II, Exhibits B and C is avoidable and recoverable under DCL sections 273-279, sections 544(b), 547, and 548 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA.

1389.   Upon information and belief, some or all of the Total Two Year Initial Transfers, Total Six Year Initial Transfers, Total Initial Transfers, and Total Preference Period Transfers were subsequently transferred to the Sterling Defendants (as defined earlier, collectively the "Total Subsequent Transfers") identified in the Count IX column of Appendix II, Exhibit E (the "Sterling Subsequent Transferee Defendants").

1390.   The Sterling Subsequent Transferee Defendants were immediate or mediate transferees of some portion of the Total Subsequent Transfers, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

1391.   Each of the Total Subsequent Transfers identified in Appendix II, Exhibit C was made directly or indirectly to or for the benefit of the Sterling Subsequent Transferee Defendants.

1392.   As a result of the foregoing, pursuant to DCL sections 278 and/or 279, sections 544(b) and 550(a) of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Sterling Subsequent Transferee Defendants recovering the Total Subsequent Transfers, or the value thereof, from the Sterling Subsequent Transferee Defendants for the benefit of the estate of BLMIS.

## COUNT TEN: STERLING CLAIMS DEFENDANTS
## DISALLOWANCE OF DEFENDANTS' CUSTOMER CLAIMS

1393.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

1394.   The Sterling Defendants identified in the Count X column of Appendix II, Exhibit E (the "Sterling Claims Defendants") filed Customer Claims in the SIPA proceeding which have not yet been determined, or which were the subject of timely filed objections.  Appendix II, Exhibit D, Sterling Claims Defendants' Customer Claims.

1395.   Such Customer Claims should not be allowed pursuant to section 502(d) of the Bankruptcy Code because the Sterling Claims Defendants are the recipients of transfers of BLMIS' property which are avoidable and recoverable under sections 544(b), 547, 548, and/or 550(a) of the Bankruptcy Code, DCL sections 273-279 and section 78fff-2(c)(3) of SIPA as set forth above, and the Sterling Claims Defendants have not returned such avoidable transfers to the Trustee.

1396.   The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating.  As a result of the foregoing, the Trustee intends to resolve the Sterling Claims Defendants' Customer Claims and any related objections through the mechanisms contemplated by the Claims Procedures Order.

1397.   As a result of the foregoing, the Trustee is entitled to an order disallowing the Customer Claims held by the Sterling Claims Defendants as listed in Appendix II, Exhibit D.

## COUNT ELEVEN: STERLING CLAIMS DEFENDANTS EQUITABLE SUBORDINATION

1398.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

1399.   The Sterling Claims Defendants identified in the Count XI column of Appendix II, Exhibit E engaged in inequitable conduct, including behavior described in this Complaint, that has resulted in injury to the customers and creditors of the estate and has conferred an unfair advantage on the Sterling Claims Defendants.

1400. Based on the Sterling Claims Defendants' inequitable conduct as described above, the customers of BLMIS have been misled as to the true financial condition of the debtor, customers have been induced to invest without knowledge of the actual facts regarding BLMIS' financial condition, and/or customers and creditors are less likely to recover the full amounts due to them because of the conduct of the Sterling Claims Defendants.

1401. The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the Sterling Claims Defendants directly or indirectly against the estate—and only to the extent such claims are allowed—are subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

1402. Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Sterling Defendants as follows:

i. On the First Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Total Two Year Initial Transfers; (b) directing that the Total Two Year Initial Transfers be set aside; and (c) recovering the Total Two Year Initial Transfers, or the value thereof, from the Sterling Two Year Actual Fraud Defendants for the benefit of the estate of BLMIS;

ii. On the Second Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Total Two Year Initial Transfers; (b) directing that the Total Two Year Initial

