Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Telephone:     (212) 450-4000
Facsimile:     (212) 701-5800

*Attorneys for the Sterling Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : <br> : <br> : <br> : |
| Plaintiff-Applicant, | :    Adv. Pro. No. 08-01789 (BRL) <br> : |
| - against - | :    SIPA LIQUIDATION <br> : |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | :    (Substantively Consolidated) <br> : |
| Defendant. | : <br> : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : <br> : |
| BERNARD L. MADOFF, | : <br> : |
| Debtor. | : <br> : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| IRVING H. PICARD, | : <br> : |
| Plaintiff, | :    Adv. Pro. No. 10-05287 (BRL) <br> : |
| - against - | : <br> :    STERLING DEFENDANTS' |
| SAUL B. KATZ, et al. | :    STATEMENT OF UNDISPUTED <br> :    MATERIAL FACTS PURSUANT |
| Defendants. | :    TO LOCAL RULE 7056-1(A) <br> : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Pursuant to Rule 7056-1(a) of the Local Rules of the United States Bankruptcy Court for the Southern District of New York, the Sterling Defendants, by their attorneys, respectfully submit this statement of undisputed material facts in support of their motion to dismiss the amended complaint or, in the alternative, for summary judgment.

**The Founding of Sterling Equities and Its Great Success**

1.      Nearly 40 years ago, brothers-in-law Fred Wilpon and Saul Katz started Sterling Equities ("Sterling"), a small real estate company.  Soon thereafter, their brothers, Richard Wilpon and Michael Katz, joined them, and over the years Sterling grew and prospered as a family-owned and operated enterprise.  (Deposition Transcript of Fred Wilpon ("Wilpon Tr."), July 20, 2010, 16:15-17:13 (Declaration of Dana M. Seshens ("Seshens Decl."), dated Mar. 20, 2011, Ex. E); Declaration of Saul B. Katz ("S. Katz Decl."), dated Mar. 19, 2011, ¶ 2.)

2.      Historically, Sterling's primary business has been real estate, although Sterling has diversified its investments through holdings in baseball, including the New York Mets baseball franchise, media, including a controlling interest in SportsNet New York ("SNY"), and private equity.  (Deposition Transcript of Arthur Friedman ("Friedman Tr."), June 22-24, 29, 2010, 43:23-44:14 (Seshens Decl., Ex. H); Rule 27 Deposition of Arthur Friedman ("Friedman Rule 27 Tr."), June 29, 2010, 5:13-6:11 (Seshens Decl., Ex. F); S. Katz Decl. ¶¶ 3-6.)

3.      With Peter Stamos and Merrill Lynch, the Sterling Partners also have a passive ownership interest in Sterling Stamos Partners ("Sterling Stamos"), a hedge fund of funds.  (Deposition Transcript of Saul Katz ("S. Katz Tr."), Aug. 4, 2010, 10:8-18; 36:21-37:1; 151:10-12 (Seshens Decl., Ex. D).)

4.      The businesses of the Sterling Partners have been extremely successful over the years, including before the first Sterling-related investments were made with BLMIS in 1985.  (S. Katz Decl. ¶ 7.)

**Madoff Was a Luminary in the Investment World**
**When the Sterling Partners Began to Use Him as Their Broker**

5.      Fred Wilpon first met Bernie Madoff ("Madoff") through their children. (Wilpon Tr. 34:7-35:13 (Seshens Decl., Ex. E).)

6.      The Wilpons and Madoffs were not "everyday" or frequent social friends. (*Id.* 42:12-43:13; 48:12-49:6.)

7.      Saul Katz had a "business social" relationship with Madoff.  (S. Katz. Tr. 75:14-76:5 (Seshens Decl., Ex. D).)

8.      When the Sterling Partners first began using Bernard L. Madoff Investment Securities LLC ("BLMIS") as their broker, Madoff was a member of the Board of Governors of the National Association of Securities Dealers and also served on its executive committee, board surveillance committee and long-range planning committee and chaired its international committee.  Peter Chapman, *Before the Fall: Bernard L. Madoff*, Traders Mag., Mar. 2009 (Seshens Decl., Ex. Q).

9.      Madoff was a member of the Cincinnati Stock Exchange and pioneered its conversion to an all-electronic exchange.  *Id.*

10.     Madoff was, until December 11, 2008, a major fixture of the investment firmament, serving as one of two vice-chairmen of the Securities Industry Association and head of its Trading Committee and chairman of the NASDAQ Board of Directors. *Id.*

11.     Arthur Levitt and Howard Squadron held Madoff in great esteem. (Wilpon Tr. 39:25-40:7; 44:15-45:7 (Seshens Decl., Ex. E).)

12.     Madoff was a "guru" who was "renowned in the [investment] field." (*Id.*)

13.     In late 1985, when a few of the Partners had some extra liquidity from their business ventures, they decided to open accounts at BLMIS. (Friedman Tr. 107:24-108:15; 116:24-118:2; 188:19-189:3 (Seshens Decl., Ex. H); Wilpon Tr. 33:13-34:6, 39:1-9 (Seshens Decl., Ex. E); S. Katz Tr. 24:1-25:5 (Seshens Decl., Ex. D).)