Transfers be set aside; and (c) recovering the Total Two Year Initial Transfers, or the value thereof, from the Sterling Two Year Constructive Fraud Defendants for the benefit of the estate of BLMIS;

iii.     On the Third Claim for Relief, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Total Six Year Initial Transfers; (b) directing that the Total Six Year Initial Transfers be set aside; (c) recovering the Total Six Year Initial Transfers, or the value thereof, from the Sterling Six Year DCL Actual Fraud Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Sterling Six Year DCL Actual Fraud Defendants;

iv.     On the Fourth Claim for Relief, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Total Six Year Initial Transfers; (b) directing that the Total Six Year Initial Transfers be set aside; and (c) recovering the Total Six Year Initial Transfers, or the value thereof, from the Sterling Six Year DCL Constructive Fraud Defendants for the benefit of the estate of BLMIS;

v.     On the Fifth Claim for Relief, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Total Six Year Initial Transfers; (b) directing the Total Six Year Initial Transfers be set aside; and (c) recovering the Total Six Year Initial Transfers, or the value thereof, from the Sterling Six Year DCL Constructive Fraud Defendants for the benefit of the estate of BLMIS;

vi.     On the Sixth Claim for Relief, pursuant to DCL sections 275, 278,

and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Total Six Year Initial Transfers; (b) directing that the Total Six Year Initial Transfers be set aside; and (c) recovering the Total Six Year Initial Transfers, or the value thereof, from the Sterling Six Year DCL Constructive Fraud Defendants for the benefit of the estate of BLMIS;

vii.     On the Seventh Claim for Relief, pursuant to NY CPLR sections 203(g) and 213(8), DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Total Initial Transfers; (b) directing that the Total Initial Transfers be set aside; (c) recovering the Total Initial Transfers, or the value thereof, from the Sterling Initial Transferee Defendants; and (d) recovering attorneys' fees from the Sterling Initial Transferee Defendants;

viii.     On the Eighth Claim for Relief, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Total Preference Period Transfers; (b) directing that the Total Preference Period Transfers be set aside; and (c) recovering the Total Preference Period Transfers, or the value thereof, from Sterling Preferential Transfers Defendants for the benefit of the estate of BLMIS;

ix.     On the Ninth Claim for Relief, pursuant to DCL sections 278 and/or 279, sections 544(b) and 550(a) of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA recovering the Total Subsequent Transfers, or the value thereof, from Sterling Subsequent Transferee Defendants for the benefit of the estate of BLMIS;

x.     On the Tenth Claim for Relief, that the claim or claims of the Sterling 502(d) Defendants be disallowed pursuant to section 502(d) of the Bankruptcy Code unless and until the Total Two Year Initial Transfers, Total Six Year Initial Transfers, Total

Initial Transfers, Total Preference Period Transfers, and Total Subsequent Transfers are returned;

xi.     On the Eleventh Claim for Relief, for subordination of all Customer Claims or proofs of claim which have been filed or brought or which may hereafter be filed or brought by, on behalf of, or for the benefit of any of the Equitable Subordination Defendants or their affiliated entities, against the Debtor's estate, in the related bankruptcy proceedings, pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA;

xii.     On all Claims for Relief, pursuant to federal common law and NY CPLR 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Total Initial Transfers, Total Preference Period Transfers, and Total Subsequent Transfers were received;

xiii.     On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS' estate;

xiv.     On all Claims for Relief, assignment of the Sterling Defendants' income tax refunds from the United States, state, and local governments paid on Fictitious Profits during the course of the scheme;

xv.     Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

xvi.     Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Date:  March 18, 2011
       New York, New York

Of Counsel:

**BAKER & HOSTETLER LLP**
PNC Center, 1900 East 9th Street
Suite 3200
Cleveland, Ohio 44114-3485
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
Thomas R. Lucchesi
Email:  tlucchesi@bakerlaw.com

**BAKER & HOSTETLER LLP**
1000 Louisiana St.
Suite 2000
Houston, Texas 77002-5009
Telephone: (713) 751-1600
Facsimile: (713) 751-1717
Dean D. Hunt
Email:  dhunt@bakerlaw.com
Matthew R. Raley
Email:  mraley@bakerlaw.com
Michelle Benavides
Email:  mbenavides@bakerlaw.com
Joshua C. Thomas
Email:  jthomas@bakerlaw.com
Jesús J. Castillón
Email:  jcastillon@bakerlaw.com

By: */s/* Fernando A. Bohorquez, Jr.

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Fernando A. Bohorquez, Jr.
Email:  fbohorquez@bakerlaw.com
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Lauren Resnick
Email:  lresnick@bakerlaw.com
Keith R. Murphy
Email:  kmurphy@bakerlaw.com
Marc Skapof
Email:  mskapof@bakerlaw.com
Kathryn M. Zunno
Email:  kzunno@bakerlaw.com
George Klidonas
Email:  gklidonas@bakerlaw.com
Amanda E. Fein
Email:  afein@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*