14.     Each investor executed a Customer Agreement, a Trading Authorization, and an Option Agreement with BLMIS. (*See, e.g.*, Declaration of Arthur Friedman ("Friedman Decl."), *In re Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789, doc. no. 720 at ¶ 4 & Exs. A-C (Nov. 12, 2009).)

15.     Each of these agreements gave Madoff discretion to invest pursuant to his "split strike conversion" strategy in each Sterling account. (*Id.*)

16.     Each BLMIS customer received monthly customer statements, quarterly reports, and regular trade confirmations, which showed account activity and holdings of blue chip stocks ranging from Exxon-Mobil to Coca-Cola when Madoff was "in the market" and U.S. Treasuries when he was not. (*Id.* ¶ 7 & Ex. D.)

17.     Over the period of their relationship, Fred Wilpon and Saul Katz would meet once a year with Madoff to discuss BLMIS and the economy in general. (Wilpon Tr. 42:12-43:13 (Seshens Decl., Ex. E); S. Katz Tr. 77:7-19; 96:10-21 (Seshens Decl., Ex. D).)

18.     Fred Wilpon did not otherwise discuss business with Madoff. (Wilpon Tr. 42:12-43:13 (Seshens Decl., Ex. E).)

19.     Saul Katz occasionally spoke with Madoff on the phone.  (S. Katz Tr. 77:7-19 (Seshens Decl., Ex. D).)

**The Partners' Individual BLMIS
Investments Increased Over Time**

20.     Most of the Sterling Partners eventually had individual BLMIS accounts, and some also had joint or tenant-in-common ("TIC") accounts, typically with each other or with family members.  (Friedman Tr. 255:19-256:3; 380:8-20 (Seshens Decl., Ex. H).)

21.     The decision to invest through BLMIS was an individual one.  As each Partner received funds from the various businesses in which he held interests, he decided what to do with them.  (Wilpon Tr. 55:3-12 (Seshens Decl., Ex. E); S. Katz Tr. 22:24-27:1 (Seshens Decl., Ex. D); Friedman 107:24-109:16 (Seshens Decl., Ex. H).)

22.     There was no "Sterling" BLMIS account, "Sterling" way of investing, or "mastermind" making investment decisions for the Partners, their families, and the operating businesses they owned.  (*Id.*)

23.     For their businesses, the Sterling Defendants used BLMIS accounts in much the same manner as they might have used traditional bank accounts, to deposit excess cash for short term investment before withdrawing it for use in operating their businesses.  For example, when season tickets for the Mets were sold in the winter, the cash generated would be deposited into a Mets BLMIS account so that returns could be maximized until the funds were needed, a few months thereafter, to meet expenses. (Friedman Tr. 358:5-18 (Seshens Decl., Ex. H); *see also* Compl. ¶ 794.)

24.     For administrative ease, Arthur Friedman, who became Sterling's treasurer and "administrative" partner shortly after the first BLMIS accounts were opened, was charged with day-to-day administration of all accounts.  (Friedman Tr. 39:23-40:13;

116:24-117:12; 250:12-23; 298:20-299:4; 600:21-601:8 (Seshens Decl., Ex. H); Wilpon

Tr. 51:1-12; 53:2-10 (Seshens Decl., Ex. E).)

**The Partners Shared the Madoff
Opportunity with Friends and Family**

25.     The Sterling Partners helped their friends and family members who were

interested in opening BLMIS accounts.  At the time, the Sterling Partners believed they

were doing something positive.  (Wilpon Tr. 87:6-16; 143:7-20 (Seshens Decl., Ex. E).)

26.     Saul Katz viewed the Madoff investments as "such a blessing that [he]

wanted to share with [his] friends and family."  (S. Katz Tr. 90:10-17 (Seshens Decl., Ex.

D).)

27.     The Sterling Partners offered BLMIS as an investment option in Sterling's

self-directed 401(k) Retirement Plan because they wanted to do something positive for

employees.  (Friedman Tr. 538:14-539:4 (Seshens Decl., Ex. H).)

28.     No Sterling Defendant "solicited" investors for BLMIS, nor did they

"steer" family and friends to BLMIS.  (S. Katz Tr. 119:25-120:9 (Seshens Decl., Ex. D);

Wilpon Tr. 84:15-18 (Seshens Decl., Ex. E).)

29.     If people asked, the Partners offered to help.  (S. Katz Tr. 119:25-120:9

(Seshens Decl., Ex. D); Wilpon Tr. 86:5-87:5 (Seshens Decl., Ex. E).)

30.     Once an account was opened, Arthur Friedman added it to his

administrative duties.  (Friedman Tr. 360:18-361:6; 600:21-601:16 (Seshens Decl., Ex.

H); Friedman Rule 27 Tr. 17:1-19:20 (Seshens Decl., Ex. F).)

31.     No payment or benefit was ever solicited or received for this service.

(S. Katz Tr. 215:5-21 (Seshens Decl., Ex. D); Wilpon Tr. 87:6-16 (Seshens Decl., Ex. E);

Friedman Tr. 378:17-379:6 (Seshens Decl., Ex. H).)

32.     The Partners were helping their family and friends, not trying to make money.  (Wilpon Tr. 87:6-16; 143:7-18 (Seshens Decl., Ex. E); S. Katz Tr. 216:13-217:1 (Seshens Decl., Ex. D).)

**The Sterling Defendants Trusted
Madoff with Their Money Until the End**

33.     Saul Katz was about to move nearly all of his Sterling Stamos investments back to BLMIS right before the disclosure of the fraud.  (Deposition of Peter Stamos ("Stamos Tr."), Aug. 19, 2010, 199:24-201:8 (Seshens Decl., Ex. A).)

34.     Within weeks of December 11, 2008, the Sterling Partners deposited millions of dollars with BLMIS.  (S. Katz Decl. ¶ 11.)

35.     On the day that Madoff was arrested, but before the arrest was publicly known, a Sterling-related foundation wired $1 million for deposit in its BLMIS account. (*Id.*)

36.     BLMIS owed the Sterling Defendants over half a billion dollars in securities on the date of the SIPA filing.  (*Id.* ¶ 12.)

37.     The Sterling Defendants trusted Madoff as a broker and as a friend.  Fred Wilpon was devastated by Madoff's confession.  (Wilpon Tr. 64:15-25 (Seshens Decl., Ex. E).)

**No One at Sterling Stamos Told the Sterling
Partners that Madoff Was a "Scam" or a Fraud**

38.     Up until the day Madoff's fraud was disclosed, Peter Stamos stood in awe of Madoff and thought he was "among the most honest and honorable men that we will ever meet."  (Stamos Tr. 211:3-212:4 (Seshens Decl., Ex. A).)

39.     Up until the day that Madoff's fraud was disclosed, Peter Stamos thought that Madoff was one of the greatest hedge fund managers of all time, a "[l]egend in the industry." (*Id*.; 161:23-162:7.)

40.     Peter Stamos does not recall ever stating that Madoff was a "scam" or "too good to be true." (*Id*. 237:6-11.)

41.     Peter Stamos does not recall anyone at Sterling Stamos, prior to December 11, 2008, ever saying that Madoff was a "scam" or "too good to be true." (*Id*. 241:4-15.)

42.     Neither Ashok Chachra nor anyone else at Sterling Stamos had "reason to think there was anything wrong [at BLMIS]." (Deposition Transcript of Ashok Chachra ("Chachra Tr."), Oct. 8, 2010, 206:6-12 (Seshens Decl., Ex. C).)

43.     Ashok Chachra viewed Madoff as "very talented" and a "pioneer" and "the grandfather of electronic trading." (*Id.* 168:8-16; 209:13-210:2.)

44.     Ashok Chachra regarded the split-strike conversion strategy as "amazing." (*Id.* 200:7-20.)

45.     At no time prior to December 11, 2008, did Ashok Chachra think or tell anyone that Madoff or BLMIS was not trading and running Ponzi scheme. (Declaration of Ashok Chachra ("Chachra Decl."), dated Mar. 16, 2011, ¶ 4.)

46.     Ashok Chachra never told the Sterling Partners not to invest with Madoff or BLMIS. (*Id.* ¶ 7.)

**Sterling Stamos Did Not Advise the Sterling Partners**
**That They Should Not Invest with Madoff**

47.     Peter Stamos never warned Saul Katz about Madoff or suggested that Mr. Katz redeem his Madoff investments. (Stamos Tr. 165:3-17; 213:11-20; 227:19-228:12 (Seshens Decl., Ex. A); S. Katz Decl. ¶ 13.)

48.     Peter Stamos only warned Saul Katz about the concentration risk associated with keeping so much money with any one manager.  (Stamos Tr. 165:3-17; 213:11-20; 227:19-228:12 (Seshens Decl., Ex. A).)

49.     Peter Stamos competed with Madoff for the Sterling Defendants' money.  (*Id.* 154:6-155:1; *see also id.* 163:2-11; Chachra Tr. 83:15-24 (Seshens Decl., Ex. C); S. Katz Tr. 158:3-159:1 (Seshens Decl., Ex. D).)

50.     Concentration risk was not specific to Madoff and has nothing to do with fraud.  (Stamos Tr. 147:6-148:2 (Seshens Decl., Ex. A).)

**The Sterling Partners Are Not**
**Sophisticated Stock Market Experts**

51.     Saul Katz is not a sophisticated stock market investor.  (S. Katz Tr. 45:7-46:6 (Seshens Decl., Ex. D).)

52.     Fred Wilpon does not have expertise in stock market investments. (Wilpon Tr. 191:6-13 (Seshens Decl., Ex. E).)

53.     Arthur Friedman is not a professional securities investor.  (Friedman Rule 27 Tr. 6:12-23 (Seshens Decl., Ex. F).)

54.     David Katz spends 90% of his time working for non-profits and is "not a numbers guy."  (Deposition Transcript of David Katz ("D. Katz Tr."), Aug. 31, 2010, 304:3-7 (Seshens Decl., Ex. G).)

55.     Sterling Equities does not hold itself out as being in the business of investing in securities.  (Friedman Rule 27 Tr. 6:12-23 (Seshens Decl., Ex. F).)

56.     Peter Stamos did not view the Sterling Partners as particularly experienced in the investment industry.  (Stamos Tr. 167:18-25 (Seshens Decl., Ex. A).)

**No Sterling Partner Became an Expert in the Brokerage**
**Business Through Sterling Stamos or Otherwise**

57.     No Sterling Partner, including Saul Katz and David Katz, had any material involvement with Sterling Stamos' investment strategies or decisions.  (Chachra Tr. 121:4-122:2; 124:5-10; 133:22-134:3 (Seshens Decl., Ex. C); Stamos Tr. 136:18-21; 137:8-138:13 (Seshens Decl., Ex. A); D. Katz Tr. 173:24-174:12, 174:21-175:4 (Seshens Decl., Ex. G); S. Katz Tr. 128:12-18; 138:11-25; 139:9-23 (Seshens Decl., Ex. D).)

58.     In its early days, Sterling Stamos did not have a formal investment committee, but its four or five employees would meet regularly to discuss investment decisions.  (Stamos Tr. 60:11-61:23 (Seshens Decl., Ex. A).)

59.     In Sterling Stamos' early days, Peter Stamos periodically would involve Saul Katz in Sterling Stamos discussions where investment decisions had to be made. (*Id.* 61:24-62:12.)

60.     In Sterling Stamos' early days, the money that Sterling Stamos was investing principally came from Saul Katz and the other Sterling Partners.  (*Id.* 137:8-138:13; 141:25-142:11; S. Katz Decl. ¶ 5.)

61.     Saul Katz and David Katz were not two of the four primary portfolio decision makers at Sterling Stamos.  (Chachra Tr. 132:6-134:22 (Seshens Decl., Ex. C).)

62.     "SP Trading" was a brokerage account for David Katz in which he traded a particular credit card stock up and down.  (D. Katz. Tr. 157:11-16; 159:6-9 (Seshens Decl., Ex. G).)

**No Sterling Partner Was Familiar with
Sterling Stamos' Due Diligence Process**

63.     No Sterling Partner was familiar with Sterling Stamos' due diligence requirements, either before or after the Merrill Lynch investment.  (S. Katz Tr. 141:17-143:7 (Seshens Decl., Ex. D); D. Katz Tr. 195:3-14; 195:25-196:6; 197:13-15 (Seshens Decl., Ex. G).)

64.     Neither Sterling Stamos general nor limited partners had access to Sterling Stamos' due diligence process.  (Chachra Tr. 118:20-119:6 (Seshens Decl., Ex. C); *cf. id.* 128:24-129:10 (Seshens Decl., Ex. C).)

65.     During the course of the Trustee's Rule 2004 investigation, Sterling produced agendas and minutes from every Sterling Partners' meeting ("Partner Meeting Minutes") for which they were taken and maintained.  (Seshens Decl. ¶ 13.)

66.     There is no record in the Partner Meeting Minutes of any discussion of any warning about the legitimacy of Madoff's operations.  (*Id.* ¶ 14.)

67.     There is no record in the Partner Meeting Minutes of any discussion of the specifics of Sterling Stamos' due diligence process.  (*Id.*)

68.     There is no record in the Partner Meeting Minutes of any discussion of Sterling Stamos' investment decision-making process.  (*Id.*)

69.     No Sterling witness testified to any discussion at Partners' meetings of any warning about the legitimacy of Madoff's operations, the specifics of Sterling Stamos' due diligence process, or Sterling Stamos' investment decision-making process.

**BLMIS Did Not Fail Sterling Stamos' and Merrill Lynch's Due Diligence Processes Because of Fraud**

70.     As Sterling Stamos grew, its due diligence process evolved, and, over time, Sterling Stamos elected not to invest in non-transparent managers.  (Stamos Tr. 201:19-202:3; 209:19-210:13; 225:1-10 (Seshens Decl., Ex. A); Chachra Tr. 172:12-173:17 (Seshens Decl., Ex. C).)

71.     Although, over time, BLMIS did not fit Sterling Stamos' criteria for investment of third-party money, Peter Stamos held Madoff in high esteem.  (Stamos Tr. 162:1-162:7; 211:12-212:4 (Seshens, Decl., Ex. A).)

72.     Sterling Stamos never conducted any diligence on BLMIS because BLMIS was ineligible for investment by Sterling Stamos due to its proprietary trading strategy.  (*Id.* 149:11-14; 162:18-23; Chachra Tr. 139:10-18 (Seshens Decl., Ex. C).)

73.     Sterling Stamos never turned down the opportunity to invest with Madoff. (Stamos Tr. 192:4-13 (Seshens Decl., Ex. A); *see also* Chachra Decl. ¶ 5.)

74.     In its early stages, Sterling Stamos wanted to invest with BLMIS.  (Stamos Tr. 191:24-192:22 (Seshens Decl., Ex. A).)

75.     In Sterling Stamos' early stages, Peter Stamos asked Saul Katz if BLMIS could be one of ten managers as part of a diversified portfolio.  (*Id.* 194:16-195:2.)

76.     Peter Stamos was told by Saul Katz that Madoff did not take capital from funds of funds.  (*Id.* 191:24-192:22.)

77.     When Peter Stamos learned that Madoff did permit investments by funds of funds, he felt, not that this was a potential badge of fraud, but that "Sterling was being treated less favorably than other managers."  (*Id.* 198:6-12.)

78.     Peter Stamos personally invested with BLMIS and developed a positive view of Madoff.  (*Id.* 146:6-21.)

79.     Peter Stamos withdrew his funds from BLMIS in 2003 and 2004 for personal reasons and to invest in Sterling Stamos—not because he had any suspicion of Madoff.  (*Id.* 117:5-25.)

80.     It was not uncommon for a fund manager to either refuse or not be able to complete a transparency report as part of Sterling Stamos' due diligence process following Merrill Lynch's acquisition of an interest in Sterling Stamos.  (*Id.* 310:9-311:2.)

**BLMIS' Proprietary "Black Box"
Strategy Was Not a "Red Flag"**

81.     Black box quantitative strategies are common, unremarkable, and entirely legal.  *See, e.g.*, Concept Release on Equity Market Structure, Exchange Act Release No. 34-61358, 75 Fed. Reg. 3594, 3606 (Jan. 21, 2010); Short Selling in Connection with a Public Offering, Exchange Act Release No. 34-56206, 72 Fed. Reg. 45,094, 45,099 (Aug. 10, 2007).  (*See also* Stamos Tr. 116:4-13 (Seshens Decl., Ex. A).)

82.     No Sterling Stamos employee or industry professional ever warned the Sterling Partners that Madoff's "black box" strategy was an indication of fraud.  (Stamos Tr. 116:4-13; 204:7-18 (Seshens Decl., Ex. A); S. Katz Decl. ¶ 13.)

83.     "Black box" strategies could perform well in stressed markets.  (Stamos Tr. 204:7-18 (Seshens Decl., Ex. A).)

84.     The Sterling Partners understood that part of Madoff's strategy was intentionally proprietary and that did not cause them concern.  (S. Katz Tr. 108:1-20

(Seshens Decl., Ex. D); D. Katz Tr. 146:10-23 (Seshens Decl., Ex. G); Friedman Tr. 272:21-273:10 (Seshens Decl., Ex. H).)

85.     Sterling Stamos provided investment advice to third parties and, therefore, had different considerations than an individual investor.  (Stamos Tr. 161:18-162:7 (Seshens Decl., Ex. A); Chachra Tr. 172:12-173:17 (Seshens Decl., Ex. C).)

**Sterling Stamos Was Not Restructured to
Help Madoff Evade SEC Scrutiny**

86.     The Sterling Partners and Peter Stamos started Sterling Stamos as an alternative investment opportunity for the Sterling Partners and their families.  (S. Katz Tr. 151:17-24 (Seshens Decl., Ex. D); D. Katz Tr. 347:20-25 (Seshens Decl., Ex. G).)

87.     Over time, the non-Sterling assets invested through Sterling Stamos grew, and Peter Stamos' vision for Sterling Stamos changed.  (S. Katz Tr. 151:17-152:14 (Seshens Decl., Ex. D); D. Katz Tr. 103:7-19; 329:21-330:3 (Seshens Decl., Ex. G).)

88.     Consistent with its growing group of investors and with recent changes in the laws applicable to funds such as Sterling Stamos, in 2005 Sterling Stamos decided to register as an investment advisor.  (D. Katz Tr. 165:16-20 (Seshens Decl., Ex. G); Stamos Tr. 46:8-47:3 (Seshens Decl., Ex. A); Chachra Tr. 49:2-23 (Seshens Decl., Ex. C).)

89.     In connection with Sterling Stamos' registration, the Sterling Partners were concerned that registration as an investment advisor would require disclosure of all of their business and family investments and relationships.  (S. Katz Decl. ¶ 18.)

90.     In connection with Sterling Stamos' registration, the Sterling Partners were concerned about having increased legal exposure to third-party investors when they did not have any investment experience and were not involved in the investment decisions at Sterling Stamos.  (*Id.* ¶ 17.)

14

91.     The Sterling Partners' relationship with Sterling Stamos was restructured to ensure that they could limit their third-party liability and remain private. (*Id.* ¶ 19.)

92.     The motivation behind the restructuring of the Sterling Partners' relationship with Sterling Stamos was not driven in any way by a desire to protect BLMIS or Madoff from regulatory scrutiny. (*Id.* ¶ 20; Stamos Tr. 51:5-12; 274:15-275:10 (Seshens Decl., Ex. A).)

**No One at Sterling Stamos Nor Any Sterling
Partner Thought Madoff Was Front Running**

93.     Peter Stamos did not think that Madoff was front running. (Stamos Tr. 152:11-20 (Seshens Decl., Ex. A).)

94.     Peter Stamos told Saul Katz that he did not think that Madoff was front running. (*Id.*)

95.     Ashok Chachra did not tell the Sterling Partners that he thought Madoff was front running. (Chachra Tr. 210:3-17 (Seshens Decl., Ex. C).)

96.     Ashok Chachra did not think that Madoff was front running. (*Id.* 206:6-15.)

97.     Saul Katz did not think that Madoff was front running. (S. Katz. Tr. 88:15-20 (Seshens Decl., Ex. D); Stamos Tr. 153:3-12 (Seshens Decl., Ex. A).)

**Self-Custodying Securities Is Not a "Red Flag"**

98.     Self-custody arrangements are not remarkable. Matt Ackermann, *Fidelity Unit Seeks Growth Via Self-Clearing Market*, American Banker, Apr. 9, 2008 (Seshens Decl., Ex. I). (*See also* Chachra Tr. 174:18-175:5 (Seshens Decl., Ex. C).)

99.     One of the risks associated with Madoff being both an investment manager and a broker-dealer who cleared his own trades was a risk of front running.

(Chachra Tr. 205:16-206:15 (Seshens Decl., Ex. C); Stamos Tr. 83:22-84:15 (Seshens Decl., Ex. A).)

100.    No one told any Sterling Partner that BLMIS' custody arrangement was in any way improper.  (S. Katz Decl. ¶¶ 10, 13.)

**Sterling Stamos' Bayou Experience Had
Nothing to Do with BLMIS or Madoff**

101.    One of the reasons Sterling Stamos redeemed its Bayou investment was that the fund manager changed investment strategies from trading short-term and small cap equities to trading currencies and commodities.  (Stamos Tr. 175:17-176:20 (Seshens Decl., Ex. A); Chachra Tr. 176:11-24 (Seshens Decl., Ex. C).)

102.    The Bayou fund manager told Sterling Stamos that he was going to implement this new strategy and substantially increase his assets under management in three months time, which Sterling Stamos did not think was feasible.  (Chachra Tr. 176:11-24 (Seshens Decl., Ex. C).)

103.    The November 2005 "special" investment opportunity offered by Madoff was a one-time, "short-term" investment opportunity.  (*See, e.g.*, A. Friedman Mem., dated Nov. 28, 2005 (Seshens Decl., Ex. J); Friedman Tr. 434:16-435:4 (Seshens Decl., Ex. H).)

104.    Nothing was different about Madoff's "special investment" strategy except the options.  (Friedman Tr. 449:19-24 (Seshens Decl., Ex. H); *see also id.* 447:15-449:18; Compl. ¶ 1041.)

105.    No Sterling Partner ever questioned the legality of the short-term "special" investment.  (Friedman Rule 27 Tr. 11:14-12:16 (Seshens Decl., Ex. F).)

106.    Peter Stamos understood that Madoff had a "substantial infrastructure in his broker-dealer."  (Stamos Tr. 230:22-231:8 (Seshens Decl., Ex. A).)

107.    Peter Stamos does not recall ever knowing who Madoff's auditor was or ever discussing Madoff's auditor with Saul Katz.  (*Id.* 229:23-230:21.)

**The Sterling Partners Undertook Diligence of Madoff**

108.    At the start of the Partners' investment relationship with BLMIS, Arthur Friedman undertook many due diligence exercises to try to understand BLMIS' "split strike conversion" strategy.  (Friedman Tr. 123:13-125:10 (Seshens Decl., Ex. H); Friedman Rule 27 Tr. 9:7-11:2 (Seshens Decl., Ex. F); *see also* Compl. ¶¶ 754-765.)

109.    For a few years Arthur Friedman tracked transaction prices by comparing them against publicly available information in the newspapers to see if they were within the reported price ranges—which they were—and to see if the value was at the high, low, or middle of the range.  (Friedman Tr. 123:13-125:10 (Seshens Decl., Ex. H); *see also id.* 139:25-142:1; Friedman Rule 27 Tr. 20:21-22:13 (Seshens Decl., Ex. F).)

110.    Arthur Friedman prepared projections of maximum gains and losses for the Sterling Partners' BLMIS accounts, given the securities they held, and giving effect to the puts and the calls, which established a ceiling and a floor for the BLMIS returns.  (Friedman Tr. 123:13-125:10 (Seshens Decl., Ex. F).)

111.    Through this exercise, Mr. Friedman tried to project the maximum the accounts could gain and lose one month in advance, and the values and returns always fell within his anticipated ranges.  (*Id.*)

112.    Arthur Friedman tried to replicate the "split strike conversion" strategy on paper to see if he could generate a profit.  (*Id.* 144:14-145:17; *see also id.* 140:7-141:5)

He identified specific transactions and then mimicked those transactions using different transaction dates and different quantities of the subject securities. (*Id.* 144:14-145:17)

113. Arthur Friedman "determined in [his] own mind that the strategy was good, it worked, but not to the extent that it worked for [Madoff]." (*Id.* 144:14-145:9.)

114. Mr. Friedman attributed his inability to do exactly what Madoff did to timing and the absence of commission costs. (*Id.* 145:18-146:8; 163:14-20.)

115. Arthur Friedman ceased his diligence exercises after the first few years because the number of Sterling accounts had begun to grow, making the effort burdensome, and he had not observed any inconsistencies between market information and what Madoff was reporting. (*Id.* 139:25-142:1; Friedman Rule 27 Tr. 21:5-22:13 (Seshens Decl., Ex. F).)

116. Over many years the Sterling Defendants and other customers continued to make deposits and withdrawals in an unremarkable manner and to receive statements and confirmations that reflected the purchase and sale of equity securities. (Friedman Tr. 150:22-153:10; 600:16-601:2; 602:16-603:12; 610:5-23 (Seshens Decl., Ex. H).)

117. Major financial institutions reviewed the Sterling Defendants' BLMIS holdings for the purposes of determining their value as collateral and as a source of liquidity, in some cases making loans to certain of the Sterling Defendants to be used as leverage, like margin loans, to increase returns on their securities investments. (*Id.* 256:12-257:23; 475:25-476:20; S. Katz Tr. 165:4-13 (Seshens Decl., Ex. D); (Deposition Transcript of Mark Peskin ("Peskin Tr."), July 29-30, 2010, 179:21-181:5 (Seshens Decl., Ex. K).)

118. In every instance, the BLMIS holdings were accepted as valuable collateral. (Peskin Tr. 186:6-187:8 (Seshens Decl., Ex. K).)

119. In 1990 the Mets were seeking financing from Travelers Insurance Company, which sought information about the BLMIS investments of certain Sterling Partners and the Mets. (S. Katz Tr. 53:11-54:6 (Seshens Decl., Ex. D).)

120. Madoff allowed Travelers' due diligence and spoke with a Travelers representative. (Barry Gonder Mem., dated Aug. 24, 1990 (Seshens Decl., Ex. L).)

121. Travelers' due diligence confirmed the Sterling Partners' understanding about Madoff's strategy and provided them with additional comfort concerning their BLMIS investments. (S. Katz Tr. 53:19-24; 56:23-57:6 (Seshens Decl., Ex. D).)

122. It was widely publicized in 2003 that Madoff had entered into a joint venture with several Wall Street firms, including Goldman Sachs and Merrill Lynch. (S. Katz Decl. ¶ 9.)

123. Although questions occasionally arose about Madoff, on each occasion the questions were answered in a manner that confirmed Madoff's honesty and standing. (Friedman Tr. 163:21-165:14 (Seshens Decl., Ex. H); Wilpon Tr. 190:9-23; 199:15-201:24 (Seshens Decl., Ex. E).)

124. The Sterling Partners knew of a widely publicized SEC investigation in 1992, in which Madoff had been completely cleared of any wrongdoing. (S. Katz Tr. 52:3-53:6 (Seshens Decl., Ex. D); Wilpon Tr. 198:5-199:7 (Seshens Decl., Ex. E).) *See also* Randall Smith, *Wall Street Mystery Features a Big Board Rival*, Wall St. J., Dec. 16 1992, at C1 (Seshens Decl., Ex. M).

125.    The Sterling Partners took comfort from the fact BLMIS was an SEC-registered broker-dealer that had government oversight.  (Stamos Tr. 153:3-12 (Seshens Decl., Ex. A); Chachra Tr. 206:21-207:14 (Seshens Decl., Ex. C).)

126.    The comfort the Sterling Partners took from the SEC's clearance of Madoff was widespread among Madoff customers.  SEC Office of Investigations, Report No. OIG-509, *Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme – Public Version* 25 (2009), *available at* http://www.sec.gov/news/studies/2009/oig-509.pdf (last visited Mar. 18, 2011).

**The Sterling Defendants Did Not Receive "Staggering" Profits**

127.    Had the Sterling Defendants invested their funds with Berkshire Hathaway rather than with BLMIS, the return on their investment would have been vastly greater. *See* Berkshire Hathaway Inc., Annual Report 2 (2009), *available at* http://www.berkshirehathaway.com/2009ar/2009ar.pdf (last visited Mar. 18, 2011).

**The Remaining Allegations Are Not Specific, Immaterial, or Irrelevant**

128.    Ivy Asset Management ("Ivy") has been sued by its investors and the New York State Attorney General for concealing its Madoff concerns.  *See, e.g.*, *In re Beacon Assocs. Litig.*, 09 Civ. 777, 2010 U.S. Dist. LEXIS 106355 (S.D.N.Y. Oct. 5, 2010); Complaint, *People v. Ivy Asset Mgmt. LLC*, No. 450489/2010 (N.Y. Sup. Ct. May 11, 2010).

129.    David Katz did not know that Ivy was a Madoff investor.  (D. Katz Tr. 155:19-22 (Seshens Decl., Ex. G).)

130.     Saul Katz has no recollection of anyone from Ivy ever advising him of any concerns Ivy had about Madoff or that Ivy had withdrawn its proprietary investment with BLMIS.  (S. Katz Decl. ¶ 14.)

131.     Saul Katz has no recollection of any consultant retained either by Sterling Stamos or Sterling ever telling him that the consultant "couldn't make Bernie's math work and something wasn't right."  (*Id.* ¶ 15.)

132.     The Sterling Partners determined that fraud insurance was an unnecessary expense given their comfort with Madoff.  (S. Katz Tr. 102:7-19 (Seshens Decl., Ex. D); Friedman Tr. 434:1-4 (Seshens Decl., Ex. H).)

133.     Suspicion that Madoff was engaged in a Ponzi scheme did not motivate the Sterling Partners' consideration of fraud insurance.  (Friedman Tr. 430:18-431:22 (Seshens Decl., Ex. H).)

134.     In and around 2001, Arthur Friedman did not even know what a Ponzi scheme was.  (*Id.* 430:18-431:22.)

135.     Peter Stamos told Saul Katz that Sterling Stamos looked for consistent returns when evaluating fund managers.  (Stamos Tr. 205:6-11 (Seshens Decl., Ex. A).)

136.     In a 2004 lenders' presentation, the future annual returns of both Madoff and Sterling Stamos were predicted to be positive 99.9% of the time.  (Lenders' Meeting Presentation, dated March 9, 2004, at 27, 28 (Seshens Decl., Ex. N).)

137.     The Sterling Partners analyzed and confirmed that Madoff's returns were tied to the Treasury rate.  (Seshens Decl., Ex. O.)

138.     Sterling Stamos was not expected to achieve the same results as BLMIS. (D. Katz Tr. 240:5-15 (Seshens Decl., Ex. G).)

139.     A hedge fund of funds with numerous different investment managers employing varied strategies is far different from a SEC-registered broker employing a single "split-strike conversion strategy."  (Chachra Tr. 161:18-162:6 (Seshens Decl., Ex. C).)

140.     The Sterling Partners used BLMIS returns as a comparative benchmark because of their longstanding investment relationship with Madoff and because they had a significant amount of money invested with BLMIS.  (D. Katz Tr. 107:4-13 (Seshens Decl., Ex. G); Chachra Tr. 143:12-144:5 (Seshens Decl., Ex. C).)

141.     Sterling structured their 401(k) Retirement Plan as participant-directed rather than trustee-directed because it was more popular and would reduce Sterling's fiduciary exposure.  (Friedman Tr. 561:12-24 (Seshens Decl., Ex. H).)

142.     As either a participant-directed or a trustee-directed retirement plan, all Plan participants would be aware of Madoff and any Plan participant could ask any questions about Madoff that they liked.  (*Id.* 537:16-538:10.)

143.     Neither Madoff nor anyone at his firm voiced any concern about or resistance to the inclusion of BLMIS as an investment option for Sterling's 401(k) Plan.  (*Id.* 540:3-540:20.)

144.     The Katzes and the Wilpons made the decision about where to invest the funds of their respective Family Foundations.  (*Id.* 662:15-663:5; S. Katz Decl. ¶ 16.)

145.     BLMIS advanced money to the Sterling Partners on only one occasion in connection with their exercise of a buyout option with Cablevision in 2004.  (S. Katz Tr. 197:8-199:5 (Seshens Decl., Ex. D); Wilpon Tr. 212:22-216:18 (Seshens Decl., Ex. E); Friedman Tr. 223:3-224:8 (Seshens Decl., Ex. H).)

146.     At the time Madoff advanced the funds, a request for a loan from Sterling's banks already had been granted.  (S. Katz Tr. 197:8-199:5 (Seshens Decl., Ex. D); Wilpon Tr. 212:22-216:18 (Seshens Decl., Ex. E); Friedman Tr. 223:3-224:8 (Seshens Decl., Ex. H); *see also* Compl. ¶¶ 991-992.)

147.     The Partners became concerned that the financing would not close in time to permit them to exercise their Cablevision buyout option.  (S. Katz Tr. 197:8-199:5 (Seshens Decl., Ex. D); Wilpon Tr. 212:22-216:18 (Seshens Decl., Ex. E); Friedman Tr. 223:3-224:8 (Seshens Decl., Ex. H); *see also* Compl. ¶¶ 991-992.)

148.     The Partners asked Madoff to liquidate certain of their accounts to ensure they had the necessary funds pending funding by the banks.  (S. Katz Tr. 197:8-199:5 (Seshens Decl., Ex. D); Wilpon Tr. 212:22-216:18 (Seshens Decl., Ex. E); Friedman Tr. 223:3-224:8 (Seshens Decl., Ex. H); *see also* Compl. ¶¶ 991-992.)

149.     Madoff instead offered to make an advance against those accounts so as not to negatively impact them while he was "in the market."  (S. Katz Tr. 197:8-199:5 (Seshens Decl., Ex. D); Wilpon Tr. 212:22-216:18 (Seshens Decl., Ex. E); Friedman Tr. 223:3-224:8; 226:15-228:3 (Seshens Decl., Ex. H); *see also* Compl. ¶¶ 991-992.)

150.     Madoff and the banks ended up advancing the funds on the very same day, so BLMIS' money was returned immediately.  (S. Katz 199:6-14 (Seshens Decl., Ex. D); Wilpon Tr. 212:22-216:18 (Seshens Decl., Ex. E); Friedman Tr. 233:6-14 (Seshens Decl., Ex. H); *see also* Compl. ¶¶ 993-995.)

Dated:   New York, New York
          March 20, 2011

DAVIS POLK & WARDWELL LLP

By:  s/ Karen E. Wagner
     Karen E. Wagner
     Dana M. Seshens

450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800

*Attorneys for the Sterling Defendants*